**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| REPUBLIC PROPERTY TRUST<br>13861 Sunrise Valley Drive<br>Suite 410<br>Herndon, VA 20171,<br><br>and<br><br>REPUBLIC PROPERTY LIMITED<br>PARTNERSHIP<br>13861 Sunrise Valley Drive<br>Suite 410<br>Herndon, VA 20171<br><br>  Plaintiffs,<br><br>  v.<br><br>REPUBLIC PROPERTIES CORPORATION<br>1280 Maryland Avenue, S.W.<br>Suite 280<br>Washington, D.C. 20024,<br><br>STEVEN A. GRIGG<br>4728 Foxhall Crescents, N.W.<br>Washington, D.C. 20007,<br><br>and<br><br>RICHARD L. KRAMER<br>515 Park Avenue, #12<br>New York, NY 10022<br><br>  Defendants. | Civil Action No. 1:07-cv-00595-RCL<br>Judge Lamberth |

**AMENDED COMPLAINT**

Plaintiffs Republic Property Trust and Republic Property Limited Partnership file this Complaint against Defendants Republic Properties Corporation, Steven A. Grigg and Richard L. Kramer, and show the Court as follows:

## THE PARTIES

1.     Plaintiff Republic Property Trust ("RPT") is a Maryland real estate investment trust, with its principal place of business in Herndon, Virginia.

2.     Plaintiff Republic Property Limited Partnership ("RPLP") is a Delaware limited partnership, with its principal place of business in Herndon, Virginia.  RPLP is a subsidiary of RPT, and RPT owns approximately 88% of RPLP.  RPT is the sole general partner of RPLP and controls the business affairs of RPLP.  Substantially all of RPT's assets are held by, and RPT's operations conducted by RPLP, and RPT's primary asset is its partnership interest in RPLP. With a few limited exceptions, RPT has the exclusive right and full authority and responsibility to manage and operate RPLP's business.

3.     Defendant Republic Properties Corporation ("RPC") is a District of Columbia Corporation.  RPC is a private real estate development, redevelopment and management company founded by, among others, Defendants Kramer and Grigg.  RPC's principal place of business is located at  1280 Maryland Avenue, Suite 280, Washington, D.C. 20024.

4.     Defendant Steven A. Grigg ("Grigg") is one of RPT's founders.  From the time of RPT's formation until February 28, 2007, Grigg served as Vice Chairman of RPT's Board of Trustees, and, until his November 13, 2006 resignation, Grigg also was employed by RPT as its President and Chief Development Officer.  Grigg remains a member of RPT's Board of Trustees. Grigg is a limited partner of RPLP.  Grigg also holds an ownership interest and serves as an officer, director and/or employee of various entities with which RPT and RPLP have transacted

business, including RPC.  Grigg is one of RPC's founders and, at all times relevant to this Complaint, Grigg was a member of RPC's Board of Directors.  From its founding through February 2006, Grigg served as President and Chief Executive Officer of RPC, and has again served as President of RPC since on or around November 2006.  Since his resignation from RPT, Grigg has returned to RPC and serves as its President.  Grigg has a 15% ownership interest in RPC and has the ability to and generally does control, along with Kramer, the affairs of RPC. Grigg is a citizen of the District of Columbia, and his home address is 4728 Foxhall Crescents, N.W., Washington, D.C. 20007.

5.     Defendant Richard L. Kramer is one of RPT's founders.  From the time of RPT's formation, Kramer has served as Chairman of RPT's Board of Trustees.  Kramer is a limited partner of RPLP.  Kramer also holds an ownership interest and serves as an officer or director of various entities with which RPT and RPLP have transacted business, including RPC.  Kramer is one of RPC's founders and, at all times relevant to this Complaint, served as the Chairman of RPC's Board of Directors.  Kramer has an 85% ownership interest in RPC and has the ability to and generally does control, along with Grigg, the affairs of RPC.  Kramer is a resident of the state of New York, and his home address is 515 Park Avenue, #12, New York, NY 10022. Kramer maintains a residence in the District of Columbia, which is located at Watergate South Cooperative, 700 New Hampshire Avenue, N.W., Unit 417, Washington, D.C.  20037.  Kramer and many of the entities in which he has an interest generally transact business in the District of Columbia, and Kramer frequently travels to the District of Columbia for business related to RPT and Republic Properties Corporation.

## JURISDICTION AND VENUE

6.     RPT and RPLP bring this action pursuant to 15 U.S.C. §§ 78j(b) and 78t(a) (Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act")), and Rule 10-b, promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5, as a result of false and/or misleading statements and omissions made by Defendants in relation to the issuance by RPLP of limited partnership units pursuant to a Development Services Rights Contribution Agreement entered into by RPLP and RPC.  RPT and RPLP also bring related District of Columbia securities law claims against all Defendants, breach of contract and indemnity claims against RPC, and an unjust enrichment claim against Grigg and Kramer.  RPT and RPLP seek the recovery of punitive damages from all Defendants.

7.     This Court has subject-matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1367.

8.     This Court has personal jurisdiction over RPC, Grigg and Kramer.

9.     Venue is proper in this Court pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b) and (c).  A substantial part of the events and omissions giving rise to the claims alleged herein, including the false statements and omissions that give rise to RPT and RPLP's claims, occurred in this district.

10.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, telephone communication systems.

## BACKGROUND

11.     RPT was organized on July 19, 2005 to own, operate, acquire and develop primarily Class A office properties, predominantly in Washington, D.C. and surrounding areas.

RPT was formed by and through the efforts of Kramer, Grigg and Mark Keller, RPT's current Chief Executive Officer and a member of RPT's Board of Trustees.

12.    RPT completed its initial public offering ("IPO") on December 20, 2005, at which time the common shares of RPT began trading on the New York Stock Exchange.

13.    In connection with its IPO, RPT, through its subsidiaries, entered into a number of transactions whereby RPT acquired property and contracts in exchange for shares of RPT and partnership units of RPLP (the "IPO Transactions").

14.    In effect, RPT was formed as a result of the consummation of the IPO Transactions, which included the following:

a) RPT, through RPLP, acquired ownership of ten commercial properties consisting of 21 office buildings, with an aggregate of approximately two million net rentable square feet. RPT acquired nine of these properties from RKB Washington Property Fund I, L.P., a commercial real estate investment fund controlled by Kramer, Keller and Grigg.

b) RPT acquired from entities controlled by Kramer, Keller and Grigg options on three office properties currently in development, representing additional office space in excess of one million square feet.

c) RPT entered into outsourcing agreements with Kramer, Grigg and RPC pursuant to which RPT provides certain management, accounting and development services for a commercial real estate development known as The Portals.

d) RPC assigned to RPT certain property management and services agreements, including a Professional Services Agreement that, as more fully described below, was a fee-based development services agreement with the City of West Palm Beach, Florida related to a development known as City Center.

## RPT'S ACQUISITION OF THE PROFESSIONAL SERVICES AGREEMENT WITH WEST PALM BEACH

15.    On or around October 26, 2004, RPC (operating under the name "Republic-WPB Corp.") and the West Palm Beach Community Redevelopment Agency (the "Community Redevelopment Agency" or "CRA"), a unit of the West Palm Beach city government, entered

into a Professional Services Agreement regarding a $100 million urban mixed-use development in West Palm Beach known as City Center (the "City Center Project"). In sum, pursuant to the Professional Services Agreement, RPC was engaged to provide fee-based services to the City of West Palm Beach to design, develop and construct the City Center Project.

16.     Grigg, as CEO and President of RPC, was substantially involved in the negotiation, administration and general oversight of the Professional Services Agreement and other matters related to the City Center Project.

17.     As Chairman of RPC, Kramer was aware of, authorized and ratified the actions of Grigg and others on behalf of RPC with respect to the Professional Services Agreement. Indeed, Grigg regularly communicated with Kramer and consulted with Kramer, and obtained Kramer's approval related to virtually every material action Grigg took on behalf of RPC.

18.     As part of the IPO Transactions, RPC "contributed" (*i.e.*, assigned) the Professional Services Agreement to RPLP pursuant to a Development Services Rights Contribution Agreement (the "Development Contribution Agreement") dated September 23, 2005.

19.     The Development Contribution Agreement was entered into in the District of Columbia. Grigg, with the knowledge and approval of Kramer, signed the Development Contribution Agreement on behalf of RPC, and Mark Keller, Chief Executive Officer of RPT, signed on behalf of RPLP. Substantially all of the representations and omissions made by RPC, Grigg and Kramer regarding the validity of the Development Contribution Agreement occurred in the District of Columbia, as did the exchange of consideration therein specified. A true and correct copy of the Development Contribution Agreement is attached hereto as Exhibit A.

20.     As more fully described in paragraph 53, below, the Professional Services Agreement was amended so that RPT, through Republic WPB LLC (hereinafter referred to as "RPT/Republic WBP"), an indirectly wholly owned subsidiary of RPLP, replaced RPC as the service provider for the City Center Project and was, therefore, entitled to receive the fees related thereto.

21.     In exchange for RPC's assignment of the Professional Services Agreement to RPT, RPT caused RPLP to issue to RPC 100,234 partnership units, valued at approximately $1,202,808 at the time of the IPO.  Of the RPLP units issued to RPC as consideration for the assignment of the Professional Services Agreement, 84,929 units, valued at approximately $1,022,388 at the time of the IPO, were issued and are currently held by RPC for the benefit of Kramer, and 15,305 units, valued at approximately $180,420 at the time of the IPO, were issued and are held by RPC for the benefit of Grigg.

22.     Prior to the termination of the Professional Services Agreement, RPT and RPLP provided the requisite services under the Professional Services Agreement through RPT/Republic WBP.  RPT and these affiliates, however, were never fully paid for these services.

**ILLEGAL PAYMENTS TO COMMISSIONER RAYMOND LIBERTI**
**WHILE HE IS CASTING VOTES REGARDING THE**
**PROFESSIONAL SERVICES AGREEMENT AND THE CITY CENTER PROJECT**

23.     RPC first became aware of the possibility of the City Center Project in late 2002 or early 2003.

24.     Prior to October 2004, RPC retained the law firm of Greenberg Traurig to represent RPC and assist it in matters related to dealing with the City of West Palm Beach regarding the City Center Project.  Over time, various lawyers at Greenberg Traurig provided

services to RPC regarding the City Center Project, as well as other business activities in West Palm Beach and the surrounding area.

25.    Robert Sanders, an attorney with Greenberg Traurig and former West Palm Beach City Administrator, was one of the attorneys involved in the representation of RPC with respect to these matters.

