## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REPUBLIC PROPERTY TRUST


and

REPUBLIC PROPERTY LIMITED
PARTNERSHIP


      Plaintiffs,

        v.

REPUBLIC PROPERTIES CORPORATION


STEVEN A. GRIGG


and

RICHARD L. KRAMER


      Defendants.

Civil Action No. 1:07-cv-00595-RCL

## MOTION OF DEFENDANTS
## RICHARD L. KRAMER AND REPUBLIC PROPERTIES CORPORATION
## TO DISMISS THE AMENDED COMPLAINT

Defendants Richard L. Kramer and Republic Properties Corporation ("RPC") hereby

move to dismiss the Amended Complaint for failure to state a claim and failure to meet the

relevant pleading standards.  The grounds for the Motion are set forth fully in the accompanying

Memorandum.

> For the reasons stated, the Amended Complaint should be dismissed in its entirety.


Respectfully submitted,


Paul Martin Wolff (Bar No. 90217)
George A. Borden (Bar No. 419772)
Kenneth C. Smurzynski (Bar No. 442131)
William T. Burke (Bar No. 471948)
Williams & Connolly LLP
725 12th Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029


Counsel for Republic Properties Corporation and
Richard L. Kramer


Dated:  May 11, 2007

## CERTIFICATE OF SERVICE

> I hereby certify that on this 11th day of May, 2007, the foregoing Motion of Defendants Richard L. Kramer and Republic Properties Corporation To Dismiss the Amended Complaint, and accompanying Memorandum, were served, by posting on the Court's electronic filing system and first-class mail, postage prepaid, upon Mark Nagle, Troutman Sanders, LLP, 401 9th Street, N.W., Suite 1000, Washington, D.C. 20004, and Seymour Glanzer, Dickstein Shapiro LLP, 1825 Eye Street, N.W. Washington, D.C. 2006.

George A. Borden

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REPUBLIC PROPERTY TRUST


and

REPUBLIC PROPERTY LIMITED
PARTNERSHIP


      Plaintiffs,

        v.

REPUBLIC PROPERTIES CORPORATION


STEVEN A. GRIGG


and

RICHARD L. KRAMER


      Defendants.

Civil Action No. 1:07-cv-00595-RCL

**MEMORANDUM IN SUPPORT OF DEFENDANTS RICHARD L.
KRAMER AND REPUBLIC PROPERTIES CORPORATION'S MOTION
<u>TO DISMISS THE AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

BACKGROUND AND ALLEGED FACTS ............................................................. 1

ARGUMENT ............................................................................................................. 4

I.     PLAINTIFFS FAIL TO STATE ARGUMENT UNDER SECTION 10(b) AND RULE 10b-5. ............................................................................................ 4

     A.     Plaintiffs' Claims of Omissions Fail as a Matter of Law ...................... 5

          1.     Any Claim of Omissions or Representations Other than Those in the Contribution Agreement Is Barred by the Agreement's Integration Clause. ............................................................... 5

          2.     The Defendants Had No Duty To Disclose Additional Information About the Liberti Agreements. ............................... 6

               a.     Defendants Had No Duty To Disclose that Liberti Was a Public Official. ............................................................ 6

               b.     Defendants Had No Duty To Accuse Themselves of Misconduct. ..................................................................... 6

               c.     Defendants Had No Duty To Speculate as to the Potential "Effect" of the Liberti Consulting Arrangement. ........................................................... 7

          3.     Kramer Had No Duty To Disclose. ............................................ 8

     B.     Plaintiffs' Claims of Misrepresentation Fail as a Matter of Law ............................ 9

     C.     RPT Has No Claim under Section 10(b) Because It Did Not Engage in any Purchase or Sale of Securities. ............................................... 12

     D.     Plaintiffs Fail To Allege Facts Giving Rise to a Strong Inference of Scienter. ................................................................................................. 12

II.    PLAINTIFFS FAIL TO STATE A CLAIM AGAINST KRAMER FOR CONTROL-PERSON LIABILITY UNDER SECTION 20(a). ........................ 13

III.   AFTER DISMISISNG THE FEDERAL SECURITIES CLAIMS, THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' STATE-LAW CLAIMS. ................... 15

IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR SECURITIES FRAUD UNDER THE DISTRICT OF COLUMBIA CODE........................................................ 15

V.    PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT. ............. 16

VI.    PLAINTIFFS FAIL TO STATE A CLAIM FOR INDEMNIFICATION. ...................... 17

VII.    PLAINTIFFS FAIL TO STATE A CLAIM FOR COMMON-LAW FRAUD................ 17

VIII.    PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT. ................ 18

IX.    COUNT IX IS DUPLICATIVE OF KRAMER'S ADVANCEMENT SUIT AND SHOULD BE DISMISSED. ...................................................................................... 19

X.    PLAINTIFFS FAIL TO STATE A CLAIM OF ENTITLEMENT TO PUNITIVE DAMAGES. ................................................................................................ 21

CONCLUSION........................................................................................................................... 22

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Acito v. IMCERA Group*, 47 F.3d 47 (2d Cir. 1995) ...................................................7, 8

*Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317 (7th Cir. 1988) .............................6

*Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97 (5th Cir. 1974) ...........18

*BASF Corp. v. Symington*, 50 F.3d 555 (8th Cir. 1995) ...................................................20

*Ballan v. Wilfred America Education Corp.*, 720 F. Supp. 241 (E.D.N.Y. 1989).....................7, 8

*Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952) ....................................12

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1974) .....................................12

*Boguslavsky v. Kaplan*, 159 F.3d 715 (2d Cir. 1998) ......................................................13

*Carden v. Arkoma Associates*, 494 U.S. 185 (1990) .......................................................15

*Carnegie-Mellon University v. Cohill*, 484 U.S. 614 (1988)............................................15

*Carpenter v. Harris, Upham & Co., Inc.*, 594 F.2d 388 (4th Cir. 1979)..........................13

*Ciresi v. Citicorp*, 782 F. Supp. 819 (S.D.N.Y. 1991), *aff'd mem* 956 F.2d 1161
        (2d Cir. 1992)............................................................................................................6

*In re Citigroup, Inc. Sec. Litigation*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004)...................7

*Columbia Plaza Corp. v. Security National Bank*, 525 F.2d 620 (D.C. Cir. 1975)......................19

*Feick v. Fleener*, 653 F.2d 69 (2d Cir. 1981) ..................................................................18

*In re Global Crossing, Ltd. Securities Litigation*, Civ. 910 (GEL), 2005 U.S. Dist. LEXIS
        26942 (S.D.N.Y. Nov. 4, 2005) ..............................................................................14

*In re Independent Energy Holdings PLC Sec. Litigation*, 154 F. Supp. 2d 741 (S.D.N.Y.
        2001) .........................................................................................................................8

*In re Keyspan Corp. Securities Litigation*, 383 F. Supp. 2d 358 (E.D.N.Y. 2003) ......................6

*In re Kulicke & Soffa Industrial, Inc. Securities Litigation*, 697 F. Supp. 183 (E.D. Pa.
        1988) .........................................................................................................................6

*Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397 (S.D.N.Y. 2002)..............................................18

*Miller v. Miller*, 423 F.2d 145 (10th Cir. 1970).............................................................................20

*Mishkin v. Ageloff*, No. 97 Civ. 2690 (LAP), 1998 U.S. Dist. LEXIS 14890 (S.D.N.Y. Sept. 23, 1998) ...............................................................................................................14

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) .............................................................................13

*One-O-One Enterp., Inc. v. Caruso*, 848 F.2d 1283 (D.C. Cir. 1988)...................................5, 17

*In re Par Pharmaceuticals, Inc. Securities Litigation*, 733 F. Supp. 668 (S.D.N.Y. 1990) ...........7

*Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000)...........................................................................5

*Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880 (3d Cir. 1975) ...................................................13

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ...........................................................................14

*Runkle v. Gonzales*, 391 F. Supp. 2d 210 (D.D.C. 2005) ................................................................2

*SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450 (2d Cir. 1996)................................................13

*SEC v. Savoy Industrial, Inc.*, 587 F.2d 1149 (D.C. Cir. 1978).....................................................13

*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) .........................................................................12

*Sailors v. Northern States Power Co.*, 4 F.3d 610 (8th Cir. 1993) ..................................................6

*Shanahan v. Vallat*, No. 03 Civ. 3496 (MBM), 2004 U.S. Dist. LEXIS 25523 (S.D.N.Y. Dec. 14, 2004)................................................................................................................14

*Steed Financial LDC v. Nomura Securities Int'l, Inc.*, No. 00 Civ. 8058 (NRB), 2001 U.S. Dist. LEXIS 14761 (S.D.N.Y. Sept. 19, 2001).......................................................14

*Thayer/Patricoff Education Funding, L.L.C. v. Pryor Resources, Inc.*, 196 F. Supp. 2d 21 (D.D.C. 2001) ...........................................................................................................20

*In re U.S. Office Products Co., Inc. Securities Litigation*, 251 F. Supp. 2d 77 (D.D.C. 2003) ...................................................................................................................................5

*In re U.S. Office Products Securities Litigation*, 326 F. Supp. 2d 68 (D.D.C. 2004)..........4, 12, 14

*Washington Metropolitan Area Transit Authority v. Regonese*, 617 F.2d 828 (D.C. Cir. 1980) ...................................................................................................................................19

*Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509 (7th Cir. 1989).............................6

*Yoder v. Heinhold Commodities, Inc.*, 630 F. Supp. 756 (E.D. Va. 1986)....................20

## STATE CASES

*Caulfield v. Stark*, 893 A.2d 970 (D.C. 2006) ...............................17

*District Cablevision L.P. v. Bassin*, 828 A.2d 714 (D.C. 2003)...................21

*In re Dynex Capital, Inc. Sec. Litigation*, No. 05 Civ. 1897, 2006 WL 314524 (S.D.N.Y. Feb. 10, 2006) .............................13

*Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 613 A.2d 916 (D.C. 1992) ...........17

*Homestore, Inc. v. Tafeen*, 886 A.2d 502 (Del. 2005)..................20

*Lipson v. Supercuts, Inc.*, Civ. A. 15074-NCC, 1996 WL 560191 (Del Ch. Sept. 10, 1996) .............................20

*News World Communications, Inc. v. Thompsen*, 878 A.2d 1218 (D.C. 2005) ...........18

## DOCKETED CASES

*Grigg v. Republic Property Trust*, No. 2006 ca 009051 B (D.C. Sup. Ct.)....................1

## FEDERAL STATUTES, RULES AND REGULATIONS

28 U.S.C. § 1367.............................15

28 U.S.C. § 2201.............................20

17 C.F.R. § 240.10b-5.............................4

Fed. R. Civ. P. 9(b) .............................4

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) .............4, 12, 14

## STATE STATUTES

D.C. Code § 31-5605, -5606 (2004) .............................15-16

## MISCELLANEOUS

*Black's Law Dictionary* (8th ed. 2004) .............................10

Plaintiffs and defendants in this case are related parties battling for control of various common enterprises. Two other cases are already pending between some or all of these parties in other courts. This case should be dismissed for failure to state a claim.[1]

## BACKGROUND AND ALLEGED FACTS

All parties to this case are related. Plaintiff Republic Property Trust ("RPT" or the "Trust") is a publicly-traded real estate investment trust (or "REIT") formed in 2005. Amended Complaint (the "Complaint") ¶¶ 1, 11. Plaintiff Republic Property Limited Partnership ("RPLP") is the operating subsidiary of RPT. *Id.* ¶ 2. Defendant Richard L. Kramer is one of the founders of RPT, is the chairman of the board of trustees of RPT, and holds an ownership interest in RPLP. *Id.* ¶ 5. Defendant Steven A. Grigg was also one of the founders of RPT, is also a member of the board of trustees of RPT and was an officer of RPT until November 2006, and also holds an ownership interest in RPLP. *Id.* ¶ 4. Both Kramer and Grigg are also principals of defendant Republic Properties Corporation ("RPC"). *Id.* ¶¶ 4, 5.

As has been publicly reported, Kramer and Grigg believe that the events described in the Amended Complaint are a pretext for an attempt to undermine their positions with RPT.[2] Both Kramer and Grigg have initiated litigation against RPT. In fact, many of the claims in the Complaint in this case were originally lodged as counterclaims in *Grigg v. Republic Property Trust*, No. 2006 CA 009051 B (Superior Court of the District of Columbia), a case in which Grigg alleges that RPT violated his employment agreement. (Some of those counterclaims have

---

[1] Defendants RPC and Kramer hereby join and incorporate all applicable arguments made in Defendant Grigg's motion to dismiss.

[2] *See, e.g.*, Dana Hedgpeth, *Fla. Project Causes REIT Furor; 2 Jobs on the Line after Hiring of Official who Voted on Contract*, Wash. Post, Nov. 17, 2006, at D4 (quoting Kramer, who characterized RPT's investigation that led to this case as "a mechanism for the board and the current management to force us out of the company for whatever agendas they have.").

now been withdrawn, while other, substantially similar ones remaining pending.)  In addition, on

March 6, 2007, Kramer brought suit in the United States District Court for the District of

Maryland seeking advancement of legal fees from RPT.[3]  Compl. ¶ 97.

As set forth in the Complaint, plaintiffs' claims center on RPC's assignment to RPLP of

RPC's rights under a contract (the "Professional Services Agreement") to develop a project in

West Palm Beach, Florida known as City Center.[4]  The assignment of RPC's rights and

obligations under the Professional Services Agreement was embodied in a document called the

Development Services Rights Contribution Agreement ("Contribution Agreement"), which is

attached to the Complaint as Exhibit A.[5]  In consideration for this assignment, RPC received

limited-partnership units in RPLP, RPT's subsidiary.  Compl. ¶ 21.

The Contribution Agreement was entered into in September 2005.  Compl. Ex A.  The

Professional Services Agreement was then successfully transferred to an RPT subsidiary

(Republic WPB LLC) in December 2005.  Compl. ¶ 53.  It was only months later, in May 2006,

that the contract became the subject of public controversy.

---

[3] Kramer voluntarily dismissed that suit on May 3, 2007, and re-filed the same claim in the
Circuit Court of Baltimore County.

[4] The Professional Services Agreement is attached hereto as Exhibit 1.  Because the Professional
Services Agreement is referred to and relied on in the Complaint, it may be considered here
without turning this motion into a motion for summary judgment.  *See Runkle v. Gonzales*, 391
F. Supp. 2d 210, 216 n.1 (D.D.C. 2005).  The Professional Services Agreement could be
terminated by the City of West Palm Beach Community Redevelopment Agency (the "CRA")
"at any time for convenience, without cause and without any penalty, when in its sole discretion
it deems such termination is in the best interests of" the Agency.  § 6.15.1.

[5] The Contribution Agreement provides, among other things, that "[t]his Agreement . . . shall,
together with the [RPLP limited partnership agreement] constitute[s] the entire agreement and
supersedes all prior agreements and understandings, both written and oral, among the parties
with respect to the subject matter hereof . . . ."  Contribution Agreement § 6.3.

- 2 -

As alleged in the Complaint, RPC entered into consulting agreements with a man named Raymond Liberti. Compl. ¶ 30. At the time, Liberti was a member of the City Commission and the CRA of West Palm Beach, and cast votes that affected the City Center project. Compl. ¶ 27. The agreements recited that they were for consulting services with respect to properties outside of the City of West Palm Beach. Compl. ¶ 36. City Center was within the City of West Palm Beach.[6]

RPC's relationship with Liberti became a political hot potato when Liberti was charged with completely unrelated crimes in May 2006 (he eventually pled guilty to federal charges unrelated to RPC). Compl. ¶¶ 71, 79. Eventually, the City notified RPT (the successor to RPC under the PSA) of its intent to terminate the PSA. Compl. ¶ 77.[7]

Although the Complaint uses the word "Illegal" once in a heading (Compl. p. 7) and elsewhere vaguely refers to "improper" conduct, it identifies no law that was violated by the consulting agreements. Nor does it ever expressly allege that there was any quid pro quo between RPC and Liberti.[8] Although the Complaint states that the mayor of West Palm Beach

---

[6] Defendants believe that the consulting agreements were completely legal and proper, but that is not the basis of this Motion.

[7] It has been publicly reported that the CRA wished to terminate the Professional Services Agreement irrespective of the events involving Liberti. *See* Thomas R. Collins, *West Palm commits $11.1 million for complex*, Palm Beach Post, June 27, 2006 (reporting that "[t]he city wanted to get out of the deal anyway, because City Center's private element has been eliminated and Republic was considered no longer necessary").

[8] The Complaint alleges only that payments were made "while Liberti cast favorable votes," Compl. ¶ 30 (emphasis added). In contrast, the corresponding paragraph in the now withdrawn counterclaim in the related Superior Court litigation alleged that payments were made "in exchange for Liberti's favorable votes." Counterclaims ¶ 24 (emphasis added). Obviously plaintiffs know how to make such an allegation when they wish to, and they decided not to do so here. It is also worth noting that plaintiffs crafted their allegations already having had the benefit of the investigation conducted by the Shulman Rogers law firm (Compl. ¶¶ 81-87), which included interviews of Liberti, Grigg, Kramer and others and the review of millions of pages of documents, including files downloaded from Grigg's office computers, Compl. ¶ 84.

reportedly alerted state and federal prosecutors of RPC's payments to Liberti (Compl. ¶ 76), no charges have ever been brought in connection with the consulting agreements between RPC and Liberti.

The Professional Services Agreement was never formally terminated. Rather, as of October 19, 2006, RPT's subsidiary, Republic WPB LLC, assigned all its rights and obligations under the contract to the CRA in an Assignment and Assumption Agreement. Compl. ¶ 80.[9] There has never been any finding, or any formal accusation, that RPC breached or was in default under the Professional Services Agreement.

## ARGUMENT

I. **PLAINTIFFS FAIL TO STATE ARGUMENT UNDER SECTION 10(b) AND RULE 10b-5.**

The elements of a cause of action under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 CFR § 240.10b-5, are: (1) a material misstatement or omission, (2) made with scienter (intent to deceive), (3) made in connection with the purchase or sale of a security, (4) furthered by the use of the mails or a national securities exchange, and (5) on which the plaintiff detrimentally relied. *In re U.S. Office Prods. Sec. Litig.*, 326 F. Supp. 2d 68 (D.D.C. 2004). Claims of securities fraud must also meet the stringent pleading requirements of Fed. R. Civ. P. 9(b) and the even higher pleading standards established by the Private Securities Litigation reform Act of 1995 (the "PSLRA"). *Id.* The Complaint's allegation that defendants committed securities fraud because they did not disclose, at the time they assigned their rights under the Professional Services Agreement to RPLP, the "full nature, extent and effect" of RPC's relationship with Liberti, Compl. ¶ 88, fails to state a claim.

---

[9] A copy of the Assignment and Assumption Agreement is attached as Exhibit 2.

A.    **Plaintiffs' Claims of Omissions Fail as a Matter of Law.**

1.    **Any Claim of Omissions or Representations Other than Those in the Contribution Agreement Is Barred by the Agreement's Integration Clause.**

Plaintiffs' allegation that the defendants fraudulently failed to disclose the "full, nature, extent and effect" of their relationship with Liberti cannot stand in light of the Contribution Agreement's integration clause, which precludes reliance on alleged omissions or representations not contained in the Contribution Agreement. To state a claim under Section 10(b) plaintiffs must allege facts indicating that their alleged reliance was reasonable, and they cannot do so in the presence of the integration clause. *One-O-One Enterp., Inc. v. Caruso*, 848 F.2d 1283, 1286 (D.C. Cir. 1988). *See also Rissman v. Rissman*, 213 F.3d 381, 384 (7th Cir. 2000); *In re U.S. Office Prods. Co., Inc. Sec. Litig.*, 251 F. Supp. 2d 77, 101-02 (D.D.C. 2003).

In *One-O-One*, the D.C. Circuit, writing through then-Judge Ruth Bader Ginsburg, held that claims of misrepresentations and omissions under Section 10(b) and the common law were barred by an integration clause that was materially identical to the clause at issue here. The clause in that case provided that the parties' written agreement "supercede[d] any and all previous understandings and agreements." *Id.* at 1285. The Contribution Agreement's integration clause similarly provided that "[t]his Agreement . . . shall, together with the [RPLP limited partnership agreement] constitute[s] the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof . . . ." Compl. Ex. A § 6.3. The D.C. Circuit held that to allow a claim for securities fraud to proceed despite such an integration clause would mean that "contracts would not be worth the paper on which they are written." *Id.* at 1287 (quotations omitted). Accordingly, to the extent plaintiffs' claims are based on omissions or representations not contained in the Contribution Agreement itself, they must be dismissed.

2.    **The Defendants Had No Duty To Disclose Additional Information About the Liberti Agreements.**

a.    **Defendants Had No Duty To Disclose that Liberti Was a Public Official.**

Plaintiffs allege that the defendants should have disclosed that Liberti was a City Commissioner and member of the CRA who voted on issues affecting the City Center project. Compl. ¶ 106.  This claim is barred by the well-settled rule that the securities laws impose no duty to disclose publicly available information.  *See, e.g., Sailors v. Northern States Power Co.*, 4 F.3d 610, 613 (8th Cir. 1993) ("Rule 10b-5 does not protect nondisclosed facts equally known or available to both parties") (quotations omitted); *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989) ("It is pointless and costly to compel firms to reprint information already in the public domain."); *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1323 (7th Cir. 1988) ("The securities laws require the disclosure of information that is otherwise not in the public domain."); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377-78 (E.D.N.Y. 2003); *In re Kulicke & Soffa Indus., Inc. Sec. Litig.*, 697 F. Supp. 183, 186 (E.D. Pa. 1988) ("It is clear that defendants owed no duty to disclose information already available to the public which is part of the total mix of information available to the reasonable investor.").

b.    **Defendants Had No Duty To Accuse Themselves of Misconduct.**

As noted above, the Complaint does not allege that the consulting agreements were a quid pro quo for Liberti's votes.  Even if it had, however, defendants had no duty to disclose that the consulting agreements were a "cover" (Compl. ¶ 35), that the payments were related to the City Center Project (Compl. ¶ 81), or otherwise to declare themselves guilty of misconduct.  As the court held in *Ciresi v. Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991), "the law does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement," *aff'd*

*mem.*, 956 F.2d 1161 (2d Cir. 1992). *See also In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d

367, 377 (S.D.N.Y. 2004) ("[T]he federal securities laws do not require a company to accuse

itself of wrongdoing."); *Ballan v. Wilfred Am. Educ. Corp.*, 720 F. Supp. 241, 248-49 (E.D.N.Y.

1989) (holding that the rules "do not require a company's management to confess guilt to

uncharged crimes or to accuse itself of antisocial or illegal policies") (citation and internal

quotations omitted).

      Plaintiffs allege vaguely that defendants should have disclosed the "nature" of the

agreements with Liberti. They identify no reason, however, that disclosure of routine consulting

agreements was necessary other than their characterization of the agreements as improper.

Defendants had no obligation to adopt this characterization.

<div align="center">

**c.**      **Defendants Had No Duty To Speculate as to the Potential
"Effect" of the Liberti Consulting Arrangement.**

</div>

      Nor did the defendants have a duty to attempt to speculate as to possible consequences of

the consulting agreements. In *In re Par Pharmaceuticals, Inc. Securities Litigation*, 733 F. Supp.

668, 678 (S.D.N.Y. 1990), the court held that a company "was not obligated to speculate as to

the myriad of consequences, ranging from minor setbacks to complete ruin, that might have

befallen the company if the bribery scheme was discovered, disclosed or terminated. . . .

Defendants cannot be held liable for failing to 'disclose' what would have been pure

speculation." (Citation and quotations omitted.) The same conclusion applies here.

      *Acito v. IMCERA Group*, 47 F.3d 47 (2d Cir. 1995), is also instructive. There, the FDA

had inspected on two separate occasions a drug manufacturing facility owned by the defendant's

subsidiary and found numerous deficiencies both times. The defendant issued an annual report

discussing its subsidiaries' growth, but did not mention these inspections. Approximately three

months later, the FDA again inspected the facility and, at the FDA's behest, it was shut down.

The plaintiffs sued, claiming the defendants engaged in securities fraud by, among other things, failing to predict that the FDA might shut down the facility during its upcoming inspections. *Id.* at 52. The Second Circuit agreed that the FDA's third inspection was "inevitable" given the subsidiary's pending drug applications. *Id.* The court went on to hold, however, that "one cannot infer that it was a 'foregone conclusion' that the Kansas City plant would fail the inspection and adverse consequences would ensue." *Id.* at 53. Consequently, the defendant was under no obligation to discuss either the upcoming inspection or its possible consequences. *See also Ballan*, 720 F. Supp. at 248 ("[D]efendants were not bound to predict as the 'imminent' or 'likely' outcome of the investigations that indictments of [the defendant corporation] and its chief officer would follow, with financial disaster in their train."); *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 760 n.15 (S.D.N.Y. 2001) ("The Prospectus' failure to forecast the outcome of OFGEM's investigation is not actionable.").

Likewise, here, the defendants should not have been expected to speculate as to the likely consequences of the consulting arrangement with Liberti, especially in light of the extraneous factors (i.e., Liberti's unrelated criminal charges) that were critical to the ultimate resolution of the situation.

### 3.     Kramer Had No Duty To Disclose.

Even if RPC had a duty to disclose additional information to plaintiffs (which it did not, for the reasons discussed above), Kramer had no such duty. The party that entered into the assignment of the Professional Services Agreement was RPC, not Kramer. The party that transferred rights and obligations to RPLP under the Contribution Agreement was RPC, not Kramer. The party that entered into the consulting arrangements with Liberti and made

payments to him was RPC, not Kramer.  There is no basis for direct personal liability under Section 10(b) on the part of Kramer.[10]

**B.      Plaintiffs' Claims of Misrepresentation Fail as a Matter of Law.**

Plaintiffs attempt to allege falsity in certain of the representations made by RPC in the Contribution Agreement (the agreement that assigns the Services Agreement from RPC to RPLP), but close scrutiny demonstrates that none of these was false.

