**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REPUBLIC PROPERTY TRUST, *et al.*,

    Plaintiffs,

    v.

REPUBLIC PROPERTIES CORPORATION, *et al.*,

    Defendants.

Civil Action No. 1:07-cv-00595-RCL
Judge Lamberth

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION OF
DEFENDANTS RICHARD L. KRAMER AND REPUBLIC PROPERTIES
CORPORATION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND .............................................................................2

    I.     OVERVIEW OF A REIT ..................................................................4

    II.    RPT AND RPLP'S FACTUAL ALLEGATIONS ............................5

         A.  RPC, Kramer, and Grigg and the Liberti Relationship ..............6

         B.  RPT's Formation and the Development Contribution Agreement ...........8

         C.  Federal Charges Against Liberti, Termination of the Professional Services Agreement and RPT's Independent Investigation .......................9

CONTROLLING LEGAL STANDARD .........................................................10

    I.     LEGAL STANDARD FOR RULE 12(b)(6) MOTION TO DISMISS ...........10

    II.    PLEADING STANDARD UNDER RULE 9(b) FOR FRAUD CLAIMS ...........11

    III.   PLEADING STANDARD UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT FOR FEDERAL SECURITIES FRAUD CLAIMS ...........12

ARGUMENT .....................................................................................................13

    I.     RPT AND RPLP HAVE SUFFICIENTLY PLED A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 ...........13

         A.  RPT and RPLP's Claims of Omission – that Defendants Failed to Disclose RPC's Payments to Liberti while He was Casting Votes in Favor of and Acting for the Benefit of RPC – are a Sufficient Basis for RPT and RPLP's Securities Fraud Claims ...........14

            1.    RPT and RPLP's Claims are not Barred by the Development Contribution Agreement's Integration Clause ...........15

            2.    Defendants Had a Duty to Disclose that RPC was Making Payments to Liberti ...........17

                a.    RPT and RPLP did not have Equal Access to Information Regarding the Liberti Relationship ...........17

b.    RPT and RPLP's Claim is not Based on
Defendants' Failure to "Accuse Themselves of
Misconduct" ........................................................................19

c.    RPT and RPLP's Claim is not Based on
Defendants' Failure to "Speculate as to the Potential
'Effect'" of the Liberti Relationship ...............................20

3.    **Kramer Had a Duty to Disclose** ................................................22

**B. RPT and RPLP'S Claims of Misrepresentation are a Sufficient
Basis for RPT and RPLP's Securities Fraud Claim** ....................23

**C. As RPLP's General Partner, RPT Engaged in the Sale of
Securities** ..........................................................................................25

**D. RPLP and RPT Have Alleged Facts Giving Rise to a Strong
Inference of Scienter** ......................................................................26

1.    **RPT and RPLP have Sufficiently Pled Facts Against
RPC Creating a Strong Inference of Scienter** ..........................27

a.    Extreme Recklessness ......................................................27

b.    Motive and Opportunity ..................................................28

2.    **RPT and RPLP have Sufficiently Pled Facts Against
Kramer Creating a Strong Inference of Scienter** ......................29

a.    Extreme Recklessness ......................................................29

b.    Motive and Opportunity ..................................................30

**II.    RPT AND RPLP HAVE SUFFICIENTLY PLED SECTION 20(a)
CONTROL PERSON LIABILITY AGAINST KRAMER** ..............................31

**A. CULPABLE PARTICIPATION IS NOT REQUIRED TO PLEAD
A PRIMA FACIE CLAIM FOR CONTROL PERSON
LIABILITY** ......................................................................................31

**B. RPT AND RPLP HAVE SUFFICIENTLY PLED CULPABLE
PARTICIPATION** ............................................................................33

**III.    THE COURT CAN PROPERLY EXERCISE SUPPLEMENTAL
JURISDICTION OVER RPT AND RPLP'S STATE LAW CLAIMS** ..........34

**IV.    RPT AND RPLP HAVE SUFFICIENTLY PLED A CLAIM FOR
SECURITIES FRAUD UNDER THE DISTRICT OF COLUMBIA
CODE** ..................................................................................................35

V.    **RPT AND RPLP HAVE SUFFICIENTLY PLED A CLAIM FOR BREACH OF CONTRACT** ...................................................................36

VI.   **RPT AND RPLP HAVE SUFFICIENTLY PLED A CLAIM FOR INDEMNIFICATION** ........................................................................36

VII.  **RPT AND RPLP HAVE SUFFICIENTLY PLED A CLAIM FOR COMMON LAW FRAUD** ....................................................................37

VIII. **RPT AND RPLP HAVE SUFFICIENTLY PLED A CLAIM FOR UNJUST ENRICHMENT** ...................................................................38

IX.   **RPT AND RPLP HAVE SUFFICIENTLY PLED A CLAIM FOR UNDER THE *COLORADO RIVER* "EXCEPTIONAL CIRCUMSTANCES" TEST, COUNT IX SHOULD NOT BE DISMISSED** .................................................................................39

X.    **RPT AND RPLP HAVE ADEQUATELY PLED ENTITLEMENT TO PUNITIVE DAMAGES** ............................................................43

**CONCLUSION** .......................................................................................44

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REPUBLIC PROPERTY TRUST, *et al.*,

      Plaintiffs,

      v.

REPUBLIC PROPERTIES CORPORATION, *et al.*,

      Defendants.

Civil Action No. 1:07-cv-00595-RCL
Judge Lamberth

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION OF
DEFENDANTS RICHARD L. KRAMER AND REPUBLIC PROPERTIES
CORPORATION TO DISMISS THE AMENDED COMPLAINT**

     Plaintiffs Republic Property Trust ("RPT") and Republic Property Limited Partnership

("RPLP") file this Memorandum in Opposition to the Motion of Defendants Richard L. Kramer

("Kramer") and Republic Properties Corporation ("RPC") to Dismiss the Amended Complaint,

and show the Court as follows:

**INTRODUCTION**

     This case is about Defendants' fraudulent conduct.  Although Kramer and RPC are

correct in asserting that the parties are related, that there are multiple actions pending between

the various parties hereto,[1] and that the relationship of the parties has grown increasingly

---

[1] For example, various claims related to Grigg's employment with RPT are currently being litigated in *Grigg v. Republic Property Trust*, No. 2006 CA 009051, (D.C. Super. Ct.) (the "D.C. Superior Court Action").  RPT's counterclaim in the D.C. Superior Court Action originally included common law fraud, District of Columbia securities fraud, and unjust enrichment claims similar to those asserted in this action.  Although the Superior Court denied Grigg's motion to dismiss all other claims asserted in RPT's counterclaim, RPT voluntarily dismissed the

acrimonious, their contention that this litigation is a pretext for an attempt to undermine

Kramer's and Steven Grigg's ("Grigg") positions with Republic Property Trust is patently false.

The reason for this litigation, and for the deterioration of the relationship between RPT and

Grigg and Kramer, is Defendants' fraud and Defendants' subsequent bad faith acts that damaged

RPT and RPLP.  Had Defendants not defrauded RPT and RPLP by failing to disclose their

improper payments to an elected official, neither this nor any of the other currently pending

litigation would be necessary.

## FACTUAL BACKGROUND

RPT is a publicly traded real estate investment trust (REIT) formed in July 2005.  RPT

operates through RPLP, a Delaware limited partnership.  Defendants Kramer and Grigg are two

of  RPT's founders.  Both were intimately involved in RPT's formation and its initial public

offering, which occurred in December 2005.  Since its formation, Kramer has served as

Chairman and a member of RPT's Board of Trustees, and Grigg has served on RPT's Board of

Trustees.[2]  Kramer and Grigg also have various outside business interests, unaffiliated with RPT,

several of which have transacted and continue to transact business with RPT.  Kramer and

Grigg's outside business interests include Defendant Republic Properties Corporation ("RPC"), a

District of Columbia corporation founded by, among others, Kramer and Grigg, and currently

owned and controlled by Kramer and Grigg.

---

claims enumerated above without prejudice so that it could pursue its federal securities fraud, District of Columbia
securities fraud, common law fraud, unjust enrichment, and related claims against all parties in one proceeding.

[2] From the time of RPT's formation until February 28, 2007, Grigg also served as Vice Chairman of RPT's Board of
Trustees, and, until his November 13, 2006 resignation, Grigg was employed by RPT as its President and Chief
Development Officer.

2

At the heart of this litigation is a Development Services Rights Contribution Agreement (City Center) (the "Development Contribution Agreement"), pursuant to which RPC, at the direction of Grigg and Kramer, assigned to RPLP its rights and obligations under a Professional Services Agreement between RPC and the City of West Palm Beach, Florida Community Redevelopment Agency (the "Community Redevelopment Agency "). In return, RPT caused RPLP to issue to RPC 100,234 RPLP limited partnership units, which currently are held by RPC for the benefit of Kramer (84,929 units) and Grigg (15,305 units). The Professional Services Agreement related to a $100 million urban mixed-use development in West Palm Beach known as City Center (the "City Center Project"). In seeking to dismiss RPT's and RPLP's claims related to the Development Contribution Agreement, RPC and Kramer ask the Court to ignore, among other things, the following:

- From late 2004 through early May 2006, RPC, at the direction of Grigg and with Kramer's consent, made a series of payments to Raymond Liberti ("Liberti"), *an active commissioner of the City of West Palm Beach, Florida* (the "City"), *and a voting member of the CRA* (a) while Liberti cast favorable votes regarding RPC's involvement in the City Center Project, including the Professional Services Agreement, and otherwise voted and acted for the benefit of RPC, and other businesses in which Kramer and Grigg had an interest, and (b) during the time that RPC provided development services to the City of West Palm Beach and the CRA pursuant to the Professional Services Agreement.

- At the time RPC and RPLP entered into the Development Contribution Agreement -- whereby RPC contributed the Professional Services Agreement to RPLP in exchange for RPLP limited partnership units – RPC, Kramer and Grigg *wholly failed to disclose to RPT or RPLP that RPC was making payments to an active government official, Liberti, who was voting on issues affecting the City Center Project and Professional Services Agreement and otherwise acting for the benefit of RPC, Kramer and Grigg.*

- After Liberti was indicted on other corruption charges in May 2006, RPC's relationship with Liberti became public and the City and the CRA notified RPT and RPLP of their intent to terminate the Professional Services Agreement. Accordingly, RPT and RPLP entered into an Assignment and Assumption Agreement with the CRA, pursuant to which RPT and RPLP gave up all future rights to participate in the City Center Project

(and revenue and profits therefrom) and walked away from hundreds of thousands of dollars in fees already earned.[3]

In asking the Court to disregard these facts, which are pled in detail in the Amended Complaint, Kramer and RPC mischaracterize RPT and RPLP's allegations and misapply the relevant legal standards. As more fully explained below, RPC and Kramer's motion to dismiss wholly lacks merit and should be denied in its entirety.

## I.   **OVERVIEW OF A REIT**

While RPT's Amended Complaint describes RPT's general operating structure, a very basic overview of real estate investment trusts should assist the Court in scrutinizing the issues raised in Kramer and RPC's motion. RPT is an "UPREIT," which is a fairly standard structure used by real estate investment trusts. The primary purpose of this structure is to permit the REIT to acquire property on a tax efficient basis by issuing partnership units to property owners.