26.    Throughout 2003 through 2006, Sanders engaged in various activities on behalf of RPC, including monitoring developments regarding the City Center Project and interacting with city officials, including Raymond Liberti.  From December 20, 2005 through June 2006, Greenberg Traurig also represented RPT.

27.    At all relevant times prior to his resignation on May 8, 2006, Raymond Liberti ("Liberti") was a member of the City Commission of West Palm Beach (the "City Commission") and a voting member of the City's Community Redevelopment Agency.

28.    Kramer was originally introduced to Liberti by Sanders in or about March 2004.

29.    Grigg was originally introduced to Liberti by Sanders not later than October 2004. Prior to that time, Grigg and others had been involved in submitting RPC's proposal regarding the City Center Project and had made one or more presentations to city officials, including Liberti.

30.    Beginning at or about the time of their initial meeting and continuing through May 5, 2006, Grigg, on behalf of RPC, and Liberti engaged in a scheme whereby Grigg authorized payments from RPC to Liberti while Liberti cast favorable votes and engaged in other related activities as a member of the City Commission and the Community Redevelopment Association on matters benefiting RPC, RPT, and other businesses in which Grigg, Kramer and

others held an interest.  Payments from RPC to Liberti were made under the guise of a series of "Consulting Agreements."

31.    Kramer was aware of the "Consulting Agreements" at or around the time of the initial "Consulting Agreement," (described below in Paragraphs 36-40)  and throughout the period of time that RPC made payments to Liberti.

32.    The Community Redevelopment Agency selected RPC as the preferred service provider for the City Center Project and approved the Professional Services Agreement on October 12, 2004.  On that date, a majority of the members of the Community Redevelopment Agency, including Liberti, voted to approve the Professional Services Agreement for "Phase 1" programming services for the City Center Project.

33.    Grigg was aware, on or around the time of the vote, that Liberti voted to approve the Professional Services Agreement.

34.    On October 13, 2004 – the day after the first vote approving the Professional Services Agreement – Liberti accompanied Grigg to a meeting with the President of Florida Atlantic University ("FAU").  On or around the time of the meeting with FAU, Liberti and Grigg had an understanding that, if RPC reached a deal regarding development work at FAU, Liberti would be entitled to a success fee or participation interest.

35.    Upon information and belief, there were no development opportunities at FAU at the time of the October 13, 2004 meeting, or at any other time from October 13, 2004 through May 2006.  The purported FAU opportunities provided "cover" for the initial Consulting Agreement between RPC and Liberti.

36.    On  November 12, 2004 – one month after the initial vote approving the Professional Services Agreement – Liberti sent Grigg, as President of RPC, a letter "Consulting

Agreement" (the "November 12, 2004 Letter") specifying that Liberti would perform "business development, government relations, lobbying, planning, and all general and specific issues within the objectives of process approval for the awarding of any contracts to Republic Properties outside the city limits of the City of West Palm Beach."

37.     The November 12, 2004 Letter provided for three monthly payments of $5,000 by RPC to Liberti and also noted a "previously discussed success fee if the [FAU] contract is awarded to Republic Properties."

38.     Grigg countersigned the November 12, 2004 Letter.

39.     A true and correct copy of the November 12, 2004 Letter, with Grigg's countersignature, is attached hereto as Exhibit B.

40.     Pursuant to the November 12, 2004 Letter, Grigg authorized three payments by RPC to Liberti, totaling $15,000.

41.      On January 28, 2005, Liberti sent a letter to RPC's Accounts Payable Department (the "January 28, 2005 Letter") stating that, "as per Steve Grigg, there is a need to extend my contract to continue the negotiations and lobbying efforts with Florida Atlantic University hospital/medical school, dorm, and stadium proposals and provide research and lobbying for large developable tracts within Palm Beach County and anywhere else Mr. Grigg directs."

42.     Liberti stated that the January 28, 2005 Letter would be considered "an extension agreement through April 2005 at the existing rate of $5,000 per month."

43.     A true and correct copy of the January 28, 2005 Letter is attached hereto as Exhibit C.

44.     Subsequent to the January 28, 2005 Letter, Grigg authorized RPC to make three additional payments to Liberti, totaling $15,000.

45.    On March 28, 2005, the Community Redevelopment Agency voted to approve Amendment No. 1 to the Professional Services Agreement, which authorized RPC/Republic-WPB to provide "Phase II – Schematic Design" services for the City Center Project in exchange for a fee to RPC and its subcontractors totaling $1,188,268.  The Community Redevelopment Agency and Republic-WPB later executed Amendment No. 1.  As a member of the Community Redevelopment Agency, Liberti voted to approve Amendment No. 1 to the Professional Services Agreement while receiving payments from RPC.

46.    Grigg was aware, on or around the time of the vote, that Liberti voted to approve Amendment No. 1 to the Professional Services Agreement.

47.    In an email to Grigg dated March 30, 2005, Kramer stated that he was "very fond of Ray [Liberti] and his talents" and suggested "a structure that would meet our mutual objectives. . . ."  That email was part of a series of communications among Liberti, Kramer and Grigg, and a meeting between Liberti and Kramer, concerning the possibility of Liberti entering an exclusive employment relationship with RPC.

48.    On April 19, 2005, Liberti sent a letter to Grigg, as President of RPC (the "April 19, 2005 Letter"), to "extend and amend my contract."

49.    The April 19, 2005 Letter referenced a "discussion of April 15" between Liberti and Grigg and an agreement that, from May until December 2005, Liberti would receive $8,000 per month from RPC for "negotiations, lobbying efforts, government relations, planning, zoning, real estate brokerage, and other duties," which were "required to meet the needs and direction of Republic Properties, Inc. in Florida."

50.    Grigg countersigned the April 19, 2005 Letter.

51.    A true and correct copy of the April 19, 2005 Letter, with Grigg's countersignature, is attached hereto as Exhibit D.

52.    Pursuant to the April 19, 2005 Letter, Grigg authorized payments by RPC to Liberti totaling $64,000.

53.    On December 19, 2005, the Community Redevelopment Agency voted to approve the assignment of the Professional Services Agreement and its amendments from RPC/Republic-WPB to RPT/Republic WPB.  As a member of the Community Redevelopment Agency, Liberti voted to approve the assignment of the Professional Services Agreement and its amendments from RPC/Republic-WPB to RPT/Republic WPB while receiving payments from RPC.

54.    Grigg was aware, on or around the time of the vote, that Liberti voted to approve the assignment of the Professional Services Agreement and its amendments.

55.    Kramer and Grigg, both through their interest in RPC and personally, benefited from the assignment of the Professional Services Agreement and its amendments.

56.    On January 24, 2006, Liberti sent a letter to Grigg, as President of RPC (the "January 24, 2006 Letter"), noting "a need to extend and amend my contract."

57.    The January 24, 2006 Letter stated that "negotiations, lobbying efforts, government relations, planning, zoning, real estate brokerage, and other duties are required to meet the needs and direction of Republic Properties Corporation in Florida, but, as in the past, I will not be involved in any matter, within or affecting the City of West Palm Beach."

58.    A true and correct copy of the January 24, 2006 Letter is attached hereto as Exhibit E.

59.    Subsequent to the January 24, 2006 Letter, Grigg authorized payments by RPC to Liberti totaling $32,000.

60.    On March 13, 2006, the Community Redevelopment Agency voted to approve Amendment No. 2 to the Professional Services Agreement, which authorized RPT/Republic WPB to perform all work "in the prosecution and proper completion of the demolition and partial preparation" of the City Center Project site.  In exchange, RPT/Republic WPB was to receive $36,366.96 as a "Developer's Fee" for its services related to Amendment No. 2.  The Community Redevelopment Agency and RPT/Republic WPB later executed Amendment No. 2. As a member of the Community Redevelopment Agency, Liberti voted to approve Amendment No. 2 to the Professional Services Agreement while receiving payments from RPC.

61.    As a result of the improper conduct alleged herein, RPT was never paid the Developer's Fee associated with the Amendment No. 2 to the Professional Services Agreement.

62.    Grigg was aware, on or around the time of the vote, that Liberti voted to approve Amendment No. 2 to the Professional Services Agreement.

63.    On April 10, 2006, the Community Redevelopment Agency voted to approve Amendment No. 3 to the Professional Services Agreement, which provided for RPT/Republic WPB to serve as the developer to complete the City Center project under a "Guaranteed Maximum Price" contract for an aggregate fee in excess of $4 million.  As a member of the Community Redevelopment Agency, Liberti voted to approve Amendment No. 3 to the Professional Services Agreement while receiving payments from RPC.

64.    Amendment No. 3 was never executed; however, prior to May 5, 2006, RPT/ Republic WPB performed services pursuant to Amendment 3 entitling it to approximately $1 million.  Due to the acts described herein, which led to the termination of the Professional Services Agreement, RPC was never paid for this work.

65.     Grigg was aware, on or around the time of the vote, that Liberti voted to approve Amendment No. 3 to the Professional Services Agreement.

66.     At all times relevant hereto, Grigg and Kramer were aware that Liberti, in his capacity as a member of the City Commission and Community Redevelopment Agency, was voting on matters affecting, and otherwise acting for the benefit of, RPT, RPC and other entities in which Grigg and Kramer had an interest.

67.     During the period from October 2004 through April 2006, the City Commission and Community Redevelopment Agency also voted and took actions on projects related to non-RPT business ventures in which RPC, Kramer, Grigg and others were involved, including a project in West Palm Beach known as the "Datura & Olive" project.  RPC, Grigg, Kramer, and others involved in these projects benefited from each of these votes and actions.  As a member of the City Commission and the Community Redevelopment Agency, Liberti also voted on these matters during the time that he was receiving payments from RPC.

68.     Upon information and belief, Liberti also discussed the issues involved in and related to each of the votes described above with other members of the City Commission and Community Redevelopment Agency and took positions favorable to RPT, RPC and other entities in which Kramer and Grigg had an interest, including the Datura & Olive project.

69.     Throughout the course of these events, Grigg informed Kramer regarding RPC's business activities in and around the City of West Palm Beach, including the various votes described above, RPC's relationship with Liberti and the payments made to him pursuant to the "Consulting Agreements."

70. As Chairman of RPC, Kramer was aware of, authorized and ratified the actions of Grigg related to Grigg's dealings with Liberti, including Grigg's authorization of payments by RPC to Liberti.

### FEDERAL CHARGES AGAINST LIBERTI
### AND TERMINATION OF THE PROFESSIONAL SERVICES AGREEMENT

71. On May 5, 2006, the United States Attorney's Office for the Southern District of Florida filed a criminal information charging Liberti with fraud and corruption relating to his accepting $66,000 in payments in abuse of his elected position as a City Commissioner. These charges did not involve RPT, RPLP, the Consulting Agreements or the Development Contribution Agreement.