Plaintiffs point to RPC's representations that the Contribution Agreement "and each agreement, document and instrument executed and delivered by or on behalf of RPC pursuant to this Agreement constitutes, or when executed and delivered will constitute, the legal, valid and binding obligation of RPC, each enforceable in accordance with its respective terms," and that the Professional Services Agreement "is in full force and effect and to the knowledge of RPC, neither it nor CRA is in default thereunder."  Compl. ¶ 89(a), (c).  Plaintiffs intimate that these representations were false because the Professional Services Agreement was allegedly not "legal, binding or in full force and effect."  Compl. ¶ 90.  This assertion fails for two reasons.

First, the representation concerning the validity of the Contribution Agreement and documents executed and delivered "pursuant to" the Contribution Agreement does not address the Professional Services Agreement at all.  This representation is found in section 2.2 of the Contribution Agreement, which is captioned "Authority" and addresses RPC's empowerment to enter into the transaction.  The documents executed and delivered pursuant to the Contribution Agreement are described in Section 5.2 of the Contribution Agreement (Compl. Ex. A at 10).  They included a duly executed Assignment and Assumption Agreement, a duly executed Limited Partnership Acceptance, and a certificate of non-foreign status.  Because the warranty made by

---

[10] The separate question of whether plaintiffs have adequately pled control-person liability under Section 20(a) against Kramer is addressed in Section II below.

RPC was that these documents constituted the legal, valid and binding obligations "of RPC," it is clear that this warranty related to promises made by RPC to RPLP, either in or pursuant to the Contribution Agreement. The Professional Services Agreement was not executed and delivered pursuant to the Contribution Agreement, and thus is not addressed by this warranty. In particular, the warranty did not address whether the obligations of the CRA under the Professional Services Agreement were binding.

Second, the representations in Section 2.10 of the Contribution Agreement that the Professional Services Agreement was "in full force and effect" and that RPC was not "in default thereunder" also were true. The Professional Services Agreement remained in full force and effect until it was effectively terminated as a result of the assignment by Republic WPB LLC to CRA. *See* Compl. ¶ 80 (Professional Services Agreement was "terminated" on October 19, 2006). The facts alleged by plaintiffs do not show that RPC was "in default" under the Professional Services Agreement. "Default" means "[t]he omission or failure to perform a legal or contractual duty." *Black's Law Dictionary* 449 (8th ed. 2004). Plaintiffs make no allegation that RPC had failed to perform the professional services called for under the Professional Services Agreement, nor could they. At most, plaintiffs have pled only that certain of the representations made by RPC in the Professional Services Agreement were false, not that RPC was "in default" of any of its obligations under the contract.

Plaintiffs also allege that defendants made three misrepresentations in the Professional Services Agreement. Compl. ¶ 90. As an initial matter, these alleged misrepresentations do not support plaintiffs' Section 10(b) claim because: (1) they were representations to the CRA, not to the plaintiffs; and (2) they were not made in connection with the purchase or sale of any securities. Moreover, even if breach of a representation under the Professional Services

Agreement could render RPC "in default" under the Contribution Agreement and plaintiffs'

allegation could otherwise support a claim under Section 10(b), plaintiffs have not pled facts

showing that RPC breached any representation under the Professional Services Agreement. No

facts pled by plaintiffs show that RPC failed to "conduct business in a reputable manner." No

facts pled by plaintiffs show that RPC "employed or retained any company or person [or] paid or

agreed to pay any person . . . any fee, commission, percentage, gift, or any other consideration

contingent upon or resulting from the award or making of this [Professional Services]

Agreement." At most, plaintiffs allege that RPC paid Liberti "while" he was voting on matters

affecting RPC, not that the payments were "contingent upon or resulting from" the award of the

Professional Services Agreement. Plaintiffs have pled no facts showing that RPC had or

acquired any "interest . . . which would conflict in any manner with its performance" under the

Professional Services Agreement or that it "employed or engaged" anyone "for said

performance" who had "any [such] interest." These representations embodied RPC's statements

to CRA that RPC (and anyone RPC employed to perform the work called for under the contract)

owed no duty to another that could disable <u>RPC's</u> performance under the Professional Services

Agreement. RPC did not warrant that Liberti or any other members of the CRA had no conflict

of interest.

Finally, plaintiffs cite RPC's representation that "[t]here is no (a) litigation or proceeding,

either judicial or administrative, pending or, to RPC's knowledge, threatened, affecting all or any

portion of the Professional Services Agreement . . . ." Compl. ¶ 89(b). But there is no allegation

that there was any investigation or threatened investigation affecting the professional Services

Agreement at the time it was assigned to RPLP, and there was none.

**C.      RPT Has No Claim under Section 10(b) Because It Did Not Engage in any Purchase or Sale of Securities.**

It is axiomatic that a Section 10(b) claim may be brought only by a purchaser or seller of securities. *See Blue Chip Stamps v. Manor Drug* Stores, 421 U.S. 723, 749 (1974); *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 463 (2d Cir. 1952). The only arguable purchase or sale of securities alleged in the Complaint is the issuance of limited-partnership units to RPC by RPLP – not RPT – pursuant to the Development Services Rights Contribution Agreement (Compl. Ex. A). RPT is not alleged to have purchased or sold any securities. Accordingly, RPT's claim under Section 10(b) must be dismissed. To any extent that RPT argues that it was the seller of the units in question, then it is RPLP that has no standing. Only one of them was the seller.

**D.      Plaintiffs Fail To Allege Facts Giving Rise to a Strong Inference of Scienter.**

The PSLRA provides that with respect to each act or omission alleged to violate the Exchange Act, the plaintiff must "state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (2000). In a case under Section 10(b), this provision requires plaintiffs to plead facts giving rise to a strong inference of scienter. *In re U.S. Office Prods. Sec. Litig.*, 326 F. Supp. 2d 68, 75 (D.D.C. 2004). Scienter is defined as requiring at least "extreme recklessness," which is an "extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *SEC v. Steadman*, 967 F.2d 636, 641-42 (D.C. Cir. 1992) (quotations omitted). Plaintiffs fail to plead facts giving rise to a strong inference of scienter as to either RPC or Kramer.

RPC may not be charged with scienter because Plaintiffs allegations of scienter as to both Grigg and Kramer are insufficient. The reasons the allegations fail as to Grigg are set forth in his motion to dismiss, incorporated herein. The scienter allegations against Kramer are particularly

- 12 -

lacking. The Complaint contains no allegation showing that Kramer had any motive to commit fraud by causing RPC to transfer an allegedly worthless asset to RPLP, especially when the consideration RPC received was not cash but an ownership interest in RPLP itself. Moreover, Plaintiffs' allegations of Kramer's knowledge of relevant facts are vague and conclusory. *See* Compl. ¶¶ 17, 31, 66, 69, 70. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). It is insufficient to allege generally that defendants received reports or statements containing the contradictory information. *See In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897, 2006 WL 314524, at *8-9 (S.D.N.Y. Feb. 10, 2006). Yet that is all that Plaintiffs offer with respect to Defendant Kramer.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM AGAINST KRAMER FOR CONTROL-PERSON LIABILITY UNDER SECTION 20(a).

To state a claim under § 20(a), a plaintiff must allege (1) a primary violation [of § 10(b)] by the controlled person, (2) control of the primary violator by the targeted defendant, and (3) that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person. *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996).[11] Plaintiffs have failed to adequately plead the elements of control person liability against Kramer in two respects.

First, and most fundamentally, plaintiffs' § 20(a) claims must be dismissed because they have failed to adequately plead the existence of a primary violation by RPC of Section 10(b).

---

[11] It is not settled in this Circuit whether the third prong of the test set forth by the Second Circuit – culpable participation – is required. *See SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1170 & n.49 (D.C. Cir. 1978) (noting divergent case law). The Second, Third, and Fourth Circuits have adopted the culpable-participation requirement. *See Boguslavsky*, 159 F.3d 715; *Carpenter v. Harris, Upham & Co., Inc.*, 594 F.2d 388 (4th Cir. 1979); *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir. 1975). Defendants respectfully suggest that the culpable-participation standard is the proper one.

*See Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004); *In re United States Office Prods. Sec. Litig.*, 326 F. Supp. 2d at 83.

Second, plaintiffs' control-person claims under § 20(a) are deficient because the Complaint does not adequately allege that Kramer was a "culpable participant" in the alleged fraud. Under this required element of § 20(a) claims, courts have insisted that plaintiffs allege both the individual defendant's "fraudulent conduct and [his] culpable state of mind." *Steed Fin. LDC v. Nomura Secs. Int'l, Inc.*, No. 00 Civ. 8058 (NRB), 2001 U.S. Dist. LEXIS 14761, at *32 (S.D.N.Y. Sept. 19, 2001). Because this "culpable participation" element requires proof that the defendant 'acted with a particular state of mind, many courts have held that it must be pled with particularity under 15 U.S.C. § 78u-4(b)(2). *See In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2005 U.S. Dist. LEXIS 26942, at *24 (S.D.N.Y. Nov. 4, 2005); *Mishkin v. Ageloff*, No. 97 Civ. 2690 (LAP), 1998 U.S. Dist. LEXIS 14890, at *25 (S.D.N.Y. Sept. 23, 1998). "The controlling person's role must be stated with particularity and give rise to an inference of scienter—that is, there must be a strong reason to believe that the controlling person either knew or should have known that the controlled person was committing fraud." *Shanahan v. Vallat*, No. 03 Civ. 3496 (MBM), 2004 U.S. Dist. LEXIS 25523, at *17 (S.D.N.Y. Dec. 14, 2004).

Here, plaintiffs have failed to set forth with particularity facts showing culpable participation by Kramer. The Complaint does not even attempt to allege that Kramer played any significant role in the alleged fraud or even in the negotiation and execution of the Contribution Agreement. As noted above, plaintiffs' only allegations of knowledge on Kramer's part (Compl. ¶¶ 17, 31, 66, 69, 70) are vague, conclusory and altogether insufficient under the governing standards.

**III.    AFTER DISMISISNG THE FEDERAL SECURITIES CLAIMS, THE COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFFS' STATE-LAW CLAIMS.**

Although in their initial Complaint plaintiffs pled that diversity of citizenship existed between the parties, they have now abandoned that position.  *Compare* Compl. ¶ 7 *with* Compl. ¶ 7.  There is no question that the presence of RPLP as a plaintiff in a suit against certain of its limited partners destroys complete diversity.  *See Carden v. Arkoma Associates*, 494 U.S. 185, 189 (1990) (limited partnership has the citizenship of each of its limited partners).  Accordingly, once the Court dismisses the claims under the federal securities laws, it will have discretion to dismiss the other claims, over which it has supplemental jurisdiction under 28 U.S.C. § 1367.  *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if (3) the district court has dismissed all claims over which the district court has original jurisdiction").  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 614, 619 n.7 (1988).  That is the case here.

**IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR SECURITIES FRAUD UNDER THE DISTRICT OF COLUMBIA CODE.**

In Count III of the Complaint, plaintiffs attempt to state a claim against all defendants under the District of Columbia's securities-fraud statute.[12]  This count fails as a matter of law for the reasons already addressed above with respect to the federal securities fraud claims.

---

[12] Plaintiffs confusingly refer to various sections of the D.C. Code in the caption and body of Count III. The caption refers to Section 31-5605.02, which is entitled "Fraudulent Transactions," and Section 31-5605.05, which addresses "Unlawful representations concerning licensing, registration, notice filing, or exemption" and is irrelevant here.  In the body of Count III (¶ 124), the Complaint refers to Section 31-5606.02, which deals with administrative enforcement, and Section 31-5605.05.  Nowhere does plaintiff refer to Section 31-5606.05, which is the section of the D.C. Code that creates civil liability.

Section 31-5606.05 of the District of Columbia Code provides for civil liability.[13]  In particular, Section 31-5606.05(a)(2) states:

> A person shall be civilly liable to another person who sells a security if the person offers to purchase or purchases the security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading, the seller does not know of the untruth or omission, and the purchaser does not sustain the burden of proof that the purchaser did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

D.C. Code § 31-5606.05(a)(2) (2004).

First, just as with the federal securities law claims, the Contribution Agreement's integration clause bars plaintiffs' claim under this section to the extent it is based on omissions or alleged misrepresentations outside the Agreement.

Second, because RPT did not sell any securities, it has no claim under Section 31-5606.05.  In the alternative, if it was RPT that sold the units in question, then RPLP has no claim.

Third, because RPLP allegedly sold securities to RPC, not to Kramer, there is no direct claim against Kramer under Section 31-5606.05.

## V.    PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT.

Count V of the Complaint purports to state a claim for breach of representations and warranties made by RPC in the Contribution Agreement.  As set forth in Section I.B. above, however, none of the representations and warranties identified in the Complaint was false.

The heart of plaintiffs' argument is that the representations and warranties in the Contribution Agreement were false because "the Professional Services Agreement was not legal, binding or in full force and effect."  Compl. ¶ 90.  As shown in Section I.B., the representations

---

[13] Although plaintiffs refer to Section 31-5605.02, there is no private right of action provided under that section.

containing the terms "legal" and "valid" did not address the Professional Services Agreement at all.  In addition, plaintiffs' own allegations show that  Professional Services Agreement remained in full force and effect until it was effectively terminated as a result of the assignment by Republic WPB LLC to CRA.  Consequently, plaintiffs' claim for breach of contract fails as a matter of law.

## VI.    PLAINTIFFS FAIL TO STATE A CLAIM FOR INDEMNIFICATION.

Count VI of the Complaint, seeking indemnification pursuant to the Contribution Agreement, depends on the existence of a breach of representations or warranties made in the Contribution Agreement.  Because plaintiffs have pled no valid claim for such a breach, as set forth in Section V above, there is no claim for indemnification.

## VII.    PLAINTIFFS FAIL TO STATE A CLAIM FOR COMMON-LAW FRAUD.

The elements of a claim for common-law fraud are (1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation.  *Caulfield v. Stark*, 893 A.2d 970, 974 (D.C. 2006).  Here, Count VII for common-law fraud, fails as a matter of law for numerous reasons.

First, as set forth above in Section I.A.1., the integration clause in the Contribution Agreement bars plaintiffs' claim to the extent it is based on any omission or any representation not contained in the Agreement itself.  *See One-O-OneEnterp., Inc. v. Caruso*, 848 F.2d 1283, (D.C. Cir. 1988) (claim of common-law fraud, like claim for federal securities fraud, barred by integration clause).  *See also Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 613 A.2d 916, 932-935 (D.C. 1992) (citing *One-O-One* and holding that integration clause barred common-law fraud claims due to lack of reasonable reliance and lack of materiality).  No alleged reliance by plaintiffs could have been reasonable in light of the integration clause.

- 17 -

Second, as set forth in Section I.A.2. above, neither RPC nor Kramer owed a duty to disclose the allegedly omitted information.

Third, as explained in Section I.B. above, plaintiffs' claims of misrepresentations in the Contribution Agreement fail as a matter of law.

Fourth, as described in Section I.D. above, Plaintiffs allegations of scienter (knowledge of falsity and intent to deceive) are insufficient.

## VIII.  PLAINTIFFS FAIL TO STATE A CLAIM FOR UNJUST ENRICHMENT.

In Count VIII, plaintiffs purport to state a claim for unjust enrichment against Kramer. Unjust enrichment occurs when (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust. *News World Communications, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005). No claim for unjust enrichment lies against Kramer here.

First, because RPT (as opposed to RPLP) did not confer a benefit on any of the defendants, it has no claim for unjust enrichment.

Second, Kramer did not receive a benefit from RPLP in the transaction in question. Under the Contribution Agreement, RPLP issued limited-partnership units to RPC, not to Kramer. Compl. Ex. A, § 1.2(a). The Complaint's vague allegation that RPC holds units "for the benefit of" Kramer, Compl. ¶ 21, is meaningless and is superseded by the Agreement itself, which is attached to the Complaint. Where documents incorporated in a complaint contradict such allegations, the incorporated documents control. *See, e.g., Feick v. Fleener*, 653 F.2d 69, 75 & n.4 (2d Cir. 1981); *Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974); *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002).

- 18 -

Third, for all the reasons discussed above, even if Kramer had received a benefit pursuant to the Contribution Agreement, plaintiffs have pled no facts showing that it would not be unjust for him to retain it.

## IX.   COUNT IX IS DUPLICATIVE OF KRAMER'S ADVANCEMENT SUIT AND SHOULD BE DISMISSED.

In Count IX, plaintiffs plead their side of the issue already being considered on an expedited track by the Circuit Court of Baltimore City in Maryland – whether Kramer is entitled to advancement and indemnification of legal expenses from RPT. Count IX should be dismissed in deference to the Maryland action because that case was filed first.[14] Alternatively, regardless of which party filed first, Claim IX should be dismissed in light of the policy strongly disfavoring federal court interference with ongoing state court proceedings, and the ample discretion of federal courts to decline jurisdiction in a declaratory-judgment action.

The general rule is "where two cases between the same parties on the same cause of action are commenced in two different [] courts, the one which is commenced first is to be allowed to proceed to its conclusion first." *See Washington Metro. Area Transit Auth. v. Regonese*, 617 F.2d 828, 830 (D.C. Cir. 1980). The D.C. Circuit has cautioned that the first-filed rule should not be rigidly or mechanically applied but should be governed by equitable considerations,. *see Columbia Plaza Corp. v. Security Nat'l Bank*, 525 F.2d 620, 627 (D.C. Cir. 1975). Here , it is clear that the first-filed case is Kramer's advancement suit in Maryland.[15]

---

[14] Kramer filed a complaint against RPT seeking advancement of his legal expenses in the United States District Court for the District of Maryland on March 6, 2007. On May 3, 2007, Kramer voluntarily dismissed his complaint in federal court. On the same day, Kramer re-filed his complaint in the Circuit Court of Baltimore City.

[15] Even if the Court reaches a contrary conclusion based on Kramer's voluntary dismissal of his original complaint and re-filing in state court, RPT should not be afforded the benefit of first-to-file status. The most common exception to the first-filed rule is where a natural defendant in a situation preemptively brings a declaratory-judgment action to secure its choice of forum and

Kramer has requested expedited consideration in that case, and Kramer expects it to progress rapidly. The issue presented is a narrow one, and time is of the essence – the very nature of the right to advancement of legal expenses suggests that the right can be lost if its enforcement is delayed. "Clearly, to be of any value to the executive or director, advancement must be made promptly, otherwise its benefit is forever lost because the failure to advance fees affects the counsel the director may choose and litigation strategy that the executive or director will be able to afford." *Homestore, Inc. v. Tafeen*, 886 A.2d 502, 505 (Del. 2005); *see also Lipson v. Supercuts, Inc.*, Civ.A. 15074-NCC, 1996 WL 560191, at *2 (Del Ch. Sept. 10, 1996) ("[I]f advance indemnification is to have any utility or meaning, a claimant's entitlement to it must be decided relatively promptly.").

Irrespective of the operation of the first-filed rule, however, the policies of judicial federalism and the ample discretion of federal courts to decline jurisdiction in a declaratory-judgment action weigh heavily in favor of the dismissal of Count IX. District courts exercise substantial discretion "to decide whether to entertain declaratory judgment actions" under 28 U.S.C. § 2201. *BASF Corp. v. Symington*, 50 F.3d 555, 557 (8th Cir. 1995). Declining to exercise jurisdiction is appropriate "where the declaratory judgment action was filed in anticipation of a suit in another forum." *Yoder v. Heinhold Commodities, Inc.*, 630 F. Supp. 756, 760 (E.D. Va. 1986). This is especially true when the other forum is a state court and the matter in controversy is a pure matter of state law. *See Miller v. Miller*, 423 F.2d 145, 148 (10th Cir.

---

assert what are in reality defenses to the true plaintiff's claim, *see, e.g., Thayer/Patricoff Education Funding, L.L.C. v. Pryor Resources, Inc.*, 196 F. Supp. 2d 21, 29-31 (D.D.C. 2001). Here, it is incontrovertible that the true plaintiff with respect to the issue of advancement is Kramer, and RPT has sought to raise its defenses to Kramer's claim through a declaratory-judgment action in this Court. Consequently, even if RPT is deemed first-to-file the Court should still dismiss Count IX in deference to Kramer's suit in Maryland, as he is the true plaintiff.

1970) (stating that federal courts should decline to exercise jurisdiction "over a declaratory judgment action raising state law issues which are being presented contemporaneously to state courts"). Here, plaintiffs' declaratory-judgment action was not even filed in anticipation of a suit in another forum, it was filed with full knowledge of such a suit. Plaintiffs added their claim for declaratory relief in a transparent attempt to nullify Kramer's choice of forum and force Kramer's advancement claim – a pure matter of Maryland state law – to be tried in this Court rather than in Maryland.[16] Such a calculating maneuver is particularly unavailing here, as the existing state court forum coupled with the nature of the state law controversy make it clear that plaintiffs' action for declaratory relief should not be maintained in this Court.

For all these reasons, Count IX should be dismissed.

## X.    PLAINTIFFS FAIL TO STATE A CLAIM OF ENTITLEMENT TO PUNITIVE DAMAGES.

Punitive damages is a remedy, not a cause of action. Because plaintiffs have failed to plead any viable cause of action that could entitle them to punitive damages, their request for such damages (Count IX) should be dismissed. Moreover, even if plaintiffs had successfully pled fraud (which they have not for the reasons discussed in Section I, IV and VII above), they have not pled any entitlement to punitive damages. "[I]n the absence of 'gross fraud' or comparable wrongdoing, proof of even intentional misrepresentation may not suffice to justify punitive damages." *District Cablevision L.P. v. Bassin*, 828 A.2d 714, 725-26 (D.C. 2003). Plaintiffs have not successfully pled fraud at all here, much less "gross fraud."

---

[16] On April 6, 2007, RPT filed a Motion to Transfer Venue from the District of Maryland to this Court. Count IX is simply an alternate, and impermissible, means to achieve this objective.

## CONCLUSION

For the reasons stated above, the Complaint should be dismissed.

Respectfully submitted,

Paul Martin Wolff (Bar No. 90217)
George A. Borden (Bar No. 419772)
Kenneth C. Smurzynski (Bar No. 442131)
William T. Burke (Bar No. 471948)
Williams & Connolly LLP
725 12th Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029

Dated: May 11, 2007

# EXHIBIT 1
# PART 1



## WEST PALM BEACH COMMUNITY REDEVELOPMENT AGENCY

## <u>CITY CENTER PROJECT</u>

### <u>Phase 1 - Programming</u>

**Republic Properties Corporation**

**RFP #03/04-109**

---

TABLE OF CONTENTS

SECTION 1 - AGREEMENT
SECTION 2 -  PROJECT; SCOPE OF WORK
SECTION 3 -  PROFESSIONAL SERVICES FEE
SECTION 4 -  PROFESSIONAL SERVICES
SECTION 5 -  TERM
SECTION 6 -  SMALL BUSINESS PROGRAM ORDINANCE GOAL
SECTION 7 -  TEAM
SECTION 8 -  PROJECT MANAGER
SECTION 9 – TERMS AND CONDITIONS
SECTION 10 – HEADINGS, CAPTIONS, TITLES
SCHEDULE "1" -  PROJECT/SCOPE OF WORK
SCHEDULE "2" -  PROFESSIONAL SERVICES FEE & EXPENSES
SCHEDULE "3A" - PROFESSIONAL  SERVICES
3.        Standard Professional Services
3.1       Phases of Professional Services
3.2       Professional Services Included
          3.2.1   Programming Phase
3.3.      Estimated Construction Costs
3.4       Non-Included Additional Services
          3.4.1   Information Furnished by the CRA
          3.4.2   Material Changes by the CRA or a Governing Body
          3.4.3   Renderings or Models for CRA
          3.4.4   Alternate Bids
          3.4.5   Unanticipated Procurement of Other Professional Services
          3.4.6   Agreed Travel
          3.4.7   Bid Protests, Re-Bidding or Renegotiating of Contracts
          3.4.8   Surveys
          3.4.9   DEVELOPER in Proceedings
          3.4.10  Redesign
3.5       Modifications by the CRA to the Project

3.6    Delay
SCHEDULE "3B" - PROFESSIONAL SERVICES
SCHEDULE "4" - TERM
SCHEDULE "5" - SMALL BUSINESS GOAL FOR THE PROJECT
SCHEDULE "6" - ADDITIONAL STANDARD TERMS AND CONDITIONS
6.1    Responsibilities of the CRA
    6.1.1   Designation of CRA Representative on Project
    6.1.2   Specification of CRA Requirements for Project
    6.1.3   Items to be Furnished upon the DEVELOPER's Request
    6.1.4   Access to Property
    6.1.5   Attendance at Meetings
6.2    Availability of Funds
6.3    Representations of the DEVELOPER
    6.3.1   Warranty of Design and Constructability
    6.3.2   Authority of DEVELOPER to Conduct Business
    6.3.3   No Solicitation
    6.3.4   Independent Contractor Relationship
    6.3.5   Personnel
        6.3.5.1   Non-Discrimination by DEVELOPER
        6.3.5.2   Fair Labor Standards Act
        6.3.5.3   Unauthorized Aliens
        6.3.5.4   Possession of Firearms
    6.3.6   Selection of Sub-consultants
    6.3.7   Absence of Arrears
    6.3.8   Absence of Conflicts of Interest
    6.3.9   State Taxes
    6.3.10  Obligation to Furnish Documents to the CRA
    6.3.11  Public Entity Crime Act
    6.3.12  Compliance with Laws
6.4    Public Records Law
6.5    Confidentiality
6.6    CRA's Ownership of Documents
6.7    DEVELOPERs Competitive Negotiation Act
6.8    CRA of West Palm Beach Small Business Ordinance
    6.8.1   Small Business Program Ordinance
    6.8.2   Small Business Records
6.9    Invoices and Audit of Records
    6.9.1   Invoices to the CRA
    6.9.2   Charges Above the Professional Fee and Supporting Records
    6.9.3   Significance of "Final Invoice"
6.10   Access and Audit
6.11   Insurance
    6.11.1  Insurance Requirements Generally
    6.11.2  Required Types and Amounts of Coverage
    6.11.3  CRA as Additional Named Insured
6.12   Indemnification
6.13   Successors and Assigns
6.14   Communications and Notice
6.15.   Termination
    6.15.1  Right to Terminate
    6.15.2  Termination for Cause

RPT 00874

6.15.3   Termination for Convenience
6.15.4   Implementation Procedures for Termination
6.16   Litigation; Waiver of Jury Trial
6.17   Waiver
6.18   Third Party Beneficiaries
6.19   Joint Preparation
6.20   Severability of Provisions
6.21   Entire Agreement
6.22   Amendments

<u>**Professional Services Agreement**</u>
**CITY CENTER PROJECT**
**PHASE 1 -  Programming**
**RFP #03/04-109**

This  Agreement  is  made  by  and  between  the  WEST  PALM  BEACH  COMMUNITY REDEVELOPMENT AGENCY ("CRA") located at 200 Second Street, West Palm Beach, Florida 33401 and **REPUBLIC-WPB CORP.,** a District of Columbia corporation, authorized to do business in the State of Florida, with a principal address of 1280 Maryland Avenue, Suite 200, Washington, DC 20024 (the "DEVELOPER").