In an UPREIT structure, real estate and other assets are contributed to a limited partnership, which operates as an "umbrella partnership." In exchange for these assets, the umbrella partnership issues limited partnership units to the people or entities contributing assets. Contemporaneously, a REIT is formed and sells shares to the public. The REIT contributes the proceeds from the public offering to the umbrella partnership in exchange for a general partnership interest.

In general, all business operations are conducted through the umbrella partnership (and not by the publicly held REIT). Similarly, virtually all of the real properties and other assets of the enterprise are held by the umbrella partnership. In general, the umbrella partnership is

---

[3] RPT and RPLP have also incurred significant additional damages, including costs in excess of $1 million to conduct internal and independent investigations of the Liberti Relationship, which were necessary to determine the scope of wrongful conduct and the appropriate actions for RPT to take.

4

required to reimburse the publicly held REIT for all of the REIT's expenses as well as purchase prices paid by the REIT to acquire assets or stock. Accordingly, the economic and legal interests of the umbrella partnership and the REIT are intertwined in virtually all respects and, in many ways, are indistinguishable.

An important feature of the UPREIT structure is that the units in the umbrella partnership are the close economic equivalent of the REIT's public common shares. The total number of outstanding common shares of the REIT equals the total number of partnership units owned by the REIT. In addition, the cash distributions made on each partnership unit mirror the cash distributions made on each publicly held common share of the REIT. Finally, the limited partners of the umbrella partnership generally have a right to have their partnership units redeemed by the umbrella partnership. In such a circumstance, the REIT may, at its election, pay cash to the limited partner or issue public common shares of the REIT on a share-for-partnership unit basis. Partnership units in the umbrella partnership are otherwise generally not transferable.

As more fully explained below, in this case, RPLP is the "umbrella partnership," and RPT is the REIT. RPT is the general partner of RPLP, and it owns approximately 88% of the total outstanding RPLP partnership units. RPT has the exclusive authority to manage RPLP's business.[4]

## II.    RPT AND RPLP'S FACTUAL ALLEGATIONS

RPT and RPLP's 33-page Amended Complaint contains more than 150 paragraphs. Comparing Kramer and RPC's motion to the entirety of the Amended Complaint highlights the specious nature of their arguments. RPT and RPLP have pled the elements of each of their

---

[4] Attached to this Memorandum as Exhibit "A" is a diagram of the REIT's structure as of December 20, 2005, the date of RPT's initial public offering.

claims and have provided substantial factual detail, particularly regarding the nature of

Defendants' failure to disclose to RPT and RPLP their relationship with Liberti. RPT and RPLP

will not restate each of its factual allegations here; however, the following provides a summary.[5]

### A.    RPC, Kramer, and Grigg and the Liberti Relationship[6]

Defendant RPC is a private real estate development, redevelopment and management

company founded by, among others, Kramer and Grigg. (Am. Compl. at ¶ 3.) Kramer owns an

85% interest in RPC and, at all times relevant to this action, served as the Chairman of RPC's

Board of Directors. (*Id.* at ¶ 5.) Grigg owns a 15% interest in RPC, and, at all times relevant to

this action, served as a member of RPC's Board. (*Id.* at ¶ 4.) During relevant times hereto,

Grigg also served as RPC's President and Chief Executive Officer. (*Id.*)

Sometime in late 2002 or early 2003, RPC became aware of the possibility of the City

Center Project. (*Id.* at ¶ 16, 23.) RPC was interested in the City Center Project and engaged the

law firm of Greenburg Traurig to represent it in matters related to dealing with the City of West

Palm Beach regarding the City Center Project and other business opportunities. (*Id.* at ¶ 24.) In

March 2004, Robert Sanders ("Sanders"), a Greenberg Traurig partner and former West Palm

Beach City Administrator, introduced Kramer to Liberti, a member of the City Commission of

West Palm Beach and a voting member of the City's Community Redevelopment Agency. (*Id.*

at ¶¶ 25-29.) Subsequently, Sanders introduced Grigg to Liberti. (*Id.*)

---

[5] This section is intended to be an overview of the facts alleged in the Amended Complaint. RPT and RPLP provide greater detail regarding the allegations in the Amended Complaint in the Argument and Citation of Authority, *infra*, as necessary to respond to the specific arguments in Kramer and RPC's motion to dismiss.

[6] For the ease of reference, RPT and RPLP will refer to the relationships described in this section between Liberti and RPC, Grigg and Kramer as the "Liberti Relationship." The Liberti Relationship is set forth in detail in Paragraphs 23-70 of the Amended Complaint.

Beginning around the time of their initial meeting and continuing through May 5, 2006, Grigg engaged in a scheme with Liberti whereby RPC made  payments to Liberti while Liberti, as a member of the City Commission and the Community Development Agency, cast favorable votes and engaged in other activities on matters benefiting RPC (and later RPT) and other businesses in which Grigg and Kramer had an interest.  (*Id.* at ¶¶ 30-31.)  Kramer knew of and approved of this arrangement.  (*Id.*)  Payments from RPC to Liberti were made under the guise of a series of "Consulting Agreements."  (*Id.*)

Specifically, in the time period from October 2004 through December 2005, Grigg authorized RPC to make a total in $94,000 in payments to Liberti.  (*Id.* at ¶¶ 29-52.)  During this time, Liberti, as a member of the Community Redevelopment Agency: (1) voted to select RPC as the preferred service provider of the City Center Project and to approve the Professional Services Agreement, (*Id.* at ¶ 32); (2) voted to approve Amendment No. 1 to the Professional Services Agreement, which entitled RPC and its subcontractors to $1,118,268, (*Id.* at ¶ 44); and, (3) voted to approve the assignment, described below, of the Professional Services Agreement to an affiliate of RPT/RPLP.  (*Id.* at ¶ 53.)  Liberti also voted on and took actions with respect to projects related to other business ventures in which Kramer and Grigg had an interest, including a project in West Palm Beach known as the Datura & Olive project.  (*Id.* at ¶ 67.)

Although Grigg was Liberti's primary contact at RPC, Grigg kept Kramer apprised of RPC's relationship with Liberti and Liberti's actions for the benefit of RPC, and Kramer also communicated with Liberti directly.  (*Id.* at ¶¶ 69.)  Indeed, Kramer was so pleased with the results of RPC's relationship with Liberti that on March 30, 2005, Kramer sent Grigg an email expressing that he was "very fond of Ray [Liberti] and his talents" and suggesting a "structure that would meet our mutual objectives."  (*Id.* at ¶ 47.)

7

**B.     RPT's Formation and the Development Contribution Agreement**

In July 2005, during the height of the Liberti Relationship, RPT – now a publicly traded REIT which owns, operates and develops primarily Class A Office Properties, predominantly in Washington, D.C. – was organized primarily through the efforts of three individuals: Kramer; Grigg; and Mark Keller, RPT's current Chief Executive Officer and a member of RPT's Board of Trustees. (*Id.* at ¶¶ 1, 4-5, 11.) As is typical for a REIT, RPT did not conduct business and did not have any real assets prior to going public.

Substantially all of RPT's assets are held by and managed through RPLP, the umbrella limited partnership in this UPREIT structure. (*Id.* at ¶2.) RPT owns approximately 88% of RPLP, is RPLP's sole general partner, and generally has the exclusive right and full authority and responsibility to manage and operate RPLP's business. (*Id.*) This operating structure came together as a part of the formation of the REIT and in anticipation of its initial public offering ("IPO"). During this formative process, RPT, through RPLP and other subsidiaries, entered into a number of transactions whereby RPLP acquired property and contracts in exchange for shares of RPT and partnership units of RPLP (the "IPO Transactions"). (*Id.* at ¶¶ 13-14.)

One of the IPO Transactions was the Development Contribution Agreement between RPLP and RPC, pursuant to which RPC contributed the City Center Project Professional Services Agreement to RPLP, so that the agreement became an asset and an obligation of the REIT. (*Id.* at ¶¶ 15-22.) As consideration for the contribution of the Professional Services Agreement to the REIT, RPT admitted RPC as a limited partner of RPLP by causing RPLP to issue 100,234 Class A partnership units to RPLP. *See* Development Contribution Agreement, Exhibit A, "Form of Limited Partner Acceptance." A true and complete copy of the Development Contribution Agreement is attached to the Amended Complaint as Exhibit A.

8

Although Kramer and Grigg were fiduciaries of RPT and stood on both sides of the transaction and although RPC made various representations in the Development Contribution Agreement regarding the validity of the Professional Services Agreement, neither Kramer nor Grigg nor RPC disclosed the Liberti Relationship to RPT or RPLP in connection with the Development Contribution Agreement.  (*E.g., id.* at 88-91.)

### C.     Federal Charges Against Liberti, Termination of the Professional Services Agreement and RPT's Independent Investigation

The Liberti Relationship continued until May 2006, with RPC continuing to make payments to Liberti and Liberti continuing to vote and otherwise act for the benefit of RPC, RPT and other businesses in which Grigg and Kramer had an interest.  (*Id.* at ¶¶ 53-70.)  The Liberti Relationship ended only when the United States Attorney's Office for the Southern District of Florida filed a criminal information charging Liberti with fraud and corruption in relation to accepting payments (not related to RPC or RPT) in abuse of his elected position as City of West Palm Beach Commissioner.  (*Id.* at ¶¶ 71-87.)  On May 5, 2006, the same day that Liberti was charged, RPT and RPLP learned for the first time that Grigg, with Kramer's approval, had authorized RPC, under a series of "consulting agreements," to make payments to Liberti while he was an acting commissioner of the City of West Palm Beach and a voting member of the Community Redevelopment Agency.  (Am. Compl. at ¶¶ 23-91.)  Subsequently, as a result of the improper and undisclosed payments made by RPC to Liberti, the City of West Palm Beach informed RPT that it intended to terminate the Professional Services Agreement.  (*Id.* at ¶ 77.)

In light of the above revelations, RPT's independent Audit Committee engaged the law firm of Shulman, Rogers, Gandal, Pordy & Ecker, P.A. ("Shulman Rogers") as independent counsel to assist the Audit Committee in a full investigation the Liberti Relationship.  (*Id.* at ¶ 75.).  During the course of the Audit Committee's investigation, a number of other relevant

events occurred. On June 29, 2006, local press reports indicated that Florida state prosecutors planned to impanel a grand jury to investigate Liberti's dealings with RPC. (Am. Compl. at ¶ 78.) On October 18, 2006, Liberti pled guilty to the charges filed against him and was sentenced to 18 months incarceration followed by three years probation. (*Id.* at ¶ 79.) The following day, in an effort to mitigate any damages it suffered as a result of the wrongful acts of RPC, Grigg and Kramer, the REIT entered into an "Assignment Agreement" with the Community Redevelopment Agency, which had the effect of terminating the Professional Services Agreement. (*Id.* at ¶ 80.)