72. Also on May 5, 2006, Grigg received a telephone call from West Palm Beach Mayor Lois Frankel, during which call Mayor Frankel inquired about the relationship between RPC, Grigg and Liberti. In response to Mayor Frankel's inquiries, Grigg disclosed for the first time to Mayor Frankel that RPC had been making payments to Liberti while Liberti was a voting member of the City Commission and Community Redevelopment Agency.

73. Neither Grigg nor Kramer informed RPT of the extent of the relationship with Liberti prior to May 5, 2006. However, after Grigg was contacted by Mayor Frankel on May 5, 2006, he sent an email to Mark Keller, RPT's Chief Executive Officer, Gary Siegel, RPT's Chief Operating Officer, and Michael Green, RPT's Executive Vice President and Chief Financial Officer, disclosing, for the first time, that RPC had "retained Liberti under an agreement dated November 2004 on retainer, that was extended by Republic Properties Corporation in January 2006. Liberti was paid by [RPC] checks."

74. Grigg did not disclose to RPT, on May 5, 2006, the full nature and extent of Grigg's and RPC's relationship with Liberti, or that Liberti had voted on issues affecting, and

otherwise acted for the benefit of, RPC, RPT and other entities in which Grigg and Kramer had an interest.  Likewise, Kramer did not inform RPT of these circumstances.

75.     As a result of conversations between  other officers of RPT and West Palm Beach officials between May 5, 2006 and May 7, 2006, RPT became aware of some of the votes cast and other actions taken by Liberti for the benefit of RPC, RPT and other entities in which Grigg and Kramer had an interest.  Throughout this time period, Grigg attempted to minimize the full nature and extent of his and RPC's relationship with Liberti.

76.     Shortly after federal prosecutors filed charges, the West Palm Beach press reported that RPC had paid consulting fees to Liberti while he was voting on matters affecting RPC – *i.e.*, the Professional Services Agreement and the City Center Project.  The press also reported that Mayor Frankel had alerted federal and state prosecutors to RPC's payments to Liberti.

77.     In May 2006, as a result of the improper and undisclosed payments by RPC to Liberti, the City and the Community Redevelopment Agency provided notice to RPT/Republic WPB of their intent to terminate the Professional Services Agreement.

78.     On June 29, 2006, PalmBeachPost.com reported that state prosecutors planned to impanel a grand jury to investigate Liberti's dealings with RPC as part of a comprehensive review of all private parties doing business with the City of West Palm Beach.

79.     Liberti pled guilty to the charges against him and, on October 18, 2006, a federal judge sentenced Liberti to 18 months incarceration followed by three years probation and immediately remanded him into custody in connection with his guilty plea to two counts of mail fraud and one count of witness tampering.

80.     On October 19, 2006, Republic WPB LLC entered into an assignment agreement with mutual releases (the "Assignment Agreement") with the Community Redevelopment Agency, acting for itself and on behalf of the City.  Among other things, the Assignment Agreement terminated the Professional Services Agreement and removed RPT and its affiliates from any continuing involvement in the City Center Project.

### RPT'S INDEPENDENT INVESTIGATION

81.     From October 2004 through early May 2006, neither Grigg nor Kramer nor RPC (nor anyone else) disclosed to RPT or RPLP that RPC was making payments to a member of the City Commission and Community Redevelopment Agency, or that those payments were related to or in furtherance of the City Center Project, and RPT was not otherwise aware of these facts.

82.     On June 20, 2006, RPT's Audit Committee approved hiring Shulman, Rogers, Gandal, Pordy & Ecker, P.A. ("Shulman Rogers") as special independent counsel to conduct an independent investigation into, among other things, RPC's and Grigg's relationship with Liberti. An internal investigation was previously begun by RPT's outside legal counsel, Hogan & Hartson LLP.

83.     Shulman Rogers was engaged to investigate, among other things:

   a)  the nature of the dealings between Liberti and Grigg in connection with the City Center Project and other projects in Florida;

   b)  the legality of the "consulting agreements" entered between Liberti and Grigg;

   c)  whether Grigg's conduct in Florida after December 20, 2005, including but not limited to his dealings with Liberti, provided a basis for RPT to terminate Grigg for cause; and

   d)  whether any other facts and circumstances learned in the course of the investigation suggested violations of law, contract and corporate governance or ethical standards.

84.     Shulman Rogers' investigation included a review of the files of RPT, RPC and other entities related to the City Center Project, Liberti and Grigg's travel to Florida through April 2006.  Shulman Rogers also reviewed RPT's SEC filings and internal documents relating to RPT's IPO, City of West Palm Beach public files, and other RPT documents.  In addition, Shulman Rogers had access to over five million electronic documents stored on RPT's server, as well as files downloaded from Grigg's office computers.  After using targeted searches to identify relevant documents, Shulman Rogers reviewed and coded approximately 40,000 documents.

85.     In the course of its investigation, Shulman Rogers conducted 20 formal and eight informal interviews of RPT employees, current and former employees of RPC, and other individuals.  Grigg, Kramer and Liberti were each interviewed by Shulman Rogers.

86.      RPT's independent investigation concluded on October 31, 2006, and cost RPT in excess of $1 million.

87.     On October 31, 2006, Shulman Rogers provided the findings of its investigation to the Audit Committee.  The findings of the investigation revealed to RPT, for the first time, the fraud alleged in this Complaint – *i.e.,* the full extent of Grigg's authorization of payments to Liberti and Liberti's votes on matters affecting, and other actions taken for the benefit of, RPC, RPT and other entities in which Grigg and Kramer had an interest.

## RPC, GRIGG AND KRAMER'S FAILURE TO DISLCOSE THE LIBERTI RELATIONSHIP

88.     Prior to the execution of the Development Contribution Agreement, neither RPC nor Grigg nor Kramer disclosed to RPT the full nature, extent and effect of the Liberti relationship.

89.     In addition to failing to disclose the full nature, extent and effect of the Liberti relationship, Grigg and Kramer, through RPC, made numerous affirmative representations in the Development Contribution Agreement.  Among the express representations and warranties made by RPC, the Development Contribution Agreement provides:

a)   "This Agreement and each agreement, document and instrument executed and delivered by or on behalf of RPC pursuant to this Agreement constitutes, or when executed and delivered will constitute, the legal, valid and binding obligation of RPC, each enforceable in accordance with its respective terms."  (§2.2)

b)   "There is no (a) litigation or proceeding, either judicial or administrative, pending or, to RPC's knowledge, threatened, affecting all or any portion of the Professional Services Agreement . . ."  (§2.4)

c)   "The Professional Services Agreement is in full force and effect and to the knowledge of RPC, neither it nor CRA is in default thereunder.  RPC shall timely perform all of its obligations thereunder."  (§2.10)

90.     Because of the relationship between RPC, Grigg and Liberti as described above, the Professional Services Agreement was not legal, binding or in full force and effect.  The Professional Services Agreement contained several representations by RPC as developer that were rendered false by the existence of the relationship among RPC, Grigg and Liberti, including:

a)   In Section 6.3.2, RPC represented, *inter alia,* that it would "at all times conduct business in a reputable manner."

b)   In Section 6.3.3, RPC represented that it "ha[d] not employed or retained any company or person . . . and has not paid or agreed to pay any person, company, corporation, individual, or firm . . . any fee, commission, percentage, gift, or any other consideration contingent upon or resulting from the award or making of this Agreement.

c)   In Section 6.3.8, RPC represented that it had "no interest and shall acquire no interest, either direct or indirect, which would conflict in any manner with its performance hereunder. . . ."  RPC further represented that "no person having any interest shall be employed or engaged by it for said performance. . . ."  RPC agreed to "promptly notify the CRA in writing by certified mail of all potential conflicts or [sic] interest for any prospective business association, interest or other circumstance that may influence or

appear to influence [RPC's] judgment or quality of services being provided hereunder."

91.    Because of the relationship between RPC, Grigg and Liberti as described above, the Professional Services Agreement was worth nothing at the time that it was assigned to RPT.

## BAD FAITH AND DELIBERATE DISHONESTY

92.    RPC, Grigg and Kramer's actions alleged herein involved bad faith and deliberate and active dishonesty, and resulted in improper benefits to Kramer and Grigg, and to entities in which Kramer and Grigg hold an interest, including, but not limited to, RPC.

## KRAMER'S REQUEST FOR ADVANCEMENT OF LEGAL FEES AND INDEMNIFICATION

93.    RPT's Articles of Amendment and Restatement of Declaration of Trust (the "Declaration of Trust") and RPT's First Amended and Restated Bylaws (the "Bylaws") provide that RPT's Trustees shall be entitled to advancement of legal fees and indemnification incurred in connection with certain actions, suits or proceedings.

94.    The advancement and indemnification provisions in the Declaration of Trust and Bylaws are limited to circumstances in which a Trustee incurs fees or liability as a result of his or her status as a Trustee of RPT.

95.    The advancement and indemnification provisions in the Declaration of Trust and Bylaws do not apply (i) where a Trustee's act or omission was material to the matter giving rise to the proceeding, and was committed in bad faith or was the result of active and deliberate dishonesty, or (ii) where a Trustee actually received an improper personal benefit in money, property or services.

96.    Maryland law also precludes advancement and/or indemnification (i) where the Trustee's actions are material and involve bad faith or active and deliberate dishonesty, or (ii)

where the Trustee received an improper personal benefit in money, property or services.  MGCL § 2-418.

97.    On March 6, 2007, Kramer filed a Complaint against RPT in the United States District Court of the District of Maryland, Southern Division, Civil Action No. 1:07-cv-00554-WMN, seeking, among other things, a declaration that RPT was required to advance to Mr. Kramer legal fees incurred by Kramer in responding to the Shulman Roger's investigation, as well as legal fees incurred by Kramer with respect to his position on and relationship with RPT's Board of Trustees.

98.    Kramer erroneously asserted that the Court had subject matter jurisdiction under 28 U.S.C. § 1332.  Because Kramer is a shareholder and Trustee of RPT, there is no diversity of citizenship and the Maryland District Court therefore cannot hear the case.  This Court, however, has jurisdiction to hear the controversy under 28 U.S.C. § 1367.

99.    On April 4, 2007, Kramer requested that RPT pay and advance his legal fees incurred in his defense of this litigation.