WHEREAS, the CRA issued its Request for Proposal RFP #03/04-109 (the "RFP") pursuant to state and local law to solicit proposals to design and construct a public/private project including a City Hall, public library, photographic center, and parking facility, along with other facilities that may be mutually agreed upon, known as "City Center" (the "Project"); and

WHEREAS, DEVELOPER responded to the RFP by submitting its proposal dated May 6, 2004 (the "Proposal"), which proposal was accepted by the CRA and City; and

WHEREAS, the CRA and DEVELOPER are in the process of negotiating a contract for the complete scope of services necessary for the design, construction and development of the City Center Project, but desire to commence Project programming and other initial services to provide information regarding scope and costs necessary for the details of the design, construction and development contract, which shall constitute Phase 1 of the Project;

NOW, THEREFORE, in consideration of the mutual promises contained herein, the CRA and the DEVELOPER desire to enter into a Professional Services Agreement for the initial programming phase of the City Center Project (the "Agreement"), the terms of which follow:

## SECTION 1 - AGREEMENT

The term "Agreement" shall include all the terms and conditions and project requirements set forth in the RFP #03/04-109, the Proposal and this Agreement, all of which taken together form the Agreement.  Unless the context requires otherwise, all references to "this Agreement," and use of the terms "herein," "hereby," "hereof," "hereto," "hereunder," and the like shall be deemed to include the RFP, the Proposal, this Agreement and any addenda thereto.  Except as otherwise specifically provided herein, in the event of any conflict between the specific provisions of this Agreement and the requirements or provisions of the RFP, the provisions shall be given precedence in the following order: (1) this Agreement, (2) the RFP, (3) the Proposal.  Wherever possible, the provisions of the documents shall be construed in such manner as to avoid conflicts between provisions of the

various documents.

## SECTION 2 – PROJECT; SCOPE OF WORK

The DEVELOPER agrees to provide to the CRA professional services in connection with the City Center Project scope identified on Schedule "1" attached hereto (the "Project").

## SECTION 3 - PROFESSIONAL SERVICES FEE

The professional services fee to be paid by the CRA to the DEVELOPER for all professional design services of both the DEVELOPER and any of its subcontractors in connection with the Project hereunder is set forth on Schedule "2" attached hereto (the "Professional Services Fee").

## SECTION 4 - PROFESSIONAL SERVICES

The DEVELOPER agrees that in exchange for the Professional Services Fee, it will render the professional services outlined on Schedule "3" attached hereto, which include both standard professional services outlined in the Scope of Work in Schedule "1" and the standard services outlined in Schedules "3.A"/"3.B" (the "Professional Services").

## SECTION 5 - TERM

This Agreement shall commence as of the last date of execution of this Agreement, unless otherwise indicated in Schedule "4", and shall continue in force until such time set forth on Schedule "4" attached hereto, unless extended by Amendment hereto or terminated early by either party (the "Term").  Notwithstanding the expiration date or early termination date hereunder, it is agreed that the indemnity provisions, the right to audit and all covenants, agreements, representations and warranties made herein or otherwise made in writing by the DEVELOPER, including but not limited to any representations made herein relating to disclosure or ownership of documents, shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

## SECTION 6 - SMALL BUSINESS PROGRAM ORDINANCE GOAL

The City of West Palm Beach Small Business Program, set out in Chapter 66 of the City Code, is incorporated herein by reference, and a copy is attached as part of Schedule 5.

## SECTION 7 – TEAM

Pursuant to DEVELOPER's Proposal, DEVELOPER covenants and agrees that it intends, as it deems necessary, to enter into contracts with the following firms or persons to provide services for

RPT 00877

the Project as members of DEVELOPER's team. DEVELOPER shall not make any change, or substitution of any consultants, subcontractors or team members without the written authorization of CRA, whose approval shall not be unreasonably withheld. DEVELOPER shall ensure that its subcontracts with its team members will comply in all respects with this Agreement, including, but not limited to insurance and indemnification provisions.

Song + Associates, Inc. – Architecture
Michael Graves & Associates – Architecture
Resource Planning Group – Library DEVELOPER
Michael Singer & Associate – Public/Creative Art
Michael Redd & Associates – Landscape Architecture
Thornton-Tomasetti Engineers – Structural
Meinhardt, USA – MEP
Craven Thompson – Civil/ Survey
Ardaman & Associates – Geotechnical / Environmental
Rolf Jenson & Associates – Fire Protection & Safety
Catalfumo Construction, Ltd. - Construction
LB Limited
Cary O'Donnell Public Relations Group, Inc.

## SECTION 8 – PROJECT MANAGER

The DEVELOPER designates Steven A. Grigg as its Project Manager. The Project Manager, or his designate, will meet with the CRA's project team at the commencement of each Phase and Task and weekly for progress meetings. DEVELOPER's Project Manager shall be available for CRA Commission presentations and meetings as needed. The CRA designates Dorritt Miller as its Project Manager.

## SECTION 9 - TERMS AND CONDITIONS

The parties agree to comply with all terms and conditions contained herein, including those set forth on Schedule "6" attached hereto (the "Terms and Conditions").

## SECTION 10 - HEADINGS, CAPTIONS, TITLES

Headings, captions or titles contained herein are for reference and convenience purposes only and shall not be used to interpret the content of the provisions herein.

IN WITNESS WHEREOF, the parties hereto have made and executed this Agreement and

have hereunto signed in their names by their duly authorized representatives as of the day and year indicated below.

ATTEST:

By: _____
         Secretary

WEST PALM BEACH COMMUNITY
REDEVELOPMENT AGENCY

By: _____
         Lois J. Frankel, Chair

CRA COUNSEL
Approved as to form
and legal sufficiency
By: _____
Date: _____10/8/04_____

F:\NDU\CityCenter\Phase1K.doc
100 04-01442ndu

WITNESSES:

By: _____
Print Name:    Rose Jeffrey

REPUBLIC-WPB CORP.,

By: _____
Print Name:    Steven A. Grigg
Title:           President

Date: _____October 26_____, 2004

SCHEDULE "1"

PROJECT / SCOPE OF WORK

PROJECT:     *CITY CENTER PHASE 1*
RFP#         **#03/04-109**

The City Center Project consists of the design, construction and development of an urban mixed-use project which shall include a City Hall and Commission Chambers of approximately 130,000 gross square feet, a public library of approximately 85,000 gross square feet, a photographic center and museum of approximately 35,000 gross square feet and sufficient public parking (the "Public Facilities") along with private development which may include commercial, office and/or residential components, to be known as "City Center" (the "Project"). The size of all Project components will be determined through Phase 1, the programming phase. The Project shall be a focal point for community activity that will be an identifiable City Center and will incorporate public open space, public art and amenities.

The Project will be constructed on approximately three (3) acres consisting of two parcels: i) the full CRA block bounded by Clematis Street, Banyan Boulevard, Dixie Highway and Quadrille Boulevard; ii) a parcel of land approximately 100 feet deep along Quadrille Boulevard, from Clematis Street to Banyan Boulevard; and (iii) any air rights easements necessary (collectively, the "Property").

An estimated budget of $50,000,000 including site preparation, architectural and design services, building construction, engineering services, consultants, furniture, fixtures and equipment is proposed for the Public Facilities and CRA portion of the Project. Interior finish, furniture, fixtures and equipment will not be included for the photographic center. This budget may be adjusted as a result of the programming phase, value engineering, fund raising, or as determined by the CRA. Such budget modifications may have corresponding impacts upon the design and scope of the Project.

The DEVELOPER and its team members shall provide all professional services to perform Phase 1, the programming phase and conceptual design for the City Center Project Public Facilities including development of a plan for public participation and the conduct of public workshops. DEVELOPER shall perform the Programming Tasks as more specifically described herein as Phase 1 tasks in DEVELOPER's Scope of Services marked as **Exhibit 1**, following this page and incorporated herein.

It is anticipated that upon acceptance of the Programming Report and conceptual design, the parties will enter into a subsequent contract or contracts for the completion of the Project design, construction and the development and sale of the private portion.



**EXHIBIT**

**1**

**KEY**

1 = Phase I - week 1 to 8
2 = Phase II - week 9 to 26

**Project Management**
    Public
        Coordination with Owner
        Coordination with Government Agencies
        Coordination with Development Team
        Coordination with Design Team
        Coordination with Public Relations Team

**Program Verification**
    Review of Existing Programmatic Information
    Development of Adjacencies & Relationships: Bubble Diagram
    Development of Project: Web-site and E-Mail Links
    Small Group Visits to Five or Six Facilities
    Development of Powerpoint Presentation from Trips
    Stakeholder Workshop/Library
    Stakeholder Workshop/City Hall
    Stakeholder Workshop/Museum
    Stakeholder Workshop/Overall & Outdoor
    Imperative Public Workshop/Charette 1
    Public Art Program Development
    Preparation of Building Systems Narrative
    Completion of Draft Program
    Review & Approval by West Palm Beach Council
    Printing and Distribution of Building Program

**Study and Strategy**
    Development of Use-Mix Market Study
    Preparation of the Private Space Program
    Development of a Rental Marketing Strategy
    Develop and distribute a project newsletter to community
    Initiation of Concept Design
    Prepare Site Survey Data
    Preliminary Utility Research and Coordination

RPT 00881

| |
|---|
| Obtain and Review Geotechnical Data |
| Obtain and Review Environmental Data |
| Preliminary Traffic and Pedestrian Circulation Analysis & Report |
| Preliminary Parking Analysis & Report |
| Public Art Program Development |
| Prepare System Narratives |
| Stakeholder Workshops/Charrette 2 |
| Library Alternative Concepts |
| City Hall Alternative Concepts |
| Museum Alternative Concepts |
| Overall & Outdoor Alternative Concepts |
| Interim Presentation to Client Committee |
| Preparation of Concetual Cost Estimate |
| Completion of Concept Design |
| Presentation to West Palm Beach Commission |
| Review and Approval by West Palm Beach Commission |

RPT 00882

SCHEDULE "2"

**PROFESSIONAL SERVICES FEE & EXPENSES**

PROJECT:     *CITY CENTER PHASE 1*
RFP#         **#03/04-109**

**2.1     Professional Service Fee**:   The Professional Services Fee, including normal related administrative expenses, for Phase 1, the Programming Phase of the City Center Project shall not exceed Five Hundred Eighty-Five Thousand and 00/100 Dollars ($585,000.00).

**2.2**     The Professional Services Fee includes all fees or payments that the DEVELOPER proposes to pay or make to its subcontractors, consultants and team members in connection with this Agreement.  The Professional Services Fee is inclusive of Administrative out-of-pocket expenses and Other Expenses (as defined in 2.4 and 2.5) to be incurred in connection with the performance of the Services hereunder.

**2.3**     Payment of the Professional Services Fee on account of services rendered shall be made in accordance with the following payment and deliverable schedule and upon acceptance of deliverables satisfactory to the CRA and presentation of DEVELOPER's statement of services.

| Task Deliverable | Fee |
| --- | --- |
| Task 1 – First public workshop/charette | $195,000.00 |
| Task 2 – Second public workshop/charette | $195,000.00 |
| Task 3 – Submittal of final Programming Report | $195,000.00 |

**2.4     Administrative Expenses**.   The administrative out-of-pocket expenses include administrative expenses directly related to the Project.  Administrative Expenses are limited to reasonable charges for the following: long distance telephone calls and facsimile transmissions, courier deliveries, FedEx or delivery services, U.S mail and certified mail, photocopies and reproduction of plans prepared for distribution to the construction manager, contractors and or CRA, printing, plotting and book production expenses (the "Administrative Expenses"), which are included within the Professional Service Fee..

**2.5     Other Expenses**.  Other Expenses are any other expenses such as transportation, lodging, meals, the utilization of specialized equipment or special consulting services necessitated by the Project or permit fees, which expenses shall not be incurred for the account of the CRA absent prior written approval by the CRA from time to time following the request by the DEVELOPER and shall be paid in accordance with the City of West Palm Beach Travel Policy (the "Other Expenses").

**2.6     Releases**.  The DEVELOPER shall, upon receipt of any payment from the CRA, provide the CRA with written releases, in form and substance acceptable to the CRA, for all services performed by any team member or sub-DEVELOPER or other entity, through the date covered by the payment.

## SCHEDULE "3A"

## PROFESSIONAL SERVICES

PROJECT:    *CITY CENTER PHASE 1*
RFP#        *#03/04-109*

### 3.    Standard Professional Services

Further to and in conjunction with Section 4 of this Agreement, the DEVELOPER agrees to serve as the CRA's professional DEVELOPER for the Project and to provide professional advice based on the needs of the CRA.  The DEVELOPER's services hereunder include all services to be performed by DEVELOPER and its team members and consultants.

### 3.1    Phases of Professional Services

The Professional Services intended to be compensated by the Professional Services Fee hereunder shall include and be broken down into the following phases of service:

1.    Programming Phase

The DEVELOPER shall not commence any other services related to the Project, until a written agreement for such services is executed by the parties:

### 3.2    Professional Services Included

In consideration for the Professional Services Fee for the Project, the DEVELOPER agrees to perform the Professional Services as follows:

#### 3.2.1    Programming Phase

Upon signature hereof, the CRA authorizes the DEVELOPER to commence performance of the Programming Phase.  The DEVELOPER shall thereafter:

1.    Consult with the CRA regarding the CRA's requirements for the Project and review available data;

2.    Meet regularly with the CRA's Project Manager/Project Team;

3.    Advise the CRA as to the necessity of the CRA's provision or acquisition from others of certain services of the types described in Section 3.4 below, and assist CRA in obtaining such services;

4.    Develop a comprehensive plan for public involvement.  Conduct public workshops and charettes to receive public input.  Interview elected officials;

5.    Provide analyses of the CRA's needs, surveys, site evaluations, and comparative solutions;

6.    Develop the program for the Public Facilities, based on analysis of the CRA's needs, including alternatives and shared-use elements;

7.    Develop an Estimated Construction Cost;

8.    Prepare a report containing the gross building square footage, a floor by floor, room by room description of each proposed building and a conceptual design, along with proposed alternatives for consideration and Estimated Construction Cost (the "Programming Report");

9.    Present one original Programming Report, together with ten (10) copies thereof for review and comment by the CRA;

10.    Present the Programming Report to the CRA Board at a public meeting;

11.    Revise the Programming Report, as requested by the CRA to enable the CRA to approve the programming Report;

12.    Submit one (1) original and ten (10) copies of the final approved Programming Report to the CRA.

## 3.3    Estimated Construction Costs

The Estimated Construction Cost of the Public Facilities and public portion of the Project shall include the total cost to the CRA of those elements of the Project designed and specified by DEVELOPER; excluding (1) the Professional Services fee, administrative costs and other reimbursable expenses hereunder; (2) the cost of land, rights-of-way, or compensation for or damages to properties; (3) the costs of the CRA's legal, accounting, insurance or auditing services; and (4) interest and financing charges incurred in connection with the Project or the cost of other services to be provided by the CRA directly or by others to the CRA pursuant to Section 3.4 herein. Since DEVELOPER has no control over local conditions, the cost of labor, materials, equipment or services furnished by others, or over competitive bidding or market conditions, DEVELOPER does not guarantee the accuracy of any estimates of construction costs as compared to construction contractor's bids or the actual cost to the CRA.

## 3.4.    Non-Included Additional Services

If, and only if, authorized in writing in advance by CRA, or if set forth on Schedule 3C hereto, DEVELOPER shall furnish or caused to be furnished additional services identified in the Sub-Sections immediately below (the "Additional Services"). These services are not included as part of the Professional Services being compensated hereunder by virtue of the Professional Services Fee, and will be compensated as Other Expenses as such term is defined in Schedule "2" hereof.

### 3.4.1    Information Furnished by the CRA

Additional Services may include services to make measured drawings of or to investigate existing conditions or facilities, or to verify the accuracy of drawings or other information furnished by the CRA to the extent that such services are not expressly included in the request for proposal or other invitation for procurement by the CRA identified on Schedule "1" of this Agreement.

### 3.4.2    Material Changes by the CRA or a Governing Body

Additional Services will include services resulting from material changes in the general scope, extent or character of the Project or its design including (1) material changes in size, complexity, the CRA's schedule, character of construction or method of financing or (2) revising previously accepted studies, reports, design documents or construction contract documents when such revisions are required by changes in laws, rules, regulations, ordinances, codes or orders enacted subsequent to the preparation of such studies, reports or documents, or are due to other causes reasonably beyond DEVELOPER's control but only to the extent that such significant changes or revisions of previous studies increase the overall amount of time intended for the

Project.

### 3.4.3  Renderings or Models for CRA

Additional Services may include, upon the request of the CRA, providing renderings or models for the CRA's use to the extent that such services are not expressly included in the Request for Proposal or other invitation for procurement by the CRA identified on Schedule "1" of this Agreement.

### 3.4.4  Alternate Bids

Additional Services may include preparing documents for alternate bids requested by CRA for contractor(s)' work that is not completed.

### 3.4.5  Unanticipated Procurement of Other Professional Services

Additional Services may include the furnishing of services by independent professional associates and consultants for other than the Professional Services set forth in Section 3 or on Schedule "2" hereto that, according to the joint determination by the CRA and DEVELOPER, each acting reasonably and in good faith, were not anticipated in either the Request for Proposal or other procurement notice or in the related Proposal by the DEVELOPER (the "Unanticipated Professional Services"). Moreover, if Unanticipated Professional Services are subsequently designated by the CRA and DEVELOPER, each acting in good faith, as Substituted Services, those services shall not be billed by the DEVELOPER as Additional Services, but shall be considered to be included in the Professional Services Fee for the Project. Unanticipated Professional Services may include customary civil, structural, mechanical and electrical engineering and customary engineering design incidental thereto, as well as the provision of data or services if the CRA elects to engage a professional consultant under the competitive selection procedures mandated by Fla. Stat. 287.055 to provide such data or services in lieu of furnishing the same itself in accordance with said Section.

### 3.4.6  Agreed Travel

Additional Services may include services requiring out-of-town travel requested in writing from time to time by the CRA of the DEVELOPER (not including visits to the construction site or to the CRA's office as already required by this Agreement), such as mill and shop inspection of manufactured or fabricated items during construction. The limitations and procedures relating to reimbursement of such expenses shall be subject to the terms of the City of West Palm Beach Travel Policy, Policy 5-1, effective May 5, 2003, attached hereto as Exhibit 3-1.

### 3.4.7  Bid Protests, Re-Bidding or Renegotiating of Contracts

Additional Services may include the provision of assistance to the CRA in connection with bid protests or re-bidding contracts for construction, materials, equipment or services, unless the need for said services arises from the act or failure to act of the DEVELOPER.

### 3.4.8  Surveys

Additional Services may include the provision, requested by the CRA following execution hereof, of any type of property, boundary, easement, right-or-way, topographic and utility surveys and field surveys for design purposes or DEVELOPER surveys and staking to enable the contractor(s) to proceed with their work, as well as the provision of other special field surveys, unless the scope of work in the RFP included a requirement of surveying in which case the cost of the relating surveys shall already be included.

### 3.4.9  DEVELOPER in Proceedings

Additional Services may include preparation required to serve or serving as a DEVELOPER or witness for the CRA in any litigation, arbitration or other legal or administrative proceeding

involving the Project. However, the CRA shall have no responsibility for additional services or otherwise for DEVELOPER being a named party or witness in any proceeding, and DEVELOPER shall be solely responsible for all such expenses.

### 3.4.10   Redesign

It is expressly agreed that any redesigning services to keep the Project within the established Budget are included within the Services hereunder and DEVELOPER shall not seek additional compensation beyond those imposed for the purpose of keeping the Project within the established Budget.

## 3.5     Modifications by the CRA to the Project

Notwithstanding the foregoing provisions, the CRA reserves the right to make changes to the Project at any time, including alterations, reductions therein or additions thereto. Upon receipt by the DEVELOPER of CRA's written notification of a contemplated change, the DEVELOPER shall in writing: (i) provide a detailed estimate for the increase or decrease in construction and design cost that would result from the contemplated change; (ii) notify the CRA of any estimated change in the completion date; and (iii) advise the CRA how the contemplated change shall affect the DEVELOPER'S ability to meet the completion dates or schedules of this Agreement. If the CRA so instructs in writing, the DEVELOPER shall suspend work on the portion of the scope of work affected by a contemplated change, pending the CRA's decision to proceed with the change. If the CRA elects to make the change, the parties shall execute a written amendment to this Agreement and the DEVELOPER shall not commence work on any such change until such Amendment is signed by the parties. It is further acknowledged and agreed that changes or revisions of services that do not increase or change the overall estimate of time on the Project shall be considered mere substitution of work or scope of work ("Substituted Services") already included in the Professional Service Fee hereunder.   Substituted Services shall not in any circumstances be considered compensable as Other Expenses hereunder, and, to the extent that the event of Substituted Services causes an overall reduction in the amount of time for services considered in the Professional Services hereunder, such shall result in pro-rata reduction of the Professional Services Fee.

## 3.6     Delay

DEVELOPER acknowledges responsibility for any delay damages suffered by the CRA as a result of DEVELOPER's negligent, reckless or intentional wrongful actions or inactions. In the event that the CRA suffers or reasonably believes that it will suffer actual delay damages as a result of DEVELOPER's aforesaid actions or inactions, the CRA, in its sole discretion, said discretion to be exercised reasonably and in good faith, shall have the right and be entitled to withhold the amount of damages or loss from DEVELOPER's payments, as reasonably determined by the CRA.   The withholdings of any amount pursuant to this provision shall not be construed to constitute a breach of this Agreement by the CRA.

The DEVELOPER's services shall be timely performed in compliance with Schedule 3B hereto. If the DEVELOPER is delayed at any time in the progress of his Services by any act, failure to act or neglect of the CRA, or any separate developer or consultant hired directly by the CRA, or by occurrences beyond the control and without any fault or negligence of the DEVELOPER, the DEVELOPER shall provide to the CRA, within five (5) working days of the date the delay began, written notice of the delay. Provided the DEVELOPER has timely notified the CRA of the delay, the CRA shall amend Schedule 3B, in writing, for the time delay actually caused by such occurrence, as determined by the CRA in its sole discretion. This extension of time shall be the DEVELOPER's sole and exclusive remedy attributed to such delay.
*[End of Schedule 3A]*



## TRAVEL POLICY

### AUTHORITY

This administrative policy is made pursuant to City Charter, Section 3.01(12) and is in keeping with the provisions of Florida Statutes Section 112.061, as modified by City ordinance.

### POLICY STATEMENT

Travel must be for a public purpose and authorized in advance. Transportation for higher education is not a public purpose under this policy.

### PURPOSE

The purpose is to provide a method for travel authorization and to set forth criteria and guidelines for travel and related expense reimbursement.

### SCOPE OF APPLICABILITY

This policy applies to all travelers including elected officials, employees, or others approved by the Mayor. Where provisions of this policy conflict with a collective bargaining agreement, the collective bargaining agreement will prevail.

### <u>DEFINITIONS</u>

    A. <u>**Common Carrier**</u> - Train, bus, commercial airline operating scheduled flights, or rental cars.

    B. <u>**Immediate Vicinity**</u> – An area within 20 miles from the official headquarters to the destination.

    C. <u>**Official Headquarters**</u> – City Hall or another City location where the employee reports to work on a normal workday.

    D. <u>**Travel**</u> - Authorized official business away from the immediate vicinity.

    E. <u>**Travel Expense**</u> – Lodging, meals, transportation, gas purchased when using City car, mileage when using a personal vehicle, tolls, parking fees and other incidental expenses incurred when traveling.

### <u>SECTION I - AUTHORITY TO INCUR TRAVEL EXPENSES</u>

All travel, except by the Mayor, a City Commissioner or the City Administrator, must be authorized in advance by the appropriate department director or designee. All travel by department directors must be approved by the City Administrator or an Assistant City

RPT 00888

Administrator.   All travel by Assistant City Administrators must be approved by the City Administrator or the Mayor.

## SECTION II – MEAL ALLOWANCE

Allowances for meals will be based on the following schedule:

**Breakfast** – When travel begins before 6 a.m. <u>and</u> extends beyond 8 a.m.

**Lunch** – When travel begins before 12 noon <u>and</u> extends beyond 2 p.m.

**Dinner** – When travel begins before 6 p.m. <u>and</u> extends beyond 8 p.m. or when travel occurs during nighttime hours due to special assignments.

No allowance will be made for meals when travel is confined to the immediate vicinity.  No one, whether traveling in the state or out of the state, will be reimbursed for any meal or lodging included in a convention or conference registration fee that was paid by the City.  Continental breakfasts, receptions, and airline food are not considered meals.

## SECTION III - TRANSPORTATION

A.  Transportation must be by a usually traveled or most direct route.  If a person travels by an indirect route or any preferred class for one's own convenience, the traveler will pay the extra costs.

B.  Transportation must be by the most economical and efficient means of travel, keeping in mind:

- The nature of the business;
- The time of the traveler, impact on the productivity of the traveler, cost of transportation, and other allowable expenses; and
- The number of persons making the trip and the amount of equipment or material to be transported.

C.  Mode of Transportation:

Transportation must be justified on the "Travel Request" form.