On October 31, 2006, after a full and thorough investigation, Shulman Rogers provided the findings of its investigation to RPT's Audit Committee. (*Id.* at ¶¶ 81-87.) The findings of the investigation revealed for the first time to RPT and RPLP the full extent of the Defendants' conduct with respect to the Liberti Relationship, beginning prior to RPT's formation and continuing up to the point of the investigation. (*Id.* at ¶ 87.)

## CONTROLLING LEGAL STANDARD

## I.     LEGAL STANDARD FOR RULE 12(b)(6) MOTION TO DISMISS[7]

"[O]n a motion to dismiss, the plaintiff's allegations are to be taken as true and all reasonable favorable inferences arising therefrom are to be indulged." *Callaway v. Hamilton Nat'l Bank*, 195 F.2d 556, 559 (D.C. Cir. 1952); *see McBryde v. Amoco Oil Co.*, 404 A.2d 200, 202 (D.C. 1979) ("[T]he complaint must be construed in the light most favorable to the

---

[7] RPT and RPLP note the recent decision of the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 2007 U.S. LEXIS 5901, at *4-7 (2007), in which the Court disapproved of the holding in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief." The Court in *Bell Atlantic* did not otherwise disapprove or overrule of the current 12(b)(6) standard applied by Courts, and confirmed that a claim need only include factual allegations that are sufficient to "raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.*

plaintiff."). In addition, any "ambiguities or uncertainties concerning the sufficiency of the claims must be resolved in favor of the plaintiff." *Conservative Club of Wash. v. Finkelstein*, 738 F. Supp. 6, 7-8 (D.D.C. 1990) (citations omitted). The appropriate "inquiry is not whether the plaintiffs will ultimately prevail at trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3rd Cir. 2002); *accord, Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1086 (D.C. Cir. 1998).

## II.    PLEADING STANDARD UNDER RULE 9(b) FOR FRAUD CLAIMS

Counts I (federal securities fraud), III (D.C. securities fraud) and VII (common law fraud) of the Amended Complaint are subject to the heightened pleadings requirements of Federal Rule of Civil Procedure 9(b.)[8] Rule 9(b) requires that the allegations supporting these claims must generally include "the time, place and content of the false misrepresentations, the fact misrepresented and what was obtained or given up as a consequence of the fraud." *Zirintusa v. Whitaker*, No. 05-1738, 2007 U.S. Dist. LEXIS 29, at *20 (D.D.C. Jan. 3, 2007) (citations omitted). Although Rule 9(b) requires particularity, it does not abrogate Rule 8's provision that a pleading need only contain a short, plain statement of a claim. *Semon v. Ledecky*, 326 F. Supp. 2d 68, 74 (D.D.C. 2004); *accord, United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.* 238 F. Supp. 2d 258, 267-68 (D.D.C. 2002). Under Rule 9(b), plaintiffs may allege scienter generally. Fed. R. Civ. P. 9(b). Where a pleading does not meet Rule 9(b)'s heightened

---

[8] Kramer and RPC argue that Count II (federal securities control person) also is subject to the heightened pleadings requirements of Rule 9(b) and the Private Securities Litigation Reform Act. As described in more detail in Section II(A) of the Argument, *infra*, Kramer and RPC's interpretation of Section 20(a) of the Exchange Act is contrary to the interpretation of the majority of courts that have addressed the issue, and is inconsistent with the plain language of the statute. In any event, RPT and RPLP have sufficiently pled federal control person liability, even if Kramer and RPC's standard is adopted by this Court.

pleading requirement, the court should freely grant leave to amend. *Shields v. Wash.*

*Bancorporation,* No. 90-1101, 1992 U.S. Dist. LEXIS 4177, at *14 (D.D.C. 1992).

### III.   PLEADING STANDARD UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT FOR FEDERAL SECURITIES FRAUD CLAIMS

In addition to being subject to Rule 9(b) particularity requirements, Count I (federal

securities fraud) also is subject to the additional pleading requirements of the Private Securities

Litigation Reform Act of 1995 (the "PSLRA").

In order to state a claim for securities fraud under Section 10(b) of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. 78j(b), and Rule 10b-5 promulgated

thereunder, 17 C.F.R. 240.10b-5, plaintiffs must allege "(1) a material misstatement *or omission,*

(2) made with scienter (an intent to deceive), (3) made in connection with the purchase or sale of

a security, (4) furthered by the use of the mails or a national securities exchange, and (5) upon

which plaintiff detrimentally relied." *E.g., Burman v. Phoenix Worldwide Indus. Inc.*, No. 04-

1276, 2006 U.S. Dist. LEXIS 46071, at *11 (D.D.C. July 7, 2006) (citations omitted).

In 1995, Congress amended the Exchange Act through the passage of the PSLRA.

Congress's stated aim in passing the PSLRA was to discourage the filing of specious securities

fraud claims – often times referred to as strike suits – by, among other things, curtailing the

following practices, *none of which is applicable in this litigation*: (1) filing lawsuits in response

to a drop in stock price, but with no evidence of fraud; (2) targeting financially resourceful

defendants; (3) use of excessive discovery to encourage settlements, and (4) the manipulation of

plaintiffs by class attorneys.  H.R.. Rep. No 104-369, at 31 (1995) (Conf. Rep.), as reprinted in

1995 U.S.C.C.A.N 730, 730; *see Novak v. Kasaks*, 216 F.3d 300, 306 (2nd Cir. 2000) (PSLRA

enacted to "deter strike suits wherein opportunistic private plaintiffs file securities fraud claims

of dubious merit in order to exact large settlement recoveries").

Among the measures taken to deter meritless strike suits, the PSLRA requires that plaintiffs in a securities fraud case "specify each statement [or omission] alleged to have been misleading, [and] the reason why the statement is misleading . . ." 15 U.S.C. § 78u-4(b)(1). The PSLRA further requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

RPT and RPLP have satisfied the applicable pleading standard for each of the claims asserted in their Amended Complaint.

## ARGUMENT

Kramer and RPC's motion to dismiss should be denied by this Court in its entirety. In support of their motion, Kramer and RPC misstate the allegations in the Amended Complaint, mischaracterize the nature of RPT and RPLP's claims and improperly construe and apply several relevant legal standards. As demonstrated below, RPT and RPLP have sufficiently pled all of their claims, and this case should go forward.

## I.   RPT AND RPLP HAVE SUFFICIENTLY PLED A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5

RPC and Kramer's argument that the Amended Complaint's allegation that the Defendants failed to disclose the "'full nature, extent and effect' of RPC's relationship with Liberti fails to state a claim," (RPC Memo at 4), is disingenuous and wholly ignores RPT and RPLP's detailed factual allegations. RPC and RPT dedicate 47 paragraphs of the Amended Complaint to describing in detail the "full nature, extent and effect" of RPC, Kramer and Grigg's relationship with Liberti. (Am. Compl. at ¶¶ 23-70.) These allegations, described as the "Liberti Relationship" in Section II(B) of the Factual Background, *supra*, include detailed facts regarding payments made by RPC to Liberti under a series of "consulting agreements," which were approved by Grigg, with the knowledge of Kramer. (*Id.*) Likewise, RPT and RPLP allege

13

specific instances in which Liberti, as a member of the City Commission and Community Redevelopment Agency and while he was on RPC's payroll, voted on and otherwise acted for the benefit of matters affecting the City Center Project, the Professional Services Agreement, and other business interests of Grigg and Kramer. (*Id.*) It is these specifically alleged facts comprising the Liberti Relationship that Defendants failed to disclose to RPT and RPLP at the time of the execution of the Development Contribution Agreement.[9] Having pled these allegations in detail, summarizing them as the "full nature, extent and effect of the Liberti relationship" does not render the Amended Complaint deficient. In the sections below, RPT and RPLP demonstrate that each of RPC and Kramer's grounds for dismissal of RPT and RPLP's federal securities fraud claim is without merit.

A. **RPT and RPLP's Claims of Omission – that Defendants Failed to Disclose RPC's Payments to Liberti while He was Casting Votes in Favor of and Acting for the Benefit of RPC – are a Sufficient Basis for RPT and RPLP's Securities Fraud Claims**

RPC and Kramer apparently recognize that the primary fraud alleged by RPT and RPLP is Defendants' failure to disclose the Liberti Relationship at the time of the execution of the Development Contribution Agreement, but argue that RPT and RPLP have failed to plead this omission with the requisite particularity. (RPC Memo at 5-9.) An omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable [party] as having significantly altered the 'total mix' of information made available." *E.g., TSC Indus., Inc. v. Northway, Inc.* 426 U.S. 438, 449 (1976) (holding that an omission is material if "the omitted fact would have assumed actual significance in the deliberations of a

---

[9] RPT and RPLP's federal securities fraud, District of Columbia securities fraud and common law fraud claims are based on Defendants' failure to disclose the facts related to the Liberti Relationship that occurred prior to the execution of the Development Contribution Agreement.

reasonable [person]").  Moreover, because RPT and RPLP have alleged Defendants' complete failure to disclose the Liberti relationship, RPT and RPLP's reliance can be presumed.  *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) (noting that in complete omission cases, reliance may be difficult to prove and can therefore be presumed); *accord, e.g., Eacho v. N D Resources, Inc.*, No. 83-2903, 1985 U.S. Dist. LEXIS 19558 (D.D.C. May 24, 1985).

Here, RPC and Kramer do not, and cannot, argue that RPC's undisclosed payments to Liberti, while Liberti was casting favorable votes for RPC's role on the City Center Project and the Professional Services Agreement, were not material facts related to the Development Contribution Agreement.  Indeed, the failure to disclose the Liberti Relationship made the entire Development Contribution Agreement misleading and rendered worthless the Professional Services Agreement contributed by RPC to RPLP.  Had RPT and RPLP known of the Liberti Relationship, RPT would not have caused RPLP to enter into the Development Contribution Agreement and issue RPLP limited partnership units to RPC.  (Am. Compl. at ¶¶ 105-108, 120-123, 146.)  As demonstrated below, not only was Defendants' omission material, RPT's and RPLP's claims are not barred by the Development Contribution Agreement's integration clause, and Defendants had a duty to disclose the Liberti Relationship.

1. **RPT and RPLP's Claims are not Barred by the Development Contribution Agreement's Integration Clause**

RPC and Kramer misinterpret and misapply the holding in *One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283 (D.C. Cir. 1988) to argue that the Development Contribution Agreement's integration clause bars RPT and RPLP's federal securities fraud claim.  Neither *One-O-One* nor any of the other cases cited by RPC and Kramer preclude fraud claims with respect to a contract that contains an integration clause.  Instead, they merely bar fraudulent inducement claims based on ***prior representations made during the parties' negotiations*** that

are not ultimately included in the written agreement between the parties. *One-O-One*, 668 F.

Supp. at 693, 698-99 (fraud claim based on oral commitment as to future actions, which was

made during negotiations but not included in final agreement); *Rissman v. Rissman*, 213 F.3d

381, 383-84 (7th Cir. 2000) (fraud in the inducement claim based on prior oral representation that

defendant explicitly refused to include in final written agreement); *In re U.S. Office Prods. Co.,*

*Inc. Sec. Litig.*, 251 F. Supp. 2d 77, 101-02 (D.D.C. 2003) (fraud claim based on representations

as to future actions, which were made during the course of negotiations but not included in final

agreement).