100.    RPT has refused Kramer's requests and maintains that it is not required to advance the legal expenses of or indemnify Kramer because, among other reasons: (1) certain of the fees sought have not been and in the future will not be incurred by Kramer in his capacity as a Trustee of RPT; (2) certain of the fees sought have not been and in the future will not be incurred by Kramer in connection with any "proceeding;" (3) Kramer has acted in bad faith and with active and deliberate dishonesty; (4) Kramer has received improper personal benefits, and (5) Kramer and his counsel have not substantiated the request for reimbursement for fees already paid by submitting appropriately detailed billing records identifying with sufficient precision the hours worked and the nature of the services performed by counsel.

101.    All conditions precedent to the filing of this Complaint have been satisfied.

## COUNT I – SECURITIES FRAUD UNDER SECTION 10(b)
## OF THE EXCHANGE ACT AND RULE 10b-5 OF THE SEC
### (AGAINST ALL DEFENDANTS)

102.    The allegations set forth in Paragraphs 1 through 101 above are incorporated into this Count as if fully set forth herein.

103.    As more fully set forth above, at the time of the assignment of the Professional Services Agreement to RPLP in exchange for the issuance of units in RPLP, Defendants each failed to disclose to RPLP and RPT that RPC had made payments to Liberti, an acting City Commissioner and member of the Community Redevelopment Agency, and that Liberti had voted on issues involving the Professional Services Agreement and the City Center Project, and had otherwise attempted to achieve favorable outcomes for RPC in the City.

104.    RPLP's issuance of 100,234 partnership units to RPC for the benefit of Grigg and Kramer, in accordance with the terms of the Development Contribution Agreement, constituted a sale of securities.

105.    Grigg's and RPC's relationship with Liberti and Liberti's actions on behalf of Grigg and RPC, if disclosed, would have been material to RPT's and RPLP's decision to enter into the Development Contribution Agreement and have RPLP issue units to RPC in exchange for the assignment of the Professional Services Agreement.

106.    As more fully set forth above, at the time of the execution of the Development Contribution Agreement and the issuance of RPLP units to RPC, Defendants knew, or were reckless in failing to know, that RPC had made payments to Liberti, that Liberti was a City Commissioner and member of the Community Redevelopment Agency, and that Liberti had voted on issues involving the Professional Services Agreement and the City Center Project, and

had otherwise attempted to achieve favorable outcomes for RPC in the City.  Defendants also

knew, or were reckless in failing to know, at the time of the execution of the Development

Contribution Agreement, that their misstatements and omissions bearing upon the Liberti

relationship were material and misleading because of potential impact of the true facts on the

validity of the Professional Services Agreement.

107.    In reliance upon the misrepresentations and omissions by Defendants, RPT

caused RPLP to enter into the Development Contribution Agreement, and RPLP issued 100,234

partnership units to RPC, which had an approximate value of $1,202,808 at the time of their

issuance.

108.    Had RPT and RPLP known of the nature of Grigg's and RPC's relationship with

Liberti, RPT would not have caused RPLP to enter into the Development Contribution

Agreement, and RPLP would not have issued 100,234 partnership units.

109.    By reason of the conduct alleged herein, Defendants knowingly and/or recklessly

have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that

they (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of

material facts or omitted to state material facts necessary in order to make statements made, in

light of the circumstances under which they were made, not misleading; or (c) engaged in acts,

practices and a course of conduct that operated as a fraud or deceipt on RPT and RPLP in

connection with the Development Contribution Agreement.

110.    RPLP and RPT were injured by Defendants' fraudulent and misleading statements

and omissions in that RPT caused RPLP to issue to RPC, for the benefit of Kramer and Grigg,

100,234 RPLP partnership units pursuant to the Development Contribution Agreement.

Accordingly, RPLP and RPT are entitled to recover damages from Defendants in an amount to be established and proven at trial.

## COUNT II – "CONTROL PERSON" LIABILITY
## UNDER SECTION 20(a) OF THE EXCHANGE ACT
### (AGAINST KRAMER AND GRIGG)

111.    The allegations set forth in Paragraphs 1 through 110 above are incorporated into this Count as if fully set forth herein.

112.    During all times relevant hereto, Kramer was a controlling person of RPC within the meaning of Section 20 of the Exchange Act.  By reason of his position as Chairman of the Board of Directors, and as owner of 85% of RPC's shares, Kramer had the power and authority to control RPC with respect to the conduct alleged herein, and exercised such control.

113.    During all times relevant hereto, Grigg was a controlling person of RPC within the meaning of Section 20 of the Exchange Act.  By reason of his position as President and Chief Executive Officer, as a member of the Board of Directors, and as owner of 15% of RPC's shares, Grigg had the power and authority to control RPC with respect to the conduct alleged herein, and exercised such control.

114.    During all relevant times hereto, Kramer was a controlling person of Grigg within the meaning of Section 20 of the Exchange Act.  By reason of his position of superiority over Grigg, his personal relationship with Grigg, and his dominance over RPC, Kramer had the power to control and influence Grigg with respect to the conduct alleged herein, and exercised such control.

115.    By reason of his position of control over RPC and Grigg, as alleged above, Kramer is liable jointly and severally with and to the same extent as RPC and Grigg to RPT and RPLP for the wrongful conduct alleged in Count I.

116.    By reason of his position of control over RPC, as alleged above, Grigg is liable jointly and severally with and to the same extent as RPC for the wrongful conduct alleged in Count I.

### COUNT III – SECURITIES FRAUD UNDER
### D.C. CODE ANN. §§  31-5605.02  & 31-5605.05
### (AGAINST ALL DEFENDANTS)

117.    The allegations set forth in Paragraphs 1 through 116 above are incorporated into this Count as if fully set forth herein.

118.    As more fully set forth above, at the time of the assignment of the Professional Services Agreement to RPLP in exchange for the issuance of units in RPLP, Defendants each failed to disclose to RPLP and RPT that RPC had made payments to Liberti, an acting City Commissioner and member of the Community Redevelopment Agency, and that Liberti had voted on issues involving the Professional Services Agreement and the City Center Project, and had otherwise attempted to achieve favorable outcomes for RPC in the City.

119.    RPLP's issuance of 100,234 partnership units to RPC for the benefit of Grigg and Kramer, in accordance with the terms of the Development Contribution Agreement, constituted a sale of securities.

120.    Grigg's and RPC's relationship with Liberti and Liberti's actions on behalf of Grigg and RPC, if disclosed, would have been material to RPT's and RPLP's decision to enter into the Development Contribution Agreement and have RPLP issue units to RPC in exchange for the assignment of the Professional Services Agreement.

121.    As more fully set forth above, at the time of the execution of the Development Contribution Agreement and the issuance of RPLP units to RPC, Defendants knew, or were reckless in failing to know, that RPC had made payments to Liberti, that Liberti was a City

Commissioner and member of the Community Redevelopment Agency, and that Liberti had voted on issues involving the Professional Services Agreement and the City Center Project, and had otherwise attempted to achieve favorable outcomes for RPC in the City. Defendants also knew, or were reckless in failing to know, at the time of the execution of the Development Contribution Agreement, that their misstatements and omissions bearing upon the Liberti relationship were material and misleading because of potential impact of the true facts on the validity of the Professional Services Agreement.

122.    In reliance upon the misrepresentations and omissions by Defendants, RPT caused RPLP to enter into the Development Contribution Agreement, and RPLP issued 100,234 partnership units to RPC, which had an approximate value of $1,202,808 at the time of their issuance.

123.    Had RPT and RPLP known of the nature of Grigg's and RPC's relationship with Liberti, RPT would not have caused RPLP to enter into the Development Contribution Agreement, and RPLP would not have issued 100,234 partnership units.

124.    Defendants conduct alleged herein violates D.C. Code Ann. §§ 31-5606.02 and 31-5605.05.

125.    RPT and RPLP hereby tender to RPC their remaining interest in the Professional Services Agreement, which was terminated as a result of RPC's, Grigg's, Kramer's and Liberti's conduct described herein. Accordingly, RPT and RPLP are entitled to recover from RPC the limited partnership units issued to RPC pursuant to the Development Contribution Agreement, as well as all costs and reasonable attorneys' fees incurred in connection with this action.

126.    RPLP and RPT were injured by Grigg's and Kramer's fraudulent and misleading statements and omissions in relation to RPLP's issuance of 100,234 partnership units pursuant to

the Development Contribution Agreement.  Accordingly, and RPLP and RPT are entitled to recover damages from all Defendants, jointly and severally, in an amount to be established and proven at trial.

## COUNT IV – "CONTROL PERSON" LIABILITY
## UNDER D.C. CODE ANN. § 31-5605.05 (c)
### (AGAINST GRIGG AND KRAMER)

127.    The allegations set forth in Paragraphs 1 through 126 above are incorporated into this Count as if fully set forth herein.

128.    At all times relevant to this action, Kramer and Grigg directly and indirectly controlled the actions of RPC and its employees.

129.    At all times relevant to this action, Kramer was Grigg's superior at RPC and directly and indirectly controlled Grigg as RPC's President and CEO.

130.    At all times relevant to this action, Kramer and Grigg were each directors and officers of RPC.

131.    Pursuant to D.C. Code Ann. § 31-5605.05 (c), Kramer and Grigg are jointly and severally liable to RPLP and RPT for the various violations of the D.C. securities laws as alleged in Count IV, above.  Accordingly, RPLP and RPT are entitled to recover damages from Kramer and Grigg, jointly and severally, in an amount to be established and proven at trial.

## COUNT V – BREACH OF CONTRACT
### (AGAINST RPC)

132.    The allegations set forth in Paragraphs 1 through 131 above are incorporated into this Count as if fully set forth herein.

133.    As more fully described above, RPC's relationship with Liberti breached the express representations and warranties made by RPC as part of the Development Contribution Agreement.

134.    RPT and RPLP were injured by RPC's breach.  Accordingly, RPT and RPLP are entitled to recover damages from RPC in an amount to be established and proven at trial, but not less than $1,202,808, the approximate value (at the time of their issuance) of the RPLP partnership units issued to RPC in connection with the Development Contribution Agreement; plus all costs to RPT associated with the internal investigation and the independent investigation; plus compensation for work done on the City Center Project and additional damages incurred by RPT and RPLP as a result of the termination of the Professional Services Agreement; along with RPT's costs and attorneys' fees incurred in this litigation.

### COUNT VI - INDEMNIFICATION
### (AGAINST RPC)

135.    The allegations set forth in Paragraphs 1 through 134 above are incorporated into this Count as if fully set forth herein.