1.  **City Vehicle** – will be used by a traveler on official business when one is available and the use is feasible.
2.  **Planes, Trains, Buses, etc.** – will be used by a traveler when most economical and feasible.  Only "coach class" fare will be paid by the City.
3.  **Rental Car** – may be used by a traveler only when most economical and absolutely necessary.  Justification must be pre-approved on the "Travel Request"

RPT 00889

form.

4.  **Privately Owned Vehicles** – may be used by a traveler on official business, in lieu of City owned vehicles or common carrier, if pre-approved on the "Travel Request" form. When authorized, the driver will be compensated for mileage at a fixed rate per mile as shown in Appendix 1, not to exceed the cost of travel by common carrier.

    - Reimbursement will not be allowed for expenditures related to the operation, maintenance, and ownership of the privately owned vehicle.
    - The traveler will be compensated for miles driven on official business.
    - While at the travel destination, actual mileage may be allowed if driving is necessary and a satisfactory explanation is provided.
    - Odometer readings or mileage as published by the Department of Transportation is required for claiming mileage.
    - Only one person per vehicle may be compensated for mileage.

D.  If a traveler uses a common carrier and personally pays for the transportation, proof of payment must be provided.


## SECTION IV – LODGING

Overnight accommodations may be allowed when a traveler leaves the immediate vicinity to attend an event, such as a conference or training. Accommodations may be approved for the last day of the event if the traveler is expected to return home after 10:00 p.m. Accommodations may be approved for the night before an event if the traveler needs to begin travel before 6:00 a.m. in order to reach the destination at the required time.

The point of origin is as follows:

- On a workday, the point of origin is the traveler's residence or official headquarters, whichever is closer to the destination.
- On a non-work day, the point of origin is the traveler's residence.

The maximum rate allowable for a traveler is single-occupancy unless additional people who stay in the room are also authorized City travelers.

RPT 00890

## SECTION V- MISCELLANEOUS PROVISIONS AND REGULATIONS

The City allows reimbursement for some miscellaneous expenses but excludes others. The reimbursable expenses must be authorized, actually paid for by the traveler, and supported by receipts.

### A. Reimbursable Expenses

1. Reasonable taxi or shuttle fare.
2. Ferry fares; and bridge, road, and tunnel tolls.
3. Parking fees or emergency car storage.
4. Communication expenses (Must be documented as official business).
5. Gasoline and oil while driving City owned vehicles or rental cars.
6. Convention, conference or training course registration fees.
7. Room taxes when documented on a hotel bill. All travelers should use the Tax-Exempt Certificate for accommodations in Florida.

### B. Non-Reimbursable Expenses

1. Tips and gratuities.
2. Laundry and dry cleaning.
3. Personal and local telephone calls.

### C. Incidental Expenses

For overnight travel, an allowance of $2.00 per day may be claimed, without receipts, for incidental expenses that are not reimbursable by the City as actual expenses.

## SECTION VI – TRAVEL FORMS

### A. Travel Request

The "Travel Request" is used to pre-approve all travel except travel by the Mayor, a City Commissioner, or the City Administrator. Any special circumstances must be justified on the form and a cost-comparison provided.

A copy of the form and appropriate attachments must be included with every form FN121 that is submitted to the Finance Department to request direct payment of travel expenses. The original must be submitted with the "Travel Expense Report" after the travel has been completed.

RPT 00891

## B.  FN121 – Direct Payment

FN121 is used to request advance payment of registration fees, hotel room, and plane fare.  An invoice or written cost estimate must be provided.

The form may also be used for pre-travel reimbursement of personally paid expenses; written proof of payment must be provided.

## C.  FN118 – Travel Expense Report

FN118 "Travel Expense Report" is used to provide a mandatory detailed record of all expenses for travel that is financed through expenditure of City funds.  All travelers must submit FN118 to the Director of Finance within ten business days after returning from their trip.

Every traveler must complete this form even if all expenses were paid prior to the travel and no money is owed either to the City or to the traveler.

If a traveler does not submit this form or if the Finance Department does not approve it, the entire amount paid by the City will be reported to the IRS as personal, taxable income.

All information about the travel and every allowable expense must be provided in the appropriate sections of the form.

If reimbursement is requested for personally paid expenses, receipts or other proof of payment must accompany the expense report.

## D.  Local Mileage Reimbursement Report

The "Local Mileage Reimbursement Report" is used to request payment when the only travel expense is mileage.

- The driver must use a personal vehicle.
- The distance must be 20 miles or less between locations.
- Odometer readings and justification must be provided.

Policy 5-1 is effective on this _____ day of _____, 2003.

_____
Lois J. Frankel
Mayor

Effective Date
February 20, 2002

<div align="right">
Chapter 5
General
Policy 5-1
Appendix 1
</div>

## RATES FOR MEALS AND MILEAGE

The Travel Policy of the City of West Palm Beach, Florida is set forth by City ordinance. The ordinance provides that meal allowances and an allowance for incidental expenses shall be the low rates of the High-low Rates Method as issued by the Internal Revenue Service and allocated as below. The mileage reimbursement is set as the mileage rate of the Internal Revenue Service.

The current amounts (effective January 1, 2004) are:

|                    |          |
|--------------------|----------|
| Breakfast          | $ 5.00   |
| Lunch              | 9.00     |
| Dinner             | 18.00    |
|                    |          |
| Mileage            | $ .375   |
|                    |          |
| Incidental Expenses | $ 2.00  |

Mileage rates in effect under this policy:

| | |
|---|---|
| February 20, 2002 - December 31, 2002: | .345 |
| January 1, 2003 – December 31, 2003 | .36 |
| January 1, 2004 | .375 |

## SCHEDULE "3B"

## PROFESSIONAL SERVICES

### Agreed Completion Dates

PROJECT:     *CITY CENTER PHASE 1*
RFP#          *#03/04-109*

| *Phase* | *Agreed Completion Date* |
| --- | --- |
| Phase 1 - I. Programming<br>Delivery of Programming Report | 60 days after CRA furnishes items 3, 4 and 6 listed in Section 6.1.3 of Schedule 6 of the Agreement, unless extended by force majeure or other reason beyond DEVELOPER's control. |

*[End of Schedule No. 3B]*

# SCHEDULE "4"

## <u>TERM</u>

PROJECT:     **CITY CENTER PHASE 1**
RFP#         **#03/04-109**


     The Term of this Agreement shall run from the date this Agreement is last executed and shall continue for ninety (90) days, unless extended by written amendment hereto, subject to the provisions of Sections 5 and 7, and Schedules 3.B.and 6 (Section 6.2) of the Agreement.


*[End of Schedule No. 4]*

## SCHEDULE "5"

## SMALL BUSINESS GOAL FOR THE PROJECT

PROJECT:     *CITY CENTER PHASE 1*
RFP#         **#03/04-109**


      The DEVELOPER shall comply with the requirements of the City of West Palm Beach's Small Business Program throughout the term of the Agreement.  A copy of the relevant sections of Chapter 66 of the City Code of Ordinances follow this page and are incorporated herein.

## ARTICLE IX. SMALL BUSINESS PROGRAM*

_____

*Cross references: Businesses and business regulations, ch. 22.

_____

### Sec. 66-221. Short title.

This article shall be known and may be cited as the "City of West Palm Beach's Small Business Program Ordinance" or "small business program code."

(Code 1979, § 2-451)

### Sec. 66-222. Policy and purpose.

(a)     The policy of the city is that all businesses be afforded an opportunity for full participation in the city's procurement system and that discrimination by the city or its providers of goods, services or construction is prohibited.

(b)     The purpose of this article is to serve the public interest by spurring economic development through encouraging small businesses, including minority- and women-owned businesses that meet the small business definition, to locate and remain in the county and, especially, the city. Accordingly, this article will afford opportunities and assistance to small businesses so that they may gain experience, knowledge, technical capacity and resources and may have obstacles to their success lessened. The city is committed to ensuring full and equitable participation by small businesses in the provision of goods, services and construction to the city.

(c)     It is declared to be the policy of the city to take all necessary, reasonable and legal action to prevent discrimination in its procurement process, to ensure that all businesses, including small businesses, are afforded the maximum opportunity to participate in the city's procurement process and to establish a recordkeeping system to monitor small business participation in procurement.

(Code 1979, § 2-452)

### Sec. 66-223. Definitions.

The following words, terms and phrases, when used in this article, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

*Best value* shall have the same meaning set forth in article II of this chapter.

*Bid* means the process for competitive bidding through invitations to bid as set forth in the procurement code.

*Certification* means the process by which the small business division determines a business meets the definition of a small or a minority- or woman-owned business.

*Certified business* means a business that has been certified by the small business division or whose certification from another agency has been accepted and approved by the small business division manager.

*Commercially useful function* means a function which results in the provision of needed materials, supplies, equipment or services to the city. A small business must demonstrate expertise in the commodity area that they are supplying and those commodity area must be identified and listed in the certification approval letter. Acting merely as a conduit to transfer funds to another business does not constitute a commercially useful function.

*Construction* means the process, usually requiring the professional services of an architect and/or engineer, for building, altering, repairing, improving or demolishing any structure or building or other improvements of any kind to any real property as determined by the procurement official.

*Contractor* means a separate and distinguishable business entity participating or seeking to participate in the performance of a contract, excluding providers of goods.

*Controlled,* for the purposes of determining whether a business is a minority- or woman-owned business, means the minority, the woman or combination of minorities and women, as the context requires, who:

    (1)   Possesses legal authority and power to manage business assets, goodwill and daily operations of the business; and

    (2)   Actively and continuously exercises such authority and power in determining the policies and directing the operations of the business. The term "controlled" for the purposes of determining whether a business is a small business shall mean that no large business:

        a.   Possesses legal authority and power to manage business assets, goodwill and daily operations of the business; and

        b.   Actively and continuously exercises such authority and power in determining the policies and directing the operations of the business.

*Days* means calendar days unless specified otherwise.

*Debarment* means the exclusion for cause of a vendor or contractor from bidding and/or doing business with the city.

*Emergency procurement,* as authorized by the mayor, means a procurement made in response to a requirement when a delay caused by complying with all governing rules, regulations and/or procedures would be detrimental to the interests, health, safety or welfare of the city.

*Goal* means the annual amount projected to be spent with small businesses expressed as a percentage of the total dollar volume in procurements.

*Goal setting* means a committee established pursuant to section 66-229.

*Goods* means supplies, materials, products, machinery, equipment, furniture, computers, vehicles, tools and other tangible property used by the city.

*Joint venture* and *partnership* mean an association of two or more persons or businesses to carry out a single business for profit for which purpose they combine their property, capital, efforts, skills and knowledge and includes limited or general partnerships.

*Large business* means a business that does not meet the definition of small business as defined in this article.

*MB* means a minority-owned business.

*Minority person* means an individual who is a citizen or lawful permanent resident of the United States who is:

(1)    An African American, a person having origins in any of the black racial groups of Africa;

(2)    A Hispanic American, a person of Spanish or Portuguese culture who has origins in Central or South America, or the Caribbean, regardless of race;

(3)    An Asian American, a person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands; or

(4)    A Native American, a person who has origins in any of the Indian tribes of North America prior to 1835.

*Owned*, for the purposes of determining whether a business is a minority- or woman-owned business, means that the minorities or women, as the context requires, shall possess an ownership interest of at least 51 percent. The term "owned," for the purposes of determining whether a business is a small business, shall mean that no large business shall possess an ownership interest in excess of 49 percent.

*Practicable* means reasonably capable of being accomplished.

*Preferential programs* means the preferences extended for small business participation in city procurement.

*Prime contractor* means any person or business entity who has a contract with the city.

*Procurement code* means the city's procurement code set forth in this chapter, as it may be amended from time to time.

*Procurement goals* means goals expressed as percentages of the total dollar volume for participation of small businesses on individual bids, proposals, resulting work authorizations, purchase orders (POs) or city contracts.

*Professional services* means any narrow discipline wherein a known practitioner has, through education and experience, developed expert advisory and programming skills as a vocation, any service performed primarily by vocational personnel which requires the certification of a professional before the services are acceptable to the user of the service, or any other advisory study or programming activity where the procurement official determines that the level of skills and/or creativity of the potential or known practitioner warrant a solicitation process other than the competitive bid process.

*Proposal* means an executed formal document submitted by an offeror to the city stating the goods, services and/or construction offered to satisfy the need as requested in the requisition, request for proposal, request for information or request for qualifications.

*Quotation* means any oral or written offer as a result of an informal request by a vendor to the city to furnish specific goods, services and/or construction at a stated price.

*Request for quotation* means a request, either oral or written, to solicit prices for specific goods, services and/or construction.

*Services* means the furnishing primarily of labor, time and/or effort by a contractor, wherein the provision of goods or other specific end products other than reports, studies, plans, advisories, contractual documents or other documents, relating to the required performance is incidental or secondary. This term "services" shall not include construction or employment agreements.

*Small business* means a person or firm that:                    RPT 00899

(1)    Has been in existence for at least one year and has filed a federal income

tax return and includes regulated professionals, such as engineers, architects, certified public accountants and attorneys, who have at least three years of professional experience and who own businesses that have been in existence for less than one year and may not have filed a federal income tax return;

(2)    During the last three years (or less if the business has been in existence for less than three years) has had average annual gross sales:

    a.   In commodities of less than $3,500,000.00;

    b.   In professional services of less than $3,500,000.00; or

    c.   In construction of less than $7,000,000.00; and

(3)    Meets the certification criteria set forth in this article.

*Small business committee* means the committee established pursuant to section 66-238.

*Small business listing* means a supplier list of certified small businesses by commodity codes established by the National Institute of Governmental Purchasing (NIGP) and published by the small business division and made available to contractors or vendors for use in identifying subcontractors and material suppliers.

*Subcontractor* means any person providing goods, services and/or construction to a prime contractor for profit, if such goods, services and/or construction are procured or used in fulfillment of the prime contractor's obligations arising from a contract with the city, excluding providers of goods directly acquired by the city.

*Vendor* means an actual or potential supplier of goods, services and/or construction.

*WB* means a woman-owned business.

(Code 1979, § 2-453)

**Cross references:** Definitions generally, § 1-2.

## Sec. 66-224. Scope.

(a)    Except as otherwise provided in this article, this article shall apply to the solicitation of all goods, services, professional services and construction by the city.

(b)    Businesses eligible to participate in this program must:

(1)    Be certified by the small business division as meeting the definition of a small business; and

(2)    Be registered as a vendor by the city.

(Code 1979, § 2-454)

## Sec. 66-225. Program administration.

The director of the economic and community development department has the overall responsibility for administering the small business program. The small business division shall be responsible for developing, managing and implementing the small business program on a day-to-day basis. The director of the economic and community development department may promulgate policies and procedures consistent with this article and any federal or state law, regulation or grant requirement.

(Code 1979, § 2-455; Ord. No. 3691-03, § 3, 9-29-2003)

**Sec. 66-226. Implementation.**

The city shall take all necessary and reasonable steps permissible by law to ensure that certified small businesses have the maximum opportunity to participate in the city's procurement processes.

(1)    The small business division manager shall:

a.    Identify procurement opportunities for small businesses;

b.    Analyze small business availability for the procurement of goods, services, professional services and construction;

c.    Prepare an annual budget detail that allocates resources, including budget and staff to carry out the mandates of this article;

d.    Develop and maintain records of certified small businesses so that vendor listings can be produced for use in identifying potential contractors, subcontractors, material suppliers and providers of goods, services and construction;

e.    Recommend individual procurement goals to the goal setting committee;

f.    Monitor and maintain records to verify steps taken and results achieved to maximize small business participation;

g.    Promote the city's small business program;

h.    Provide quarterly truth-in-reporting reports to the city commission and to the small business committee detailing small business participation in the city's procurement. This report shall include both total dollars and percentages and shall not omit any procurement in the calculation of such. The first quarterly report shall be for the period ending June 30, 2001;

i.    Refer small businesses to available programs that provide technical assistance, including, but not limited to, business planning, financial aid and other training for small businesses;

j.    Recommend that the procurement official schedule pre-bid or pre-proposal meetings where appropriate to inform potential contractors about small business requirements and encourage small businesses to attend these meetings;

k.    Provide information and assistance to small businesses on certification procedures, subcontracting practices and bonding requirements;

l.    Plan and participate in training seminars for the purpose of informing potential bidders/proposers/vendors of the city's small business program;

m.    Recommend that, when appropriate, the procurement official place notices of procurement opportunities in small business trade association newsletters, local or regional newspapers and minority and woman focused media; and

n.    Collect and maintain data through software systems in order to report on compliance with the article and monitor and report on utilization of minority- and woman-owned business as compared to their availability.

(2)    The procurement official shall implement those requirements of this article that are included within the authority and duties of the procurement official as set forth in the procurement code, including, where appropriate, revising the procurement procedures.

(3)    Department directors shall, whenever practicable:

a.    Separate discrete and unconnected work elements from projects for separate contracts, where separation will not cause substantial adverse fiscal, administrative, or legal impact;

b.    Divide procurements into component parts or work elements on goal setting worksheets so that the small business division can determine which small businesses are available to participate as subcontractors; and

c.    Establish delivery schedules that do not discourage small or large business participation, especially, in master agreements.

(Code 1979, § 2-456)

## Sec. 66-227. Waiver.

(a)    *Emergency waiver.* Whenever an emergency procurement is authorized by the mayor pursuant to the procurement code, the requirements of this article shall be deemed waived.

(b)    *Single source waiver.* Whenever the procurement official makes a single source determination pursuant to the procurement code, the requirements of this article shall be deemed waived.

(c)    *Performance waiver.* The small business division manager may waive compliance with this article if such compliance is no longer possible or practicable during the period of performance of the contract.

(Code 1979, § 2-457)

## Sec. 66-228. Goals.

(a)    *Annual goal.* Small business participation goals will be set on a procurement by procurement basis as set forth in this article. At the request of the city commission, but no less than on an annual basis, the small business division shall provide a formal report on small business utilization and availability data to the city commission. Upon evaluating such data, the city commission may establish or revise an annual participation goal for the next fiscal year.

(b)    *Annual budget detail.* Each department shall, by no later than October 1, provide the small business division with its annual budget detail. The small business division manager shall compile a prospective procurement list based on the annual budget detail received from the individual departments and make these listings available to the goal setting committee for their use and consideration in establishing procurement goals and to the small business community for the purpose of providing them with advance notice of upcoming opportunities.

(c)    *Goals for procurements over twenty-five thousand dollars.* Specific goals for each bid or proposal shall be adopted on a procurement by procurement basis.

RPT 00902

(1)     *Goal setting committee.* The goals will be established by a goal setting committee composed of a representative of administration, the small business division, the parks and recreation department, the procurement division, the public utilities department, and any other department or division as determined by the mayor. The city attorney shall serve as legal advisor to the committee.

(2)     *Criteria for bid or proposal goal establishment.* In setting bid or proposal goals, the following factors shall be considered:

    a.     The type of work required;

    b.     The contracting and subcontracting opportunities for small businesses, including support and ancillary services, and the number of certified small businesses available in comparison with other registered vendors;

    c.     Past and current experience of the city in meeting its goal and the results and reasons therefore; and

    d.     Special circumstances relating to the procurement including, but not limited to, scheduling constraints.

(3)     *Procedure for establishing an individual procurement goal.*

    a.     The department responsible for the procurement shall prepare a goal setting worksheet that identifies its various components. The goal setting worksheet will be submitted to the small business division outlining the potential contracting and subcontracting opportunities and the estimated percentage that each bears to the total bid, proposal, or work authorization, or procurement. The goal setting worksheet shall show the scope of the work for each component that has potential for being subcontracted and the qualifications required of the subcontractor to do the work if they are not evident in the scope of work. The goal setting worksheet shall also identify if the procurement has any other specific requirements such as may be imposed by a federal/state grant. The goal setting worksheet is forwarded to the small business division manager.

    b.     The small business division then compares the goal setting worksheet against the listing of certified small business vendor database to determine the availability of small businesses qualified to do the work in each potential subcontract component, reviews the listing of other vendors and calculates the goal for each bid, proposal and work authorization. Upon calculating the goal, the small business division shall provide the completed goal setting worksheet, the list of qualified small business vendors and the list of other vendors to the procurement official, the department responsible for the procurement, and all members of the goal setting committee. The individual goal set by the small business division shall become final, unless a review is requested by the procurement official, the department responsible for the procurement, or any member of the goal setting committee within three business days of the goal calculation by the small business division. If a review is requested, the small business division shall coordinate the scheduling of a meeting of the goal setting committee to review the goal calculation, such meeting to be held as soon as practicable, but no later than within seven business days of the request.

    c.     The goal setting committee may approve the goals calculated by the small business division or set other goals for the bid or proposal or work authorization based on other information presented at the goal setting

meeting. No individual procurement goal for small business participation may exceed 50 percent. If there are no available certified small businesses for the procurement, no goal will be established.

d.    The established goal shall be applied to the full monetary value of the procurement; no portion of the procurement is exempt from consideration in determining whether the goal was met or not.

e.    In case of a certified small business submitting a bid as a prime contractor, the small business is credited with meeting the percentage of the procurement goal that the small business will perform with its own forces plus the percentage of subcontractors awarded to other certified small businesses.

f.    A single purpose joint venture or partnership consisting of a small business where the small business owns and controls at least 51 percent of the entity and a non-small business, functioning as a prime contractor, will be credited with small business participation on the basis of percentage of ownership, participation in the work, risk and profit by the small business.

g.    Bidders or proposers will receive credit for small business participation goal attainment only for subcontractors who are certified and licensed, if required, in the specific area of expertise for which credit is sought at the time of bid or proposal opening.

(d)    *Quotes for small procurements valued at $2,500.00 to $25,000.00.* Whenever practicable, the procurement official shall obtain quotes from small businesses when they are listed on the computerized supplier lists by NIGP codes.

(e)    *Procurement card and other purchases valued at less than twenty-five hundred dollars.* The procurement official shall encourage the use of small businesses.

(Code 1979, § 2-458)

## Sec. 66-229. Preferential programs.

Although small business participation shall be strongly encouraged on all procurements, the following preferences shall not apply to procurements valued at less than $25,000.00:

(1)    *Bid preference (for procurements over twenty-five thousand dollars).*

a.    For procurements that involve an invitation to bid and when the bid providing the best value to the city is less than $1,000,000.00, then the bidder selected shall be the bidder that provides the best value for the city and meets the small business goals, so long as that bid does not exceed the bid otherwise providing the best value to the city by ten percent. If the bid providing the best value to the city which meets the small business goal is more then ten percent greater than the bid otherwise providing the best value to the city on the bid, the city shall award the bid to such bidder and the small business goals shall be deemed waived for such contract or work authorization.

b.    For procurements or work authorizations using a competitive-bid basis and when the bid providing the best value to the city is $1,000,000.00 or more, then the award shall be made to the bid providing the best value to the city that meets the small business goals, so long as that bid does not exceed the bid that otherwise provides the best value to

RPT 00904

the city by $100,000.00. If the bid which meets the small business goal is more than $100,000.00 greater than the bid that otherwise provides the best value to the city, the city shall award the bid to such bidder and the small business goals shall be deemed waived for such contract.

(2)    *Request for proposals preference (over twenty-five thousand dollars).* For procurements using requests for proposals, the procurement official or, if applicable, evaluation committee established to evaluate the proposals, shall consider compliance with the small business goals as a material criterion for selection, i.e., such goals shall be given significant weight.

(Code 1979, § 2-459)

## Sec. 66-230. Good faith efforts.

(a)    Contractors submitting bids or proposals to provide goods, services and construction to the city shall attempt to comply with small business participation goals. In the event the goals are not achieved, the contractor must include with its bid evidence of good faith efforts to achieve the goals. A bidder or proposer may still be selected subject to the provisions of this article, and the city shall consider the following criteria in determining good faith efforts:

(1)    Attendance at the pre-bid conference, if held;

(2)    Whether and when the contractor provided written notice to all certified small businesses that perform the type of work to be subcontracted appearing on the listings by commodity codes established by NIGP as published by the small business division and advising the small businesses:

    a.    Of the specific work the contractor intends to subcontract;

    b.    That their interest in the contract is being solicited; and

    c.    How to obtain information for the review and inspection of contract plans and specifications;

(3)    Whether the contractor selected feasible portions of work to be performed by small businesses, including, where appropriate, dividing work elements in any manner that maximize the opportunity for small business participation. The ability of the contractor to perform the work with its own work force will not in itself excuse a contractor from making positive efforts to meet goals for small business participation on the contract;

(4)    Whether the contractor considered all quotations received from small businesses, and for those quotations not accepted, the contractor shall provide a written explanation of why the small business will not be used during the course of the contract. Receipt of a lower quotation from a non-small business will not in itself excuse a contractor's failure to meet project goals;

(5)    Whether the contractor provided interested small businesses assistance in reviewing the contract plans and specifications;

(6)    Whether the contractor assisted interested small business firms in obtaining information regarding required bonding, lines of credit or insurance if such assistance was necessary;

(7)    Whether the contractor advertised the subcontracting opportunities in publications of general circulation, trade associations, and small business focused media;

(8)     Whether the contractor followed up initial solicitations of interest by contacting small businesses to determine with certainty whether the small business was interested;

(9)     Whether the contractor negotiated in good faith with interested small businesses, based on a reasonable investigation of their capabilities;

(10)    Whether the contractor effectively used the services of available small business associations (community organizations, contractors business groups); local, state and federal small business assistance offices; and other organizations that provide assistance in the recruitment and placement of small business businesses;

(11)    Whether the contractor has utilized small business subcontractors on other (city and private sector) contracts within six months preceding the date of the specific contract under consideration;

(12)    Whether the contractor's efforts were merely pro forma, given all relevant circumstances, and could not reasonably be expected to provide sufficient small business participation to meet the goals.

(b)     This list is not intended to be all inclusive, and the city will consider the quality, quantity, intensity and timeliness of the contractor's efforts. The small business division shall develop procedures and clarifications which provide objective guidelines pertaining to the criteria for determining of good faith efforts.

(c)     It is the responsibility of the contractor to exercise good faith efforts. Any act or omission by the city shall not relieve the bidder or proposer of this responsibility.