Faced with a reading of *One-O-One* similar to that proposed by RPC and Kramer, the

D.C. Circuit, in *Whelan v. Abell*, 48 F.3d 1247 (D.C. Cir. 1995), rejected the broad application of

*One-O-One.* The court in *Whelan* noted that the alleged fraudulent misrepresentations in *One-O-*

*One* related to oral promises as to future behavior and concealment related to those promises, all

of which occurred during the negotiation of the contract, and held that:

> [In *One-O-One]* two of the three alleged frauds rested on alleged oral promises as
> to future behavior, not included in the final, written contract, [cit.],and thus
> appeared clearly barred by the integration clause. . . . Our conclusion in [*One-O-*
> *One*] was plainly not intended to say that an integration clause bars fraud-in-the-
> inducement claims generally or confines them to claims of fraud in execution.
> [cit.] Such a reading would leave swindlers free to extinguish their victims'
> remedies simply by sticking in a bit of boilerplate. [cit.] Thus the integration
> clause in the parties' agreement here does not, as the Whelans suggest, establish
> that all of defendants' claims of fraud in the inducement were false [sic] as a
> matter of law.

*Whelan,* 48 F.3d at 1258.

Here, RPT and RPLP's Section 10(b) claim does not involve alleged misrepresentations

made during the course of negotiations, nor are RPT and RPLP attempting through their claim to

vary the terms of the Development Contribution Agreement. Rather, RPT and RPLP's securities

fraud claim goes to the heart of the Development Contribution Agreement – the Professional

16

Services Agreement being contributed to the REIT.  RPT and RPLP clearly have alleged that Defendants failed to disclose to them the Liberti Relationship, which was integrally related to the Professional Services Agreement and which ultimately led to the termination of that Agreement. Simply put, Defendants failed to disclose to RPT and RPLP that, because of Defendants actions, the consideration contributed by RPC to the Development Contribution Agreement was essentially worthless.[10]  RPC and Kramer's reliance on  *One-O-One, Rissman* and *In re U.S. Office Products* is misplaced.  Hence, their motion to dismiss should be denied.

### 2. **Defendants Had a Duty to Disclose that RPC was Making Payments to Liberti**

RPC and Kramer argue that Defendants did not have a duty to disclose the Liberti Relationship because: (a) Liberti's status as a member of the City Commission and the Community Redevelopment Agency was publicly available information; (b) Defendants had no duty to accuse themselves of wrongdoing with respect to the Liberti Relationship; and (c) Defendants had no duty to speculate as to the outcome of the Liberti relationship.  (RPC Memo at 6-8.)  As demonstrated below, RPC and Kramer misstate the applicable legal standards regarding duties to disclose information and mischaracterize RPT and RPLP's allegations regarding the Liberti relationship.

### a. RPT and RPLP did not have Equal Access to Information Regarding the Liberti Relationship

RPC and Kramer's argument that RPT and RPLP's Section 10(b) claim should be dismissed because Defendants had "no duty to disclose that Liberti was a public official," lacks merit.  (RPC Memo at 6.)  First, and most importantly, RPT and RPLP's claim is not based on

---

[10] In addition to this complete omission, RPT and RPLP have alleged that certain specific statements in the Development Contribution Agreement were rendered false and misleading by Defendants' failure to disclose the Liberti relationship.  Those allegations are addressed in Section I(B), *infra*.

Defendants' failure to disclose that Liberti was a public official. Rather, their claim is based on Defendants failure to disclose the entire Liberti Relationship – *i.e.,* RPC's "Consulting Agreements" and payments to Liberti while Liberti was voting and acting for the benefit of RPC, particularly with respect to the City Center Project and the Professional Services Agreement. This information first became "publicly available" in May 2006, and the Professional Services Agreement was terminated as a result. (Am. Compl. at ¶¶ 71-80.)

Moreover, the fact that Liberti was a public official who voted on matters affecting the City Center project is not the type of publicly available and widely disseminated information that can serve as a bar to a securities fraud claim. Contrary to RPC's and Kramer's argument, there is no well-settled rule that the securities laws impose no duty to disclose publicly *available* information. *E.g., In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 n.10 (3d Cir. 2004) (noting that company's announcement in single pre-IPO press release, though publicly available, does not qualify as publicly known for purposes of Section 10(b) litigation); *cf. In re Adelphia Commc'ns. Corp.*, No. 04-2192 2005 U.S. Dist. LEXIS 2722, at *32 (S.D.N.Y. Feb. 16, 2005)(holding "generally known" information to be "information … so public that a person interested in knowing the information could obtain it in a reliably authentic form without special knowledge or substantial difficulty or expense")(citation omitted). Plaintiffs are not required to search for every piece of information that is technically "publicly available," regardless of the public's actual access to the information, prior to entering into a transaction to purchase or sell securities.

The cases relied upon by RPC and Kramer stand merely for the proposition that information that is *widely disseminated* and truly in the public domain may bar a non-disclosure claim. *See Sailor v. N. States Power, Co.,* 4 F.3d 610, 613 (8th Cir. 1993) (no duty to disclose

"public information that could have easily been obtained by any investor," but noting authority holding that "brief mention in a few poorly-circulated or lightly read publications does not relieve a corporation of the duty to disclose material information") (citations omitted); *Wieglos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989) (no duty to disclose Code of Federal Regulations, but noting duty to disclose other publicly available information – namely, a brief description of pending proceedings and litigation); *Acme Propane Inc. v. Tenexco, Inc.* 844 F.2d 1317, 1323 (7th Cir. 1988) (no duty to disclose statutes at large); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377-78 (E.D.N.Y. 2003) (no duty to provide a summary of the Public Utility Company Holding Act or to disclose publicly filed document available on EDGAR); *In re Kulicke & Soffa Indus., Inc. Sec. Litig.*, 697 F. Supp. 183, 186 (E.D. Pa. 1988) (no duty to disclose publicized information regarding overall industry downturn).

Requiring RPT and RPLP to search the voting records of every government entity in the areas where they conduct business to ensure that Defendants were not making inappropriate payments to public officials would impose a tremendous burden on RPT and RPLP, far beyond what is currently required by federal securities laws. Such a burden would be particularly inappropriate here because RPT and RPLP entered into a contract with a company owned, controlled and managed by the Chair and Vice-Chair of RPT's Board of Trustees, and its President and Chief Development Officer. *See, e.g., Chiarella v. United States*, 445 U.S. 222, 232-33 (1980) (holding that duty to disclose may arise if the parties had a fiduciary or agency relationship, or if prior dealings or circumstances were such that one party had placed trust or confidence in the other). Accordingly, RPC and Kramer's motion should be denied.

           b.   RPT and RPLP's Claim is not Based on Defendants' Failure to "Accuse Themselves of Misconduct"

RPC and Kramer's argument that Defendants had no duty to accuse themselves of wrongdoing with respect to the Liberti Relationship is irrelevant. Although Defendants were not required to accuse themselves of misconduct, they were required to disclose the material information that underlies the alleged misconduct. *See, e.g., In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 674 (S.D.N.Y. 1990.) In *In re Par Pharmaceutical, Inc.*, the Court held:

> Defendants rely heavily on a line of cases holding that a corporation is under no duty to announce publicly that it or its officers are guilty of uncharged criminal behavior, or to accuse itself of antisocial or illegal policies. [cit.] However, these cases are not dispositive here. ***The illegality of corporate behavior is not a justification for withholding information that the corporation is otherwise obligated to disclose.*** *See also Roeder [v. Alpha Indus., Inc.,]* 814 F.2d [22,] 25 ("The securities laws do not operate under the assumption that material information need not be disclosed if management has a reason to suppress it"); . . .

733 F. Supp. at 674-75 (emphasis added.) Similarly, the cases relied on by RPC and Kramer do not support non-disclosure of the Liberti Relationship. *See, e.g., Ballan v. Wilfred Am. Educ. Corp.*, 720 F. Supp. 241, 249 (E.D.N.Y. 1989) ("The fact that a defendant's act may be a crime does not justify its concealment.").

RPT and RPLP's claim is based on Defendants' failure to disclose the Liberti Relationship, not Defendants' failure to accuse themselves of a crime. Regardless of whether the Liberti Relationship involved criminal behavior, disclosure of its existence would have been material to RPT and RPLP's decision to enter into the Development Contribution Agreement. Therefore RPC and Kramer's motion should be denied.

### c. RPT and RPLP's Claim is not Based on Defendants' Failure to "Speculate as to the Potential 'Effect'" of the Liberti Relationship

RPT and RPLP's omission claim is based on Defendants' failure to disclose the existence of Liberti Relationship, not on Defendants' "failure to speculate as to the potential 'effect'" of the Liberti Relationship. (RPC Memo at 7-8.) Accordingly, RPC and Kramer's reliance on *In re*

*Par Pharmaceuticals,* and *Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995), is misguided.

In *In re Par Pharmaceuticals,* the Court denied a motion to dismiss Section 10(b) claims that were based on the defendants' failure to disclose facts regarding a bribery scheme. Though the Court held that the defendants had no duty to speculate as to the ***potential effects*** of the scheme, it held that the plaintiffs' allegations regarding the failure to disclose the ***existence*** of the bribery scheme were "sufficient to withstand defendants' motions to dismiss for failure to state a claim under Rule 10b-5." 733 F. Supp. at 673-79.

*Acito,* upon which RPC and Kramer also rely, is completely inapposite. There, a court held that information regarding two prior FDA inspections of a facility were immaterial, and that defendants had no duty to speculate as to the results of a third inspection that had not yet taken place. 47 F.3d 47. Nowhere in *Acito* did the Court hold that the defendants had no duty to disclose presently available material facts, the omission of which was deceptive.

As noted in another case relied on by RPC and Kramer, "[w]hile defendants correctly note that the securities laws may not require disclosure of possible future sanctions . . . ***they certainly require disclosure of information that would permit an investor to appreciate the risk that the future sanction may arise.***" *In re: Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 760 (S.D.N.Y 2001) (emphasis added).

RPT and RPLP's Section 10(b) claim is based on Defendants' failure to disclose the Liberti Relationship, and not their failure to speculate as to the ultimate results of that relationship. Clearly, RPT and RPLP were entitled to information regarding the Liberti Relationship in order to permit them to appreciate the risk of the ultimate outcome here – termination of the Professional Services Agreement.

### 3. **Kramer Had a Duty to Disclose**

Kramer's argument that he had no duty to disclose the Liberti relationship is remarkable considering the fact that Kramer is, and at all relevant times was, Chair of RPT's Board of Trustees. (Am. Compl. at ¶ 5.) The law is clear that those in a fiduciary capacity owe a "***duty of utmost good faith and loyalty and the obligation . . . to make full disclosure of all known information that is significant, and material . . . .***" *Lampton v. LaHood,* 617 A.2d 1142, 1151 (Md. Ct. Spec. App. 1993) (emphasis added) (citations omitted);[11] *see Herring v. Offutt,* 295 A2d 876, 879-80 (Md. 1972) (same.) The duty of a fiduciary to disclose material information applies to federal securities claims. *See, e.g., Powers v. British Vita, P.L.C.,* 57 F.3d 176, 189 (2d Cir. 1995) (holding that "fiduciary relationship or other relationship of trust and confidence can give rise to a duty to disclose material information; unique access to information can also trigger such a duty").