136.    In relevant part, Section 2.11 of the Development Contribution Agreement provides as follows:

> RPC acknowledges that [RPLP] may rely upon the representations and warranties in this Article II in determining to enter into this Agreement.  RPC agrees to indemnify, defend and hold harmless [RPLP] and the officers, directors and affiliates thereof, and any employees or agents of any of the foregoing, against , against any and all loss, liability, claim, damage or expense whatsoever (including, but not limited to, any and all expenses, including attorneys' fees, reasonably incurred in investigating, preparing or defending against any claim or litigation commenced or threatened) due to or arising out of a breach of any such representations or warranties.

137.    Accordingly, RPLP and RPT are entitled to recover from RPC any and all  losses, liabilities, claims, damages and expenses whatsoever, which will be established and proven at trial, but not less than $1,202,808, the approximate value (at the time of their issuance) of the RPLP partnership units issued to RPC in connection with the Development Contribution Agreement; plus all costs to RPT associated with the internal investigation and the independent

investigation; plus compensation for work done on the City Center Project and additional damages incurred by RPT and RPLP as a result of the termination of the Professional Services Agreement; along with RPT's costs and attorneys' fees incurred in this litigation.

138.    Moreover, Kramer has filed suit against RPT in the United States District Court for the District of Maryland seeking reimbursement of fees and expenses allegedly incurred by him in connection with the special investigation and other matters described above.  While RPT denies that Kramer is entitled to reimbursement from RPT for such expenses, RPT and RPLP are entitled to recovery of any such reimbursable fees and expenses from RPC, along with any and all fees and expenses incurred in the defense of the Maryland litigation.

<u>**COUNT VII – FRAUD**</u>
**(AGAINST ALL DEFENDANTS)**

The allegations set forth in Paragraphs 1 through 138 above are incorporated into this Count as if fully set forth herein.

139.    At the time of the execution of the Development Contribution Agreement, RPT and RPLP were led to believe by Defendants that the Professional Services Agreement was a validly executed contract and that there was no unlawful or improper activity related to the Professional Services Agreement and RPC's involvement with the City Center Project, as well as other RPC-affiliated business ventures in West Palm Beach.

140.    As more fully set forth above, at the time of the execution of the Development Contribution Agreement, Kramer, Grigg and  RPC each failed to disclose to RPT that RPC had made payments to Liberti, a City Commissioner and member of the Community Redevelopment Agency, and that Liberti, while receiving such payments, had voted on issues involving the Professional Services Agreement and the City Center Project, and had otherwise attempted to achieve favorable outcomes for RPC in the City.  RPT was not otherwise aware of these facts.

141.    Grigg's and RPC's relationship with Liberti and Liberti's actions on behalf of Grigg and RPC, if disclosed, would have been material to RPT's decision to enter into the Development Contribution Agreement and have RPLP issue partnership units to RPC in exchange for the assignment of the Professional Services Agreement.

142.    As more fully set forth above, at the time of the execution of the Development Contribution Agreement, Defendants knew or recklessly disregarded that RPC had made payments to Liberti, that Liberti was a City Commissioner and member of the Community Redevelopment Agency, and that Liberti had voted on issues involving the Professional Services Agreement and the City Center Project, and had otherwise attempted to achieve favorable outcomes for RPC in the City.

143.    Defendants intended for RPT and RPLP to rely on their misleading statements and omissions.

144.    Defendants had a duty to disclose to RPT and RPLP the nature of Grigg's and RPC's relationship with Liberti.

145.    RPT and RPLP relied on Defendants' misrepresentations and omissions.

146.    Had RPT and RPLP known of the nature of Grigg's and RPC's relationship with Liberti and the related facts and circumstances described above, RPT would not have caused RPLP to enter into the Development Contribution Agreement, and RPLP would not have entered into the Development Contribution Agreement.

147.    RPT and RPLP were injured by Defendants' fraudulent conduct.  Accordingly, RPT and RPLP are entitled to recover damages from Defendants, jointly and severally, in an amount to be established and proven at trial, but not less than $1,202,808, the approximate value (at the time of their issuance) of the RPLP partnership units issued to RPC in connection with the

Development Contribution Agreement; plus all costs to RPT associated with the internal investigation and the independent investigation; plus compensation for work done on the City Center Project and additional damages incurred by RPT and RPLP as a result of the termination of the Professional Services Agreement; along with RPT's costs and attorneys' fees incurred in this litigation.

## COUNT VIII – UNJUST ENRICHMENT
### (AGAINST GRIGG AND KRAMER)

148.    The allegations set forth in Paragraphs 1 through 147 above are incorporated into this Count as if fully set forth herein.

149.    RPT and RPLP conferred upon Kramer and Grigg, both personally and through their interests in RPC, benefits from the Development Contribution Agreement in the form of RPLP partnership units.

150.    Kramer and Grigg were aware of the benefits conferred upon each of them at the time of the issuance of the RPLP partnership units.

151.    Under the facts and circumstances of this case, as more fully set forth above, it would be unjust for Kramer and Grigg to retain the benefits conferred upon each of them without paying for the full value of the partnership units issued for their benefit.

152.    Accordingly, RPT and RPLP are entitled to recover from Kramer and Grigg the full benefit received by each of them, in an amount to be established and proved at trial, but not less than the full value of the RPLP partnership units held directly by them or for their benefit.

## COUNT IX – DECLARATORY RELIEF PURSUANT TO
### FED. R. CIV. P. 57 AND 28 U.S.C. § 2201
### (AGAINST KRAMER)

153.    The allegations set forth in Paragraphs 1 through 152 above are incorporated herein.

154.    An actual controversy exists between Kramer and RPT regarding whether Kramer is entitled to payment and advancement of legal fees and expenses sought by Kramer from RPT.

155.    Kramer is not entitled to advancement of fees or indemnification under the Declaration of Trust, the Bylaws or applicable law.

156.    Accordingly, RPT is entitled to an order declaring that Kramer is not entitled to the payment and advancement of any of the fees and expenses that he has sought from RPT.

## COUNT X – PUNITIVE DAMAGES
### (AGAINST RPC, GRIGG AND KRAMER)

157.    The allegations set forth in Paragraphs 1 through 156 above are incorporated into this Count as if fully set forth herein.

158.    The conduct of RPC, Kramer and Grigg described throughout this Complaint demonstrate that their actions, collectively and separately, showed willful misconduct, malice, fraud, wantonness, oppression, and/or that entire want of care that would raise the presumption of conscious indifference to consequences, such that the RPT and RPLP are entitled to recover punitive and exemplary damages from each of them in amounts to determined by the enlightened conscience of the jury.

## BASIS OF ALLEGATIONS

159.    RPT and RPLP have alleged the foregoing based on facts and records in their possession, as well as facts and records established and discovered through the course of the independent investigation conducted by Shulman Rogers, which is more fully described above.

**WHEREFORE**, RPT and RPLP respectfully request that this Court enter a judgment in their favor as follows:

(1)  that judgment be entered for RPT and RPLP and against RPC, Kramer and Grigg on RPT and RPLP's claims against each of them in accordance with the allegations set forth above;

(3)  that RPT and RPLP recover compensatory and punitive damages from RPC, Kramer and Grigg, jointly and severally, in amounts to be established and proven at trial;

(4) that RPLP recover from RPC the RPLP partnership units issued to RPC in connection with the Development Contribution Agreement;

(5)  that RPT and RPLP recover from RPC, Kramer and Grigg their expenses of litigation, including attorneys' fees and costs, in an amount to be established and proven at trial;

(6) that an order be entered declaring that RPT is not required to pay or advance the legal fees and expenses sought by Kramer; and

(7)  that the Court award such other and further relief as is deemed just, equitable and proper.


## JURY DEMAND

RPT and RPLP demand a trial by jury on all issues so triable.


Dated:  April 27, 2007

Respectfully submitted,


/s/ Mark E. Nagle_____
Mark E. Nagle, Bar No. 416364
Tracy P. Varghese, Bar No. 472805
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000

Washington, D.C. 20004
(202) 274-2972
mark.nagle@troutmansanders.com

*Counsel for Republic Property Trust and*
*Republic Property Limited Partnership*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of April 2007, I caused a copy of the foregoing Amended Complaint to be filed electronically pursuant to the Court's ECF rules by sending an e-mail to the Court's generic ECF email address at dcd_cmecf@dcd.uscourts.gov; served upon all counsel of record via ECF and electronic mail; and served upon Richard L. Kramer and Paul Martin Wolff via first-class mail and/or electronic mail as set forth below:

George A. Borden
William T. Burke
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005
*Counsel for Republic Properties Corporation*

Deborah P. Kelly
Marianela Peralta
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C. 20006
*Counsel for Steven A. Grigg*

Via first-class mail to:

Richard L. Kramer
515 Park Avenue, # 12
New York, NY 10022

Via electronic and first-class mail to:

Paul Martin Wolff
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005

/s/ Tracy P. Varghese
Tracy P. Varghese

Execution Copy

## DEVELOPMENT SERVICES RIGHTS CONTRIBUTION AGREEMENT
### (CITY CENTER)

THIS DEVELOPMENT SERVICES RIGHTS CONTRIBUTION AGREEMENT (the "Agreement") is entered into as of this 23rd day of September, 2005 between REPUBLIC PROPERTIES CORPORATION, a District of Columbia corporation ("RPC"), and REPUBLIC PROPERTY LIMITED PARTNERSHIP, a Delaware limited partnership (the "Operating Partnership").

## W I T N E S S E T H

WHEREAS, in connection with the initial public offering (the "IPO") of the common shares of beneficial interest, par value $.01 per share, of Republic Property Trust, a Maryland real estate investment trust (the "REIT"), the REIT and the Operating Partnership and their affiliates will complete a series of related transactions (collectively with the IPO, the "IPO Transactions");

WHEREAS, pursuant to that certain Professional Services Agreement (the "Professional Services Agreement") made and entered into as of October 26, 2004 between RPC (operating under the name "Republic-WPB Corp.") and West Palm Beach Community Redevelopment Agency ("CRA"), RPC provides development services to CRA in connection with the design and development of that certain public/private real estate development project known as "City Center", which such project is more fully described in the Professional Services Agreement (the "Project");

WHEREAS, in connection with the IPO Transactions, RPC desires to contribute to the Operating Partnership, and the Operating Partnership desires to acquire, RPC's right, title and interest in and to the Professional Services Agreement at the time of the Closing (as defined in Section 5.1 below) in exchange for Class A units of limited partnership interest (the "Units") in the Operating Partnership, on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    **CONTRIBUTION**

1.1    Contribution. Subject to the terms and conditions hereof, RPC agrees to contribute or otherwise transfer to the Operating Partnership, and the Operating Partnership agrees to acquire and accept from RPC, on the date of the Closing (as defined in Section 5.1 below), all of RPC's right, title and interest in and to the Professional Services Agreement.