(Code 1979, § 2-460)

## Sec. 66-231. Bid and proposals requirements.

Bids and proposals shall include the following:

(1)     A provision prohibiting any agreement between a contractor and a small business where the small business promises not to provide subcontracting quotations to other bidders or potential bidders.

(2)     A statement that credit for small business subcontractors or partnerships for goal attainment is applicable only for those which are certified by the city in the specific area of expertise for which credit is sought at the time of the bid opening.

(3)     A requirement that the bidder or proposer shall provide, as appropriate, such forms as needed to demonstrate compliance with this article.

(4)     A statement to the effect that if a contractor lists a small business who has been decertified after submission of bids or proposals, but prior to the award of the contract, the city shall require the contractor, within a specific reasonable timeframe, to attain the small business goal with a certified small business or demonstrate good-faith efforts.

(Code 1979, § 2-461)

RPT 00906

## Sec. 66-232. Contract.

The following shall be included in the body of the contract with the city for the provision

of goods, services, and construction:

 (1) A provision indicating that this article is incorporated by reference.

 (2) A requirement that the contractor shall comply with the commitment to use small businesses made in their proposal or bid. Small businesses that no longer remain associated with the contract of the contractor shall be replaced with other certified small businesses unless approval to the contrary is granted by the small business division manager.

 (3) A requirement to maintain relevant records and information necessary to document compliance with this article and to permit the city to inspect and audit such records.

(Code 1979, § 2-462)

## Sec. 66-233. Contract compliance requirements.

 (a) The small business division will establish procedures for monitoring and evaluating program performance and compliance. Failure to comply with the small business requirements of an awarded contract may result in suspension or debarment of the firms or individuals involved in accordance with all applicable articles.

 (b) Any contractor or firm who falsely represents that it is a small or minority- or woman-owned business or any contractor or firm which submits a bid or proposal which is determined to contain false representations as to the utilization of small businesses may be disqualified from bidding, proposing, or negotiating on any city procurement for 36 months.

(Code 1979, § 2-463)

## Sec. 66-234. Disqualification.

 (a) The city reserves the right to reject any bid or proposal where the bidder or proposer has previously failed to perform properly and who have done so by commission or omission of an act of such serious and compelling nature that the act indicates a serious lack of business integrity or honesty. Such acts include, but are not limited to:

 (1) Violating any applicable law, regulation, or contract provision relating to the performance of obligations incurred under a city contract.

 (2) Making or purporting to make any false statement or using deceit for the purpose of influencing in any way any action of the city.

 (3) Making false representations as a small business for the purposes of qualifying for certification as such a business under this article.

 (b) It is unlawful for any individual to falsely represent any entity as a minority/woman or small business for purposes of qualifying for certification as such a business under this article.

 (c) Any contractor or firm which falsely represents to the city that it is a small business firm and/or which represents that it will use the services or commodities of a small business and subsequently does not do so, without prior city approval, may be in breach of contract. Upon determination that a breach of contract has occurred, the city shall have all available remedies for breach of contract.

(Code 1979, § 2-464)

RPT 00907

## Sec. 66-235. Documentation of small business subcontractor utilization and payment.

Every contract let by the city for the performance of work shall contain a provision requiring the prime contractor to certify in writing that all small business subcontractors, subconsultants, and suppliers have been utilized in accordance with the participation levels provided by the prime contractor at the time of contract and have been paid for work and materials from previous progress payments received, less any retainage, prior to receipt of any further progress payments. During the contract and upon completion of the contract, the city shall require documentation from the prime contractor to certify utilization and payment to small business subcontractors, subconsultants or suppliers. This provision in no way creates any contractual relationship between any subcontractor, subconsultant, or supplier and the city or any liability on the city for the contractor's failure to make timely payment to the subcontractor, subconsultant or supplier.

(Code 1979, § 2-465)

## Sec. 66-236. Certification.

(a)    *Eligibility standards for small businesses.* An eligible small business is a business that meets the following criteria:

(1)    Meets the definition of small business as set forth in this article;

(2)    Has its principal place of business located within the county;

(3)    Performs a commercially useful function and is responsible for execution of a discrete element of work of a contract and carrying out its responsibilities by actually performing, managing, and supervising the work performed; and

(4)    Is not owned nor controlled by a large business as defined in this article.

(b)    *Eligibility standards for minority/woman business.* Participation in the preferential programs set forth in this article is limited to small businesses only. A small business may additionally be certified as a minority- or woman-owned business. Additional certification as a minority or woman owned business shall only be used by the city for data collection and monitoring purposes. An eligible MB/WB is a business concern which meets all of the criteria for a small business above and the following criteria:

(1)    Is a business that is both owned and controlled by minorities or by women or combination thereof. This means that minorities or women must own at least 51 percent of the business and that the management and daily business operations are controlled by the minorities or women who own it.

(2)    Is an independent business. The ownership and control by minorities and/or women shall be real, substantial and continuing and shall continue beyond the pro forma ownership of the firm as reflected in its ownership documents. The minority or woman owners shall enjoy the customary incidents of ownership and shall share in the risks and profits commensurate with their ownership interests, as demonstrated by an examination of the substance rather than form or arrangements. Recognition of the business as a separate legal entity for tax or corporate purposes is not necessarily sufficient for recognition as a MB/WB. In determining whether a potential MB/WB is an independent business, the city shall consider all relevant factors, including, but not limited to, the date the business was established, the adequacy of its resources for the type

RPT 00908

of work specified, and the degree to which financial, equipment leasing and other relationships with nonminority firms vary from established industry practices.

a.    *Ownership.* In determining ownership of the business, the contribution of capital or expertise by the minority or woman owners to acquire their interest in the firm shall be real and substantial. Examples of insufficient contributions include, but are not limited to, a promise to contribute capital, a note payable to the firm or its owners who are not minorities or women, or the mere participation as an employee, rather than as a manager/owner. Businesses which have had a transfer of ownership or control from a nonminority or man who maintains any interest in the business to a minority or woman shall not be considered for certification for one year of such transfer.

b.    *Control.* The minority or woman owner must have operational and managerial control of the business. The primary consideration determining operational control and the extent to which the minority person or woman actually operates the business will rest upon the peculiarities of the industry of which the business is a part. Accordingly, in order to clarify the level of operational involvement of the minority person or woman in the business to be certified as an MB/WB, the following examples are put forth and are not to be all inclusive:

1.    The minority person or woman must have experience in the industry for which certification is sought.

2.    The minority person or woman must be able to demonstrate that basic decisions pertaining to the daily operation of the business are made independently.

3.    The minority person or woman must have technical competence in the industry for which certification is sought. The minority person or woman must have a working knowledge of the technical requirements of the business needed to operate in the industry.

c.    *Managerial control.* Managerial control means that the minority or woman demonstrates the ability to make independent and unilateral business decisions needed to guide the future and destiny of the business. For a minority or woman to demonstrate the extent of their control, the following examples are put forth and are not intended to be all inclusive:

1.    Corporate bylaws or partnership agreements or other agreements should be free of restrictive language which dilutes the minority's or woman's control, thus preventing them from making those decisions that affect the destiny of the business.

2.    The minority person or woman should be able to clearly show, through production of documents, the areas of control, such as, but not limited to:

i.    Authority and responsibility to sign payroll checks and letters of credit;

ii.    Authority for negotiations and signature responsibility for insurance and/or bonds; and

iii.    Authority for negotiations and/or execution of documents.

If the owners of the firm who are not minorities or women are disproportionately responsible for the operation of the firm, then the firm is not to be considered an MB/WB within the meaning of this program. Where the actual management of the firm is contracted out to individuals other than the owner, those persons will be considered as controlling the business.

(c)    *Application procedures.* All applicants wishing to be considered as certified businesses for the benefits of this program must apply for small business certification by completing a small business disclosure affidavit, provided by the small business division. The small business division will prepare a certification guidebook which will be distributed to interested small businesses and which will provide guidelines for the preparation of a small business certification application. Applicants must submit copies of the following documentation as appropriate for their business. Documents not in English shall be accompanied by a certified translation.

(1)    *Corporations.*

a.    Proof of minority/woman status, e.g., copy of birth certificate, driver's license or other records, if applicable;

b.    Articles of incorporation, including date approved by the state and any subsequent amendments;

c.    Bylaws;

d.    Prior three years' federal corporate tax returns (or less if the business has been in existence less than three years), including all schedules; if a regulated professional has been in practice less than one year, financial statements reviewed by a certified public accountant for the period of existence;

e.    Resumes of principals and management personnel of business showing education, training and employment with dates;

f.    Stock transfer agreement;

g.    License to do business in the county and any other necessary licenses;

h.    Bank signature card;

i.    Minutes of first corporate organizational meeting;

j.    Last three months' corporate payroll;

k.    Stock ledger;

l.    The corporation's distribution of profits for the previous year;

m.    Third-party agreements, such as rental and lease agreements, management agreements or purchase agreements;

n.    Stock certificates issued; and

o.    Proof of stock purchase/capital invested.

(2)    *Partnerships.*

a.    Proof of minority/woman status, e.g., copy of birth certificate, driver's license or other documentation, if applicable;

b.    Partnership agreement;

c.    Bank signature card;

d.    Prior three years' federal tax returns (or less if the business has

been in existence for less than three years) including all schedules; if a regulated professional has been in practice less than one year, financial statements reviewed by a certified public accountant for the period of existence;

e.    Resumes of all partners and management personnel showing education, training and employment with dates;

f.    License to do business in the county and any other necessary licenses;

g.    Buy-out rights agreement;

h.    Profit-sharing agreement;

i.    Last three months' payroll;

j.    Proof of capital invested;

k.    The partnership's distribution of profits for the previous year; and

l.    Third-party agreements, such as rental and lease agreements, management agreements, or purchase agreements.

(3)    *Sole proprietors.*

a.    License to do business in the county and other necessary licenses;

b.    Verification to do business under an assumed name (fictitious name certificate);

c.    Owner and management personnel resumes showing education, and employment with dates;

d.    Prior three years' federal tax returns (or less if the business has been in existence less than three years) including all schedules; if a regulated professional has been in practice less than one year, financial statements reviewed by a certified public accountant for the period of existence; and

e.    Proof of minority/woman status. e.g., copies of birth certificate, driver's license or other documentation.

(d)    *Application review procedures.* Once an applicant has submitted the disclosure affidavit and all supporting documentation, certification review will be completed within 60 days and the following procedures will apply:

(1)    The small business disclosure affidavit and all supporting documents will be logged in, as appropriate. Applications will not be processed until all documents are received. The small business division will inform the applicant of any missing documentation. Any applicant failing to submit the documentation within 30 days of the notice shall be deemed to have abandoned its application. A list of required documentation will be provided with the application.

(2)    The application will be reviewed for completeness and accuracy. References will be called and information verified by third parties, when appropriate.

(3)    When deemed appropriate by the small business division, a personal interview (site visit) will be scheduled with the principal to discuss the documentation submitted and to determine if the applicant meets the established criteria.

(4)    Applicants approved for certification will be notified immediately by mail.

# EXHIBIT 1
# PART 2

Certified small businesses shall be listed in the city's small business computer database.

(e)    *Denial of certification.* Applicants denied certification shall be notified by certified mail and informed of their right to appeal the denial. An applicant denied certification may not reapply for certification for 120 days from the denial of the certification.

(f)    *Appeal of certification denial.* Any person or firm that believes it has been wrongfully denied certification as a small business or MB/WB may file an appeal in writing, signed and dated, with the small business division. The appeal shall be filed no later than 15 days from the date of the notice of denied certification.

(g)    *Hearing on appeal of certification denial.* If an appeal is filed, an administrative hearing will be conducted with the small business committee. The hearing will be scheduled within 60 days of the filing of the request for appeal. At the hearing, the committee may not consider any new information which was not available at the time of the application. This hearing is the final step available in the city's administrative process for the denial of a certification application. The small business committee will provide written notice as to the outcome of the hearing within ten working days of the date of the hearing. Any person who is a party to the proceeding before the small business committee may appeal to the circuit court of the county in accordance with applicable state appellate rules.

(h)    *Reciprocal certification.* Only firms certified by the city or by any other political subdivision or governmental entity and granted reciprocal certification by the small business division will be used in determining goal attainment and will have the advantage of preferential programs contained within this article. Reciprocity shall be granted to small business firms which have been certified by other jurisdictions which meet the certification standards of this article and that provide documentation supporting such other certification. Eligibility for reciprocal certification shall be contingent upon a determination by the small business division manager that the standards of the certifying jurisdiction meet the certification standards of the city. The small business seeking reciprocal certification must submit to the small business division a copy of the current certification from the certifying jurisdiction and a copy of the completed application submitted to the certifying jurisdiction along with any affidavits of continued eligibility.

(i)    *Recertification.* Certified small businesses are required to submit an affidavit of their continued eligibility as a small business every three years. The small business division may conduct site visits or review documents to ensure continued compliance as a small business. If there has been a change in ownership interest and/or control, the small business must notify the small business division within 30 days of the change. Supporting documentation may be required for continued certification. A company that fails to submit its affidavit of continued eligibility or fails to submit documentation requested by the small business division will no longer be deemed certified for purposes of participation as a small business. The criteria for recertification shall be the same as for certification. An applicant may request an appeal of denial of recertification within 15 days of the date of notice of denial. The hearing shall be conducted in the manner described above, and notice of the outcome of the hearing shall be sent within ten working days of the hearing. This hearing shall be the final step in the administrative review of denial of recertification. An applicant denied recertification may not reapply for certification for 120 days from the denial of recertification.

(j)    *Decertification.* The small business division shall decertify the small business if:

(1)    The small business cannot be contacted at the last-known address;

(2)    The small business is no longer in business;

(3)    The small business is no longer licensed to do the type of business for

RPT 00912

which it was certified;

(4)    The small business obtained its original certification and/or recertification through false representation or deceit;

(5)    The small business has experienced such a substantial change in ownership or control that continued certification would be contrary to the policy of the city's small business program; or

(6)    The small business has been disbarred or suspended as a vendor by the city's procurement official. At the expiration of any suspension, the firm may reapply for certification.

The small business division shall notify the small business by certified mail that decertification is recommended. The small business may request an appeal hearing of the decertification within ten working days of the date of the receipt of the notice. The hearing shall be conducted in the manner described in subsections (f) and (g) of this section, and notice of the outcome of the hearing will be sent within ten working days of the hearing. This hearing shall be the final step in the administrative review of a decertification. Nothing in this section shall prevent the small business division manager from commencing an investigation regarding the legitimacy of a firm's small business certification based upon information received from an independent third party.

(Code 1979, § 2-466)


## Sec. 66-237. Graduation from small business program.

Participation in the small business preferential programs will be dependent upon the small business's need for the preferences extended to small businesses under this article. A business shall not be eligible for continued participation in the preferential programs contained in this article if the business no longer meets the definition of small business contained in this article.

(Code 1979, § 2-467)


## Sec. 66-238. Small business committee.

(a)    There is hereby created and established the small business committee, appointed by the mayor consisting of seven members. Members shall serve for staggered terms of three years. Initially, three members shall be appointed for a term of three years, two members shall be appointed for a term of two years, and two members shall be appointed for a term of one year. Vacancies shall be filled in the same manner as the original appointments for the remainder of the vacant term. Each member shall serve without compensation and may be removed by the mayor without cause. All members must be residents of the county.

(b)    The small business committee shall have the following duties and functions:

(1)    To consider and decide any appeals of the small business division manager's decision to:

a.    Not certify;

b.    Not recertify; or

c.    Decertify a person, firm, or business pursuant to this article.

RPT 00913

(2)    To review proposed changes to this article and make recommendations to

the mayor and city commission.

The only actions, decisions, and recommendations of the small business committee that shall be binding on the city shall be the small business committee's decision regarding appeals related to certification, decertification, and recertification.

(c)    A chair and vice-chair shall be elected by a majority vote of the small business committee and shall serve for a term of one year. The duties of the chair shall be to preside at small business committee meetings. The vice-chair shall perform the duties of the chair in the chair's absence.

(d)    Meetings of the small business committee shall be held at the call of the chair or according to a meeting schedule adopted by the committee. Four members of the small business committee shall constitute a quorum and a majority of the quorum shall be sufficient to take action. The small business committee shall adopt such rules for its operation, meetings and proceedings as it deems desirable.

(Code 1979, § 2-468)

61

WPB-FS1\513154v03\10/1/04\66237.010300

62

RPT 00915

SCHEDULE "6"

## ADDITIONAL STANDARD TERMS AND CONDITIONS

PROJECT:    *CITY CENTER PHASE 1*
RFP#        **#03/04-109**

### 6.1    Responsibilities of the CRA
#### 6.1.1    Designation of CRA Representative on Project
The CRA agrees to designate, in writing, an individual to act as the CRA's representative with respect to the Professional Services to be rendered hereunder provided that such representative shall not have the authority to amend or modify this Agreement. Such person shall have complete authority to transmit instructions, receive information and interpret and define the policies and decisions of the CRA with respect to the DEVELOPER's Professional Services hereunder.

#### 6.1.2    Specification of CRA Requirements for Project
The CRA agrees to specify all criteria and provide information as to the CRA's requirements for the Project, including design objectives and constraints, space, capacity and performance requirements, flexibility and expendability and budgetary limitations, as well as any design and construction standards that are more stringent than the applicable building code. The CRA shall also assist DEVELOPER by placing at DEVELOPER's disposal all available information pertinent to the Project including previous reports and any other data relative to design or construction of the Project.

#### 6.1.3    Items to be Furnished upon the DEVELOPER's Request
The designated representative of the CRA will use reasonable efforts to provide the following existing items requested by the DEVELOPER from time to time with the understanding that time is of the essence:
1.    Data prepared by or services of others relevant to the Project;
2.    Appropriate professional interpretations of data prepared by or services of others relevant to the Project;
3.    Environmental assessment and impact statements, existing and in possession of the CRA;
4.    Property, boundary, easement, right-of-way, topographic and utility surveys, existing and in possession of the CRA;
5.    Property descriptions; and
6.    Zoning, deed and other land use restrictions, as known by the CRA.

#### 6.1.4    Access to Property
The CRA agrees to arrange for access to and make all provisions for DEVELOPER to enter upon public and private property as required for the DEVELOPER to perform services under this Agreement.

#### 6.1.5    Attendance at Meetings
The CRA agrees that a representative of the CRA will attend all public meetings and DEVELOPER meetings to which the CRA is requested to attend.

control. The DEVELOPER shall exercise control over the means and manner in which it and its employees perform the work, and in all respects the DEVELOPER's relationship and the relationship of its employees to the CRA shall be that of Independent Contractor and not as employees or agents of the CRA. The DEVELOPER does not have the power or authority to bind the CRA in any promise, agreement or representation other than specifically provided for in this Agreement. The DEVELOPER shall be responsible to the CRA for all work or services performed by the DEVELOPER or any person or firm engaged as a sub-DEVELOPER or subcontractor to perform work in fulfillment of this Agreement.

### 6.3.5  Personnel

The DEVELOPER represents that it has or will secure at its own expense, all necessary personnel required to perform its obligations hereunder. It is understood and agreed that such personnel shall not be employees of or have any contractual relationship with the CRA. All of the services required hereunder shall be performed by the DEVELOPER or under its supervision, and all personnel engaged in performing the services shall be fully qualified and, if required, licensed or permitted under all applicable federal, state and local laws and regulations to perform such services. The DEVELOPER warrants, moreover, that all services shall be performed by skilled and competent personnel in accordance with all applicable national, federal, state, and local professional and technical standards. DEVELOPER more specifically acknowledges that: its employees will not be eligible to participate in any employee benefit maintained by the CRA; will not be covered by the CRA's workers' compensation insurance; and DEVELOPER will be solely and exclusively responsible for payment of all federal and state income, social security, unemployment and disability taxes due in respect of all compensation and/or other consideration paid by the CRA to DEVELOPER hereunder.

### 6.3.5.1    Non-Discrimination by Developer.  The DEVELOPER warrants and represents that all of its employees and applicants for employment are treated equally without regard to race, color, religion, disability, gender, age, national origin, ancestry, marital status or sexual orientation.

### 6.3.5.2    Fair Labor Standards Act.  DEVELOPER is required to pay all employees not less than the Federal minimum wage and to abide by other requirements as established by the Congress of the United States in the Fair Labor Standards Act, as amended from time-to-time.

### 6.3.5.3    Unauthorized Aliens.  The CRA shall consider the employment by DEVELOPER of unauthorized aliens a violation of section 274A(e) of the Immigration and Nationalization Act. Such violation shall be cause for unilateral cancellation of this Agreement.

### 6.3.5.4    Possession of Firearms.  Possession of firearms will not be tolerated on CRA or City of West Palm Beach property. "Firearm" means any weapon (including a starter gun or antique firearm) which will, is designed to, or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any destructive device; or any machine gun. No person who has a firearm in their vehicle may park their vehicle on CRA property. Furthermore, no person may possess or bring a firearm on CRA property. If any employee of an independent contractor or sub-contractor is found to have brought a firearm on CRA property, said employee will be terminated from the CRA project by the independent contractor or sub-contractor. If the sub-contractor fails to terminate said employee, the sub-contractor's agreement with the independent contractor for the Project shall be terminated. If the independent contractor fails to terminate said employee or fails to terminate the agreement with the sub-contractor who fails to terminate said employee, the independent contractor's agreement with the CRA shall be terminated.

### 6.3.6  Selection of Sub-consultants.

Other than the Team members identified in Section 7 of the Agreement, the DEVELOPER shall obtain the prior written approval of the CRA as to each proposed sub-consultant and the CRA reserves the right to reject the selection of a particular sub-consultant and to inspect all facilities of any sub-consultant in order to make a determination as to the capability of the sub-consultant to perform properly under this Agreement.  If the DEVELOPER determines that it is necessary to replace a particular sub-consultant to complete its part of the work on the Project in a professional or timely fashion, the DEVELOPER shall promptly do so, subject to prior written approval and acceptance of the new sub-consultants by the CRA, which approval shall not be unreasonably withheld.  All sub-consultant agreements entered into by DEVELOPER with respect to the Project shall name the CRA as a third-party beneficiary.  CRA shall have the right to communicate with sub-consultants in the presence of DEVELOPER.  However, nothing in the foregoing shall create any contractual relationship between sub-consultants and CRA.

### 6.3.7  Absence of Arrears

The DEVELOPER shall not pledge the credit of the CRA or City of West Palm Beach or attempt to make the CRA a guarantor of payment or surety for any contract, debt, obligation, judgment, lien, or any other form of indebtedness.  The DEVELOPER further warrants and represents that it has no obligation or indebtedness that would impair its ability to meet the completion dates or schedule of this Agreement.

### 6.3.8  Absence of Conflicts of Interest

The DEVELOPER represents that it presently has no interest and shall acquire no interest, either direct or indirect, which would conflict in any manner with its performance hereunder.  The DEVELOPER further represents that no person having any interest shall be employed or engaged by it for said performance.  The DEVELOPER shall promptly notify the CRA in writing by certified mail of all potential conflicts of interest for any prospective business association, interest or other circumstance that may influence or appear to influence the DEVELOPER's judgment or quality of services being provided hereunder. Said notification shall identify the prospective business interest or circumstance and the nature of work that the DEVELOPER intends to undertake and shall request the opinion of the CRA as to whether such association, interest or circumstance would, in the opinion of the CRA, constitute a conflict of interest if entered into by the DEVELOPER. The CRA agrees to notify the DEVELOPER by certified mail of its opinion within thirty (30) calendar days of receipt of the said notification and request for opinion. If, in the opinion of the CRA, the prospective business association, interest or circumstance would not constitute a conflict of interest by the DEVELOPER, the CRA shall so state in its opinion and the DEVELOPER may, at its option, enter into said association, interest or circumstance and it shall be deemed not in conflict of interest with respect to services provided to the CRA by the DEVELOPER under the terms hereof.

### 6.3.9  State Taxes

The CRA is exempt from payment of Florida State Sales and Use Taxes.  The CRA agrees to sign an exemption certificate submitted by the DEVELOPER.  The DEVELOPER agrees and understands that it shall not be exempted from paying sales tax to its suppliers for materials used to fulfill contractual obligations with the CRA, nor is the DEVELOPER authorized to use the City of West Palm Beach or CRA's tax exemption number in securing such materials.  The DEVELOPER shall be responsible for payment of its own and its share of its employees' payroll taxes and benefits with respect hereof.

### 6.3.10  Obligation to Furnish Documents to the CRA

The DEVELOPER shall deliver to the CRA for approval and acceptance, and before being

eligible for final payment of any amounts due, copies of all documents and materials prepared by and for the CRA in connection herewith.

### 6.3.11  Public Entity Crime Act

DEVELOPER represents that the execution of this Agreement will not violate the Public Entity Crime Act, Section 287.133, Florida Statutes, which essentially provides that a person or affiliate who is a contractor, developer, or other provider and who has been placed on the convicted vendor list following a conviction for a public entity crime may not submit a bid on a contract to provide any goods or service to CRA, may not submit a bid on a contract for the construction or repair of a public building or public work, and may not be awarded or perform work as a contractor or DEVELOPER under a contract with the CRA and may not transact any business with the CRA in excess of the threshold amount set forth in the statute for a period of 36 months from the date of being placed on the convicted vendor list.  DEVELOPER represents that there has been no determination that it committed a "public entity crime" and that it has not been formally charged with committing a "public entity crime" and has not been placed on the State Convicted Vendor List. Violation of this Section shall result in termination of this Agreement and recovery of all moneys paid by CRA under this Agreement, and may result in debarment from the competitive procurement activities.

### 6.3.12  Compliance with Laws

DEVELOPER shall comply with all applicable federal, state and local laws, codes and ordinances in performing its duties, responsibilities and obligations under this Agreement.

## 6.4  Public Records Law

The DEVELOPER shall allow public access to all documents, papers, letters or other material subject to the provisions of Chapter 119, Florida Statutes, and made or received by the DEVELOPER in conjunction with this Agreement.  Failure by the DEVELOPER to grant such public access shall be grounds for immediate unilateral cancellation of this Agreement by the CRA.