In arguing that he had no duty to disclose, Kramer attempts to distance himself from the Development Contribution Agreement and the Liberti Relationship. (RPC Memo at 8.) Kramer, however, is one of RPC's founders, was the Chairman of RPC's Board of Directors at the time of the Development Contribution Agreement, has an 85% ownership interest in RPC and controls RPC's actions. (Am. Compl. ¶ 2.) Essentially, Kramer is RPC and benefits personally from all of RPC's business successes. Moreover, though Kramer denies that he personally benefited from the Development Contribution Agreement, RPT and RPLP have alleged sufficient facts that

---

[11] RPT is a Maryland REIT. Thus, Maryland law governs Kramer's fiduciary duties to the REIT.

he did, (Am. Comp. at ¶ 21), and nothing in the current record before the Court establishes

otherwise.[12]  Therefore, RPC and Kramer's motion should be denied.

### B.  RPT and RPLP'S Claims of Misrepresentation are a Sufficient Basis for RPT and RPLP's Securities Fraud Claim

Under Rule 10b-5, a statement, though literally true, may still be actionable if it is

rendered misleading by the failure to disclose additional, material information.  17 C.F.R.

240.10b-5; *see, e.g., In re Par Pharm., Inc.* 733 F. Supp. at 676-79 (denying motion to dismiss

Rule 10b-5 claim based in part on literally true, but allegedly misleading statements.)  A

"statement is misleading if a reasonable investor, in the exercise of due care, would have

received a false impression from the statement." *In re Par Pharm., Inc.,* 733 F. Supp. at 677; *see*

*TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449 (1976) (a genuinely **misleading statement** is

material and actionable if it "would have assumed actual significance in the deliberations of a

**reasonable** shareholder").  The determination of whether a statement is misleading:

> must go to the jury unless the Court, drawing all reasonable inferences in favor of the plaintiff, determines that reasonable minds could not differ on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made.

*In re Par Pharm., Inc.,* 733 F. Supp. at 677; *cf. Bielski v. Cabletron Sys. (In re Cabletron Sys.),*

311 F.3d 11, 34 (1st Cir. 2002) (reversing grant of motion to dismiss and holding that, "[i]n

general, the materiality of a statement or omission is a question of fact that should normally be

left to a jury rather than resolved by the court on a motion to dismiss").

Here, the entire Development Contribution Agreement was misleading in light of the

---

[12] The factual record will support RPT and RPLP's allegations.  For example, RPT's prospectus, filed with the SEC on December 17, 2005, indicates that 84,929 of the 100,234 RPLP limited partnership units transferred to RPC in connection with the Development Contribution Agreement, valued at $1,022,388, were transferred to and are held by RPC for the benefit of Kramer.  Prospectus at p. 12.

circumstances in which it was made. Disclosure of the Liberti Relationship would have been not only material, but essential, to RPT and RPLP's valuation of the right, title and interest in the Professional Services Agreement that RPC was transferring to RPLP. Certainly, RPT and RPLP were reasonable in expecting its founders, the Chair and Vice-Chair of its Board of Trustees, its President and Chief Development Officer, and the Company owned and controlled by them, to disclose the existence of the Liberti Relationship prior to entering into the Development Contribution Agreement.

Moreover, RPT and RPLP have alleged specific statements in the Development Contribution Agreement that were misleading in light of the circumstances under which they were made. For example, RPT has alleged that Section 2.10 of the Development Contribution Agreement was misleading because RPC represented in the Agreement that "The Professional Services Agreement is in full force and effect and to the knowledge of RPC, neither it nor the CRA is in default thereunder. . . ." (See Am. Compl. at ¶ 89.) RPT and RPLP allege that Defendants' failure to disclose the Liberti Relationship rendered this statement misleading when made. The statement was particularly misleading given the provisions of the Professional Services Agreement, including RPC's representations therein that it would "at all times conduct business in a reputable manner," (Section 6.3.2), and that it had not retained or paid any person "contingent upon or resulting from the award of making of this Agreement," (Section 6.3.3), and RPC's commitment to "promptly notify the CRA in writing by certified mail of all potential conflicts or [sic] interest or other circumstance that may influence or appear to influence [RPC's] judgment or the quality of services being provided thereunder," (Section 6.3.8.) (Am. Compl. at ¶ 90.) Remarkably, RPC and Kramer admit that RPT and RPLP may have pled that RPC defrauded the Community Redevelopment Agency, but not that it breached its obligations under

the Professional Services Agreement. (RPC Memo at 10 ["At most, plaintiffs have pled only that certain of the representations made by RPC in the Professional Services Agreement were false, not that RPC was 'in default' of any of its obligations under the contract."].)  In any event, it is for the trier of fact to determine whether the omission of facts regarding the Liberti Relationship rendered Section 2.10 of the Development Contribution Agreement misleading.

Similarly, RPT and RPLP have alleged that Defendants' failure to disclose the Liberti Relationship rendered misleading RPC's representation in the Development Contribution Agreement regarding the validity and binding effect of the Development Contribution Agreement and the agreements, documents and instruments executed pursuant to the Agreement, (Section 2.2).  (Am. Comp. ¶ 89.)  Again, whether the omission of the Liberti relationship rendered this statement misleading should be determined by the trier of fact.  Therefore, RPC and Kramer's motion should be denied.

### C. As RPLP's General Partner, RPT Engaged in the Sale of Securities

RPC and Kramer correctly assert that only an actual purchaser or seller of securities may bring a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5. Here, RPLP issued the securities – RPLP limited partnership units – to RPC pursuant to the terms of the Development Contribution Agreement, and is therefore the seller of the securities. (Am. Compl. at ¶ 21.)  In addition, RPT executed the Limited Partner Acceptance associated with the Development Contribution Agreement, which caused the RPLP units to be issued to RPC.  (Development Contribution Agreement, Ex. A.)  Therefore, RPT also is a seller of the units.

Moreover, RPC and Kramer ignore that general partners of a limited partnership can be "deemed the 'sellers' of the limited partnership interests" for purposes of a Rule 10b-5 claim. *See Allard v. Arthur Andersen & Co.*, 924 F. Supp. 488, 496 (S.D.N.Y. 1996) (noting that

general partners have been deemed "sellers" for purposes of Section 12(a)(2) claims under the Securities Act of 1933, 15 U.S.C. § 77l(2), and that there was no reason to apply a different definition to claims under the Securities Exchange Act of 1934).  RPT is RPLP's sole general partner and controls the business affairs of RPLP.  (Am. Compl. at ¶ 2.)  RPT has alleged that, in reliance on Defendants' material misrepresentations and omissions, RPT caused RPLP to issue partnership units to RPC.  (*Id.* at ¶¶ 102-111.)  Accordingly, both RPT and RPLP are sellers of the securities and both may properly assert federal securities fraud claims against Defendants.

## D.  <u>RPLP and RPT Have Alleged Facts Giving Rise to a Strong Inference of Scienter</u>[13]

The PSLRA requires plaintiffs to "plead with particularity facts that establish a strong inference of scienter."  *Burman,* 2006 U.S. Dist. LEXIS 46071, at *12-13 (denying motion to dismiss); *In re Office Prods. Sec. Litig.*, 326 F. Supp. 2d 68, 75 (D.D.C. 2005).  Although this Circuit has not decided the applicable standard for "pleading a strong inference of scienter," District Court's have recently analyzed plaintiffs' claims under the Second Circuit Standard, which recognizes that plaintiffs may plead scienter by alleging specific facts that either (1) constitute strong circumstantial evidence of conscious or reckless behavior or (2) establish motive and opportunity.  *Burman v. Phoenix Worldwide Indus. Inc.,* 384 F. Supp. 2d 316, 331-334 (D.D.C. 2005) (scienter by extreme recklessness sufficiently pled); *In re Office Prods. Sec. Litig.,* 326 F. Supp. 2d at 75.  Accordingly, RPT and RPLP submit that this Court should apply both the reckless behavior standard and the motive and opportunity standard.[14]

---

[13] RPT and RPLP incorporate herein Section (I)(B) of the Argument in Plaintiffs' Memorandum in Opposition to Steven A. Grigg's Motion to Dismiss Plaintiffs' Amended Complaint (the "Grigg Opposition Memo"), filed contemporaneously herewith.  The Grigg Opposition Memo includes a more detailed discussion of both the extreme recklessness and the motive and opportunity standards.

[14] RPC and Kramer do not provide a basis for their decision to analyze scienter only under the recklessness standard.  Strong evidence of conscious or reckless behavior is sufficient to plead scienter under the standard

### 1. RPT and RPLP have Sufficiently Pled Facts Against RPC Creating a Strong Inference of Scienter

RPC and Kramer's sole argument that RPT and RPLP have not pled facts giving rise to a strong inference of scienter against RPC is the statement, "RPC may not be charged with scienter because Plaintiffs [sic] allegations of scienter as to both Grigg and Kramer are insufficient." This statement is contrary to the law and the facts. First, as demonstrated in subsection I(D)(2), *infra,* and in the Grigg Opposition Memo, RPT and RPLP have sufficiently pled scienter against Kramer and Grigg, and therefore also against RPC. Second, "a plaintiff may . . . allege[] scienter on the part of a corporate defendant without pleading scienter against any particular employees of the corporation." *In re Dynex Capital Inc. Sec. Litig.*, No. 05-1897, 2006 WL 314524, at *6 (S.D.N.Y. Feb. 10, 2006) *citing In re Worldcom*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005) (to show "that a corporate defendant acted with scienter, plaintiffs in securities fraud cases need not prove that any one individual employee . . . also acted with scienter"). This section focuses on allegations of scienter that relate specifically to RPC.[15]

#### a.    Extreme Recklessness

RPC entered into the Liberti Relationship, executed a series of "Consulting Agreements" with Liberti, and paid Liberti $126,000, all while Liberti was voting and otherwise acting for the benefit of RPC's role in, among other things, the City Center Project and the Professional Services Agreement. The details of the Liberti Relationship, including payments made by RPC

---

applied in the majority of circuits. *See In re Fed. Nat'l Mortgage Sec. Litig.*, MDL No. 1668, 2007 U.S. Dist. LEXIS 33939 at n. 1 (D.C. May 8, 2007) ("A majority of federal courts of appeals have held that, in order to satisfy the PSLRA's pleading requirements, a plaintiff must plead facts giving rise to a strong inference of knowing misconduct or severe recklessness"). Other Circuits continue to permit plaintiffs to plead scienter through a motive and opportunity standard. *Id.* As demonstrated below, RPT and RPLP have met both of these standards with respect to Kramer and RPC.

[15] Of course, as recognized by RPC and Kramer, RPT and RPLP's allegations establishing scienter on the part of Kramer and Grigg also apply to RPC.

and votes cast by Liberti, are set forth in detail in Paragraphs 23 through 70 of the Amended Complaint.