1



1.2    Issuance of Units.

(a)    Subject to the terms and conditions of this Agreement, in exchange for the Professional Services Agreement, the Operating Partnership shall issue to RPC, and RPC shall receive, an aggregate of 100,234 Units, in a transaction intended to qualify for nonrecognition of gain to RPC pursuant to Section 721 of the Internal Revenue Code of 1986, as amended (the "Code"). The rights of holders of the Units as of the Closing will be as set forth in the Amended and Restated Agreement of Limited Partnership of the Operating Partnership (the "Partnership Agreement").

(b)    The Operating Partnership shall issue the Units to RPC (or, at the option of RPC, directly to RPC's designees, in accordance with written instructions provided to the Operating Partnership by RPC setting forth the name and address of, and the number of Units received by, each designee, provided that each such designee (i) makes each of the representations and warranties set forth in Section 2.5, 2.9 and 2.11 hereof (and provides the Operating Partnership a certificate to that effect) and (ii) has executed and delivered the Limited Partner Acceptance attached hereto as Exhibit A (the "Limited Partner Acceptance") pursuant to Section 1.3 hereof. The name of RPC or, if applicable, each designee, and the number of Units issued to RPC or, if applicable, each designee, shall be recorded in the books and records of the Operating Partnership.

1.3    Admission as a Limited Partner.    Upon execution and delivery of the Limited Partner Acceptance by RPC and, if their designees will receive the Units pursuant to Section 1.2(b) above, each of such designees, at the Closing, and subject to the completion of the Closing, RPC and if applicable, their designees, shall be admitted as limited partners of the Operating Partnership and, as such, shall be subject to, and bound by, the Partnership Agreement, including the power of attorney granted therein and all the terms and conditions thereof.

1.4    Reimbursement for Prior Services or Expenses. Notwithstanding anything to the contrary herein, the parties hereto acknowledge that any reimbursement for prior services performed or expenses incurred by RPC in connection with the performance of its obligations under the Professional Services Agreement that accrue prior to the date of Closing (as defined below) shall be reimbursable by CRA (or other applicable party) to RPC, notwithstanding that any such costs or expenses may be actually payable after the date of Closing.

## ARTICLE II: REPRESENTATIONS AND WARRANTIES OF RPC

As a material inducement to the Operating Partnership to enter into this Agreement and to consummate the transactions contemplated hereby, RPC

hereby makes to the Operating Partnership each of the representations, warranties and covenants set forth in this Article II. Each Investor (as defined below), severally and not jointly, hereby makes to the Operating Partnership, as to itself or himself, each of the representations, warranties and covenants set forth in Section 2.5, 2.9 and 2.11 hereof. The representations and warranties set forth in this Article II are true and correct as of the date hereof.

2.1    Organization and Standing.    RPC is a corporation validly existing and in good standing under the law of its jurisdiction of organization, and has the requisite corporate power and authority to own and operate its assets, to carry on its business as currently conducted, and to execute and deliver this Agreement and to carry out the transactions contemplated hereby. RPC is duly qualified to conduct business as a foreign corporation, where necessary and is in good standing in the states in which it is so qualified.

2.2    Authority.    RPC has full right, authority, power and capacity (a) to enter into this Agreement and each agreement, document and instrument to be executed and delivered by or on behalf of RPC pursuant to this Agreement; (b) to carry out the transactions contemplated hereby and thereby; and (c) to transfer, sell and deliver all of its right, title and interest in the Professional Services Agreement to the Operating Partnership (or its designee) in accordance with this Agreement. This Agreement and each agreement, document and instrument executed and delivered by or on behalf of RPC pursuant to this Agreement constitutes, or when executed and delivered will constitute, the legal, valid and binding obligation of RPC, each enforceable in accordance with its respective terms.

2.3    Noncontravention.    Neither the entry into nor the performance of, or compliance with, this Agreement by RPC has resulted, or will result, in any violation of, or default under, or result in the acceleration of, any obligation under its charter, or any material mortgage, indenture, lien agreement, note, contract, permit, judgment, decree, order, restrictive covenant, statute, rule, or regulation applicable to RPC or under the Professional Services Agreement.

2.4    Litigation.    There is no (a) litigation or proceeding, either judicial or administrative, pending or, to RPC's knowledge, threatened, affecting all or any portion of the Professional Services Agreement; (b) outstanding order, writ, injunction or decree of any court, government, governmental entity or authority or arbitration against or affecting all or any portion of the Professional Services Agreement, which in the case of (a) and (b) hereof, would materially impair RPC's ability to enter into and perform all of RPC's obligations under this Agreement.

2.5    Status as a United States Person.    Each of RPC and each of RPC's designees who receive Units hereunder (RPC and its designees are referred to collectively as the "Investors") is not a foreign person within the meaning of Section 1445 of the Code ("Section 1445"). RPC's U.S. taxpayer identification

3

number that has previously been provided to the Operating Partnership is correct. RPC's office address is that most recent address previously provided to the Operating Partnership. At the time of Closing, each Investor shall provide to the Operating Partnership a certificate of non-foreign status substantially in the form provided in Section 1.1445-5(b)(3)(D) of the Treasury regulations.

2.6    <u>No Insolvency Proceedings</u>.    No attachments, execution proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings are pending or, to RPC's knowledge, threatened against RPC, nor are any such proceedings contemplated by RPC.

2.7    <u>No Brokers</u>. RPC has not entered into, and covenants that it will not enter into, any agreement, arrangement or understanding with any person or firm which will result in the obligation of the Operating Partnership to pay any finder's fee, brokerage commission or similar payment in connection with the transactions contemplated hereby (other than underwriting fees paid in connection with the IPO).

2.8    <u>Consents</u>. Except as may otherwise be set forth in this Agreement, each consent, approval, authorization, order, license, certificate, permit, registration, designation, or filing by or with any governmental agency or third party, including lender consents, necessary for the execution, delivery, and performance of this Agreement or the transactions contemplated hereby by RPC has been obtained or will be obtained on or before the Closing.

2.9    <u>Securities Law Matters; Transfer Restrictions</u>.

(a)    Each Investor acknowledges that the Operating Partnership intends for the offer and issuance of the Units to be exempt from registration under the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws.

(b)    Each Investor acknowledges that it is an "accredited investor" within the meaning of the federal securities laws.

(c)    Each Investor will acquire the Units for its own account and not with a view to, or for sale in connection with, any "distribution" thereof within the meaning of the Securities Act.

(d)    Each Investor has sufficient knowledge and experience in financial, tax and business matters to enable it to evaluate the merits and risks of investment in the Units. Each Investor has the ability to bear the economic risk of acquiring the Units.    Each Investor acknowledges that (i) the transactions contemplated by this Agreement involve complex tax consequences for the Investor, and each Investor is relying solely on the advice of such person's own tax advisors in evaluating such consequences, (ii) the Operating Partnership has not made (nor

4

shall it be deemed to have made) any representations or warranties as to the tax consequences of such transaction to the Investor, and (iii) references in this Agreement to the intended tax effect of the transactions contemplated hereby shall not be deemed to imply any representation by the Operating Partnership as to a particular tax effect that may be obtained by the Investor. The Investors remain solely responsible for all tax matters relating to such persons.

(e)    Each Investor has been supplied with, or had access to, information to which a reasonable investor would attach significance in making an investment decision to acquire the Units and any other information such Investor has requested.

(f)    Each Investor acknowledges that there are substantial restrictions on the transferability of the Units and that the Units will not be registered under the Securities Act or any state securities laws, and the Investor has no right to require that they be so registered. Each Investor agrees that any Units it acquires will not be sold in the absence of registration unless such sale is exempt from registration under the Securities Act and applicable state securities laws.

(g)    Each Investor understands that no federal agency (including the Securities and Exchange Commission) or state agency has made or will make any finding or determination as to the fairness of an investment in the Units (including as to the number of Units (or their value) issued pursuant hereto).

(h)    Each Investor understands that there is no established public, private or other market for the Units acquired by such Investor hereunder and it is not anticipated that there will be any public, private or other market for such Units in the foreseeable future.

(i)    Each Investor understands that Rule 144 promulgated under the Securities Act is not currently available with respect to the sale of Units.

2.10    Professional Services Agreement.    The Professional Services Agreement is in full force and effect and to the knowledge of RPC, neither it nor CRA is in default thereunder. RPC shall timely perform all of its obligations thereunder.

2.11    Reliance.    RPC acknowledges that the Operating Partnership may rely upon the representations and warranties in this Article II in determining whether to enter into this Agreement. RPC agrees to indemnify, defend and hold harmless the Operating Partnership and the officers, directors and affiliates thereof, and any employees or agents of any of the foregoing, against any and all loss, liability, claim, damage or expense whatsoever (including, but not limited to, any and all expenses, including attorneys' fees, reasonably incurred in

5

investigating, preparing or defending against any claim or litigation commenced or threatened) due to or arising out of a breach of any such representations or warranties.

Each Investor agrees, severally and not jointly, to indemnify, defend and hold harmless the Operating Partnership and the officers, directors and affiliates thereof, and any employee or agents of any of the foregoing, against any and all loss, liability, claim, damage or expense whatsoever (including, but not limited to, any and all expenses, including attorneys' fees, reasonably incurred in investigating, preparing or defending against any claim or litigation commenced or threatened) due to or arising out of a breach of such Investor's representations in Sections 2.5 and 2.9 hereof; provided, however, the indemnification obligation of the Investor hereunder is limited in the case of each Investor to the value of the Units such Investor will receive in connection with this Agreement based on the initial public offering price in the IPO.

## ARTICLE III: REPRESENTATIONS AND WARRANTIES OF THE OPERATING PARTNERSHIP

As a material inducement to RPC to enter into this Agreement and to consummate the transactions contemplated hereby, the Operating Partnership hereby makes to RPC each of the representations, warranties and covenants set forth in this Article III. The representations and warranties set forth in this Article III are true and correct as of the date hereof.

3.1     Organization and Standing.  The Operating Partnership is a limited partnership duly organized, validly existing and in good standing under Delaware law, and has the requisite partnership power and authority to own and operate its assets, to carry on its business as currently conducted, to execute and deliver this Agreement and to carry out the transactions contemplated hereby. The Operating Partnership is duly qualified to conduct business as a foreign partnership where necessary and is in good standing in the states in which it is so qualified.