## 6.5  Confidentiality

The DEVELOPER agrees that it will make no statements, press releases or publicity releases concerning this Agreement or its subject matter or otherwise disclose or permit to be disclosed any of the data or other information obtained or furnished in compliance with this Agreement, or any particulars thereof, during the period of this Agreement, without first notifying the CRA and securing its consent in writing.  The DEVELOPER also agrees that it will not publish, copyright or patent any of the data developed under this Agreement, it being understood that such data or information is the property of the CRA.

## 6.6  CRA's Ownership of Documents

All tracings, plans, drawings, specifications, maps, computer files and/or reports prepared or obtained under this Agreement, as well as all data collected, together with summaries and charts derived therefrom, will be considered works made for hire and will become the property of the CRA upon completion or termination of this Agreement without restriction or limitation on their use and will be made available, upon request, to the CRA at any time during the performance of such services and/or upon completion or termination of this Agreement.  Upon delivery to the CRA of said document(s), the CRA will become the custodian thereof in accordance with Chapter 119, Florida Statutes.  The DEVELOPER will not copyright any material and products or patent any invention developed under this Agreement.  The CRA will have the right to visit the site for inspection of the work and the products of the DEVELOPER at any time.  DEVELOPER grants to the CRA an exclusive irrevocable and perpetual right and license to use or re-use the plans, drawings, specifications and other materials prepared by DEVELOPER or its sub-consultants in accordance

RPT 00919

with Section 287.055(10), Florida Statutes, and such use or re-use shall not be considered procurement of professional services for a project or contract award. Any re-use of DEVELOPER's documents, except for the specific purpose for this Project, will be at no additional cost to the CRA and at CRA's sole risk, without liability or legal exposure to DEVELOPER.

## 6.7    DEVELOPERs Competitive Negotiation Act

The parties confirm that the procurement of the Professional Services hereunder was the subject of the competitive selection and negotiation processes mandated by Section 287.055, Florida Statutes, unless specifically exempted therefrom.

## 6.8    City of West Palm Beach Small Business Ordinance
### 6.8.1    Small Business Program Ordinance

The City of West Palm Beach, in an effort to encourage full and equitable participation by small businesses operating in Palm Beach County in the provision of goods and services to the City and CRA, has adopted the "Small Business Program Ordinance" set forth in Chapter 66 of the Code of Ordinances. The Small Business Program Ordinance is made part of this Agreement by reference thereto. The DEVELOPER shall comply with the requirements of the Small Business Program Ordinance throughout the term of this Agreement.

### 6.8.2    Small Business Records

The DEVELOPER agrees to maintain in an orderly fashion records that document its compliance with the Small Business Program Ordinance with respect to this Agreement and shall make said records available to the City and CRA for inspection during reasonable business hours throughout the Term hereof. Additionally, for purposes of enabling the City to track activity of small businesses and to update its database accurately, the DEVELOPER agrees to furnish to the City or CRA records and documentation evidencing all Small Businesses that responded to proposal to work with DEVELOPER on this Project, regardless of whether each Small Business ultimately contracted to work hereunder.

## 6.9    Invoices and Audit of Records
### 6.9.1    Invoices to the CRA

The DEVELOPER will bill the CRA for services rendered upon completion of deliverables as set forth in Schedule 2. Invoices received from the DEVELOPER pursuant to this Agreement shall be reviewed and are subject to the prior approval of the CRA to determine if services have been rendered in conformity with the Agreement. Invoices must reference the Project number and will, if approved by the CRA for payment, be paid within thirty (30) days following approval or such other period allowed by law. The CRA shall only be required to pay interest to DEVELOPER where payments are not made within the time constraints of the Florida Prompt Payment Act, Section 218.70 et seq. Fla. Stat., incorporated by reference herein.

### 6.9.2    Charges Above the Professional Fee and Supporting Records

Should the CRA deem that a change in the Professional Services Fee is appropriate, then a decrease or increase shall be agreed by the parties in writing. The DEVELOPER shall maintain complete and orderly documentation underlying all of its invoiced out of pocket expenses, including copies of paid receipts, invoices, or other documentation acceptable to the CRA. Such documentation shall be sufficient to establish that the expenses were actually incurred and necessary in the performance of the Professional Services described herein. Any travel, per diem, mileage, meals, or lodging expenses, the cost of which are subject to the CRA's prior written approval, shall be paid in accordance with the rates and conditions established by applicable law or ordinance.

### 6.9.3  Significance of "Final Invoice"

In order for both parties herein to close their books and records, the DEVELOPER shall clearly indicate "Final Invoice" on its final invoice to the CRA for the Project.  Such indication shall certify to the CRA that all services have been properly performed and all charges and costs owed in connection with this Agreement or the City Travel Policy have been invoiced to the CRA for the Project.    Since this account will thereupon be closed, any and other further requests for reimbursement or payment, if not properly included on this final notice, are waived by the DEVELOPER for the Project.

## 6.10  Access and Audit

The DEVELOPER shall maintain (a) timesheets kept in a clear and orderly fashion used to substantiate the monthly invoices to be submitted hereunder and (b) adequate records to justify all charges, expenses, and costs incurred in estimating and performing the work, as well as copies of communications regarding the performance of its obligations under this Agreement, for at least three (3) years after the date of final payment of this Agreement.  The CRA shall have access to such timesheets, books, records, and documents as required in this Section for the purpose of inspection or audit during normal business hours, at the DEVELOPER's place of business located in the State of Florida during the Term hereunder and for at least three (3) years after the date of final payment of this Agreement.

## 6.11  Insurance

### 6.11.1  Insurance Requirements Generally

The DEVELOPER shall not commence work under this Agreement until it has:  (1) obtained all insurance required under this Section;  (2) furnished certificates of such insurance to the CRA; and, (3) obtained the written approval by the CRA as to the sufficiency of such insurance.  All insurance policies applicable hereunder shall be issued by companies authorized to conduct business under the laws of the State of Florida and as required under the RFP.  The certificates of insurance furnished to the CRA shall clearly indicate that the DEVELOPER has obtained insurance of the type, amount, and classification as required for strict compliance with this Section and that any material change or cancellation thereof will take effect only thirty (30) days after written notice of same is provided to the CRA.  Notwithstanding the provisions herein, compliance with the foregoing requirements shall not relieve the DEVELOPER of its liability and obligations under this Agreement.

### 6.11.2  Required Types and Amounts of Coverage

6.11.2.1    Without limiting its liability under this Agreement, the DEVELOPER shall procure and maintain during the term of this Agreement the types of insurance in the minimum amounts as follows:

1.    General liability, including contractual liability insurance covering the indemnification provision of this Agreement in the minimum amount of $5,000,000 per accident, $10,000,000 annual aggregate, to protect the DEVELOPER from claims for damages for personal injury as well as from claims of property damages which may arise from any operations under this Agreement, whether such operations be by the DEVELOPER or by anyone directly or indirectly employed by the DEVELOPER;

2.    Comprehensive automobile liability insurance in the minimum amount of $1,000,000 per occurrence, $3,000,000 annual aggregate, for bodily injury and property damage liability to protect the DEVELOPER from claims for personal injury, as well as from claims for property damage, which may arise from the ownership, use, or maintenance of owned and non-owned automobiles, including rented automobiles whether such operations are by the DEVELOPER or by anyone directly or indirectly employed by the DEVELOPER; and

CRA Center – Phase 1
10/07/04

23

RPT 00921

3.    Adequate Worker's Compensation Insurance and Employer's Liability Insurance in at least such amounts as are required by law for all its employees per Florida Statute 440.02.

6.11.2.2    DEVELOPER shall require the architect and/or engineer team member to procure and maintain during the term of this Agreement Standard Professional Liability Insurance in the minimum amount of $1,000,000 per occurrence, $2,000,000 annual aggregate;

6.11.2.3    Certificates of Insurance shall be provided to the CRA prior to execution of this Agreement, shall provide that no material alteration or cancellation, including expiration and non-renewal, shall be effective until receipt of the statutory written notice by the CRA.

6.11.2.4    Anything to the contrary notwithstanding, the liabilities of the DEVELOPER under this Agreement shall survive and not be terminated, reduced or otherwise limited by any expiration or termination of insurance coverages.

### 6.11.3   CRA as Additional Named Insured

All insurance, other than Professional Liability and Worker's Compensation, to be maintained by the DEVELOPER, shall specifically name and include the CRA as an "Additional Named Insured". Designation of the CRA as an "Additionally Named Insured" shall be done by the issuance of a rider or endorsement by the Insurer, as opposed to only the issuance of a Certificate of Insurance from the DEVELOPER's insurance agent. The CRA shall be exempt from, and in no way liable for, any sums of money which may represent a deductible in any insurance policy. The payment of such deductible shall be the responsibility solely of the DEVELOPER providing such insurance.

## 6.12    Indemnification

To the fullest extent permitted by law, the DEVELOPER shall indemnify and hold harmless the CRA and its officers and employees from all liabilities, damages, losses and costs, including but not limited to reasonable attorneys' fees, to the extent caused by the negligence, recklessness or intentional wrongful conduct of the DEVELOPER and any other persons directly or indirectly employed or utilized by the DEVELOPER. The parties mutually acknowledge that the provisions of §725.08, Fla. Stat., govern this provision. This indemnification agreement is separate and apart from, and in no way limited by, any insurance provided pursuant to this Agreement or otherwise. This clause shall survive the expiration or termination of this Agreement.

## 6.13    Successors and Assigns

The CRA and the DEVELOPER each binds itself and its partners, successors, executors, administrators and assigns to the other party of this Agreement and to the partners, successors, executors, administrators and assigns of such other party, in respect to all covenants of this Agreement. Neither the CRA nor the DEVELOPER shall assign, sublet, convey or transfer its interest in this Agreement without the written consent of the other. Nothing herein shall be construed as creating any personal liability on the part of any officer or agent of the CRA that may be a party hereto, nor shall it be construed as granting any rights or benefits hereunder to anyone other than the CRA and the DEVELOPER.

## 6.14    Communications and Notice

All notices required by this Agreement to be sent to the CRA shall be sent to the CRA via certified U.S. mail to:

West Palm Beach Community Redevelopment Agency

CRA Center – Phase 1
10/07/04

24

RPT 00922

c/o Dorritt Miller
200 2nd Street - P.O. Box 3366
West Palm Beach, FL 33402

All notices required by this Agreement to be sent to the DEVELOPER shall be sent via certified U.S. mail to the attention of the DEVELOPER at the address indicated at the top of this Agreement.

## 6.15.  Termination
### 6.15.1   Right to Terminate
The CRA may terminate this Agreement in whole or in part for cause in the event that: (1) the DEVELOPER materially violates any provisions of this Agreement or performs same in bad faith or (2) unreasonably delays the performance of the Professional Services, upon written notice to the DEVELOPER seven (7) days prior to termination ("Termination for Cause").

The CRA, in addition to the right and option to terminate given above, or any other provisions set forth in this Agreement, expressly retains the right to terminate hereunder at its sole option at any time for convenience, without cause and without penalty, when in its sole discretion it deems such termination is in the best interest of the CRA.  Payment for services satisfactorily performed shall be made in accordance hereunder ("Termination for Convenience").

The DEVELOPER shall have no right to terminate this Agreement for convenience.

Upon receipt of written notice of either Termination for Cause or Termination for Convenience, the DEVELOPER shall promptly assemble and submit as provided herein or as required in the written notice hereunder, all documents including drawings, signed and sealed drawings, CADD files, calculations, specifications, correspondence, and all other relevant materials associated with the Project.

### 6.15.2   Termination for Cause
In the event this Agreement is terminated by the CRA for cause, the CRA may take over the Professional Services and complete them by contracting with another DEVELOPER(s) or otherwise, and in such event, the DEVELOPER shall be liable to the CRA for any additional cost incurred by the CRA due to such termination. "Additional Cost" is defined as the difference between the actual cost of completion of such incomplete services and the cost of completion of such services which would have resulted from payments to the DEVELOPER hereunder had the Agreement not been terminated.  Payment for services satisfactorily performed by the DEVELOPER prior to receipt of notice of Termination for Cause, and accepted by the CRA, shall be made in accordance with the payment procedures hereunder and the CRA shall have no further liability for compensation for expenses or fees to DEVELOPER.  In the event of Termination for Cause, no payments to the DEVELOPER shall be made (1) for services not satisfactorily performed and (2) for assembly of submittal of documents for the services performed satisfactorily or unsatisfactorily.  In no event shall CRA be obligated to compensate DEVELOPER for lost profits, or any resulting or consequential damages in the event of Termination for Cause.

### 6.15.3   Termination for Convenience
In the event the CRA causes abandonment, termination or suspension of the DEVELOPER's services or parts thereof without cause as provided above, the DEVELOPER shall be compensated for services rendered up to the time of receipt of said abandonment, termination or suspension and for assembly and submittal to the CRA of affected documents, and the CRA shall have no further liability for compensation expenses or fees to DEVELOPER.

RPT 00923

### 6.15.4 Implementation Procedures for Termination

In the event of either Termination for Cause or Termination for Convenience, as defined above, the DEVELOPER, upon receipt of the notice of such termination, shall: (1) stop the performance of the Professional Services under this Agreement on the date and to the extent specified in the notice of termination; (2) place no further orders or subcontracts except as may be necessary for completion of any portion(s) of the services not terminated and as authorized by the written notice; (3) terminate all orders and subcontracts to the extent that they relate to the performance of the services terminated by the notice of termination; (4) transfer title to the CRA (to the extent that title has not already been transferred) and deliver according to the manner, at the times, and to the extent directed by the CRA, all property purchased under this Agreement and reimbursed as direct items of cost and not required for completion of the services not terminated; (5) promptly assemble and submit as provided herein all documents for the services performed, including drawings, calculations, specifications, correspondence, and all other relevant materials affected by the termination; and, (6) promptly complete performance of any services not terminated by the notice of termination.

### 6.16    Litigation; Waiver of Jury Trial

This Agreement shall be governed and interpreted by the laws of the State of Florida. The parties agree that the courts located in the State of Florida shall have the exclusive jurisdiction of the parties and the subject matter of any litigation, civil or administrative, arising hereunder. For purposes of state court action, venue shall lie in Palm Beach County, Florida, and for purposes of federal court action, venue shall lie in the Southern District of Florida. No remedy herein conferred upon any party is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by stature or otherwise. No single or partial exercise by any party of any right, power, or remedy hereunder shall preclude any other or further exercise thereof. In the event that any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorney's fees, court costs, and all expenses (including taxes) even if not taxable as court costs (including, without limitation, all such fees, costs and expenses incident to appeals), incurred in that action or proceeding, in addition to any other relief to which such party or parties may be entitled. DEVELOPER and CRA hereby expressly waive any rights either party may have to a trial by jury of any civil litigation related to this Agreement.

### 6.17    Waiver

The waiver of either party hereto of one provision shall not under any circumstances constitute or be interpreted as a waiver of the same provision or any other provision either at the time of the waiver or at any time in the future. Nothing herein shall be interpreted to constitute a release of the responsibility and liability of the DEVELOPER, its employees, sub-contractors, agents and sub-DEVELOPERs for the accuracy and competency of their designs, working drawings, Final Drawings, Specifications or other documents and works, nor shall any approval by the CRA in connection with the Project be deemed to be an assumption of such responsibility by the CRA for a defect or omission in designs, working drawings, and specifications or other documents prepared by the DEVELOPER, its employees, sub-contractors, agents or sub-DEVELOPERs. Nothing herein shall be deemed to be a waiver of the limitation placed upon the CRA's liability as set forth in Florida Statutes, Section 768.28.

AMENDMENT NO. 1 to
Professional Services Agreement for
CITY CENTER PROJECT
PHASE II - Schematic Design
RFP #03/04-109

THIS AMENDMENT NO. 1 to the Professional Service Agreement for the City Center Project (RFP No. 03/04-109) is entered into by and between the **WEST PALM BEACH COMMUNITY REDEVELOPMENT AGENCY** ("CRA") and **REPUBLIC-WPB CORP.** (the "Developer").

WHEREAS, the CRA and Developer entered into a Professional Services Agreement for the Programming Phase (Phase 1) of the City Center Project, dated October 26, 2004; and

WHEREAS, the parties thereto have fully performed Phase I pursuant to the terms and conditions thereof; and

WHEREAS, the CRA and Developer are in the process of negotiating a contract for the complete scope of services necessary for the design, construction and development of the City Center Project (the "Project"), but must first complete the schematic design phase in order to develop the complete scope and guaranteed maximum price for such contract;

NOW, THEREFORE, in consideration of the mutual promises contained herein, the CRA and the Developer desire to enter into Amendment No. 1 to the Agreement for Phase II of the Project, the terms of which follow:

1.     **Recitals**.  Developer and CRA hereby acknowledge and agree that the recitals set forth in this Amendment are true and correct in their entirety.

2.     **Agreement**.  All references to "Agreement" shall mean the terms and conditions contained in the Professional Services Agreement for the Programming Phase (Phase 1) of the City Center Project, dated October 26, 2004 (the "Agreement").  All defined terms in this Amendment shall have the same meaning of the term as established in the Agreement.

3.     **Scope of Work**. The Developer agrees to provide to the CRA professional services for Phase II – Schematic Design of the City Center Project, as more specifically described in Schedule "3A / Phase II" and **Exhibit 3A-II**, both attached hereto and incorporated herein.

4.     **Professional Services Fee**.  The professional services fee to be paid by the CRA to the Developer for all professional design services of both the Developer and any of its subcontractors in connection with Phase II of the Project is set forth on Schedule "2 / Phase II" attached hereto.

5.     **Term.**  The term of the Agreement, as amended, shall continue in force until all Phase II Services and deliverables have been provided to the CRA, unless extended by Amendment subject to the provisions of Sections 5 and 7, and Schedules 3.B and 6 (Section 6.2) of the Agreement or

City Center – Phase 2
032505

1

terminated by either party. Notwithstanding the expiration date or early termination date hereunder, it is agreed that the indemnity provisions, the right to audit and all covenants, agreements, representations and warranties made herein or otherwise made in writing by the Developer, including but not limited to any representations made herein relating to disclosure or ownership of documents, shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

6.  **Guaranteed Maximum Price for Construction**.

6.1  After the scope and design of the Project is defined by the City Commission and CRA, the Developer will establish and submit in writing to the City for its approval a Guaranteed Maximum Price guaranteeing the maximum price to the City for the construction cost of the Project.

6.2  The Guaranteed Maximum Price for Construction ("GMP") shall include all costs necessarily incurred in the Work  sometime referred to as the costs for the Project  during the construction phase for construction services and paid or to be paid by the Developer.  Such costs shall include but not be limited to the items set forth below:

(a)  Wages paid for labor (as opposed to wages paid to management or supervisory personnel) in the direct employ of the Developer in the performance of its work at the job site, times a multiple of 1.52 to cover all taxes, burden, insurance, workers' compensation, or other benefits.  Temporary help or leased employees shall not be considered labor in the direct employ of Developer, and such costs will be addressed as Sub-Contractors costs.

(b)  Payments to Sub-Contractors for work performed on the Project.

(c)  Cost of all materials, supplies and equipment substantially consumed or incorporated in the Project, including costs of transportation and reasonable storage thereof.

(d)  Cost including transportation and maintenance of all materials, supplies, equipment, temporary facilities and tools not owned by the workmen, which are employed or consumed in the performance of the work, cost of such items used but not consumed which may be turned over to the City at the end of the project in accordance with instructions to be furnished by the City, and cost less salvage value on such items used but not consumed which remain the property of the Developer.

(e)  Rental charges on all necessary machinery and equipment, exclusive of personal tools used at the site of the Project, including installation, dismantling, removal, costs of lubrication, transportation and delivery costs thereof, which are used in the support of a Sub- Contractor of the Developer's own forces in the performance of the work, at rental charges consistent with those prevailing in the area.

(f)  Cost of the premiums for all insurance and cost of premiums for the performance and payment bonds which the Developer will be required to procure  which are specifically attributable to the construction Project.

(g)  Sales, use, gross receipts or similar taxes related to allowable direct costs of the Project imposed by any governmental authority, and for which the Developer is liable.  The GMP will only include those taxes in the cost of the Project which are legally enacted at the time the GMP is established.  Subsequently imposed taxes, if any, shall be an add-on to the GMP.

(h)  Royalty or license or design fees paid for the use of a particular design or process provided such costs or fees are approved in advance in writing by the City.

(i)  Demolition and debris removal.

(j)  Costs for trash and construction debris control and removal from the site.

RPT 00927

(k)    Permit or inspection fees, costs for testing and laboratory costs  not due to nonconforming or delayed work by Developer or its Sub-Contractors, or anyone directly or indirectly employed by either of them.  Additional such fees necessitated by defective work by Developer shall not be included herein.

(l)    Costs for security fencing for the project.

(m)    Costs for efficient logistical control of the site, including horizontal and vertical transportation of materials and personnel.

(n)    All costs directly incurred in the performance of the Project for the benefit of the Project.

(o)    A construction contingency not to exceed  ten percent (10%) of the estimated GMP for the purpose of defraying the expenses due to unforeseen circumstances relating to construction.   This contingency fee will be more specifically defined in the final contract between the parties for this Project.

7.    <u>Developer's Fee</u>.   The Developer will submit in writing to the City for its approval its proposed fee for services during the construction Phase of the Project.

8.    <u>Team</u>.  The parties hereby agree that the firm of Centex Construction Company, Inc., will substitute for Catalfumo Construction, Ltd., and Developer intends to enter into a contract with Centex Construction Company to provide construction services for the Project as a member of Developer's team.

9.    <u>Effect of Amendment</u>.  Except to the extent the Agreement is modified by this Amendment, the terms and provisions of the Agreement shall remain unmodified and in full force and effect.

10.    <u>Construction</u>. In the event of a conflict between the terms of the Agreement and the terms of this Amendment, the terms of this Amendment shall govern and prevail.

[Remainder of Page Intentionally Left Blank.  Signatures on Following Page.]

IN WITNESS WHEREOF, the parties hereto have made and executed this Amendment by their duly authorized representatives as of the day and year indicated below.

ATTEST:

By: _~Florence Nudermen~_
    Secretary

100 04-01442ndu

WEST PALM BEACH COMMUNITY
REDEVELOPMENT AGENCY

By: _____
    Lois J. Frankel, Chair

Date: _____, 2005

CRA COUNSEL
Approved as to form
and legal sufficiency
By: _____
Date: ___3-28-05___

WITNESSES:

By: _____
Print Name: ___ROSE JEFFREY___

REPUBLIC-WPB CORP.

By: _____
    Steven A. Grigg, President

City Center – Phase 2
032505

4

SCHEDULE "2/ Phase II"

## PROFESSIONAL SERVICES FEE & EXPENSES

PROJECT:    **CITY CENTER PHASE II**
RFP#         **#03/04-109**

**2.1    Professional Service Fee**:  The Professional Services Fee, including related Administrative Expenses and Other Expenses for Phase II, Schematic Design, shall be a fixed fee of One Million One Hundred Eighty-Eight Thousand Two Hundred Sixty-Eight and 00/100 Dollars ($1,188,268.00).

**2.2**    The Professional Services Fee includes all fees or payments that the Developer proposes to pay or make to its subcontractors, consultants and team members in connection with this Amendment.  The Professional Services Fee is inclusive of Administrative out-of-pocket expenses and Other Expenses to be incurred in connection with the performance of the Services hereunder.  It is understood that Exhibit 3-A2, attached hereto, reflect best estimates for illustrative purposes.

**2.3**    Payment of the Professional Services Fee on account of services rendered shall be made in accordance with the following payment and deliverable schedule and upon acceptance of deliverables satisfactory to the CRA and presentation of Developer's statement of services.

| Deliverable | Fee |
|---|---|
| Presentation to City Commission of alternative concepts for overall Project, City Hall, Library, museum and open/public spaces | $594,134.00 |
| Submittal of Schematic Design Package including schedule and GMP | $594,134.00 |

**2.4    Releases**.  The DEVELOPER shall, upon receipt of any payment from the CRA, provide the CRA with written releases, in form and substance acceptable to the CRA, for all services performed by any team member or sub-contractor or other entity, through the date covered by the payment. Attached hereto as **Exhibit 2-II** is a form of such release acceptable to the CRA.

WEST PALM BEACH COMMUNITY REDEVELOPMENT AGENCY

**EXHIBIT**
2 - II

## *PARTIAL RELEASE OF LIEN*

The undersigned lienor, in consideration of the partial payment in the amount of $_____ hereby waives and releases its lien and right to claim a lien of labor, services or materials furnished from _____, 200\_\_\_\_ through _____, 200\_\_\_ to:
    (Insert date)                                    (Insert date)

_____
Contractor Company Name

On the job of THE WEST PALM BEACH COMMUNITY REDEVELOPMENT AGENCY
for the construction of:

RFP No. 03/04-109         Project: **CITY CENTER PROJECT**

This release does not cover any retention of labor, services, or materials furnished after the date specified.

Dated on _____, 200\_\_\_\_

Lienor's Name: _____(SEAL)
                        (company name)
Signed By:_____

Printed Name:_____

Title:_____

STATE OF FLORIDA                    }
COUNTY OF PALM BEACH                } SS:

Sworn to and subscribed before me this \_\_\_\_\_ day of _____, 200\_\_\_\_, a Notary Public appeared _____ of _____ who acknowledged that he/she executed the above PARTIAL RELEASE OF LIEN on behalf of the Corporation and its free act deed.

_____
Signature of Notary Public

                        _____
                        Print, Type, or Stamp Name of Notary

Personally Known _____

                Produced Identification_____

                Type of Identification Produced_____

RPT 00931

Final Release of Lien

SCHEDULE "3A / Phase II"

**PROFESSIONAL SERVICES**

PROJECT:    ***CITY CENTER PHASE II***
RFP#        **#03/04-109**

**3.1    Phases of Professional Services**
    The Professional Services intended to be compensated by the Professional Services Fee for Phase II shall include the following phase of service:

            Schematic Design Phase

The Developer shall not commence any other services related to the Project, until a written agreement for such services is executed by the parties:

**3.2    Professional Services Included**
    In consideration for the Professional Services Fee for the Project, the Developer agrees to perform the Professional Services as follows:

**3.2.2    Schematics Phase**
    Based upon the initially approved Programming Report as evidence by the Resolution concerning same approved by the CRA, the Developer shall:

    1.    Prepare a schematic design package consisting of design criteria, preliminary drawings, outline specifications and written descriptions of the Project. The schematic designs shall include sketches, site plans and additional renderings, as needed, showing the scale, character and relationship of project components. These designs shall include floor plans, elevations, building sections, site plan and additional renderings, showing the scale and relationship of Project components. All drawings shall be to scale and shall be sufficiently detailed to support all decisions made for the Project (the "Schematic Design Package"). At the conclusion of this Phase, the majority of project scope and program decisions for the Project will have been finalized.