Despite the ongoing Liberti Relationship, RPC failed to disclose the Liberti Relationship when it entered into the Development Contribution Agreement and assigned the Professional Services Agreement to RPLP. (*Id.* at ¶¶ 88, 103.) RPC's disclosure is particularly alarming given that RPC's owners were the founders and then Chair and Vice-Chair of RPT and RPT's President and Chief Development Officer. (*Id.* at ¶¶ 4, 5.) Moreover, RPC represented and warranted the validity of the Professional Services Agreement, which, among other things, included representations that RPC would conduct business in an above board manner and without conflicts. (*Id.* at ¶¶ 89-90.) That RPC admits that RPT and RPLP may have pled that RPC lied to the City of West Palm Beach and the Community Redevelopment Agency when entering into the Professional Services Agreement confirms that RPT and RPLP have pled RPC's intentional and, at the very least, extremely reckless behavior. (RPC Memo at 10.) Therefore, RPT and RPLP have pled facts sufficient to raise a strong inference of scienter.

b.   <u>Motive and Opportunity</u>

As demonstrated in subsection (a), RPC clearly had the opportunity to commit securities fraud. Additionally, RPC also had motive, which is defined as "concrete benefits that could be realized by one or more false statements and wrongful nondisclosures." *Novak v. Kasaks*, 216 F.3d 300, 307 (2nd Cir. 2000.) Here, had RPC disclosed the Liberti relationship, RPT would not have caused RPLP to issue 100,234 RPLP limited partnership units to RPC, valued at $1,202,808 at the time of their issuance. (Am. Comp. at ¶¶ 117-126.) By failing to disclose the Liberti Relationship, RPC was able to obtain these valuable partnership units and rid itself of the tainted – and ultimately terminated – Professional Services Agreement. (*Id.* at ¶¶ 15-22.) Even today,

28

RPC retains the benefit of the RPLP partnership units, while RPT and RPLP have incurred tremendous expenses and are involved in various lawsuits, all resulting from the Liberti Relationship and RPC's assignment of the Professional Services Agreement to RPLP. (*E.g., id.* at 21, 137.)

### 2. RPT and RPLP have Sufficiently Pled Facts Against Kramer Creating a Strong Inference of Scienter

#### a.     Extreme Recklessness

RPT and RPLP have sufficiently pled facts against Kramer to constitute strong circumstantial evidence of conscious or reckless behavior. Here, Kramer is a founder and 85% owner of RPC, and Chair of RPC's Board of Directors. (Am. Compl. at ¶ 5.) He met with Liberti, and had *direct knowledge of the Liberti Relationship, including knowledge that Liberti, in his capacity as a public official and while on RPC's payroll, was casting votes related to the City Center Project and the Professional Services Agreement.* (Am. Compl. at ¶¶ 17, 28, 31, 47, 66, 69, 70.) Kramer even went so far as to suggest entering into a permanent relationship with Liberti in a "structure that would meet our mutual objectives . . ." (*Id.* at ¶ 47.)

Kramer also is a founder of RPT, a recipient of substantial economic interests in RPT in connection with the IPO and the Chair of RPT's Board of Trustees. (*Id.* at ¶ 47.) In both his capacity as founder, owner, and Board Chair of RPC, and in his capacity as founder and Board Chair of RPT, Kramer knew that RPC was assigning the Professional Services Agreement to RPT; indeed, he stood on both sides of the transaction. (Am. Compl. at ¶¶ 17, 19.) Given the nature of his relationship with RPT, he also knew that RPT legally could rely on him to disclose

all material information regarding the Development Contribution Agreement. *E.g., Lampton,* 617 A.2d at 1151.

Despite his knowledge, and ignoring his duties to RPT, Kramer stood silent and benefited – both personally and through his ownership interest in RPC – from the Development Contribution Agreement. (Am. Compl. at ¶¶ 21, 55.) These facts constitute sufficient circumstantial evidence of intentional or reckless behavior to raise a strong inference of scienter.[16]

        b.    <u>Motive and Opportunity</u>

As a founder, 85% owner of RPC and trustee of RPT, Kramer is presumed to have had the opportunity engage in securities fraud. *See, e.g., In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 327 (S.D.N.Y. 2001) (holding opportunity "apparent" for all defendants because by virtue of their positions as principals, co-founders, and vice-presidents, they had the "opportunity to report false and misleading information" about corporation's accounting). By failing to disclose the Liberti Relationship at the time that RPC and RPLP entered into the contribution Agreement, Kramer was able to rid his two person company, RPC, in which he owns an 85% interest, of the tainted Professional Services Agreement. In exchange, RPC received for the benefit of Kramer 84,929 RPLP limited partnership units, valued at $1,022,388 at the time of their issuance. (AM. Compl. at ¶ 21); Prospectus at 12. Indeed, as of the time of this filing, Kramer's fraud has paid off. RPC still holds valuable RPLP partnership units for the

---

[16] Kramer and RPC's reliance on cases regarding defendants' access to reports and facts is misplaced. (RPC Memo at 13.) The cases cited by Kramer and RPC in this regard merely hold that where plaintiffs allege that defendants "had access" to, but did not necessarily know of contrary facts, plaintiffs "must specifically identify the reports or statements concerning this information." *In re Dynex Capital Inc. Sec. Litig.*, No. 05-1897, 2006 WL 314524 at *8 (S.D.N.Y. Feb. 10, 2006.) Here, RPT and RPLP do not allege that Kramer "had access" to information or reports regarding the Liberti relationship, they allege that Kramer knew of and blessed the relationship.

benefit of Kramer, while RPT is saddled with the fallout from Liberti Relationship. (*E.g.* Am. Compl. at ¶ 21) Therefore, RPT and RPLP have pled sufficient facts to create a strong inference of scienter based on Kramer's motive and opportunity.

## II.    RPT AND RPLP HAVE SUFFICIENTLY PLED SECTION 20(a) CONTROL PERSON LIABILITY AGAINST KRAMER

As demonstrated in Section I, *supra*, RPT and RPLP have sufficiently pled primary violations of Section 10(b) and Rule 10b-5 against RPC and Grigg.[17]  Moreover, Kramer and RPC do not argue that RPT and RPLP have not sufficiently pled that Kramer was a controlling person of RPC and Grigg.[18] (Am. Compl. at ¶¶ 5, 112, 114.)  Kramer and RPC argue only that RPT and RPLP have failed to state a claim for control person liability because they have not pled that he was a "culpable participant" in the underlying fraud.  Kramer and RPC's argument fails for two reasons.  First, the text of Section 20(a) and the majority of courts that have addressed the issue do not require plaintiffs to plead culpable participation to state a control person claim.  Second, even if this Court requires allegations showing culpable participation, RPT and RPLP have met their burden.

### A.    CULPABLE PARTICIPATION IS NOT REQUIRED TO PLEAD A PRIMA FACIE CLAIM FOR CONTROL PERSON LIABILITY

Section 20(a) of the Exchange Act provides:

---

[17] RPT and RPLP also have sufficiently pled a primary violation against Kramer.

[18] The regulations promulgated under Sections 15 and 20 define "control" as "the possession, direct or indirect, of the power to direct or cause the direction of management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C. F. R. §§ 230.405, 240.12b-2.23

> Joint and several liability; ***good faith defense***. Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, ***unless*** the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (emphasis added).  Based on this language, the majority of courts to address the requirements of a control person claim have held that good faith and lack of actual participation is an affirmative defense, and that it is therefore unnecessary for plaintiffs to plead or show actual participation.  *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir. 1996); *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880-81 (7th Cir. 1992); *First Interstate Bank, N.A. v. Pring*, 969 F.2d 891, 896-97 (10th Cir. 1992), rev'd on other grounds sub nom. *Cent. Bank v. First Interstate Bank*, 511 U.S. 164 (1994); *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir. 1985); *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981).

Requiring plaintiffs to plead culpable participation is contrary to both the letter and the spirit of the Section 20(a).  *In re Enron Corp. Sec., Derivative & ERISA Litig.*, MDL 1446, 2003 U.S. Dist. LEXIS 1668, at *44 (S.D. Tex. Jan. 28, 2003) (requiring plaintiffs to plead a section 20(a) claim with particularity does not comport with the congressional intent); *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 395 (S.D.N.Y. 2003) ("the holding that Section 20(a) has no scienter element is also commanded by the congressional intent underlying Section 20(a)…"); *see also Sennot v. Rodman & Renshaw*, 414 U.S. 926, 929 (1973) (Douglas,

32

dissenting in denial of cert.) (noting that Section 20(a) is remedial and has been interpreted as requiring only some indirect means of influence short of actual direction to hold a "controlling person" liable, and that the purpose of the Securities Act is to expand the public's remedies). Moreover, implying a culpable participation requirement essentially conflates a violation of Section 20(a) with a violation of Section 10(b). *E.g., G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 n.23 (5th Cir. 1981) (the burden of proving good faith is on the defendant and noting that there would be no purpose for the controlling person liability provision unless it differed in some way from the standards for non-controlling liability). Because Rule 20(a) was designed to provide a remedy in cases where a party may not have directly violated Section 10(b), requiring culpable participation would defeat both the purpose and the text of the statute. *E.g., In re MicroStrategy, Inc. Sec. Lit.*, 115 F. Supp. 2d 620, 659-60 (E.D. Va. 2000).

In advocating the culpable participation requirement, Kramer relies almost exclusively on cases from the Second Circuit, and particularly from the Southern District of New York. (RPC Brief at 13-14.) Even in the Southern District, however, there exists confusion over whether and with what particularity culpable participation must be pled. *See, e.g. In re IPO Sec. Lit.*, 241 F. Supp. 2d at 397 *citing SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996). Accordingly, the prevailing interpretation of Section 20(a) requires only allegations sufficient to state a Section 10(b) claim against the primary violator – RPC and Grigg – and allegations of control against the alleged control person – Kramer. Because RPT and RPLP have satisfied this pleading standard, their control person claim against Kramer should proceed.

**B.    RPT AND RPLP HAVE SUFFICIENTLY PLED CULPABLE PARTICIPATION**

Even if this Court requires allegations showing culpable participation, RPT and RPLP have met their burden. As recognized by the authority relied upon by Kramer and RPC, in order

to plead culpable participation, plaintiffs must plead with particularity facts that give rise to a strong inference that "the controlling person either knew or should have known that the controlled person was committing fraud." *Shanahan v. Vallat*, No. 03-3496, 2004 U.S. Dist. Lexis 25523, at * 15 (S.D.N.Y. Dec, 19, 2004) (denying motion to dismiss and holding that given defendant's position with company and alleged involvement in affairs of company, he should have known of fraud); *see, e.g., Steed Finance LDC v. Nomura Securities Int'l, Inc.*, No. 00-8058, 2001 U.S. Dist. LEXIS 14761, at *32-33 (S.D.N.Y Sept. 20, 2001) (denying motion to dismiss Section 20(a) claim because plaintiffs had pled that defendant knew material information that was not disclosed and did not disclose it order to realize a financial gain).