3.2     Authority.  The Operating Partnership has full right, authority, power and capacity (a) to enter into this Agreement and each agreement, document and instrument to be executed and delivered by or on behalf of the Operating Partnership pursuant to this Agreement; (b) to carry out the transactions contemplated hereby and thereby; and (c) to transfer, sell and deliver the Units to RPC (or its designees) in accordance with this Agreement. This Agreement and each agreement, document and instrument executed and delivered by or on behalf of the Operating Partnership pursuant to this Agreement constitutes, or when executed and delivered will constitute, the legal, valid and binding obligation of the Operating Partnership, each enforceable in accordance with its respective terms.

6

3.3    Noncontravention.  Neither the entry into nor the performance of, or compliance with, this Agreement by the Operating Partnership has resulted, or will result, in any violation of, or default under, or result in the acceleration of, any obligation under its agreement of limited partnership, or any material mortgage, indenture, lien agreement, note, contract, permit, judgment, decree, order, restrictive covenant, statute, rule, or regulation applicable to the Operating Partnership.

3.4.    Litigation.  There is no litigation or proceeding, either judicial or administrative, pending or, to the Operating Partnership's knowledge, threatened, affecting all or any portion of the Units or the Operating Partnership's ability to consummate the transactions contemplated hereby.  There is no outstanding order, writ, injunction or decree of any court, government, governmental entity or authority or arbitration against or affecting all or any portion of the Units, which in any such case would impair the Operating Partnership's ability to enter into and perform all of the Operating Partnership's obligations under this Agreement.

3.5    Units Validly Issued.  The Units, when issued, will have been duly and validly authorized and issued, free of any preemptive or similar rights, without any obligation to restore capital except as required by the Delaware Revised Uniform Limited Partnership Act (the "Limited Partnership Act") or as agreed between the Operating Partnership and any limited partner in the Operating Partnership.

3.6    No Brokers.  The Operating Partnership has not entered into, and covenants that it will not enter into, any agreement, arrangement or understanding with any person or firm which will result in the obligation of RPC to pay any finder's fee, brokerage commission or similar payment in connection with the transactions contemplated hereby

3.7    Consents.  Except as may otherwise be set forth in this Agreement, each consent, approval, authorization, order, license, certificate, permit, registration, designation, or filing by or with any governmental agency or body necessary for the execution, delivery, and performance of this Agreement or the transactions contemplated hereby by the Operating Partnership has been obtained or will be obtained on or before the Closing.

3.8    Reliance.  The Operating Partnership acknowledges that RPC may rely upon the representations and warranties in this Article III in determining whether to enter into this Agreement.  The Operating Partnership agrees to indemnify, defend and hold harmless RPC and the officers, directors and affiliates thereof, and any employees or agents of any of the foregoing, against any and all loss, liability, claim, damage or expense whatsoever (including, but not limited to, any and all expenses, including attorneys' fees, reasonably incurred in investigating, preparing or defending against any claim or litigation commenced or

threatened) due to or arising out of a breach of any such representations or warranties.

## ARTICLE IV:  CONDITIONS TO CLOSING

4.1    Conditions to the Operating Partnership's Obligation to Close. The obligation of the Operating Partnership to consummate the Closing is subject to the fulfillment, at or prior to the Closing, of the following conditions (unless such conditions are waived in writing by the Operating Partnership):

(a)    IPO Transactions.    The IPO Transactions shall have occurred (or shall be occurring simultaneously with the Closing).

(b)    Representations and Warranties.    The representations and warranties made by RPC (and in the case of Sections 2.5 and 2.9, the Investors) pursuant to this Agreement shall be true and correct in all material respects when made, and on and as of the Closing, as though such representations and warranties were made on the Closing.

(c)    Performance.    RPC shall have performed and complied with all agreements and covenants that it is required to perform or comply with pursuant to this Agreement prior to the Closing in all material respects.

(d)    Legal Proceedings.    No order, statute, rule, regulation, executive order, injunction, stay, decree, or restraining order shall have been enacted, entered, promulgated or enforced by any court of competent jurisdiction or governmental entity that prohibits the consummation of the transactions contemplated hereby, and no litigation or governmental proceeding seeking such an order shall be pending or threatened.

(e)    Consents and Approvals.    All necessary consents of governmental and private parties to effect the transactions contemplated by this Agreement, including, without limitation, consents of lenders and consent from CRA (which consent must include the consent to allow the Operating Partnership to assign the rights and obligations under the Professional Services Agreement to one or more affiliates of the Operating Partnership, and that, upon such assignment the obligation to perform any services under the Professional Services Agreement shall reside exclusively with any such assignee) shall have been obtained.

(f)    Professional Services Agreement.    The Professional Services Agreement shall be in full force and effect and neither of the parties thereto shall be in default thereunder.

4.2    Conditions to RPC's Obligation to Close.    The obligation of RPC to consummate the Closing is subject to the fulfillment, at or prior to the Closing, of the following conditions (unless such conditions are waived in writing by RPC):

(a) <u>Representation and Warranties</u>. The representations, warranties and covenants of the Operating Partnership contained in this Agreement shall be true and correct as of the Closing.

(b) <u>Performance</u>. The Operating Partnership shall have performed and complied with all agreements and covenants that it is required to perform or comply with pursuant to this Agreement prior to the Closing in all material respects.

(c) <u>Legal Proceedings</u>. No order, statute, rule, regulation, executive order, injunction, stay, decree, or restraining order shall have been enacted, entered, promulgated or enforced by any court of competent jurisdiction or governmental entity that prohibits the consummation of the transactions contemplated hereby, and no litigation or governmental proceeding seeking such an order shall be pending or threatened.

(d) <u>Consents and Approvals</u>. All necessary consents of governmental and private parties to effect the transactions contemplated by this Agreement shall have been obtained.

4.3 <u>Further Assurances</u>. Each of the parties herein shall execute and deliver all such other and further instruments and documents and take or cause to be taken all such other and further actions that any other party may reasonably request in order to effect the transactions contemplated by this Agreement.


## ARTICLE V: CLOSING; CLOSING DELIVERIES

5.1 <u>Closing</u>. The closing hereunder (the "**Closing**") shall occur on the same day as the closing of the IPO, as close in time to the closing of the IPO as is reasonably practicable under the circumstances.

5.2 <u>Closing Deliveries by RPC</u>. At the Closing, RPC shall deliver to the Operating Partnership:

(i) a duly executed Assignment and Assumption Agreement, substantially in the form attached hereto as <u>Exhibit B</u> ("**Assignment Agreement**"), pursuant to which RPC shall convey to the Operating Partnership or its designee title to the Professional Services Agreement;

(ii) a duly executed Limited Partner Acceptance executed by the appropriate Investor; and

9

(iii)   a certificate of non-foreign status in a form acceptable to the Operating Partnership.

5.3   Closing Deliveries by the Operating Partnership.   At the Closing, the Operating Partnership shall deliver to the RPC or, if applicable, the Investors, the following:

(i)   the Units; and

(ii)   a duly executed Assignment Agreement.

## ARTICLE VI: MISCELLANEOUS

6.1   Term of Agreement.   This Agreement may be terminated by the mutual consent of the parties at any time before the Closing.  If the Closing does not occur by September 30, 2006, this Agreement shall be deemed terminated and shall be of no further force and effect and neither the Operating Partnership nor RPC or any Investor shall have any further obligations pursuant to this Agreement except as specifically set forth in this Agreement.

6.2   Amendment; Waiver.   Any amendment hereto shall be effective only if signed by all parties hereto.  No waiver of any provisions of this Agreement shall be valid unless in writing and signed by the party against whom enforcement is sought.

6.3   Entire Agreement; Counterparts; Applicable Law.   This Agreement (a) shall, together with the Partnership Agreement, constitute the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof, (b) may be executed in one or more counterparts, each of which will be deemed an original and all of which shall constitute one and the same instrument, and (c) shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of Delaware without giving effect to the conflict of law provisions thereof.

6.4   Assignability.   This Agreement shall be binding upon, and shall be enforceable by and inure to the benefit of, the parties hereto and their respective successors and assigns; provided, however, that this Agreement may not be assigned (except by operation of law) by any party without the prior written consent of the other party, and any attempted assignment without such consent shall be void and of no effect; provided further, that this Agreement may be assigned by the Operating Partnership, without the prior written of RPC, to and among an affiliate of the Operating Partnership, including, without limitation, Republic Property TRS, LLC, a Delaware limited liability company and wholly owned subsidiary of the Operating Partnership.  Upon any such assignment, the assignee shall have the exclusive right and obligation to perform the services hereunder.

10

6.5    Severability.    If any provision of this Agreement, or the application thereof, is for any reason held to any extent to be invalid or unenforceable, the remainder of this Agreement and application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto.

6.6    Equitable Remedies.    The parties hereto agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with its specific terms or was otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any federal or state court located in the State of Delaware (as to which the parties agree to submit to jurisdiction for the purposes of such action), this being in addition to any other remedy to which they are entitled at law or in equity.

6.7    Survival.    It is the express intention and agreement of the parties hereto that the representations, warranties and covenants of the parties set forth in this Agreement shall survive the consummation of the transactions contemplated hereby.

6.8    Third Party Beneficiary.    Except as specifically set forth in this Agreement, no provision of this Agreement is intended, nor shall it be interpreted, to provide or create any third party beneficiary rights or other rights of any kind in any customer, affiliate, stockholder, partner, member, director, officer, or employee of any party to this Agreement or any other person or entity.

[Signature Page Follows]

11

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed, delivered and sealed in its name on its behalf, all as of the day and year first above written.

RPC:

REPUBLIC PROPERTIES CORPORATION

By: _____
Name: Steven A. Grigg
Title: President

OPERATING PARTNERSHIP:

REPUBLIC PROPERTY LIMITED PARTNERSHIP

By:    REPUBLIC PROPERTY TRUST,
       General Partner

       By: _____
       Name: Mark R. Keller
       Title:  Chief Executive Officer

[Signature Page to City Center Contribution Agreement]

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed, delivered and sealed in its name on its behalf, all as of the day and year first above written.

RPC:

REPUBLIC PROPERTIES CORPORATION

By: _____
Name: Steven A. Grigg
Title: President


OPERATING PARTNERSHIP:

REPUBLIC PROPERTY LIMITED PARTNERSHIP

By:    REPUBLIC PROPERTY TRUST,
       General Partner

       By: _____
       Name: Mark R. Keller
       Title:  Chief Executive Officer


[Signature Page to City Center Contribution Agreement]

<u>Exhibit A</u>

### Form of Limited Partner Acceptance

This Limited Partner Acceptance to the Amended and Restated Agreement of Limited Partnership, as amended to the date hereof, of Republic Property Limited Partnership, dated as of _____ ___, 2005 (the "**Acceptance**"), which Acceptance is entered into in connection with that certain Amended and Restated Agreement of Limited Partnership of Republic Property Limited Partnership dated as of _____, 2005 (the "**Partnership Agreement**"), is executed and delivered by the undersigned. As of the date hereof, the undersigned General Partner hereby admits the undersigned Limited Partner as a Limited Partner of the Partnership, and by said undersigned Limited Partner's execution and delivery hereof, said undersigned Limited Partner agrees to be bound by the terms and provisions of the Partnership Agreement, including the power of attorney set forth in Section [15.11] of the Partnership Agreement. The number of Class A Units issued as of the date hereof to the undersigned Limited Partner is shown opposite such Limited Partner's signature below. All terms used herein and not otherwise defined shall have the meanings given them in the Partnership Agreement.