    2.    Meet weekly with City's Project Manager/Project team.

    3.    Conduct meetings with City staff and consultants as necessary during this Phase.

    4.    Develop conceptual design as related to: public utilities, including stormwater; traffic and parking; pedestrians; site and building security; and environmental impact and permitting.

    5.    Research appropriate building systems and alternatives, including cooling/heating systems; and structural materials.

    6.    Attend value engineering sessions with the CRA's Project team.

    7.    Develop at least three (3) alternative conceptual designs for overall Project.

    8.    Develop at least three (3) alternative conceptual designs for City Hall; Library and other Project components.

RPT 00932

# EXHIBIT 1
# PART 3

9.      Attend CRA and/or City Commission meetings and/or workshops as required to obtain direction and City's decisions made during this Phase.

10.     Develop Project schedule with major milestones and critical path identified.

11.     Develop a Guaranteed Maximum Price for the Project.

12.     Submit for review by CRA, a preliminary schedule, a Guaranteed Maximum Price and proposed Developer's fee to enable CITY to develop a Total Project Budget.

13.     Present the Schematic Design Package (one original and one reproducible electronic copy) including the proposed schedule, Guaranteed Maximum Price and proposed Developer's fee to the Mayor and City Commission at a public meeting.

14.     Revise any documents in the Schematic Design Package as requested by the City and/or CRA, to enable the CRA to approve the Schematic Design Package.

15.     Developer shall prepare presentation materials and shall attend a City Commission meeting to present the proposed design and Guaranteed Maximum Price to the City Commission for approval.

16.     The date by which the Developer agrees to complete this Phase II (the "Phase II Completion Date") is set forth on Schedule 3B/Phase II.


Except to the extent the Agreement is modified by this Amendment, the terms and provisions of the Agreement and Schedule "3A" shall remain unmodified and in full force and effect.


*[End of Schedule 3A/ Phase II]*

# City of West Palm Beach
## City Center Project
### Phase II - Schematic Design
Fee by Task
March 21, 2005



| Phases and Tasks | Cost per Task | Sub-Total per Task Group |
|---|---|---|
| **1. Hold meetings and/or public workshops with Mayor, Commissioners, staff and other stakeholders to implement scope of work and design** | $    - | |
| - Hold meetings for public and private level staff and consultants for the establishment of a baseline scope and for the assignment of major tasks of investigation and points of contact. | $    21,190.00 | |
| | | $    21,190.00 |
| **2.  Meetings with governmental agencies to facilitate the development of the conceptual design as related to:** | $    - | |
| - City engineering | $    2,980.00 | |
| - Pedestrian & vehicular traffic impacts | $    5,830.00 | |
| - Available utility capacity | $    680.00 | |
| - Storm drainage concerns | $    1,870.00 | |
| - Site and Building Security | $    490.00 | |
| - Environmental impact and project permitting | $    610.00 | |
| - Meeting with Public Utilities for purpose of finding current status of City controlled underground water and sewer and storm piping | $    2,045.00 | |
| - Meeting with City Engineering Dept for current status of roadway design and interface with D.O.T. work & schedule. | $    2,510.00 | |
| - Meeting with private utility FP&L for their existing electrical underground service and relocation possibilities | $    1,380.00 | |
| - Meeting with FEC officials for the railroad R.O.W. air rights for overhead construction and for the possible use of R.O.W. space for utilities relocation. | $    1,980.00 | |
| - Meeting with Building officials for the project's approval process for site and building permitting. | $    3,056.00 | |
| - Meeting with SFWMD officials for regional storm water management issues and permits. | $    1,230.00 | |
| - Meeting with Planning staff to review current parking and street circulation issues. | $    2,070.00 | |
| | | $    26,731.00 |
| **3.  Research appropriate building systems & alternatives** | | |
| **Research mechanical HVAC creation and distribution techniques:** | $    1,000.00 | |
| - Central City-wide chilled water plant tie-in | $    1,880.00 | |
| - On-site central plant chilled water, pipe distribution as one integral system | $    1,840.00 | |
| - De-centralized building stand-alone systems for reduced single source size and single location. | $    3,310.00 | |
| - Investigation of passive and active solar collection/heating techniques | $    2,810.00 | |
| - Research into 'LEED' green systems alternative | $    15,630.00 | |

# City of West Palm Beach
## City Center Project
## Phase II - Schematic Design
**Fee by Task**
March 21, 2005

| Phases and Tasks | Cost per Task | Sub-Total per Task Group |
|---|---|---|
| **Research structural materials and erection methods:** | $ - | |
| - Restricted site limitations on building component delivery to site. | $ 3,160.00 | |
| - Availability of structural components in marketplace now and at time of order. | $ 1,906.00 | |
| - Cost of structural components based on availability | $ 1,626.00 | |
| - Assessment of labor availability based on structural components | $ 880.00 | |
| - Assessment of structural methods based on construction delivery schedule | $ 1,906.00 | |
| | | $ 35,948.00 |
| | | |
| **4.  Develop preliminary conceptual designs w / alternatives for overall project** | | |
| - Preliminary conceptual designs of only public building use on Parcel A and parking garage on Parcel B | $ 54,702.00 | |
| - Preliminary conceptual designs of a more mixed-use building combination on Parcel A and parking garage on Parcel B | $ 53,592.00 | |
| - Preliminary conceptual designs of only public building use only on Parcel A ith a full supply of on-site structured parking | $ 52,800.00 | |
| - Preliminary conceptual designs of a more mixed use building combination only on Parcel A with a full supply of on-site structured parking | $ 50,530.00 | |
| - Preliminary conceptual designs of public plaza spaces at various locations with Parcel A | $ 55,300.00 | |
| | | $ 266,924.00 |
| **5.  Develop alternative concepts for City Hall** | | |
| - One-stop permitting on ground level | $ 14,600.00 | |
| - Verification of vertical stacking relationships | $ 17,332.00 | |
| - Smaller floor plate area/greater number of stories | $ 17,332.00 | |
| - Larger floor area/less number of stories | $ 17,332.00 | |
| - Commission Chambers as a central, public focal point vs a less visible component. | $ 14,600.00 | |
| - Investigate the different street frontages | $ 20,820.00 | |
| | | $ 102,016.00 |
| **6.  Develop alternative concepts for City Library** | | |
| - Assess importance of the various street frontages and exposure as single building. | $ 19,590.00 | |
| - Compare ground floor uses of public reading and café vs more secure zones | $ 16,660.00 | |
| - Study smaller floor plate area with greater number of floors | $ 19,658.00 | |
| - Study larger floor plate area with less number of floors | $ 19,158.00 | |
| | | $ 75,066.00 |
| **7.  Develop alternative preliminary concepts for PBPCM** | | |
| - Assess importance of the various street frontages and exposure as a separate identity. | $ 18,350.00 | |
| - Study museum location relative to public use zones of City Library | $ 18,240.00 | |
| - Study number of stories vs floor plate size | $ 21,482.00 | |
| | | $ 58,072.00 |

RPT 00935

# City of West Palm Beach

## City Center Project
### Phase II - Schematic Design
**Fee by Task**
**March 21, 2005**

| Phases and Tasks | Cost per Task | Sub-Total per Task Group |
|---|---|---|
| **8.  Develop alternative concepts for outdoor public space** | | |
| - Study degree of openness vs security limits | $ 6,280.00 | |
| - Assess combinations of hardscape vs landscape | $ 8,972.00 | |
| - Investigate uses of only civic use or open to multiple functions | $ 6,280.00 | |
| - Study degree of formality vs informality | $ 6,820.00 | |
| | | $ 28,352.00 |
| **9.  Prepare preliminary construction analysis for conceptual Design & additional costing for alternatives. Cost includes:** | | |
| - Site development cost | $ 5,890.00 | |
| - Building construction and fixture | $ 8,678.00 | |
| - Furnishing and equipment | $ 1,560.00 | |
| - Contractor team member involvement to prepare conceptual pricing of | $ 7,532.00 | |
| | | $ 23,660.00 |
| **10. Develop design document preparation & building construction schedule with major milestones identified** | | |
| - Prepare schedule of design phases of Schematic Design, Design Development and Construction Documents with deliverable milestone dates | $ 5,246.00 | |
| - Building construction schedule from site demolition, foundation infrastructure, building skeleton erection, exterior skin installation, systems infrastructure development to interior finish work and build-out schedule milestones to be prepared. | $ 3,686.00 | |
| | | $ 8,932.00 |
| **11. Prepare conceptual design documents to facilitate development of GMP. Conceptual design level drawings to include:** | | |
| - Site plan and development of utilities | $ 80,300.00 | |
| - Building floor plans | $ 32,335.00 | |
| - Building elevationss | $ 30,090.00 | |
| - Building sections | $ 29,095.00 | |
| - Building finish schedule | $ 19,085.00 | |
| - Outline specifications | $ 32,116.00 | |
| - The GMP cost figure will be based on the conceptual design documents that shall describe the building components and finishes. Graphic, narrative and specification drawings and date will be provided. | $    - | |
| | | $ 223,021.00 |

# City of West Palm Beach

## City Center Project
### Phase II - Schematic Design
**Fee by Task**
March 21, 2005

| Phases and Tasks | Cost per Task | Sub-Total per Task Group |
|---|---|---|
| 12. Contractor team member to identify the major project component biddable packages to allow breakout and separation of work (foundation, demolition, HVAC, structure shell, interior build-out) | $ 20,798.00 | |
| | | $ 20,798.00 |
| 13. Prepare narratives consolidating and presenting data on: | | |
| BUILDING: | | |
| - Building structural systems | $ 9,530.00 | |
| - Building mechanical systems | $ 3,510.00 | |
| - Building electrical systems | $ 3,510.00 | |
| - Building plumbing systems | $ 3,410.00 | |
| - Building acoustical systems | $ - | |
| - Building lighting systems | $ 2,700.00 | |
| - Building vertical circulation systems | $ 2,400.00 | |
| - Building security systems | $ 2,800.00 | |
| - Building storm preparedness systems | $ 2,000.00 | |
| - Building public use systems | $ 1,600.00 | |
| - Building private use systems | $ 1,600.00 | |
| - Building signage systems | $ 2,400.00 | |
| - Building finishes systems | $ 2,400.00 | |
| SITE: | | |
| - Site pedestrian circulation systems | $ 3,330.00 | |
| - Site vehicular circulation systems | $ 3,330.00 | |
| - Site plaza materials systems | $ 2,400.00 | |
| - Site landscape and irrigation systems | $ 1,010.00 | |
| - Site security systems | $ 1,010.00 | |
| - Site utility systems | $ 2,490.00 | |
| - Site lighting systems | $ 2,000.00 | |
| - Site signage systems | $ 2,000.00 | |
| CONSTRUCTION: | | |
| - Construction implementation plan | $ 2,250.00 | |
| - Construction schedule | $ 3,580.00 | |
| - Construction phasing plan | $ 3,580.00 | |
| - Construction preliminary cost | $ 1,660.00 | |
| | | $ 66,500.00 |

# City of West Palm Beach

## City Center Project
## Phase II - Schematic Design
### Fee by Task
March 21, 2005

| Phases and Tasks | Cost per Task | Sub-Total per Task Group |
|---|---|---|
| **14.Prepare project presentation materials consisting of:** | | |
| - Overall site plan indicating adjacent properties | $ 12,000.00 | |
| - Overall site plan of project | $ 840.00 | |
| - Building floor plans | $ 840.00 | |
| - Building exterior elevations | $ 840.00 | |
| - Exterior perspectives | $ 840.00 | |
| | | $ 15,360.00 |
| | | |
| **15. Geotechnical Engineering** | $ 14,998.00 | |
| - Subsurface exploration, Penetration Test Borings | | |
| - Characterize soil profile. | | |
| | | |
| - Evaluate geotechnical suitability of subsurface compared to proposed construction. | | |
| - Provide planning and preliminary engineering recommendations for site preparation and foundation design. | | |
| and foundation design | | $ 14,998.00 |
| **Sub-Total by Hours** | | $ 987,568.00 |
| **Sub-Total by Employee Classification / Subconsultant** | $ 987,568.00 | |
| | | |
| **16. Cost Estimation, pre-construction value engineering & preparing GMP** | $ 170,700.00 $ - | $ 170,700.00 |
| **17. Developer reimbursable Expenses** | $ 30,000.00 | $ 30,000.00 |
| | | |
| **Total Phase II Tasks by Consultant** | $ 987,568.00 | $ 1,188,268.00 |

RPT 00938

# SCHEDULE "3B / Phase II"

## PROFESSIONAL SERVICES

### <u>Agreed Completion Dates</u>

PROJECT:    ***CITY CENTER PHASE II***
RFP#        **#03/04-109**

<u>*Phase*</u>

Phase II – Schematic Design
Delivery of Schematic Design Package

<u>*Agreed Completion Date*</u>

140 days after execution of Amendment No. 1
unless extended by force majeure or other
reason beyond Developer's control.

*[End of Schedule No. 3B / Phase II]*

**AMENDMENT NO. 2 to**
**Professional Services Agreement for**
**CITY CENTER PROJECT**
**Demolition**
**RFP #03/04-109**

THIS AMENDMENT NO. 2 to the Professional Service Agreement for the City Center Project (RFP No. 03/04-109) is entered into by and between the **WEST PALM BEACH COMMUNITY REDEVELOPMENT AGENCY** ("CRA") and **REPUBLIC-WPB LLC.** (the "Developer").

WHEREAS, the CRA and Developer entered into a Professional Services Agreement for the Programming Phase (Phase 1) of the City Center Project, dated October 26, 2004 (the "Agreement") pursuant to which the Developer has proceeded in a timely manner; and

WHEREAS, the CRA and Developer amended the Agreement by Amendment No. 1 for the schematic design phase, dated March 28, 2005 (collectively, the "Agreement");

WHEREAS, the CRA and Developer are in the process of negotiating a contract for the complete scope of development services necessary to plan and build the City Center Project (the "Project"), but it has been determined to be in the best interests of the CRA and the Project to proceed with the demolition of the existing structures on the Site so that the Project remains on schedule; and

WHEREAS, pursuant to that certain Consent to Assignment of Agreement dated December 19, 2005 among CRA, Former Developer and Republic Property Limited Partnership (the "Partnership"), CRA consented to the assignment and transfer by the Former Developer of all of its rights and obligations under the Agreement to the Partnership and/or its wholly-owned subsidiary, and accordingly the Agreement has been assigned and transferred to, and assumed by, Republic-WPB LLC, a wholly-owned subsidiary of the Partnership through Republic Property TRS, LLC as a permitted assignee;

NOW, THEREFORE, in consideration of the mutual promises contained herein, the CRA and the Developer desire to enter into Amendment No. 2 to the Agreement, the terms of which follow:

1.      **Recitals.**  Developer and CRA hereby acknowledge and agree that the recitals set forth in this Amendment are true and correct and are incorporated herein as though set forth in their entirety.

2.      **Agreement.**   All references to "Agreement" shall mean the terms and conditions contained in the Professional Services Agreement for the Programming Phase (Phase 1) of the City Center Project, dated October 26, 2004, as amended by Amendment No. 1 dated March 28, 2005 and this Amendment (the "Agreement").  All defined terms in this Amendment shall have the same meaning of the term as established in the Agreement.

3.      **Scope of Work.**

3.1      The Scope of development services under this Amendment consists of all work in the prosecution and proper completion of the demolition and partial preparation of the Site,

including the following work to be performed on the City block bounded by Banyan Boulevard on the North; Dixie Highway on the East; Clematis Street on the South; and Quadrille Blvd on the West (the "Site") and as further described in the demolition proposal prepared by Developer's contractor, consisting of 8 pages, attached hereto as **Exhibit A** and incorporated herein (the "Work" or "Services"). In the event of any conflict or inconsistency, Exhibit A shall govern:

- Demolition and removal of the D&D Center including slab
- Demolition and removal of five one-story CBS buildings including slabs (401, 411, 417, 419, 421, 423 and 435 Clematis Street)
- Foundations demolished and removed down to top of pile cap for all buildings (D&D, 401, 4111, 417, 419, 421, 435)
- Removal of all asphalt parking areas and alley ways (asphalt only)
- Demolition and removal of all roofing materials
- Demolition and removal of six grease traps
- Removal, containerization and disposal of all mercury containing fixtures, including fluorescent bulbs, fixture ballasts, batteries and thermostat switches
- Asbestos abatement, removal and disposal for all buildings (D&D, 401, 411, 417,419, 421, 423, 435)
- Protection of existing trees in right-of-way areas
- Rough grade the Site
- Haul off and legally dispose of all debris (includes all applicable fees)
- Installation and maintenance of 6 ft. temporary fencing with vehicle access gates around the Site through Project completion
- Daily clean-up of streets and adjacent areas
- MOT plans/Signage flagmen for temporary lane closures
- Necessary engineering or architectural services

3.2    All existing trees within the right-of-way shall be protected as best as practicable, and not relocated.

3.3    Developer shall, upon commencement of Site mobilization, install and maintain a continuous 6'-0" high chain-link fence with vehicle access gates as required around the Site to protect the general public from entering the Developer's work area, which fence shall remain throughout the course of the Project.

3.4    Time is of the essence and the Work must cause minimal disruption to businesses in the adjacent areas and be performed in an expedited highly coordinated manner.

3.5    The Scope of Work shall also include all miscellaneous and ancillary items necessary to complete the Work including, all mobilizations and demobilizations, all labor, supervision, servicing, taxes, bonds and insurance, traffic control, security, protecting the existing landscaping, dewatering, miscellaneous costs, general conditions, mark-ups, overhead and profit.

3.6    The Developer is responsible for coordinating the disconnection and relocation of Florida Power & Light ("FPL") services which will be performed by FPL, the costs of which shall be paid by the CRA outside of the GMP.

3.7    The CRA is responsible for coordinating the City of West Palm Beach so that the City provides temporary water for the Work from an existing meter.

3.8    The CRA is responsible for disconnecting and capping all City utility services to the Site.

3.9    The CRA shall be responsible for all necessary permit fees, including demolition permit fees, building permit fees for the demolition, right-of-way permit fees or any impact fees or utility fees.

3.10    The Scope of Work specifically excludes the items listed on **Exhibit A**, attached hereto and incorporated in this paragraph.

4.    **Contract Time**.  Developer shall commence the Work upon issuance of a Notice to Proceed, which shall not be dated later than April 1, 2006, and shall complete all Work within Fifty-Four (54) calendar days of the date of the Notice to Proceed (the "Contract Time").

5.    **Budget for Work**.    The CRA has budgeted and appropriated funds for the Work in the following amounts:

| | | |
|---|---|---|
| Demolition / Work | $802,711.00 | Lump Sum |
| Engineering/ Architectural services | 35,000.00 | Allowance |
| Miscellaneous Expenses | 20,000.00 | Allowance |
| Contingency (6%) | 51,463.00 | Allowance |
| Developer's Fee | 36,366.96 | |
| Budget | $945,540.96 | |

6.    **Guaranteed Maximum Price**.    Developer will accept as full compensation for all Work detailed in Section 3 and Exhibit A of this Amendment an amount guaranteed not to exceed the Budget for Work detailed in Section 5 of this Amendment, or the sum of <u>Nine Hundred Forty-Five Thousand Five Hundred Forty and 96/100 Dollars ($945,540.96)</u> ("Guaranteed Maximum Price").

7.    **Costs of Work**.

7.1    Subject to Article 3.1 above, Costs of Work shall mean costs incurred by Developer in the proper performance of the Scope of Work for Development Services, as defined in Section 1 and Exhibit A, and included in the Guaranteed Maximum Price, and including all costs directly incurred in the performance of the Work for the benefit of the Work, including:

(a)    Wages paid for labor to perform the Work.
(b)    Payments to Contractor and Sub-Contractors for Work.
(c)    Cost of all materials, supplies and equipment, including costs of transportation and reasonable storage thereof.
(d)    Cost including transportation, maintenance and storage of all materials, supplies, equipment, temporary facilities and tools not owned by the workmen;
(e)    Rental charges and all service fees on all necessary machinery and equipment.
(f)    Cost of the premiums and all related expenses for all insurance and cost of premiums for the performance and payment bonds which the Developer will be required to procure which are specifically attributable to the Work.
(g)    Sales, use, gross receipts or similar taxes related to allowable direct costs of the

Work imposed by any governmental authority, and for which the Developer is liable.

(h)     Debris hauling, removal and disposal.

(i)     Costs for security fencing for the materials, installation and maintenance.

(j)     An allowance for necessary costs for engineering or architectural services to complete the Work.

(k)     An allowance for miscellaneous expenses for travel, printing and Administrative Expenses or Other Expenses.

(l)     A contingency not to exceed Fifty-One Thousand Four Hundred Sixty-Three and 00/100 Dollars ($51,463.00) for the purpose of defraying the expenses due to unforeseen circumstances relating to construction, as set forth in Article 10.3.

7.2     Cost of Work shall not include:

(a)     All items excluded on Exhibit A;

    (b)     Extra costs not approved by CRA.

8.     **Developer's Fee**.   The Developer will be paid, as part of the Guaranteed Maximum Price, a fee equal to Four Percent (4%) of the Guaranteed Maximum Price, or Thirty-Six Thousand Three Hundred Sixty-Six and 96/100 Dollars ($36,366.96), for services related to the Work under this Amendment. In the event the final completion date is extended, regardless of whether delay is caused by any act or neglect of the City or is attributable to the City, the Developer's sole and exclusive remedy is an extension of the completion date, and the Developer is not entitled to monetary sums or an adjustment to the contract price.

9.     **Team**.   The parties hereby agree that the firm of Catalfumo Construction, Ltd., will act as the Developer's Contractor for the Work under this Amendment and that Developer intends to enter into a contract with Catalfumo Construction to provide general contracting services for the Project as a member of Developer's team.   As such, Developer covenants not to self perform any work to be performed by a licensed contractor.

10.     **Payment Procedure**.

    10.1   Developer's invoices shall be directed to: **City of West Palm Beach – Accounts Payable, PO Box 3366, West Palm Beach, FL 33402-3366.**   Developer's invoice shall reference: RFP# 03/04-109.   The City will not be responsible for any delay in payment at the City if Developer submits its estimate and invoice to any other address.   Payment will be made in accordance with the Local Government Prompt Payment Act. (F.S. 218.70, et seq.).

    10.2   Payment.   Upon completion of the Work and all of the following items, Contractor may submit its invoice:

1.     Notarized and corporate sealed Final Release of Liens from all sub-contractors and suppliers.

2.     Notarized and corporate sealed Final Release of Liens from Contractor.

3.     Consent of surety for final payment.

4.     Execution of all outstanding change orders.

The making and acceptance of the final payment shall constitute a waiver and release of all claims by the Contractor, except those previously made timely in writing and still unsettled.

10.3   Contingency/ Allowances.  The Contingency and allowance amounts included in the Budget for Work and Guaranteed Maximum Price includes an agreed sum as contingency and/or allowance for the purpose of defraying the expenses due to unforeseen conditions, or material cost escalations, extra work and circumstances, including but not limited to protection of trees, capping of existing water and sanitary services, refrigerant recovery, and other unforeseen expenses.   Developer will be required to furnish documentation evidencing expenditures charged to contingency and/or allowances prior to the release of final payment by the CRA.  All uncommitted contingency or allowance funds will be returned to the CRA at completion via a deductive change order.

10.4   Withheld Payments.  The CRA may withhold payment to such extent as may be necessary to protect CRA if:

(a)   Defective work or material is not remedied.

(b)   Claims filed or reasonable evidence indicating public filing of claims by third parties against the Developer or its Contractor.

(c)   Failure of the Developer or its Contractor to make payments to sub-contractors or for material or labor.

(d)   Damage to another contractor or the Project.

(e)   Developer is in default of any contract provision.

(f)   CRA has reasonable doubt that the Work can be or will be completed within the schedule or for the balance of the Guaranteed Maximum Price which remains unpaid.

(g)   Developer or its Contractor's insurance coverage lapsed.

(h)   Any bond claims are filed against the bonds

10.5   The provisions of the Local Government Prompt Payment Act, Section 218.70 et seq, Fla. Stat., are incorporated by reference herein.  The Act provides payment due dates, interest and payment dispute resolution.

11.   **Site Condition**.  It is understood and agreed that the Developer and its Contractor has, by careful examination, satisfied themselves as to the nature and location of the Work, the conformation of the ground, the character, quality and quantity of the materials to be encountered, the character of the equipment and facilities needed preliminary to and during the prosecution of the Work, and the general and local conditions. Execution of this Contract by the Developer is a representation that the Developer or its Contractor has visited the Site, reviewed any design criteria furnished by CRA, become generally familiar with local conditions under which the Work is to be performed and correlated personal observations with the Work requirements.  Developer deems both its inspection of the Site and review of information furnished by CRA to be an adequate investigation.  Developer represents that the Work is consistent, practical, feasible and can be completed within the scheduled contract time. Developer affirmatively covenants that it has observed no defects or discrepancies in the plans, specifications or Site and that if during performance of the Work any discrepancies, defects, etc., are discovered by or made known to Developer or its Contractor, it shall immediately communicate same to the CRA.   Subject to Article 10.3 above, Developer's failure to assess the Site conditions will not relieve it from the responsibility for properly estimating the costs and schedule of performing the Work.

12.    **Work Area**

12.1    Developer shall confine its office, storage, assembly, equipment and parking to the Site. Should Developer find it necessary to use any additional land outside the Work Site for any purpose, Developer shall, at its expense, provide for the use of any such additional land.

12.2    Developer shall provide, at all times, as part of the Work, clean and adequate sanitary facilities within the Project area for use by Developer's workers.