Here, Kramer is a founder and 85% owner of RPC, and Chair of RPC's Board of Directors. (Am. Compl. at ¶ 5.) He had direct knowledge of the Liberti relationship, including knowledge that Liberti was casting votes related to the City Center Project and the Professional Services Agreement while on RPC's payroll. (Am. Compl. at ¶¶ 17, 28, 31, 47, 66, 69, 70.) He knew that RPC was assigning the Professional Services Agreement to RPT; indeed, he stood on both sides of the transaction. (Am. Compl. at ¶¶ 17, 19.) Despite this knowledge, Kramer stood silent and benefited – both personally and through his ownership interest in RPC – from the Development Contribution Agreement. (Am. Compl. at ¶¶ 21, 55.) These facts are sufficient to create a strong inference that Kramer knew or should have known that RPC and Grigg (and Kramer) were committing securities fraud, and RPC and Kramer's motion should be denied.

## III.    THE COURT CAN PROPERLY EXERCISE SUPPLEMENTAL JURISDICTION OVER RPT AND RPLP'S STATE LAW CLAIMS

RPT and RPLP have demonstrated in Sections I and II, *supra*, that they have sufficiently stated claims under Section 10(b) of the Exchange Act and Rule 10b-5, and under Section 20(a) of the Exchange Act, rendering moot Kramer and RPC's argument that the Court should exercise

its discretion to dismiss the remaining claims. Accordingly, the exercise by this Court of

supplemental jurisdiction over RPT and RPLP's remaining claims is proper. 28 U.S.C. § 1367.

**IV.    RPT AND RPLP HAVE SUFFICIENTLY PLED A CLAIM FOR SECURITIES FRAUD UNDER THE DISTRICT OF COLUMBIA CODE**[19]

RPC and Kramer's argument that RPT and RPLP have failed to plead a claim for

violations of D.C. securities laws fails for several reasons. First, as demonstrated in Section I,

*supra*, RPT and RPLP have sufficiently pled a claim for federal securities fraud under the

heightened pleading requirements of the PSLRA. Accordingly, they have also sufficiently pled a

claim for violations of District of Columbia securities fraud under the less stringent standards of

Rule 9(b).

Second, RPT and RPLP do have a direct claim against Kramer under the District of

Columbia Code. Section 31-5605.2(a)(1) of the District of Columbia Code provides that it shall

be unlawful for any person, in connection with the sale of a security, to:

> (A) Employ a device, scheme, or artifice to defraud;

> (B) Obtain money or property by means of an untrue statement of a material fact
> or an omission to state a material fact in order to make the statements made, in the
> light of the circumstances under which they are made, not misleading; or

> (C) Engage in a transaction, practice, or course of business which operates, or
> would operate, as a fraud or deceit upon a person; . . .

Contrary to RPC and Kramer's assertion, District of Columbia securities law does not limit a

direct cause of action by the seller to only the purchaser of the securities. Section 31-

---

[19] Tellingly, RPC and Kramer do not challenge RPT and RPLP's District of Columbia control person claim against Kramer. Section 31.6506(c) provides:

> A person who directly or indirectly controls a person liable under subsection (a) of this section; a partner, officer, or director of the person liable . . . shall be liable jointly and severally with, and to the same extent as the person liable, unless her or she is able to sustain the burden of proof that he or she did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There shall be contribution among the several persons so liable.

6506.05(a)(3)(B)(ii) provides that, "a person shall be civilly liable to another person if the person . . . [e]mploys an [sic] device, scheme, or artifice to defraud the other person or engages in an act, practice, or course of business which operates or would operate as a fraud or deceit on the other person." Therefore, for the reasons stated in Section I, *supra*, RPT and RPLP have sufficiently pled violations of Section 31-5605.2(a)(1) and Section 31-5606(a)(3)(B)(ii) against Kramer.

Moreover, Kramer should be considered a purchaser for purposes of Section 31-5606.05(a)(2.) Kramer owns 85% of RPC and RPC received 84,929 RPLP partnership units, valued at over $1 million, for the benefit of Kramer. (Am. Compl. at ¶¶ 5, 21); Prospectus at 12. Consequently, RPC and Kramer's motion should be denied.

## V. RPT AND RPLP HAVE SUFFICIENTLY PLED A CLAIM FOR BREACH OF CONTRACT

Federal Rule of Civil Procedure 8(a) provides that a pleading that sets forth a claim for relief need only include "a short and plain statement of the claim showing that the pleader is entitled to relief, and . . . a demand for judgment for the relief that the pleader seeks." Here, RPT and RPLP have provided RPC with fair notice of the breach of contract claim and the grounds upon which it rests. As alleged in the Complaint, the existence of the Liberti Relationship breached the express representations in the Development Contribution Agreement, including Section 2.10 thereof.[20] (Am. Compl. at ¶¶ 132-134.) RPC's argument essentially is a denial of those allegations, not a basis for the dismissal of RPT and RPLP's breach of contract claim. As such, the Court should deny RPC and Kramer's motion.

## VI. RPT AND RPLP HAVE SUFFICIENTLY PLED A CLAIM FOR INDEMNIFICATION

---

[20] See also, Section I(B), *supra*.

As with RPT and RPLP's breach of contract claim, RPC and Kramer's ground for dismissing the indemnification claim really is a denial of the merits of the claim, and therefore does not provide a basis for dismissal.  In Section 2.11 of the Development Contribution Agreement, RPC committed to indemnify RPLP, and RPT (as an affiliate of RPLP):

> against any and all loss, liability, claim damage *or expense whatsoever (including, but not limited to, any and all expenses, including attorneys' fees, reasonably incurred in investigating, preparing or defending any claim or litigation commenced or threatened)* due to or arising out of a breach of any such representations and warranties. (emphasis added)

As a result of RPC's breaches of the Development Contribution Agreement, RPC will be obligated to pay for the losses enumerated in Paragraphs 137 and 138 of the Amended Complaint, including any indemnification that Kramer may be entitled to from RPT resulting from the outcome of Count IX for declaratory judgment.  Hence, RPT and RPLP have stated a claim for indemnification against RPC.

## VII.  RPT AND RPLP HAVE SUFFICIENTLY PLED A CLAIM FOR COMMON LAW FRAUD

As set forth in Section I, *supra,* RPT and RPLP have sufficiently pled their federal securities fraud claim under the heightened pleading requirements of the PSLRA.  Therefore, they also have sufficiently pled their claim for common law fraud under Rule 9(b.)  *E.g. Burman,* 2006 U.S. Dist. Lexis 46071, at n. 5 ("Because this Court concludes that plaintiffs' second amended complaint satisfies the pleadings requirements for the PSLRA, it must conclude that the pleadings requirements for common law fraud are also satisfied.").

RPC and Kramer's arguments specifically addressed to common law fraud are also without merit.  As demonstrated in Section 1(A)(1), RPT and RPLP have adequately stated a cause of action for federal securities fraud by omission.  RPC and Kramer's reliance on *One-O-One* is equally misplaced in the context of common law fraud.  The cases cited by RPC and

Kramer merely stand for the proposition that, "[a]t least in a commercial context, reliance on representations made by the other party during negotiations has been held unreasonable as a matter of law where these representations have not been included in the executed agreement . . ." *Hercules & Co., v. Shama Restaurant Corp.*, 566 A.2d 31, 39 (D.C. 1989).[21] Second, as demonstrated in Section 1(A)(2), RPC and Kramer owed a duty to disclose the Liberti Relationship. Indeed, the District of Columbia Court of Appeals has held that an officer's and director's failure to disclose material contracts to his employer can support a fraud claim. *Pyne v. Jamaica Nutrition Holdings, Ltd.*, 497 A.2d 118, 132-33 (D.C. 1985). Third, as shown in Section 1(B), RPT and RPLP have sufficiently pled a claim for fraud by misrepresentation. Finally, plaintiffs may plead scienter generally to state a claim for common law fraud. Fed. R. Civ. P. 9(b). Therefore RPC and Kramer's motion should be denied.

## VIII.  RPT AND RPLP HAVE SUFFICIENTLY PLED A CLAIM FOR UNJUST ENRICHMENT

RPC and Kramer's argument regarding RPLP and RPC's unjust enrichment claim is properly the subject of a denial in a future answer filed by them, not a ground for dismissal of the claim. First, RPT and RPLP have alleged that they conferred a benefit on Kramer and that Kramer has retained the benefit – RPT caused RPLP to issue partnership units to RPC, 84,929 of which were transferred to RPC and which are held by RPC for the benefit of Kramer. (Am. Compl. at ¶ 21.)[22] Contrary to RPC and Kramer's argument, the Development Contribution

---

[21] RPC and Kramer cite to a subsequent decision in this case, *Hercules & Co. v. Shama Restaurant Corp.*, 613 A.2d 916, 932-35 (D.C. 1992), the holding of which is consistent with RPT and RPLP's interpretation of *One-O-One* and the cases cited by RPT and RPLP in support of their position.

[22] RPT's Prospectus, filed with the SEC, confirms that these units were transferred for the benefit of Kramer. Prospectus at 12.

Agreement contains no relevant provisions regarding RPT and RPLP's allegations, let alone inconsistent or controlling provisions. Development Contribution Agreement, *passim*.

Second, RPT and RPLP have alleged that, under the circumstances of this case, which are more fully described in the Amended Complaint and in this brief, it would be unjust for Kramer to retain the benefits conferred upon him. (Am. Compl. at ¶ 151.)

Therefore, RPT and RPLP have sufficiently pled their claim for unjust enrichment and RPC and Kramer's motion should be denied.

## IX.     UNDER THE *COLORADO RIVER* "EXCEPTIONAL CIRCUMSTANCES" TEST, COUNT IX SHOULD NOT BE DISMISSED

Count IX of the Amended Complaint, in which Plaintiffs request a declaration that Kramer is not entitled to the payment and advancement of his legal fees and expenses from RPT, should not be dismissed because, contrary to Kramer's assertion, this case is the "first-filed" action. Moreover, the application of the *Colorado River* "exceptional circumstances" test, which Kramer ignores but in fact controls the analysis in this case, weighs heavily against dismissal.

Kramer's primary argument for dismissal of Count IX is the erroneous contention that his advancement suit against RPT, which he has brought in state court in Maryland, was filed before the present action. (RPC Memo at 19.) A review of the procedural histories of the cases in question, however, reveals that this argument is patently false. On March 28, 2007, Plaintiffs filed the instant case against Kramer and the other Defendants. On April 27, 2007, Plaintiffs amended their complaint to, *inter alia*, add a request for a declaratory judgment that Kramer is not entitled to the payment and advancement of his legal fees and expenses from RPT. On May 3, 2007, Kramer filed a complaint in the Circuit Court of Baltimore City, Maryland, against RPT for advancement of his legal expenses, the same issue that was already pending before this

Court. In short, it is indisputable that the case before this Court was filed before Kramer's Maryland suit.[23]

Kramer has failed to apply the appropriate legal analysis regarding parallel federal-state proceedings. The cases Kramer cites, *Washington Metro. Area Transit Auth. v. Regonese*, 617 F.2d 828, 830 (D.C. Cir. 1980) and *Columbia Plaza Corp. v. Security Nat'l Bank*, 525 F.2d 620, 627 (D.C. Cir. 1975), are simply not applicable because they concern parallel proceedings in two *federal* courts, which is not the situation here.[24] This case, as noted above, concerns a parallel proceeding in Maryland *state* court, and is therefore controlled by the Supreme Court's decision in *Colorado River Conservation District. v. United States*, 424 U.S. 800 (1976).