This Acceptance may be executed in two or more counterparts, each of which shall be deemed an original but all of which collectively shall constitute one and the same document.

Dated: _____

**GENERAL PARTNER:**

Republic Property Trust

By:    _____
Name:  Mark R. Keller
Title:   Chief Executive Officer

**ADDITIONAL LIMITED PARTNER:**
[Name]

Number of                 By:    _____
Class A Units:            Name:
                          Title:
                          Tax Id #: _____

_____

<u>Exhibit B</u>

Form of Assignment and Assumption Agreement

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**") is made as of _____ __, 2005 between Republic Property Limited Partnership, a Delaware limited partnership (the "**Operating Partnership**"), and Republic Properties Corporation ("**RPC**").

WHEREAS, pursuant to that certain Development Services Contribution Agreement dated as of September __, 2005 between the Operating Partnership and RPC (the "**Contribution Agreement**"), RPC is obligated to contribute or otherwise transfer to the Operating Partnership on this date all of its right, title and interest in and to the Professional Services Agreement at the time of the Closing (as defined in the Contribution Agreement) for the consideration and upon the terms and conditions set forth in the Contribution Agreement; and

WHEREAS, capitalized terms used herein and not otherwise defined shall have the meanings specified in the Contribution Agreement.

NOW, THEREFORE, in consideration of the premises and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in further consideration of the covenants and agreements contained in the Contribution Agreement, and pursuant to the terms of the Contribution Agreement (including the representations and warranties therein, which shall survive as provided for in the Contribution Agreement), the Operating Partnership and RPC do hereby covenant and agree as follows:

1.      Upon the terms and subject to the conditions specified herein and in the Contribution Agreement and as of the date hereof, RPC hereby contributes, assigns, transfers and conveys to the Operating Partnership and the Operating Partnership hereby assumes and accepts the Professional Services Agreement.

2.      Upon the terms and subject to the conditions specified herein and in the Contribution Agreement and as of the date hereof, the Operating Partnership hereby assumes and agrees to pay, honor, discharge and perform, as the case may be, in a timely manner and in accordance with their respective terms, all of the liabilities and obligations of RPC with respect to the Professional Services Agreement.

3.      This Agreement and the covenants and agreements herein set forth shall inure to the benefit of the parties hereto and their respective successors and assigns and shall be binding upon the parties hereto and their respective successors and assigns.

4.     The validity, interpretation and effect of this Agreement shall, to the extent the particular subject matter is controlled by state law, be governed by and be construed in accordance with the laws of the State of Delaware, without giving effect to the conflicts of laws provisions thereof.

[Signature Page Follows]

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered in its name and on its behalf as of the date first written above.

**REPUBLIC PROPERTY LIMITED PARTNERSHIP**

By:  Republic Property Trust, its general partner

By:_____
Name: Mark R. Keller
Title:  Chief Executive Officer

**REPUBLIC PROPERTIES CORPORATION**

By:_____
Name: Steven A. Grigg
Title:  President

## Limited Partner Acceptance

This Limited Partner Acceptance to the Amended and Restated Agreement of Limited Partnership, as amended to the date hereof, of Republic Property Limited Partnership, dated as of December 20, 2005 (the "**Acceptance**"), which Acceptance is entered into in connection with that certain Amended and Restated Agreement of Limited Partnership of Republic Property Limited Partnership dated as of December 20, 2005 (the "**Partnership Agreement**"), is executed and delivered by the undersigned. As of the date hereof, the undersigned General Partner hereby admits the undersigned Limited Partner as a Limited Partner of the Partnership, and by said undersigned Limited Partner's execution and delivery hereof, said undersigned Limited Partner agrees to be bound by the terms and provisions of the Partnership Agreement, including the power of attorney set forth in Section 15.11 of the Partnership Agreement. The number of Class A Units issued as of the date hereof to the undersigned Limited Partner is shown opposite such Limited Partner's signature below. All terms used herein and not otherwise defined shall have the meanings given them in the Partnership Agreement.

This Acceptance may be executed in two or more counterparts, each of which shall be deemed an original but all of which collectively shall constitute one and the same document.

Dated: December 20, 2005

GENERAL PARTNER:

Republic Property Trust

By: _____

Name:  Mark R. Keller
Title:   Chief Executive Officer

ADDITIONAL LIMITED PARTNER:

Republic Properties Corporation

By: _____

Name:  Steven Grigg
Title:  President
Tax Id #: _____

Number of
Class A Units:

100,234

\\\DC - 23091\0001 - 2226578 v1

This Acceptance may be executed in two or more counterparts, each of which shall be deemed an original but all of which collectively shall constitute one and the same document.

Dated: December 20, 2005

**GENERAL PARTNER:**

Republic Property Trust

By: _____
Name:  Mark R. Keller
Title:   Chief Executive Officer

**ADDITIONAL LIMITED PARTNER:**
Republic Properties Corporation

By: _____
Name:  Steven Grigg
Title:  President
Tax Id #: _____

Number of
Class A Units:

100,234

\\\DC - 23091/0001 - 2226578 v1

# DR. RAY LIBERTI

2535 Iroquois Circle
West Palm Beach, FL 33409
561-315-2872

November 12, 2004

Mr. Steven Grigg, President
Republic Properties Corporation
1280 Maryland Avenue, SW
Suite 280
Washington, DC 20024

Re:   Consulting Agreement

Dear Mr. Grigg:

Please permit this letter to serve as our contract agreement per our conversation of November 11, 2004. The present scope of services that I shall perform are business development, government relations, lobbying, planning, and all general and specific issues within the objectives of process approval for the awarding of any contracts to Republic Properties outside the city limits of the City of West Palm Beach. These duties shall relate to perspective issues as agreed upon in general and specifically the approval, planning, lobbying, funding, and awarding of a construction contract for an academic pre-med undergraduate building and teaching hospital at Florida Atlantic University, our present primary goal.

Further duties shall include meeting with Florida Atlantic University officials, planning the site for a medical school, preparing timely status reports to Republic Properties, and assist in obtaining the construction funds through public and private sources.

This effort shall begin immediately for a trial period of three months at the rate of $5,000.00 per month beginning November 15, 2004 and concluding February 15, 2005. Each payment shall be remitted on the fifteenth of each contractual month (November 15, 2004; December 15, 2004; and January 15

EXHIBIT
B

2005). This contractual arrangement may be extended upon the mutual agreement of both parties and does not include a previously discussed success fee if the contract is awarded to Republic Properties.

Please sign the enclosed copy and return to the above address.

Thank you. I am looking forward to a long relationship with Republic Properties. It appears we may both benefit from your excellent record and experience and my abilities and expertise.


Sincerely,

Raymond A. Liberti, Ph.D.




Steven Grigg, President
Republic Properties Corporation

**DR. RAY LIBERTI**
2535 Iroquois Circle
West Palm Beach, FL 33409
561-315-2872

January 28, 2005

Ms. Mary Adams
Accounts Payable Department
Republic Properties Corporation
1280 Maryland Avenue, S.W.
Washington, D. C. 20024

Re: Contract Extension

Dear Ms. Adams:

As per Steve Grigg, there is a need to extend my contract to continue the negotiations and lobbying efforts with Florida Atlantic University hospital/medical school, dorm, and stadium proposals and provide research and lobbying for large developable tracts within Palm Beach County and anywhere else Mr. Grigg directs

Please consider this letter an extension agreement through April 2005 at the existing rate of $5,000.00 per month paid on February 15, March 15, and April 15 of 2005. If we have completed all necessary work to achieve our objectives, Mr. Grigg may cancel this contract within 30 days. Upon the conclusion of this contract, both parties may option to extend this contract for any mutually agreed upon duration.

Thank you.

Sincerely,

Raymond A. Liberti, Ph.D



**DR. RAY LIBERTI**
**2535 Iroquois Circle**
**West Palm Beach, FL 33409**
**561-315-2872**

April 19, 2005

Mr. Steve Grigg, President
Republic Properties Corporation
1280 Maryland Avenue, S. W.
Washington, D. C. 20024

Re: Contract Extension and Revision

Dear Mr. Grigg:

As per our discussion of April 15, there exists a need to extend and amend
my contract. At this time, negotiations, lobbying efforts, government
relations, planning, zoning, real estate brokerage, and other duties are
required to meet the needs and direction of Republic Properties, Inc. in
Florida.

This contract will begin May 2005 and extend to the end of this year,
December 2005. The remuneration shall be at a rate of $8,000 per month
and be paid on the fifteenth of each month. The first payment will be May
15th and the last payment of this contract shall be December 15th. Upon the
conclusion of this contract, both parties may option to extend and/or amend
this contract for any mutually agreed upon duration and rate.

Thank you.

Sincerely,

Raymond A. Liberti, Ph.D.



EXHIBIT
D

# Dr. Ray Liberti

2535 Iroquois Circle
West Palm Beach, FL  33409
561-315-2872

January 24, 2006

Mr. Steven Grigg
President
Republic Properties Corporation
1280 Maryland Avenue, SW
Suite 280
Washington, DC  20024

Re:     Consulting Agreement

Dear Mr. Grigg:

As per our discussion of January 23, 2006, there exists a need to extend and amend my contract. At this time, negotiations, lobbying efforts, government relations, planning, zoning, real estate brokerage, and other duties are required to meet the needs and direction of Republic Properties Corporation in Florida, but, and as in the past, I will not be involved in any matters within, or affecting the City of West Palm Beach.

This contract will be effective as of January 1, 2006 and extend to the end of this year, December 31, 2006. The remuneration shall be at a rate of $8,000 per month and be paid on the fifteenth of each month. The first payment will be January 15th and the last payment of this contract shall be December 15th. Upon the conclusion of this contract, both parties may option to extend and/or amend this contract for any mutually agreed upon duration and rate.

Thank you.

Sincerely,

Raymond A. Liberti, Ph.D.


Accepted by:

Steven A. Grigg, President
Republic Properties Corporation



**EXHIBIT**

**E**