13.    **Dust Control**.    The Developer shall, as part of the GMP, performcode-required or industry-accepted methods of dust control suitable for the area involved.

14.    **Pollution Control.**    Developer shall, at its expense, perform its Work so as not to discharge into the atmosphere, any body of water, the ground or groundwater, from any source, smoke, dust or other contaminants in violation of the laws, rules and regulations of all federal, state and local air and water pollution requirements. Developer shall, at its expense, provide suitable facilities to prevent any such discharges. Developer shall immediately report to CRA and appropriate authorities any spill of contaminant.

15.    **Debris Disposal.**    All debris shall be legally disposed of at licensed disposal site(s) or recycling facilities.

16.    **Clean Up**. The Developer shall provide daily clean up of the Work area. Cleanup shall include, but not be limited to, removal of trash, construction debris, excavated materials and materials generated as a result of the demolition, from the sidewalks, curbs and gutters, roadway and areas adjacent to the Work area.

17.    **Explosives and Hazardous Materials.**    Developer shall obtain all required federal, state and local permits and licenses and shall be responsible for the safe and proper handling, transportation, storage and use of any explosive or hazardous material brought onto or encountered with in the Site. The Developer will notify the CRA immediately if explosive or hazardous materials are encountered on the Site. Developer shall maintain and post as necessary, Material Hazard Data Sheets for all applicable hazardous materials used in the course of the Work. In the event that hazardous material is improperly handled or stored by the Developer or its sub-contractors, which results in contamination of the Site, Developer shall immediately notify the CRA and the appropriate governmental authority and shall take whatever action is necessary or desirable to remediate the contamination at the Developer's sole cost and expense. Developer shall indemnify and hold harmless the CRA from any expense, action or liability resulting from such contamination and remedial actions.

18.    **Right-of-Way Permit; Traffic Plans**. The Developer shall obtain a City of West Palm Beach right-of-way permit for each required road closure. As part of the requirements of the permit, the Developer shall submit for CRA's review and approval, signed and sealed detailed Maintenance of Traffic (MOT) plans for each closure.

19.    **Safety**. The Developer shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work. Developer will provide to each worker on the job site the proper safety equipment for the duties being performed by the worker and will not permit any worker on the job site who fails or refuses to use the safety equipment. The Developer shall provide and maintain all necessary watchmen, barricades, warning lights, and signs and take all necessary precautions for the protection of all persons involved in the

Work, the public, and all employees or representatives of CRA. All Work and all equipment, machinery, materials and tools shall be in compliance with and conform to all applicable laws, ordinance, rules and regulations.

20.    **Changes in the Work**.

20.1    The CRA may order written additions to or deductions from the Work. All changes in the Work not covered by an authorized contingency shall be authorized by Change Order signed by the CRA and Developer before the change is implemented. The CRA's Project Manager will have authority to make minor changes in the Work not involving extra cost or contingency, and not inconsistent with the purpose of the Work.

20.2    If the Developer believes that a variation or change justifies a modification in the Guaranteed Maximum Price, the Developer may submit a written request for change order at its expense. If a request for change order is made, the Developer is not authorized to vary the Work unless a written Change Order is issued by the CRA. No change order shall be valid unless executed by the authorized signatory of the CRA and Developer. The Developer shall notify the CRA within forty-eight (48) hours of any occurrence which, in the opinion of the Contractor, entitles it to an adjustment of the price or a time extension. For the purposes of this paragraph, a day shall be defined as any business day of twenty-four hours, Monday through Friday, excluding holidays. The CRA may execute a change order authorizing any changes in the Work, adjustments in the price and extensions of time. Subject to the exception in Section 20.5(d), agreement on any Change Order shall constitute a final settlement and release by Developer of all matters relating to the change in the Work which is the subject of the Change Order, including, but not limited to, all direct and indirect costs associated with such change and any and all adjustments to the Guaranteed Maximum Price and the Contract time.

20.3    Subject to Article 20.5(d) below, the Developer expressly acknowledges that commencing work without a written Change Order executed by CRA and Developer in advance of commencement of Work waives any claim by Developer to additional contract sums or time.

20.4    At Owner's request, a bond rider from the Surety increasing the penal sum of the Bond shall be submitted to the City with each change order that increases the Guaranteed Maximum Price.

20.5    The increase or decrease in the Guaranteed Maximum Price resulting from a change in the Work shall be determined in one or more of the following ways:

(a)    by mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation by the CRA;

(b)    by unit prices stated in the Developer's Proposal or subsequently agreed upon;

(c)    by cost and a mutually acceptable fixed or percentage fee; or

(d)    by the following method:

If Developer and the CRA cannot agree on the adjustment, Developer shall promptly proceed with the Work involved only with written approval by the City, with each party expressly reserving their contractual and legal rights. The cost of such Work shall then be determined on the basis of the reasonable expenditures and savings of those performing the Work attributed to the change. However, in the event a Change Order is issued

under these conditions, the CRA's Project Manager will establish an estimated cost of the Work and the Developer shall not perform any Work whose cost exceeds that estimate without prior written approval by the City. In such case, the Developer shall keep and present, in such form as the City may prescribe, an itemized accounting together with appropriate supporting data of the increase in the Cost of the Work. The amount of decrease in the Guaranteed Maximum Price to be allowed by the Developer to the City for any deletion or change which results in a net decrease in cost will be the amount of the actual net decrease.

21.    **Concealed Conditions**.  If concealed conditions are encountered in the performance of the Work below the surface of the ground, or if unknown physical conditions below the surface of the ground are concealed, or if unknown conditions in an existing structure of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in Work of the character provided for in this Amendment are encountered, the Guaranteed Maximum Price and the Contract Time may be equitably adjusted by Change Order upon a request for Change Order in accordance with Section 20.

22.    **Emergencies.**    In any emergency affecting the safety of persons or property, the Developer shall act at its discretion, to prevent threatened damage, injury or loss.  Any increase in the Guaranteed Maximum Price or extension of time claimed by the Developer on account of emergency work shall be determined as provided in Section 20.

22.    **Performance and Payment Bonds.**

22.1.    In accordance with the provisions of Section 255.05, Florida Statutes, the Developer shall cause the Contractor to provide to the CRA, on forms furnished by the CRA consistent with AIA A-317, a 100% Performance Bond and Payment Bond (collectively, the "Bond") in an amount not less than the contract amount for the construction work to be performed by Contractor by a Surety Company acceptable to CRA.  The Bond shall incorporate by reference the terms of this Amendment.  In all respects, the CRA shall be designated in writing the Surety by way of a Rider as a Dual Obligee on such Bond.

22.2.    To be acceptable to CRA, a Surety Company shall comply with the following provisions:

(a)    The Surety Company shall have a currently valid Certificate of Authority, issued by the State of Florida Department of Insurance, authorizing it to write surety bonds in the State of Florida.

(b)    The Surety Company shall have currently valid Certificate of Authority issued by the United States Department of Treasury under Sections 9304 to 9308 of Title 31 of the United States Code.

(c)    The Surety Company shall be in full compliance with the provisions of the Florida Insurance Code.

(d)    The Surety Company shall have at least twice the minimum surplus and capital required by the Florida Insurance Code at the time the invitation to Proposal is issued.

(e)     The Surety Company shall have at least the ratings of A-/Class V in the latest issue of Best's Key Rating Guide.

(f)     The Surety Company shall not expose itself to any loss on any one risk in an amount exceeding ten (10) percent of its surplus to policyholders, provided:

22.3.    Any risk or portion of any risk being reinsured shall be deducted in determining the limitation of the risk as prescribed in this section. These minimum requirements shall apply to the reinsuring carrier providing authorization or approval by the State of Florida, Department of Insurance to do business in this state have been met.

22.4.    In the case of the surety insurance company, in addition to the deduction for reinsurance, the amount assumed by any co-surety, the value of any security deposited, pledged or held subject to the consent of the surety and for the protection of the surety shall be deducted.

23.    <u>Required Types and Amounts of Insurance Coverage</u>

23.1    Developer shall cause the Contractor to procure and maintain during the term of this Amendment the types of insurance in the minimum amounts as follows:

(a)     General liability, including contractual liability insurance covering the indemnification provision of this Amendment in the minimum amount of $5,000,000 per accident, $10,000,000 annual aggregate, to protect the CRA from contingent liability from claims for damages for personal injury as well as from claims of property damages which may arise from any Work under this Amendment, whether such operations be by the Developer , its general Contractor or by anyone directly or indirectly employed by them, including Contractor's Protective coverage for any Developer and sub-Developer operations.;

(b)     Comprehensive automobile liability insurance in the minimum amount of $1,000,000 per occurrence, $3,000,000 annual aggregate, for bodily injury and property damage liability to protect the Developer from claims for personal injury, as well as from claims for property damage, which may arise from the ownership, use, or maintenance of owned and non-owned automobiles, including rented automobiles whether such operations are by the Developer  or by anyone directly or indirectly employed by the Developer ; and

(c)     Adequate Worker's Compensation Insurance and Employer's Liability Insurance in at least such amounts as are required by law for all its employees per Florida Statute 440.02.

23.2    The Certificate of Insurance and policy endorsements or riders shall name the CRA and City of West Palm Beach as "Additional Insured" with respect to all Liability coverages. Developer shall provide evidence of continued coverage in the event of renewal or policy termination.

23.3    These insurance requirements shall not in any manner limit or qualify the liabilities and obligations assumed by Developer under the Agreement.

23.4    The Developer shall be entirely responsible for securing Certificates of Insurance

coverage as set forth above from all subcontractors who are engaged for the Work.

23.5    Certificates of Insurance shall be provided to the CRA prior to execution of this Agreement, shall provide that no material alteration or cancellation, including expiration and non-renewal, shall be effective until receipt of the statutory written notice by the CRA.

23.6    Anything to the contrary notwithstanding, the liabilities of the Developer under this Agreement shall survive and not be terminated, reduced or otherwise limited by any expiration or termination of insurance coverages.

24.    **CRA as Additional Insured.**    All insurance, other than Professional Liability and Worker's Compensation, to be maintained by the Developer, shall specifically name and include the CRA and City of West Palm Beach as an "Additional Insureds". Designation of "Additional Insureds" shall be done by the issuance of a rider or endorsement by the insurer, as opposed to only the issuance of a Certificate of Insurance from the Developer 's insurance agent. The CRA shall be exempt from, and in no way liable for, any sums of money which may represent a deductible in any insurance policy. The payment of such deductible shall be the responsibility solely of the Developer providing such insurance.

25.    **Indemnification.**    To the fullest extent permitted by law, the Developer shall indemnify and hold harmless the CRA and its officers and employees from all liabilities, damages, losses and costs, including but not limited to reasonable attorneys' fees, to the extent caused by the negligence, recklessness or intentional wrongful conduct of the Developer and any other persons directly or indirectly employed or utilized by the Developer in the performance of this Contract, or while in or about the Project site or premises, or arising from liens or claims for services rendered for labor or materials furnished in or for the performance of this Contract. This indemnification agreement is separate and apart from, and in no way limited by, any insurance provided pursuant to this Amendment or otherwise. This clause shall survive the expiration or termination of this Amendment.

26.    **Public Entity Crime.**    Neither the Developer nor any officer, director, partner, shareholder, employee, member or agent, who is active in the management of Contractor, or any affiliate or subsidiary of Developer has been convicted of a public entity crime or action regarding antitrust, fraud, theft, bribery, collusion, racketeering, conspiracy or material misrepresentation with respect to any bid or contract for goods or services to be provided to any public entity, or has been listed on the state Convicted Vendor List, within thirty-six months prior to the date of this Amendment.

27.    **Effect of Amendment.**    Except to the extent the Agreement is modified by this Amendment, the terms and provisions of the Agreement shall remain unmodified and in full force and effect. The terms and conditions of the Agreement, as amended by Amendment No. 1, are incorporated into this Amendment, and vice versa, so that this Amendment No. 2, the Agreement and Amendment No. 1 shall be deemed to be one instrument; provided that and notwithstanding anything to the contrary to the extent the Agreement and amendments or modifications contained in this Amendment conflict with the provision of the Agreement, the terms and provisions of this Amendment shall govern and prevail.

28.    Assignment.    The CRA consents to the assignment of all rights and obligations under this Amendment to Republic-WPB LLC.

IN WITNESS WHEREOF, the parties hereto have made and executed this Amendment No. 2 by their duly authorized representatives as of the day and year indicated below.

ATTEST:

By: _____
      Secretary

WEST PALM BEACH COMMUNITY
REDEVELOPMENT AGENCY

By: _____
      Lois J. Frankel, Chair

Date: _March 23_____, 2006

CRA COUNSEL
Approved as to form
and legal sufficiency
By: _____
Date: __3-28-06_____

F:\ndu\citycenter\amd 2-demo.doc
100.04-01442ndu/rw

DEVELOPER
REPUBLIC/WPB LLC

By: _____  3/29/06
      Steven A. Grigg, President

City Center -- Amd 2
032106

RPT 00950

11

City Center / West Palm Beach, FL

27 February 2006

# Demolition / Site Enclosure Package

| | | |
|---|---|---|
| Catafumo Construction, Ltd. | $802,711 | |
| Architectural & Engineering | $35,000 | |
| Miscellaneous Expenses | $20,000 | |
| Sub-Total | $857,711 | |
| Contingency | $51,463 | 6% |
| Sub-Total | $909,174 | |
| GMP Developer | $36,367 | 4% |
| Total | $945,541 | |

## Notes:

- o  Proposal is based on Catalfumo summary dated 2/24/06.
  Utility disconnect, water connections and meter, and similar items by
  City of West Palm Beach or others.
- o  Miscellaneous includes printing, travel, on-site supervision.
- o  Excludes FPL charges for utility relocation, temporary or permanent
  changes, etc.
- o  Assumes no taxes, impact or permit fees other than those
  assumed within Catafumo subcontracts.
- o  Assumes that this work will be followed-on by GMP contract; and,
  no continuing maintenance of fencing, site, supervision etc. is included
  herein.  That work will continue as part of the general GMP work.
- o  With the exception of the GMP Developer fee, all other costs are
  to be treated as an aggregated GMP for this work.

RPT 00951

Republic Property Trust

Page 1 of 1

**AMENDMENT NO. 3 to**
**Professional Services Agreement for**
**CITY CENTER PROJECT**
**Construction**
**Where the basis of the Agreement is the**
**AIA A121CMc-2003, establishing a**
**Guaranteed Maximum Price**

April ___, 2006

**AMENDMENT NO. 3 to**
**Professional Services Agreement for**
**CITY CENTER PROJECT**
**Construction**
**RFP #03/04-109**

THIS AMENDMENT NO. 3 to the Professional Service Agreement for the City Center Project (RFP No. 03/04-109) is entered into by and between the **WEST PALM BEACH COMMUNITY REDEVELOPMENT AGENCY** ("CRA") and **REPUBLIC-WPB LLC.** (the "Developer").

WHEREAS, the CRA and Developer entered into a Professional Services Agreement for the Programming Phase (Phase 1) of the City Center Project, dated October 26, 2004 (the "Agreement") pursuant to which the Developer has proceeded in a timely manner; and

WHEREAS, the CRA and Developer amended the Agreement by Amendment No. 1 for the schematic design phase, dated March 28, 2005; and

WHEREAS, the CRA and Developer amended the Agreement by Amendment No. 2 the demolition phase, dated April ___, 2006 (collectively, the "Agreement"); and

WHEREAS, pursuant to that certain Consent to Assignment of Agreement dated December 19, 2005 among CRA, Former Developer and Republic Property Limited Partnership (the "Partnership"), CRA consented to the assignment and transfer by the Former Developer of all of its rights and obligations under the Agreement to the Partnership and/or its wholly-owned subsidiary, and accordingly the Agreement has been assigned and transferred to, and assumed by, Republic-WPB LLC, a wholly-owned subsidiary of the Partnership through Republic Property TRS, LLC as a permitted assignee; and

WHEREAS, the CRA and Developer by this Amendment No. 3 wish to provide for the complete scope of development services necessary to plan and build the City Center Project (the "Project"), through the utilization of the AIA A121 CMc – 2003 Contract document, as needed; and

NOW, THEREFORE, in consideration of the mutual promises contained herein, the CRA and the Developer enter into Amendment No. 3 to the Agreement, the terms of which follow:

1.      **Recitals**.  Developer and CRA hereby acknowledge and agree that the recitals set forth in this Amendment are true and correct and are incorporated herein as though set forth in their entirety.

2.      **Agreement**.   All references to "Agreement" shall mean the terms and conditions contained in the Professional Services Agreement for the Programming Phase (Phase 1) of the City Center Project, dated October 26, 2004, as amended by Amendment No. 1 dated March 28, 2005 and by Amendment No. 2 dated April ____, 2005, and by and this Amendment (the "Agreement").  All defined terms in this Amendment shall have the same meaning of the term as established in the Agreement.

RPT 01501

3. **Form of Agreement.** The form of Agreement under this Amendment No. 3 consists of the attached AIA A121 CMc – 2003 Agreement, as modified by the parties, attached hereto and incorporated herein in its entirety by reference.


   IN WITNESS WHEREOF, the parties hereto have made and executed this Amendment No. 3 by their duly authorized representatives as of the day and year indicated below.

ATTEST:

            **WEST PALM BEACH COMMUNITY**
            **REDEVELOPMENT AGENCY**


By: _____  By: _____
   Secretary         Lois J. Frankel, Chair


            Date: _____, 2006

            CRA COUNSEL
            Approved as to form
            and legal sufficiency
            By: _____
            Date: _____


            **DEVELOPER**
            **REPUBLIC-WPB LLC**


            By: _____
            Steven A. Grigg, President

RPT 01502

**EXHIBIT "A"**
**OUTLINE OF GMP PROVISIONS**

**GMP**                             $104,600,000

**Construction Cost Basis**         Based on $84.2 Million assumptions included in package estimated and qualified by Contractor's qualifications and assumptions.

                                    To the extent that scope adjustments are necessary, City consents to adjustments to stay within the GMP or issue change to equitably adjust the scope and time.

                                    The Developer shall direct the Design Team to stay within the GMP and inform the CRA and City of material adjustments implemented to achieve the objectives outlined.

**Design Execution**                Design will be completed by the Design Team as directed by the Developer to meet the Contractor's approved budget. The Design Team will be contractually obligated to perform timely in accordance with the provisions of the GMP documents.

**Design & Permit**                 The construction contract documents will be
**Acquisition**                     completed so as to submit a complete package before the end of September, 2006.

                                    All building permits necessary for the construction will be issued before January 4, 2007.

                                    Permits for preliminary construction work including utility relocations, vibra-floatation, and foundation work shall be issued in order to allow this work to proceed in accordance with a schedule to be attached to the contract to be developed before the end of April 2006.

RPT 01503

**Furnishings & Equipment**

The furnishings and equipment are budgeted as an allowance of $6,000,000 as part of the GMP.

**Contingency**

The CRA and City acknowledges that it may require additional contingencies and sources of funding to ultimately complete the project to meet its additional needs or changes over time.

**Notice to Proceed**

This proposal is conditioned on a Notice to Proceed on or before April 11, 2006.

**Contract Documentation**

The parties shall work diligently to complete documentation and execute the GMP contract prior to April 30, 2006.

**Changes**

To the extent that the City increases the scope of the project, the Developer and its team members shall receive commensurate increases in fees and other reimbursements.

RPT 01504

# EXHIBIT
# 2

Exhibit 10.1

## Assignment and Assumption Agreement

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Agreement") is made as of October 19, 2006, between Republic WPB LLC ("Republic") and the West Palm Beach Community Redevelopment Agency, acting for itself and on behalf of the City of West Palm Beach (together, "CRA").

WHEREAS, Republic and CRA are parties to that certain Professional Services Agreement for the City Center Project (RFP No. 08/04-109), dated as of October 26, 2004, as amended by Amendment No. 1 thereto, dated as of March 28, 2005 and by Amendment No. 2 thereto, dated as of March 13, 2006 (collectively, the "Professional Services Agreement");

WHEREAS, Republic represents that funds previously received by Republic from CRA were used solely to pay subcontractor expenses or for purposes of partial reimbursement of Republic's out of pocket expenses;

WHEREAS, upon the terms and subject to the conditions specified herein and as of the date hereof, Republic has agreed to contribute, assign, transfer and convey to CRA all of its right, title and interests in the Professional Services Agreement; and

WHEREAS, capitalized terms used herein and not otherwise defined shall have the meanings specified in the Professional Services Agreement.

NOW, THEREFORE, in consideration of the premises and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Republic and CRA hereby covenant and agree as follows:

1. Assignment and Assumption. Upon the terms and subject to the conditions specified herein and as of the date hereof, Republic hereby contributes, assigns, transfers and conveys all of its rights under the Professional Services Agreement and CRA hereby accepts all of such rights and assumes all of Republic's obligations and liabilities under the Professional Services Agreement.

2. Third Party Obligations; Payment to Republic. Without limiting the foregoing, CRA hereby assumes and agrees to pay, honor, discharge and perform, as the case may be, in a timely manner and in accordance with their respective terms, all of the liabilities and obligations of Republic to Catalfumo Construction & Development, Song and Associates, Ardaman & Associates, and/or Cushing Demolition with respect to the Professional Services Agreement, including but not limited to all responsibility for amounts incurred to date, or to be incurred in the future. The foregoing includes full responsibility for payment by CRA in full of all amounts set forth in Republic's requisition dated as May 17, 2006 with respect

1

to Catalfumo Construction & Development, Song and Associates, Ardaman & Associates, and/or Cushing Demolition. CRA agrees to indemnify and otherwise hold Republic harmless as to any and all obligations as to Catalfumo Construction & Development, Song and Associates, Ardaman & Associates, and/or Cushing Demolition.

    3. Release. Republic hereby expressly and unconditionally releases CRA and the City of West Palm Beach, as well as CRA's successors, predecessors, departments, affiliates, agents, directors (in both their individual and corporate capacities), officers (in both their individual and corporate capacities), employees, Commissioners (in both their individual and governmental capacities), attorneys, insurers, and assigns, both past and present, from any and all claims, demands, suits, or causes of actions, of any kind or nature whatsoever, whether in law or in equity, and including but not limited to those arising out of or related to the City Center Project and/or the Professional Services Agreement. CRA and the City of West Palm Beach hereby expressly and unconditionally release Republic, as well as Republic's parents (including, without limitation, Republic Property Trust, Republic Property Limited Partnership and Republic Property TRS, LLC), subsidiaries, successors, predecessors, departments, affiliates, agents, directors (in both their individual and corporate capacities), officers (in both their individual and corporate capacities), employees, attorneys, insurers, and assigns, both past and present, from any and all claims, demands, suits, or causes of actions, of any kind or nature whatsoever, whether in law or in equity, and including but not limited to those arising out of or related to the City Center Project and/or the Professional Services Agreement. This Agreement shall constitute, and in executing this Agreement Republic and CRA hereby enter into, a full release as to any and all claims, including cross-claims or third party claims, relating to any and all matters between them, including but not limited to any claims involving the City Center Project and/or the Professional Services Agreement, and it is the intent of Republic and CRA to fully, finally, and forever settle and release all claims between them, which do now exist, may exist or may heretofore have existed between them. In furtherance of such intention, the releases given herein shall be and shall remain in effect as full and complete releases of all such matters notwithstanding the discovery or existence of any additional or different claims or facts related thereto. In addition, Republic agrees to execute mutual releases between Republic and each of Catalfumo Construction & Development, Song and Associates, Ardaman & Associates, and Cushing Demolition, subject to agreement to same on the part of each of Catalfumo Construction & Development, Song and Associates, Ardaman & Associates, and Cushing Demolition.

2

4. Effect of Assignment. This Agreement and the covenants and agreements herein set forth shall inure to the benefit of the parties hereto and their respective successors and assigns and shall be binding upon the parties hereto and their respective successors and assigns.

5. Governing Law. The validity, interpretation and effect of this Agreement shall, to the extent the particular subject matter is controlled by state law, be governed by and be construed in accordance with the laws of the State of Florida, without giving effect to the conflicts of laws provisions thereof.

6. Counterparts. This Agreement may be executed in one or more counterparts, each of which may be executed by one or more of the parties hereto, with the same force and effect as through all parties who executed such counterparts had executed but one instrument.

7. Amendment; Waiver. Any amendment hereto shall be effective only if signed by all parties hereto. No waiver of any provisions of this Agreement shall be valid unless in writing and signed by the party against whom enforcement is sought.

[Signature Page Follows]

3

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered is its name and on its behalf as of the date first written above.

REPUBLIC WPB LLC

By :  /s/ Gary Siegel _____
Name: Gary R. Siegel
Title : Chief Operating Officer

WEST PALM BEACH COMMUNITY
REDEVELOPMENT AGENCY

By :  /s/ Lois Frankel _____
Name :
Title :

CRA ATTORNEY
Approved As To Form
And Legal Sufficiency

By :  /s/ [ILLEGIBLE] _____
Date : 10-12-06

4

&lt;&lt; Previous Page | Next Page &gt;&gt;

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REPUBLIC PROPERTY TRUST

and

REPUBLIC PROPERTY LIMITED
PARTNERSHIP

     Plaintiffs,

     v.

REPUBLIC PROPERTIES CORPORATION

STEVEN A. GRIGG

and

RICHARD L. KRAMER

     Defendants.

Civil Action No. 1:07-cv-00595-RCL

## ORDER

Upon consideration of the Motion of Defendants Richard L. Kramer and Republic

Properties Corporation To Dismiss the Amended Complaint, the opposition thereto, and the

applicable law and record, it is this ___ day of _____, 2007, hereby

ORDERED that the Motion is GRANTED; and it is

FURTHER ORDERED that the Amended Complaint is dismissed in its entirety.


_____
United States District Judge


Copies To:

Mark Nagle
Troutman Sanders, LLP
401 9th Street, N.W.
Suite 1000
Washington, D.C. 20004

Paul Martin Wolff
George A. Borden
Kenneth C. Smurzynski
William T. Burke
Williams & Connolly LLP
725 12th Street, N.W.
Washington, D.C. 20005

Seymour Glanzer
Dickstein Shapiro LLP
1825 Eye St., N.W.
Washington, D.C. 20006