In *Colorado River*, the Supreme Court cautioned that the District Courts should decline to exercise jurisdiction in the face of parallel state court proceedings only in "exceptional circumstances." *Id.* at 815, 817-19. More specifically, the D.C. Circuit delineated the "exceptional circumstances" test, as follows:

---

[23] In a footnote, Kramer notes that he filed a complaint against RPT seeking advancement of his legal expenses in the United States District Court for the District of Maryland on March 6, 2007. (RPC Memo at 19 n.14.) However, as Kramer concedes, he voluntarily dismissed that complaint on May 3, 2007. *Id.* Six days prior to that dismissal, Plaintiffs filed their Amended Complaint in the present action, which, among other things, deleted a reference to 28 U.S.C. § 1332 from the jurisdictional allegations. Kramer's dismissal of his Maryland District Court case was undoubtedly occasioned by this filing, which revealed that he had no basis to allege diversity jurisdiction over a real estate investment trust or a limited partnership.

Kramer cannot reasonably argue that his voluntarily dismissed case in Maryland federal court somehow confers "first-filed" status on his Maryland state court action, even though the latter was clearly filed after the present suit was initiated. *See Handy v. Shaw, Bransford, Veilleux & Roth*, 325 F.3d 346, 349 n.2 (D.C. Cir. 2003) ("By the time the district court ruled on Shaw's motion to dismiss, however, its original Superior Court case had been dismissed and Handy's federal suit was then the first filed, that is, it pre-dated Shaw's *second* Superior Court action.") (emphasis in original). Indeed, such reasoning defies logic. As the timeline cited above clearly indicates, the case before this Court is the "first-filed" case regarding whether Kramer is entitled to advancement of his legal expenses from RPT, and should proceed.

[24] Indeed, Kramer disingenuously omits the word, "federal," from his quotation from *Washington Metro. Area Transit Auth.* RPC Memo at 19. The correct quotation is: "[W]here two cases between the same parties on the same cause of action are commenced in two different *Federal* courts, the one which is commenced first is to be allowed to proceed to its conclusion first . . . ." *Wash. Metro. Area Transit Auth.*, 617 F.2d at 830 (emphasis added).

> We emphasize, as has the Supreme Court, that the district court may exercise its discretion to decline jurisdiction for the purpose of judicial economy only in truly "exceptional circumstances." It may do so only after weighing a number of factors, including the inconvenience of the federal forum, the order in which the courts assumed jurisdiction, the desirability of avoiding piecemeal litigation, whether federal or state law controls and whether the state forum will adequately protect the interests of the parties. In the district court's analysis, "no one factor is necessarily determinative; [but] a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required." *"Only truly 'exceptional circumstances' will allow a federal court to stay or dismiss a federal action in favor of a concurrent action before a state court." Indeed, the balance is "heavily weighted in favor of the exercise of jurisdiction."*

*Handy v. Shaw, Bransford, Veilleux & Roth*, 325 F.3d 346, 352-353 (D.C. Cir. 2003) (citations omitted) (emphasis added). In concluding that the district court erred in dismissing the case in favor of the state court proceeding, the D.C. Circuit underscored two factors in particular: the order in which the courts assumed jurisdiction and the fact that "no substantial proceedings had occurred in" the Superior Court action. *Id.*

When the "exceptional circumstances" test is applied to this case, the inescapable conclusion is that this Court should retain jurisdiction over Count IX of the Amended Complaint. In this case, this Court, the federal forum, is not inconvenient to Kramer; indeed, Baltimore, the location of the state court proceeding, is less than an hour away, and Kramer maintains a residence in Washington, D.C. Additionally, the relevant documents and witnesses are overwhelmingly more concentrated in Washington, D.C. than in Maryland. Moreover, as noted above in great detail, this case was filed before the Maryland state action. Furthermore, "no substantial proceedings" have occurred in the Maryland state action; RPT only responded to the complaint and a summary judgment motion filed by Kramer on June 13, 2007.

Finally, the aim of "avoiding piecemeal litigation" also counsels in favor of this Court retaining jurisdiction over Count IX. Even if the Court dismisses Count IX of the Amended

Complaint in favor of the state court action, this case will proceed on the remaining counts in the Amended Complaint, resulting in two parallel proceedings. As the D.C. Circuit has opined, "parallel litigation of factually related cases in separate fora is inefficient" and has "long been recognized as a judicial inconvenience." *Id.* at 349. By contrast, if the Court retains jurisdiction over Count IX and the Maryland state action is dismissed in deference to this, the "first-filed" case, all the related claims arising from the same nucleus of operative facts will be in one forum, this Court. In sum, in light of "'the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them,'" and the application of the "exceptional circumstances" test to this case, Count IX of the Amended Complaint should not be dismissed. *Id.* at 351 (quoting *Colo. River*, 424 U.S. at 817).

Kramer also argues that Count IX should be dismissed because federal courts have the discretion to decline jurisdiction in declaratory judgment actions. (RPC Memo at 20.) Notably, Kramer does not cite a single D.C. Circuit or District Court case in support of his argument.[25] *See id.* Indeed, it appears that the D.C. Circuit has not addressed whether the *Colorado River* "exceptional circumstances" test applies to declaratory judgment actions. Other circuits are split on the issue. *See, e.g.*, *BASF Corp. v. Symington*, 50 F.3d 555, 557 (8th Cir. 1995) (noting circuit court split). This Court, however, has applied the *Colorado River* "exceptional circumstances" test to a declaratory judgment action that was subject to a parallel state court proceeding and has decided to exercise jurisdiction. *See Holman v. Cook*, 879 F. Supp. 113, 114-15 (D.D.C. 1995)

---

[25] The decisions Kramer does cite are of little assistance to his argument. In *BASF Corp. v. Symington*, the Eighth Circuit employed the "exceptional circumstances" test, just as Plaintiffs do above. 50 F.3d 555, 557 (8th Cir. 1995) ("we have decided that only in exceptional circumstances should a district court stay or dismiss a declaratory judgment action subject to parallel state litigation, even if diversity of citizenship is the only jurisdictional foundation."). Moreover, *Yoder v. Heinhold Commodities, Inc.*, 630 F. Supp. 756 (E.D. Va. 1986) is inapposite because it concerns parallel *federal* court proceedings. Finally, *Miller v. Miller*, 423 F.2d 145, 148 (10th Cir. 1970), also cited by Kramer, is inapplicable because it was decided before the Supreme Court's 1976 decision in *Colorado River*.

("I find that considerations of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation' weigh against abstention and favor moving ahead with the case at bar, . . . ."); *but cf. Maryland Cas. Ins. Co. v. Newpark Towers Assocs.*, No.89-0649-LFO, 1990 U.S. Dist. LEXIS 15317 (D.D.C. Nov. 5, 1990) (applying the *Colorado River* factors and the *Brillhart* presumption against retaining jurisdiction over declaratory judgments in diversity cases).[26]  As in that case, Plaintiffs maintain that the *Colorado River* "exceptional circumstances" test should be applied to this case as well. Accordingly, this Court should decide RPT's declaratory judgment claim.[27]

## X.    RPT AND RPLP HAVE ADEQUATELY PLED ENTITLEMENT TO PUNITIVE DAMAGES

Punitive damages are appropriate if the plaintiff can show that an intentional tort was accompanied by "fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury." *Jemison v. Nat'l, Baptist Convention,* 720 A.2d 275, 286 (D.C. 1998) (citations omitted.) *Kolstad v. ADA*, 139 F.3d 958 (D.C. Cir. 1998.)

As established above, RPT and RPLP's fraud claim should not be dismissed for failure to state a claim and RPT and RPLP have alleged that Defendants actions showed "willful

---

[26] The *Brillhart* presumption applies to diversity cases, which is not the basis of jurisdiction here.

[27] In a footnote, Kramer appears to concede that this suit is, indeed, the "first-filed" action because he argues that this case fits within an "exception to the first-filed rule" where a defendant "preemptively" brings a declaratory judgment action. (RPC Memo at 19-20 n.15.) Kramer maintains that he is the "true plaintiff" and his Maryland case should, therefore, be permitted to proceed. *Id.*  In alleged support for this argument, Kramer cites *Thayer/Patricoff Education Funding, L.L.C. v. Pryor Resources, Inc.*, 196 F. Supp. 2d 21, 29-31 (D.D.C. 2001). *Id.* However, this case, like many of the other cases cited by Kramer, involves parallel federal court proceedings, not parallel federal and state court proceedings, as is the situation here.  The proper legal analysis when federal and state court proceedings are at issue is outlined above.  Moreover, Plaintiffs did not "preemptively" file their declaratory judgment action in this Court in anticipation of litigation; indeed, Kramer's advancement suit already existed in Maryland District Court when Plaintiffs filed their federal court suit.  Plaintiffs filed in this District Court because it is the only forum, federal or state, in which all related claims against Kramer, Grigg, and RPC could be joined.

misconduct, malice, fraud wantonness, oppression, and/or that entire want of care that would raise the presumption of conscious indifference to consequences." (Am. Compl. at ¶ 158.) If RPT and RPLP prove these allegations, they would be entitled to recover punitive damages in this action. Therefore, RPT has properly pled an entitlement to punitive damages.

## CONCLUSION

For the reasons set forth herein, RPT and RPLP respectfully request that this Court deny RPC and Kramer's Motion to Dismiss in its entirety.

Dated: June 13, 2007

Respectfully submitted,

/s/ Mark E. Nagle_____
Mark E. Nagle, Bar No. 416364
Tracy P. Varghese, Bar No. 472805
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 274-2972
mark.nagle@troutmansanders.com

*Counsel for Republic Property Trust and
Republic Property Limited Partnership*

44

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was served electronically via the ECF System of this Court this 13th day of June, 2007 to:

William T. Burke
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005

*Counsel for Republic Properties Corporation and Richard L. Kramer*

Seymour Glanzer
Richard J. Conway
Marianela Peralta
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C. 20006

*Counsel for Steven A. Grigg*

/s/ Tracy P. Varghese



REIT OPERATING STRUCTURE
AS OF REPUBLIC PROPERTY TRUST'S
INITIAL PUBLIC OFFERING
DECEMBER 20, 2005



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

REPUBLIC PROPERTY TRUST, *et al.*,

      Plaintiffs,

      v.

REPUBLIC PROPERTIES CORPORATION, *et al.*,

      Defendants.

Civil Action No. 1:07-cv-00595-RCL
 Judge Lamberth

**ORDER**

      Upon consideration of the motion of Defendants Richard L. Kramer and Republic Properties Corporation to dismiss the Amended Complaint in the above-captioned case, Plaintiffs' Opposition thereto, and the entire record herein, it is by the Court this __ day of _____, 2007

      **ORDERED** that the motion to dismiss, be, and hereby is, **DENIED**.

_____
UNITED STATES DISTRICT JUDGE