**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REPUBLIC PROPERTY TRUST, ET AL.,

Plaintiffs,

vs.

REPUBLIC PROPERTIES CORP., ET AL.,

Defendants.

No. 1:07-cv-00595-RCL

**DEFENDANT STEVEN A. GRIGG'S REPLY TO PLAINTIFFS'
OPPOSITION TO DEFENDANT STEVEN A. GRIGG'S MOTION
TO DISMISS AND THEIR NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendant, Steven A. Grigg, by and through his attorneys and pursuant to Rules 9(b), 12(b)(6), and LCvR 7, hereby files the instant Reply to Plaintiffs' Opposition to his Motion to Dismiss Plaintiffs' Amended Complaint and their Notice of Supplemental Authority. As further set forth below, Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted under these rules and the Private Securities Litigation Reform Act ("PSLRA") and, thus, should be dismissed with prejudice.

Dated: June 27, 2007

Respectfully Submitted,

/s/ Seymour Glanzer
Seymour Glanzer, D.C. Bar No. 040188
  *glanzers@dicksteinshapiro.com*
Richard J. Conway, D.C. Bar No. 164541
  *conwayr@dicksteinshapiro.com*
Marianela Peralta, D.C. Bar No. 449803
  *peraltam@dicksteinshapiro.com*
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006-5403
(202) 420-2200
*Attorneys for Defendant Steven A. Grigg*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REPUBLIC PROPERTY TRUST, ET AL.,

        Plaintiffs,

        vs.

REPUBLIC PROPERTIES CORP., ET AL.,

        Defendants.

No. 1:07-cv-00595-RCL

## DEFENDANT STEVEN A. GRIGG'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT STEVEN A. GRIGG'S MOTION TO DISMISS AND THEIR NOTICE OF SUPPLEMENTAL AUTHORITY

### ARGUMENT[1]

I.    **The U.S. Supreme Court's June 21, 2007 Decision in *Tellabs v. Makor* Confirms that Plaintiffs Have Failed To Sufficiently Plead Facts In Support of a "Strong Inference of Scienter" and thus, Plaintiffs' Amended Complaint Must be Dismissed.**

Six days ago, in *Tellabs, Inc. v Makor Issues & Rights, Ltd.*, -- S.Ct. --, 2007 WL 1773208 (June 21, 2007), the U.S. Supreme Court decided what constitutes a "strong inference of scienter" for purposes of meeting the stringent requirements of the PSLRA.[2]  A copy of that

---

[1] In addition to filing separately, Mr. Grigg joins in the arguments made by Co-Defendants RPC and Mr. Kramer in their Reply Brief.

[2] In response to Mr. Grigg's Co-Defendants' Motion to Dismiss, Plaintiffs asserted that this lawsuit does not contain the type of specious securities fraud claims the PSLRA intended to discourage.  *See* Plaintiffs' Opposition to Defendants RPC and Kramer's Motion to Dismiss at 12.  To the contrary, as set forth in Mr. Grigg's Motion to Dismiss, this case falls squarely within the realm of cases the PSLRA is designed to preclude.  *See Tellabs, Inc. v Makor Issues & Rights, Ltd.*, -- S.Ct. --, slip op. at *1 (June 21, 2007) (Congress enacted the PSLRA as a "check" against abusive litigation by private parties); *see also*, *Klein v. Autek Corp.*, Fed. Sec. L. Rep. (CCH) 93, 344 (Sept. 1, 2005) (rejecting the *Klein* plaintiffs' argument that the rigorous pleading requirements of the PSLRA should be relaxed in that case because no class action law suit was involved); *Burman v. Phoenix Worldwide Indus., Inc.*, 384 F. Supp. 2d 316-326-27 (Congress passed the PSLRA in an attempt to prevent abusive and meritless lawsuits).

Plaintiffs' assertion that this lawsuit can be distinguished from other frivolous securities litigation (and is not subject to the rigid pleading requirements of the PSLRA) because it is not a
(cont'd on next page)

decision is attached as Exhibit A.  That decision is consistent with Mr. Grigg's position in his Motion to Dismiss that Plaintiffs have failed to articulate specific facts that can support a claim of securities fraud pursuant to Rules 9(b) and 12(b)(6).  In *Tellabs*, the Supreme Court held that "an inference of scienter must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, slip op. at *4.

The plaintiffs in *Tellabs* filed a class action alleging, among other things, that the company and its then President and CEO Richard Notebaert (collectively referred to as "Tellabs" or the "defendant") had engaged in securities fraud in violation of § 10b of the Securities Exchange Act of 1934.  *Id.* at *5.  In response, Tellabs moved to dismiss the complaint on the grounds that the plaintiffs had failed to plead their fraud counts with the particularity the PSLRA required.  *Id.*  The district court agreed with the defendant and dismissed the complaint.  *Id.*  The *Tellabs* plaintiffs then amended their complaint adding references to 27 confidential sources and added more specific allegations concerning the defendant's mental state.  *Tellabs*, slip op. at *6.  Despite the additional allegations, the trial court again dismissed (with prejudice) the amended complaint finding that while the plaintiffs had sufficiently pleaded that the alleged statements were *misleading*, plaintiffs had failed to sufficiently allege that the defendant acted with the

---

(cont'd from previous page

strike suit is incorrect.  The PSLRA is aimed at abusive securities litigation -- be they strike suits or other types of frivolous securities fraud lawsuits such as this one.  *See, generally*, *Tellabs*, *supra*; *Klein*, *supra*; *Burman*, *supra*.

The abusive nature of this lawsuit is clearly evidenced by the fact that, despite the very serious and damaging allegations of fraud made by the Plaintiffs against Messrs. Grigg and Kramer in this and in other pending lawsuits between these same parties, Mr. Kramer remains as Chairman of RPT's Board of Trustees and he and Mr. Grigg are still Trustees to this date.  Furthermore, prior to this litigation, Plaintiff, as a NYSE-listed company, did not file a public disclosure of these supposedly material fraud claims with the SEC so that their shareholders and the securities market would be told about these allegedly material issues affecting the company.

required *scienter*. *Id.* at *6 (emphasis added). The Seventh Circuit reversed, finding that the alleged statements were misleading and that the plaintiffs had sufficiently pleaded that Tellabs executive Notebaert acted with the requisite scienter. *Tellabs*, slip op. at *6. In reversing, the Seventh Circuit adopted the reasonable person standard (which Plaintiffs here erroneously rely on in their Opposition to Mr. Grigg's Motion to Dismiss). *Id*. On appeal, the U.S. Supreme Court rejected the Seventh Circuit's approach and held that Congress "did not merely require plaintiffs to provide a factual basis for their scienter allegations, but that Congress required plaintiffs to plead with particularity facts that give rise to a "strong" -- defined as a "powerful or cogent inference." *Id*. Furthermore, to do so, the Supreme Court held that a trial "court must consider plausible nonculpable explanations for the defendant's conduct." *Tellabs*, slip op. at *10 (emphasis added). Most important, the Supreme Court held that the inference must be more than "merely reasonable." *Id.*

As is demonstrated in Mr. Grigg's Motion to Dismiss, and as is further set forth below in this Reply, Plaintiffs have failed to allege the type of particularized facts the Supreme Court, the Second Circuit, and sister courts in this jurisdiction have held can support a claim of a "strong inference of scienter." Mr. Grigg's position that Plaintiffs have failed to adequately plead a strong inference of scienter is further demonstrated by the fact that throughout their Opposition to Mr. Grigg's Motion to Dismiss, Plaintiffs rely on what they claim is "reasonable" to support their claim that his alleged conduct was fraudulent. *See* Plaintiffs' Opposition ("Pls.' Opp.") at 7, 9. As confirmed by the U.S. Supreme Court in *Tellabs*, Plaintiffs are required to allege very specific facts to support their claim that Mr. Grigg's alleged misleading statements or omissions were made or omitted with the requisite scienter that will support a securities fraud claim pursuant to § 10b, 10b-5 and the PSLRA. Their failure to do so requires the dismissal of Plaintiffs' Amended Complaint.

**A.    Plaintiffs' "Pleading Technique" of Coupling Factual Statements With Conclusory Allegations of Fraudulent Intent Is Inadequate to Set Forth a Claim of Securities Fraud Under 10(b), 10b-5, and Rule 9(b)**

Like the plaintiffs in *Tellabs* whose amended complaint did not set forth the requisite scienter, the Plaintiffs' Amended Complaint likewise lacks "particularized facts to support the inference that on September 23, 2005, [Mr. Grigg] acted recklessly or with fraudulent intent to defraud [them]." *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. (Conn) (1994)) ("[defendant's] pleading technique is to couple a factual statement with a conclusory allegation of fraudulent intent").  Rather than setting forth particularized facts that can independently (*e.g.*, without the conclusory characterizations) support an inference of scienter, Plaintiffs make numerous conclusory statements of Mr. Grigg's (and Mr. Liberti's) alleged fraud, knowledge, and deceitful intent -- conclusions which are not factually supported and which are insufficient to support their claims.[3]

The Second Circuit's analysis of the allegations in *Shields*, a case relied upon by the Supreme Court in the recent *Tellabs* decision, is instructive.  *See Tellabs*, slip op. at *7.[4]  Like

---

[3] These unsupported allegations include, but are not limited to, the following:  (1) The statement that Mr. Grigg and Mr. Liberti "engaged in a scheme."  Am. Compl. ¶ 30.  (2) Plaintiffs allege that Mr. Grigg "was aware" on or around the time of [Liberti's] vote to approve the Professional Services Agreement.  Am. Compl. ¶¶ 33, 46, 54, 62, 65, 66.  (3) The purported FAU opportunities "provided cover."  *Id.* at 35.  (4) Plaintiffs claim the Liberti consulting agreement was a "guise."  Am. Compl. ¶ 30.  (5)  Plaintiffs claim that Mr. Grigg "orchestrated the Liberti relationship."  Pls.' Opp. at 14.

Similarly, the phrase "while receiving payments from RPC" is another example of Plaintiffs' pleading technique intended to convey a conclusion that is not supported by their allegations or particular facts.  This phrase is echoed in the Plaintiffs' Opposition by the repeated use of the phrase that Liberti was "on RPC's payroll," and the use of "consulting agreement."  Am. Compl.¶¶ 45, 53, 60, 63, 67; *see also* Pls.' Opp. at 3.  Plaintiffs' pleading technique is intended to cast the impression (without actually saying so) that the consulting payments were "in exchange for" Mr. Liberti's votes when that was not the case.

[4] In *Tellabs*, the U.S. Supreme Court recognized *Shields* for the principle that a "strong inference" is required in order to "ward off allegations of fraud by hindsight."  *Tellabs*, slip. op. (cont'd on next page)

the Plaintiffs here, the plaintiffs in *Shields* made claims that the defendants "knew or were reckless in not knowing" that a loan loss reserve was inadequate; they alleged that the defendants "intentionally concealed" vulnerabilities in real estate losses; that the defendants "knew but concealed" the poor condition of a loan portfolio; and that defendants "knew or should have known" certain loan problems were getting worse. *Shields*, *supra*, at 1129. The Second Circuit nevertheless found those allegations to be inadequate and held that they failed to give rise to a strong inference of scienter because the allegations did not allege "facts" that indicated that the defendants knew or should have known the loan loss reserve was inadequate or that the outlook was poor. *Id.* The Second Circuit went on to hold that "Shields' frequent conclusory allegations -- that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things -- [did]not satisfy the requirements of 9(b)" because those allegations were so broad as to be "meaningless." *Id. citing Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 119-20 (2d Cir. 1982). Further, the Second Circuit also stated that the conclusory allegations in the *Shields* complaint did not "adduce the kind of circumstantial evidence that would indicate conscious fraudulent behavior or recklessness. *Id.* at 1129.

Likewise, as set forth in Note 4 herein, and just as in *Shields,* the Amended Complaint and Plaintiffs' Opposition to Mr. Grigg's Motion to Dismiss and their Supplemental Notice of Authority are rife with conclusory allegations about what Mr. Grigg and all of the defendants "knew or should have known" and which are unsupported by specific facts demonstrating the

---

(cont'd from previous page
at *7 (additional citations omitted). Plaintiffs' entire Amended Complaint rests on impermissible allegations based on events which arose <u>after</u> September 23, 2005, the date of the Development Contribution Agreement. These allegations are all based on fraud by hindsight. *Acito v. Imcera Group, Inc.*, 47 F.3d 47 (2d Cir. 1995); *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978).

strong inference of scienter required to satisfy the requirements of Rule 9(b) or the PSLRA. *Id.*; *see also Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759 (S.D. N.Y. 2006) ("these allegations are deficient because plaintiffs provide no facts or details in support; plaintiffs fail to identify any documents, meetings, or reports that show that defendants knew or should have known[.]").  A sister court in this jurisdiction recently held likewise. *In re:  XM Satellite*, 479 F. Supp. 2d 165, 194 (D.D.C. March 28, 2007) (Huvelle, J.) citing *Goplen*, supra, (conclusory allegations that defendants knew or were severely reckless in ignoring that upcoming expenses would cause dramatic increases in XM's costs held insufficient to satisfy Rule 9(b)).

A review of the Amended Complaint (namely ¶¶ 23-70 which Plaintiffs identified in their Opposition as the primary basis for their securities fraud and related counts) and Plaintiffs' Opposition reveals that both documents are full of the kinds of phrases and conclusory allegations the *Shields* Court held were "meaningless" because they are used without specific facts to support them. *Id.*  In *Shields,* the Second Circuit found that these types of allegations were only sufficient to establish that the defendants in that case were "wrong," and that they "should have been more alert and more skeptical" -- but not that those allegations were sufficient to allege the requisite scienter for securities or common law fraud. *Id.*  This Court may ultimately find that it was a mistake for Mr. Grigg to have entered into the consulting agreement with Mr. Liberti, but such a mistake is not a basis for liability for federal and D.C. securities fraud.  As the *Shields* court found, Plaintiffs' allegations lack a factual basis and are therefore insufficient to set forth a strong inference of Mr. Grigg's scienter for both securities and common law fraud. *Id.* at 1129-30.  In this case, just as in *Shields,*  there are no specific facts alleged that on September 23, 2005, when Mr. Grigg entered into the Development Contribution Agreement, he consciously and deliberately "was promoting a fraud" upon the Plaintiffs. *Id.*

Nowhere is the defective nature of Plaintiffs' pleading technique better demonstrated than in the October 31, 2006 partisan report prepared for RPT by Shulman, Rogers, Gandal, Pordy & Eckers, P.A. (the "Shulman Rogers Report") on which Plaintiffs selectively rely and for which they repeatedly vouch in support of their Amended Complaint. *See* Amended Complaint ("Am. Compl.") ¶¶ 82-159; *see also*, Plaintiffs' Notice of Supplemental Authority at n.1.

Based on fragments taken out of context from that partisan investigative report, Plaintiffs disingenuously shift the basis for the allegations of federal and D.C. securities fraud as well as common law fraud -- based on the consulting payments made to Mr. Liberti -- saying now that these claims are supported by "circumstantial" evidence sufficient to back their claims when in that very same report Plaintiffs' investigators acknowledged that "**[w]e have found no direct evidence that RPC made payments to Commissioner Liberti for the express purpose of influencing his official acts.**" *Shulman Rogers Report* at 21 (emphasis added). Thereafter, Plaintiffs' investigators engaged in hypothetical speculation about the existence of "possible evidence" or "circumstantial" evidence that "could form the basis for charges." *Id*. Despite the acknowledged absence in their own investigative report of the particularized facts necessary to set forth claims of securities and common law fraud against the Defendants, Plaintiffs knowingly forged ahead with this lawsuit in which they allege claims of fraud that are based on contentions which Plaintiffs knew (months before they filed their Complaint) were not directly or indirectly supported by proof. Contrary to Plaintiffs' wishful thinking, the "possible evidence" or "circumstantial evidence" put forth by them now to justify these claims of fraud simply cannot and should not be accepted by this Court as satisfying the particularized requirements and standards of Rule 9(b) and the PSLRA.

**B.    In Applying the PSLRA's Heightened Pleading Standard for the Mental State Element of Securities Fraud, The Court Must Consider Any Competing Inference, or Non-Culpable Explanations for Mr. Grigg's Conduct**

In Section 21D(b)(2) of the 1934 Act, the PSLRA states that, in any private securities action in which the plaintiff must show that the defendant acted with a particular mental state in order to recover money damages, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." *See* 15 U.S.C. 78u-4(b)(2).  Pursuant to Section 21D(b)(2) the Court should consider whether all of the facts alleged in the Amended Complaint, taken together, give rise to a strong inference of the requisite state of mind. *See Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir. 2002); *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 431 (5th Cir. 2002).  This interpretation of the statute was confirmed in the recent *Tellabs* decision where the Supreme Court held that "[t]he inquiry is whether *all* of the facts as alleged, taken collectively, give rise to a strong inference of scienter[.]" *Tellabs, supra,* at *9 (emphasis in the original).

In determining whether the pleaded facts give rise to a strong inference of scienter, this Court must take into account  "plausible opposing inferences." *Id*.  Here, many of the same facts alleged in the Amended Complaint also give rise to the plausible opposing inference that Mr. Grigg acted <u>without</u> the requisite scienter.  That alternative plausible opposing inference is that Mr. Grigg entered into a consulting agreement on behalf of RPC that he believed honestly, sincerely, and in "good faith" was in the best interests of advancing RPC's real estate development business in Florida; that the consulting agreement was not raised with Plaintiffs because that agreement did not raise any red flags; and that Mr. Grigg did not foresee any problem with the consulting agreement and/or the Professional Services Agreement which needed to be discussed with the Plaintiffs.  The consulting agreement was a common type of agreement used in the regular course of real estate and other businesses.

8

Plaintiffs' Amended Complaint alleges a series of facts that can give rise to a plausible non-culpable inference to that which Plaintiffs posit. For example, all of the paragraphs describing the <u>written</u> consulting agreement and the extensions demonstrate that the agreement was transparent and not concealed by Mr. Grigg. *See* Am. Compl. ¶¶ 36-45, 48-52, 56-59. That Mr. Liberti was paid by check. *See* Am. Compl Ex. B, E. The fact that Mr. Kramer wanted to hire Mr. Liberti and openly said so in an e-mail to Mr. Grigg indicates that neither Mr. Grigg nor Mr. Kramer believed that there was any problem with Mr. Liberti working for RPC. Am. Compl. ¶ 47. That Mr. Liberti freely contacted an administrative employee about the consulting agreement indicates that the agreement was transparent and not secret. *See* Am. Compl. ¶ 41. No one had any knowledge of Mr. Liberti's unrelated criminal conduct. *See, generally,* Am. Compl. That Mr. Grigg signed the extension agreements again shows that the matter was being treated as a normal, run-of-the-mill contract and not an unusual or clandestine matter. *See* Am. Compl. ¶¶ 38, 50. The fact that the renewals sought by Mr. Liberti were merely timed to three-month periods (and not linked to his votes as Plaintiffs insinuate) after which each was due to expire, undermine Plaintiffs' conclusory and factually unsupported claim that the consulting agreement and the extensions were a "guise."[5] *See* Am. Compl. Ex. B-E.

Moreover, Plaintiffs' allegations about Mr. Sanders and the role of the law firm of Greenberg Traurig in introducing the Defendants to Mr. Liberti, coupled with what Plaintiffs say in their Amended Complaint was Mr. Sanders' involvement in the City Center project, further supports Mr. Grigg's position that there is no factual basis to support a "strong inference of

---

[5] Plaintiffs deliberately omit from the Amended Complaint the fact Mr. Liberti provided RPC extensive consulting services for more than six potential Florida real estate projects. The meeting with the President of Florida Atlantic University was the result of Liberti's work for RPC. *See* Am. Compl. ¶ 34. While Plaintiffs seek to have the Court view this meeting as a "cover," that meeting should be seen as the non-culpable byproduct of the substantial work Mr. Liberti performed pursuant to the consulting agreement.

scienter." *See* Am. Compl. ¶¶ 24-29; *see also, Caterpillar Inc. v. Williams,* 482 U.S. 386, 392

(1987) (expressing the principle that the plaintiff is the master of his complaint); *see also*,

*Gutierrez v. Peters,* 111 F.3d 1364, 1374 (7th Cir. 1997) (a plaintiff may plead himself out of

court by including allegations that undermine his claim).  From a business perspective <u>back</u> <u>then</u>,

it was not unreasonable for Mr. Grigg to retain Mr. Liberti's services.  First, Mr. Liberti was

recommended by a Florida attorney who is a seasoned and experienced member of a nationally

recognized law firm, who himself was a former West Palm Beach City Administrator.  *See* Am.

Compl. ¶¶ 24-29.  Second, up until the unrelated activities that led to Mr. Liberti's indictment

and subsequent guilty plea and conviction in a totally unrelated matter (which was unknown to

everyone), Mr. Liberti was a successful, experienced and well-respected member of the Florida

business and political community.  Significantly, he had served in the Florida House of

Representatives for 14 years from 1978 to 1992 -- an undisputed fact which Plaintiffs

intentionally left out of their Amended Complaint but of which the Court may take Judicial

Notice.

 Because there are many facts alleged in the Amended Complaint that give rise to a

plausible opposing inference that Mr. Grigg acted without the necessary "strong inference" of

scienter, it cannot be said that <u>all</u> of the facts as alleged, taken collectively, give rise to a strong

inference of scienter.  *Tellabs, supra,* slip op. at \*9.[6]  Furthermore, to the extent this Court

---

[6] Rendering a disservice to this Court which has to decide whether a strong inference of scienter exists in this case, Plaintiffs withheld and omitted from their Amended Complaint additional strong facts indicating non-culpable conduct which cut against a strong inference of scienter. Examples of those include:  that Shulman Rogers interviewed all of the individuals with <u>first-hand knowledge</u> about the City Center Project and none provided any facts that support a claim of securities or any other kind of fraud.  *See, generally,* Am. Compl.  The Court may also take Judicial Notice of the May 13, 2006 edition of <u>The Palm Beach Post</u> which quoted Mr. Liberti's attorney, Richard Lubin (who is presumed to be aware of the information Mr. Liberti possessed) as stating that "Ray Liberti did no work for Republic on any matters connected to the City of West Palm Beach."

(cont'd on next page)

determines that the same facts simultaneously provide affirmative support both for the

conclusion that Mr. Grigg acted with scienter and for the alternative conclusion that he acted

without scienter, the existence of a plausible competing inference, "quite clearly impedes the

plaintiffs' progress toward building the requisite strong inference of scienter." *Gompper*, *supra*,

298 F.3d at 897.  A holistic view of all of the paragraphs in the Plaintiffs' Amended Complaint

reveals that the necessary "strong inference" of scienter is lacking in this case.  Consequently,

the fraud counts and any related counts must be dismissed.[7]

## II.     Plaintiffs' View of the Facts Defies Economic Reason and Therefore Does not Yield a Reasonable Inference of Fraudulent Intent

Section I(B)(2) of Mr. Grigg's Motion to Dismiss sets forth the position that Mr. Grigg

had no motive to commit the fraudulent acts of which Plaintiffs accuse him.  *See* Grigg Motion

to Dismiss at 11-12.  In response, Plaintiffs discount (without addressing) an inherent problem

with this part of their claims by mis-casting Mr. Grigg's argument as being about what Mr. Grigg

---

(cont'd from previous page

There is no mention that Mr. Liberti was not constrained from having employment outside West Palm Beach.  Nor is there any mention that when Mr. Grigg was asked, he readily confirmed to the Mayor of West Palm Beach the information about the Liberti consulting agreement which she then shared with the law enforcement authorities.  All of those additional facts are indications of non-culpable conduct which the Court could have considered had they been supplied in the Amended Complaint.

The Shulman Rogers Report states that "[T]he decisions, if any, to charge violations of law rest with criminal prosecutors."  *Shulman Rogers Report* at 30.  Thereafter, the Plaintiffs' investigators added the following:  "Such determinations … are not the responsibility of the Audit Committee, its counsel conducting the investigation, or the Board."  (*Id*., emphasis added.)  It is telling that after having been informed about the alleged misconduct no federal, state, or local authorities took any action against Mr. Liberti, or anyone else, for unlawful or unethical conduct.  *See, generally,* Am. Compl.

[7] Likewise, Mr. Grigg contends that, contrary to Plaintiffs' claims (Pls.' Opp. at 13-15) that "circumstantial evidence of intentional or reckless behavior" exists to set forth a strong inference of scienter, no such scienter exists.  Furthermore, Plaintiffs should not be permitted to add to their Amended Complaint by now claiming (*see* Pls.' Opp. at 24) that Mr. Grigg was "extremely reckless" in entering into and failing to disclose the Liberti relationship.

stood to lose upon discovery of the alleged fraud and citing irrelevant cases about not needing to set forth a "foolproof" scheme. *See* Pls.' Opp. at 13. As demonstrated below, the point is that there still is no factual basis alleged (because there cannot be) that Mr. Grigg took actions that demonstrate a motive to commit the alleged fraud to gain the limited partnership units as Plaintiffs claim. Instead of addressing this issue, Plaintiffs impermissibly create (in hindsight) and put forth in their Opposition for the first time the motive of ridding RPC of a tainted contract which is <u>not</u> alleged anywhere in their Amended Complaint and which this Court should not belatedly accept.

### A.     Plaintiffs Provided No Factual Basis In Support of a Motive To Commit Fraud to Gain Limited Partnership Units

In light of the many conclusory statements which fail to support a strong inference of scienter in Plaintiffs' Amended Complaint, Mr. Grigg's <u>lack of motive</u> should be ascribed great significance as stated in *Tellabs*. *See Tellabs*, slip op at 11. There are no allegations that Mr. Grigg inappropriately attempted to dispose of the limited-partnership units valued at $180,420 or took any actions related to them for his own benefit. Nor are there any allegations specifically alleging that in the real estate transactions that took place in advance of RPT's IPO that Mr. Grigg had any motive to deliberately defraud the company which he helped found and build, for whom he was going to work and serve as President and Chief Development Officer, and on whose Board of Trustees he still sits, simply to improperly obtain unmarketable limited-partnership units in an entity in which he was financially involved by virtue of his contributions of a number of valuable real estate properties and contractual opportunities. "In looking for a sufficient allegation of motive, [the Court] assume[s] that the defendant is acting in his or her informed economic self interest." *See Shields, supra,* 25 F.3d at 1130 citing *Atlantic v. Gypsum Co. v. Lloyds International Corp.*, 753 F. Supp. 505, 514 (S.D. N.Y. 1990) ("Plaintiff's view of

the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent").[8]

Plaintiffs' claims that Mr. Grigg had an economic motive to commit the alleged fraud in order to gain $180,420 of limited partnership units in RPLP make no sense because that alleged motive flies in the face of reason. *Id.* Plaintiffs' view of the facts shows that Mr. Grigg had no motive to defraud the Plaintiffs. If Mr. Grigg had engaged in a securities fraud against the Plaintiffs it would have meant that he would have engaged in conduct designed to economically injure (1) himself, (2) Mr. Kramer, (3) RPT and RPLP, the companies he helped to found and participated in and, importantly, (4) his business reputation in order to improperly obtain $180,420-worth of unmarketable limited-partnership units in an entity in which he was financially involved by virtue of his assistance and contributions to it of a number of valuable real estate properties, as well as maintenance-service business contracts. That Mr. Grigg had a motive to engage in an alleged fraud against the Plaintiffs in anticipation of obtaining limited partnership units in that same company makes no sense and defies economic reason. It makes no sense that Mr. Grigg would seek to defraud the very company in which he was to become a shareholder a few months later, and to which -- even in the absence of the limited partnership

---

[8] Unlike the specific facts that have been found to support inferences of motive in the cases cited by Plaintiffs in their Opposition, here, we do not have those types of facts indicating fraud. *See* Pls.' Opp. at 11-12. For example, Plaintiffs cite cases involving insider trading, and affirmative representations of the status of a stock sale. *Id.* at 12. Here, we have what amounts to a claim of a double breach of contract by omission (the Development Contribution Agreement) that is premised on a second alleged breach of contract (the Professional Services Agreement). Neither alleged breach amounts to any kind of fraud, or misconduct as alleged by Plaintiffs. Plaintiffs' reliance on *Burman* is inapposite because the omissions alleged by them are nowhere near as specific as the allegations about contracts signed or not finalized which the *Burman* plaintiffs put forth in their case. *Burman*, *supra*, 384 F. Supp. 2d at 333. Plaintiffs' claims are more like the conclusory IRS-related claims made by the plaintiffs in *Burman* for which the trial court found that "plaintiffs <u>failed</u> to sufficiently plead scienter." *Id.* at 384.

units because he would be financially linked to the Plaintiffs by virtue of valuable properties and maintenance-service agreements worth many millions of dollars.

    **B.**    **There Are No Facts Alleged In the Amended Complaint to Support Plaintiffs' Belated Hindsight Claim that Defendant Grigg Sought to Rid RPC of the Professional Services Agreement**

In a belated assertion, Plaintiffs claim for the first time in their Opposition that Mr. Grigg had a "significant motive" to commit the alleged fraud because entering into the Development Services Contribution Agreement contract enabled him to "rid his two person company" of a "tainted contract." *See* Pls.' Opp. at 12. That assertion is not set forth anywhere in the Amended Complaint. *See generally* Am. Compl. Moreover, there simply are no particularized facts alleged in the Amended Complaint to support any claim that Mr. Grigg knew or should have known that on September 23, 2005, the Professional Services Agreement was invalid and was no longer in "full force and effect" and that he had to "rid RPC of it." *See generally* Am. Compl. No facts have been alleged to support the claim that Mr. Grigg knew the Professional Services Agreement was not a valid a contract when RPC conveyed it under the Development Services Agreement, or that there were imminent problems causing him pressure to rid RPC of the contract by passing it on to the entity in which he became a limited partner in September 2005 and which he was going to join as an executive after the IPO in December 2005 .

**III.**    **Plaintiffs' Amended Complaint Must Be Dismissed For Failure to Allege Any Due Diligence**

    **A.**    **Failure to Allege Any Due Diligence Is a Proper Inquiry at the Motion to Dismiss Stage, Consequently, Plaintiffs' Amended Complaint Should Be Dismissed For Failing to Allege the Exercise of Due Diligence**

Plaintiffs' response to Mr. Grigg's assertion that their Amended Complaint is additionally defective because they failed to allege that they conducted any due diligence comes down to their request that this issue be decided later, rather than now. *See* Pls.' Opp. at 9. Plaintiffs' response is contrary to *Hammerman v. Peacock*, 607 F. Supp. 911 (D.D.C. 1985), a long-

standing decision from this district which states that a plaintiff's failure to allege that he "exercised due diligence in connection with the transaction in question" is a basis to dismiss both federal securities fraud and common law fraud claims at the outset of a lawsuit.  *Id.* at 916-17.

*Hammerman* is instructive because it is similar to this case in several respects.  Just as in this case, *Hammerman* involved, among other claims, allegations of securities fraud, common law fraud, breach of contract and punitive damages.  *See, generally, Hammerman*, *supra*.  The plaintiff-counterclaim defendant moved to dismiss the counterclaim due to the defendant's failure state a claim under the anti-fraud provisions of the securities laws and their related rules. *Id.*  Those provisions included two which are significant and which are particularly at issue here -- the defendant's failure to allege scienter with specificity in the counterclaim and the failure to allege the exercise of due diligence in connection with the transactions alleged.  *Id.* The trial court granted that motion.  *Id.* at 916-17.  As demonstrated below, just as in *Hammerman*, this Court should address Plaintiffs' failure to allege their exercise of due diligence now at the Motion to Dismiss stage.

## B. Plaintiffs' Amended Complaint Should Be Dismissed For Failing to Allege the Exercise of Due Diligence

In this case, Plaintiffs minimize the holding in *Hammerman* by pointing to language in the Second Circuit case *Hirsch v. Dupont*, 553 F.2d 750 (2d Cir. 1977) (upon which *Hammerman* relies) for the proposition that due diligence need not be pled.  *See* Pls.' Opp. at 9. However, Plaintiffs' unsupported position that they need not plead their due diligence in their Amended Complaint is belied by the very language they cite from *Hirsch*.  The language they cite is that "plaintiffs must investigate the information available to them with the care and prudence expected from people blessed with full access to information."  *Id.*  Nowhere in their Amended Complaint do Plaintiffs allege that they conducted <u>any</u> investigation, much less that

prior to entering into the Development Contribution Agreement they investigated with "the care and prudence expected from people with full access to information" and, in this case, a team of competent lawyers.  *See generally* Am. Compl.[9]

Specifically, there are no allegations that <u>prior</u> to entering into the Development Services Agreement with RPC Plaintiffs sought access to information pertaining to the Agreement and that Mr. Grigg denied them that access.  There is no claim that <u>prior</u> to RPC's entering into Development Contribution Agreement with RPLP that Plaintiffs (who were represented) reviewed the contracts and documents related to the Professional Services Agreement.  *Id*.  There is even no allegation that Plaintiffs or their lawyers simply <u>asked</u> Mr. Grigg about the clauses in the Professional Services Agreement and the Development Contribution Agreement about which Plaintiffs now complain.  There can be no claim that in response to such a request Mr. Grigg intentionally hid or omitted information about which he had been asked and upon which Plaintiffs relied.  In the course of testing the underlying contract upon which the Development Contribution Agreement was based, Plaintiffs could have learned more than they already knew about the Liberti consulting agreement and could have, upon seeking and learning more information, exercised the option not to enter into the contract.[10]  Plaintiffs make no such allegations in the Amended Complaint.

---

[9] Here, Plaintiffs are sophisticated, experienced, knowledgeable executives who were represented by counsel in a face-to-face transaction, not the typical plaintiffs involved in securities transactions where the parties do not know each other.

[10] Plaintiffs' response to Mr. Grigg's point that a significant number of RPT and RPLP's executives and managers were part of the leadership at RPC during the period of the Liberti relationship misses the point.  While it is in Plaintiffs' interest to now claim collective corporate amnesia, such amnesia is not reflected in their own investigative report by Shulman Rogers. Mr. Grigg's point is that the Liberti consulting agreement was not a secret and that people employed by RPC who knew about the Liberti consulting agreement and relationship carried that knowledge with them to RPT's management.  This is yet another example of how Mr. Grigg and Mr. Liberti's relationship was not hidden and how the Amended Complaint fails to set forth facts to support a strong inference of scienter.

Instead, Plaintiffs inappropriately seek to put the entire onus of the complex business transaction upon Mr. Grigg for allegedly failing to tell them about the "full nature, extent and effect" of the Liberti consulting agreement and relationship which (while in hindsight may have been ill-advised) back in 2004 Mr. Grigg in "good faith" pursued because he believed the consulting agreement to be a proper contract. The absence of any representation as to their own due diligence clearly establishes that the allegations in Plaintiffs' Amended Complaint do not support their claims of federal and D.C. securities fraud or common law fraud and that all of those Counts and those related to them (Counts I, II, III, IV, VII) should be dismissed with prejudice at the inception of this litigation rather than after protracted and unduly burdensome discovery and litigation that is contrary to the goals of the PSLRA.

## IV.    Plaintiffs Have Failed to Properly Plead Federal and D.C. Control Person Liability

Section 20(a) Control Person Liability is derivative of  § 10(b) and 10b-5 liability. As set forth in this Reply, to the extent Plaintiffs have failed to set forth the requisite scienter needed to plead securities fraud, Plaintiffs have failed to adequately plead control person liability against Mr. Grigg or any defendant.  In his Motion to Dismiss, Mr. Grigg specifically adopted the arguments made by Mr. Kramer, meaning  that Plaintiffs  failed to plead control person liability against him as well.  The absence of requisite scienter to support any fraudulent conduct alleged in the Amended Complaint as to both federal and D.C. securities laws or common law fraud highlights the same pleading deficiencies in both the federal and D.C. control person liability counts.  Plaintiffs outright ignore the cases cited by Mr. Grigg on the culpability issue in favor of reciting the D.C. Code, repeating facts that do not advance their position, and in favor of their continued use of a conclusory pleading technique that does not further illuminate the basis of liability.

**V.    Plaintiffs Have Failed to Properly Allege Loss Causation**

Plaintiffs have failed to plead loss causation (and also lack standing to claim damages) because the injuries alleged in the Amended Complaint were allegedly suffered not by Plaintiffs, but by RPLP's subsidiary twice removed.  Am. Compl. ¶ 20.  According to Plaintiffs, the Professional Services Agreement was amended so that RPT, through Republic WPB LLC (referred to by Plaintiffs as "RPT/Republic [WPB]"), an indirectly wholly owned subsidiary of RPLP, replaced RPC as the service provider for the City Center Project "and was, therefore, entitled to receive the fees related thereto."  *Id*.  On December 19, 2005, the CRA voted to approve the assignment of the Professional Services Agreement and its amendments from RPC to RPT/Republic WPB.  Am. Compl. ¶ 53.  On October 19, 2006, Republic WPB LLC entered into an assignment agreement with mutual releases (the "Assignment Agreement") with the CRA.  Am. Compl. ¶ 80.  "Among other things, the Assignment Agreement terminated the Professional Services Agreement and removed RPT and its affiliates from any continuing involvement in the City Center Project."  *Id.*

The Development Contribution Agreement granted RPLP the right to take title to the Professional Services Agreement.  Am. Compl. Ex. A, ¶ 1.1.  For reasons of its own, RPLP later gave up that right by causing the Professional Services Agreement to be assigned not to RPLP, but to RPLP's subsidiary.[11]  Am. Compl. ¶¶ 20, 53.  From that moment on, (1) RPLP realized the benefit of its bargain; (2) its subsidiary held valid title to the Professional Services Agreement; and (3) any alleged loss relating to Mr. Liberti that resulted later was caused by the City and was incurred solely by Republic WPB LLC.  Although Plaintiffs seek the value of the limited partnership units as damages in Counts I-IV, according to the Amended Complaint, no injury or

---

[11] The likely reason is that RPLP was not licensed to do business in Florida and/or that it wished to maintain a corporate veil between itself and the company taking title to the Professional Services Agreement.

economic loss was suffered by any party until the Professional Services Agreement was terminated. It is evident from the allegations that RPLP received the right to transfer title to the Professional Services Agreement in exchange for the units and could not have incurred economic loss before the time the Professional Services Agreement was terminated, even if it had retained title to the Professional Services Agreement.

In addition to the securities counts, Plaintiffs seek additional damages in the form of "compensation for work done on the City Center Project and additional damages incurred by RPT and RPLP as a result of the termination of the [Professional Services Agreement]." Am. Compl. Counts V-VII. However, neither RPT nor RPLP ever held title to the Professional Services Agreement.[12] Plaintiffs therefore lack standing to seek damages for the agreement's termination, and these claims for contract termination damages must be dismissed for lack of subject matter jurisdiction under Sup. Ct. Civ. R. 12(b)(1).[13] Plaintiffs next refer to four categories of damages, three of which are *not* sought in Counts I-IV.[14] Pls.' Opp. at 17. The category of damages sought in Counts I-IV, the value of the partnership units, is conspicuously omitted from the damages listed in the Opposition in support of loss causation. Plaintiffs have not pled loss causation because no loss is apparent from the allegations in the Amended

---

[12] RPT and RPLP cannot to sue in the name of the proper party plaintiff because Republic WPB LLC released its third party claims relating to the Professional Services Agreement in the Assignment Agreement that terminated the Professional Services Agreement. The signatory was Republic WPB LLC because it was the only party that could have incurred damages due to the termination of the Professional Services Agreement. *See* Am. Compl. ¶ 80.

[13] Injury that "arises solely out of harm done to a subsidiary corporation is insufficient to confer standing to sue on a parent corporation." *Waddell & Reed Financial, Inc. v. Torchmark Corp.*, 223 F.R.D. 566, 629 (D.Kan. 2004). It is inequitable to allow a "parent to consciously cloak itself in corporate veil as shield to liabilities of its subsidiaries only to allow it to voluntarily disregard that separateness when it services its interest." *Id*.

[14] Plaintiffs also seek attorneys' fees. Am. Compl. ¶ 125. Attorneys' fees are unavailable to plaintiffs under Section 10(b) and/or Rule 10b-5 and are not sought in Count I. *See Cotton v. Slone*, 4 F.3d 176, 181 (2d Cir. 1993). The costs of the investigation are likewise unrecoverable and, in any event, are not sought under Counts I-IV.

Complaint, other than a loss allegedly incurred by a subsidiary twice removed from Plaintiff RPT, which is a loss that is not identified or sought in Counts I-IV.

**VI.    The Limited Partnership Units Are Not Securities Within the Meaning of Federal Securities Laws**

Mr. Grigg's position that the RPLP limited partnership units are not securities is based solely on the allegations in the Amended Complaint.  Therefore, Plaintiffs are wrong that this contention is "premature."  Plaintiffs' analogy relating to shares owned by the CEO of a company is misleading because under, *S.E.C. v. W. J. Howey Co.*, 328 U.S. 293, 299 (1946), if the CEO was a limited partner and simultaneously was CEO of the limited partnership, then his or her limited partnership units would *not* be securities.  *Id.*  For the reasons stated in *Howey*, profits must come solely from efforts of others -- which, based on the Amended Complaint, is not the situation here.  *See Steinhardt Group, Inc. v. Citicorp.*, 126 F.3d 144 (3d Cir. 1997).[15]  By pointing to the RPLP partnership agreement, Plaintiffs (and not Mr. Grigg)  are relying on facts outside their own Amended Complaint.  *See* Pls.' Opp. at ¶¶ 19-20.  Whether the units have been treated as securities is likewise not dispositive.  *See Steinhardt, supra,* 126 F.3d at 155 ("Steinhardt is not trying to shield itself from liability, but rather, is seeking relief for alleged violations of federal securities laws.  Federal law, therefore, determines whether the investors' involvement is significant enough to place it outside the roles of a passive investor.")

In *Steinhardt*, the court held that the issue turned on the "legal right and powers enjoyed by the investor."  126 F.3d at 155, citing *Goodwin v. Elkins & Co.*, 730 F.2d 99 at 107 (3d Cir. 1984) (general partnership interest not a security).  The *Goodwin* court stated that "[w]e of course do not quarrel with the general proposition that the legal powers of a participant in a joint

---

[15] According to the Plaintiffs, *Steinhardt* held that the limited partnership interests at issue *were* securities.  Pls.' Opp. at 19.  To the contrary, the case held the interests *were not* securities.

enterprise may be derived from private agreements and contracts, as well as public statutes."

730 F.2d at 107.  Here, it is undisputed that private agreements gave Mr. Grigg and Mr. Kramer

managerial authority to control RPLP.  The facts alleged by RPT state that Mr. Grigg and

Mr. Kramer held management authority within general partner RPT, which in turn controlled its

limited partner RPLP.  *See* Grigg Motion to Dismiss at 17; Am. Compl. ¶¶ 2-5, 11.

Plaintiffs' own allegations defeat the assertion in their Opposition at 19 that "RPC has no

ability -- ***in any capacity*** -- to assert influence or control over RPLP, and neither Kramer nor

Grigg has any such ability either as ***limited partners of RPLP or owners of RPC***."  Plaintiffs

alleged that RPLP issued units to RPC for the benefit of Mr. Kramer and Mr. Grigg.  Am.

Compl. ¶ 21.  At all relevant times, RPC had the undisputed legal power to act through its

agents, including its owners Mr. Kramer and Mr. Grigg.  At the time of RPC's investment in

RPLP, Mr. Kramer and Mr. Grigg had the undisputed legal power to participate in the

management of RPT and RPLP, and thereby influence RPLP's profits.  Am. Compl. ¶¶ 2-5, 11.

Under these undisputed facts alleged by the Amended Complaint, RPC's investment in RPLP

does not constitute a security under federal law.  *See Great Lakes Chemical Corp. v. Monsanto

C*o., 96 F. Supp. 2d 376, 392 (D.Del. 2000).

## VII.    Plaintiffs Have Not Set Forth a Claim for Unjust Enrichment

Plaintiffs cannot assert unjust enrichment against Mr. Grigg because the benefit allegedly

conferred upon Mr. Grigg is the identical benefit allegedly conferred upon RPC, the party to the

express contract with RPLP.  According to RPT, "RPT and RPLP have alleged that RPC is

holding for Grigg 15,305 of the RPLP limited partnership units it received in connection with the

Development Contribution Agreement.  (Am. Compl. ¶ 21)."  Pls.' Opp. at 27.  Plaintiffs have

not alleged that they conferred a benefit directly upon Mr. Grigg -- rather, that they conferred a

benefit upon RPC, and that RPC currently holds that benefit for Mr. Grigg.  *See* Am. Compl.

¶ 21.  Thus, RPC is the limited partner and has not transferred the units to Mr. Grigg.  Exhibit A

to Plaintiffs' Amended Complaint includes a "Limited Partner Acceptance" that is a separate

contract dated December 20, 2005, executed between RPT and RPC, granting the units to RPC.[16]

Mr. Grigg signed on behalf of RPC, and is a party to this express agreement with RPT, in his

capacity as President of RPC.

The cases cited by Plaintiffs depend on the principle that a separate benefit has been

conferred on separate parties.  *See Jordan Keys & Jessamy, LLP v. St. Paul Fire and Marine Ins.*

*Co.*, 870 A.2d 58 (D.C. 2005) relying on *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 56 (1966)

(citing examples concerning work done to land.  In these cases, a separate benefit was conferred

on the defendant through work done to his land, distinguishable from any benefit also enjoyed by

the party to the contract.  In Plaintiffs' case, by contrast, there is only one alleged benefit -- the

one allegedly held by RPC -- which is indistinguishable from any indirect benefit conferred on

RPC's owners.

Likewise, *Commerce Partnership 8098 Ltd. Partnership v. Equity Contracting Co.*, 695

So.2d 383 (Fla. App. 4 Dist. 1997) does not support the Plaintiffs' position because the

conditions set forth in that case do not exist here due to Plaintiffs' failure to allege that RPC

conferred the benefit upon Mr. Grigg.

## VIII.   Plaintiffs Have Failed to Sufficiently Allege Facts That if Proven Would Entitle Them to Punitive Damages

For the reasons set forth above in §§ I-IV, Mr. Grigg contends that Plaintiffs have failed

to plead the requisite facts needed to establish an intentional tort that would give rise to punitive

damages.  The particularized facts in support of the required element of scienter and recklessness

---

[16] This agreement is included by Plaintiffs as though it were part of the September 23, 2005
Development Contribution Agreement.  However, it is in fact a separate contract.

which Mr. Grigg contends are lacking from both the federal and D.C. securities and common law fraud counts are also lacking in Plaintiffs' punitive damages claim. Contrary to Plaintiffs' conclusory assertion in the Amended Complaint that the "[d]efendants' conduct showed 'willful misconduct, malice, fraud, wantonness, oppression/and/or the want of care that would raise the presumption of conscious indifference to consequences,'" Plaintiff have not alleged the kinds of particularized facts that would support those conclusions or punitive damages. Therefore, Plaintiffs have failed to allege a basis for punitive damages and none should be permitted.

## CONCLUSION

As set forth herein, Plaintiffs' Amended Complaint has failed to allege the requisite scienter required to support their claims against Mr. Grigg for Federal Securities Fraud (Count I); Federal Control Person Liability (Count II); D.C. Securities Fraud (Count III); D.C. Control Person Liability (Count IV); Unjust Enrichment (Count VII); and Punitive Damages (Count X). The D.C. securities fraud and the common law fraud claims (Counts III and VII) are variations of the federal securities fraud claim in Count I. To the extent the federal securities fraud claim is dismissed, Mr. Grigg respectfully requests that Counts III and VII be dismissed. Likewise, the federal and D.C. control person liability claims (Counts II and IV) and the unjust enrichment claim are also related to Count I and Mr. Grigg additionally asks that, to the extent Count I is dismissed, those claims be similarly dismissed. Finally, because there is no basis for punitive damages, that claim should be dismissed as well.

Pursuant to Rules 9(b), 12(b)(6), and to the goals of the PSLRA (which are aimed at dispensing with frivolous litigation from its inception), Mr. Grigg respectfully requests that Plaintiffs' Amended Complaint be dismissed with prejudice for failure to state a claim. It can be said that Plaintiffs have already amended twice since this Amended Complaint was filed only after Plaintiffs amended deficiencies pointed out by Mr. Grigg when the D.C. securities fraud,

common law fraud, unjust enrichment, and punitive damages claims were pending in the D.C.

Superior Court.  Thus, Plaintiffs (who have not asked for leave to amend in the event of a

dismissal) should not be permitted yet another opportunity to correctly plead their claims.


Dated:  June 27, 2007

Respectfully Submitted,


/s/ Seymour Glanzer
Seymour Glanzer, D.C. Bar No. 040188
    *glanzers@dicksteinshapiro.com*
Richard J. Conway, D.C. Bar No. 164541
    *conwayr@dicksteinshapiro.com*
Marianela Peralta, D.C. Bar No. 449803
    *peraltam@dicksteinshapiro.com*
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006-5403
(202) 420-2200
*Attorneys for Defendant Steven A. Grigg*


**Certificate of Service**

I hereby certify that, on this 27th day of June, 2007, a true and accurate copy of the foregoing
was served on the following and on the Court by posting on the Court's electronic filing system:

Mark E. Nagle                                Paul Martin Wolff
Tracy Varghese                               George A. Borden
TROUTMAN SANDERS LLP                         WILLIAMS & CONNOLLY LLP
401 9th Street, N.W., Suite 1000             725 Twelfth St., N.W.
Washington, D.C.  20004                      Washington, D.C. 20005
(202) 274-2972                               (202) 434-5000


/s/ Marianela Peralta
Marianela Peralta
D.C. Bar No. 449803
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, D.C.  20006-5403
(202)420-2200

Westlaw.

--- S.Ct. ----                                                                      Page 1
--- S.Ct. ----, 2007 WL 1773208 (U.S.)
**(Cite as: --- S.Ct. ----)**

**H**
Tellabs, Inc. v. Makor Issues & Rights, Ltd.
U.S.,2007.
Only the Westlaw citation is currently available.
Supreme Court of the United States
TELLABS, INC., et al., Petitioners,
v.
MAKOR ISSUES & RIGHTS, LTD., et al.
**No. 06-484.**

Argued March 28, 2007.
Decided June 21, 2007.

**Background:** Investors brought securities fraud class action against corporation and its chief executive officer (CEO). The United States District Court for the Northern District of Illinois, Amy J. St. Eve, J., dismissed action. Investors appealed. The United States Court of Appeals for the Seventh Circuit, 437 F.3d 588, reversed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Ginsburg, held that:

(1) in determining whether securities fraud complaint gives rise to "strong inference" of scienter, within meaning of Private Securities Litigation Reform Act (PSLRA), court must consider competing inferences, and

(2) plaintiff alleging fraud in § 10(b) action must plead facts rendering inference of scienter at least as likely as any plausible opposing inference.

Vacated and remanded.

Justices Scalia and Alito filed opinions concurring in the judgment.

Justice Stevens filed dissenting opinion.

**[1] Securities Regulation 349B ☞60.45(1)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.43 Grounds of and Defenses to Liability
                    349Bk60.45 Scienter, Intent, Knowledge, Negligence or Recklessness
                        349Bk60.45(1) k. In General.
Most Cited Cases
To establish liability under § 10(b) and Rule 10b-5, private plaintiff must prove that defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[2] Federal Civil Procedure 170A ☞1835**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1827 Determination
                    170Ak1835 k. Matters Deemed Admitted. Most Cited Cases
On motion to dismiss § 10(b) action for failure to state claim on which relief can be granted, court must accept all factual allegations in complaint as true. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ☞1832**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1827 Determination
                    170Ak1832 k. Matters Considered in General. Most Cited Cases
On motion to dismiss § 10(b) action for failure to state claim on which relief can be granted, court must consider complaint in its entirety, as well as other sources courts ordinarily examine when ruling on such motions, in particular, documents incorporated into complaint by reference, and matters of which court may take judicial notice; inquiry is whether all of the facts alleged, taken collectively, give rise to strong inference of scienter, not whether any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1773208 (U.S.)
**(Cite as: --- S.Ct. ----)**

individual allegation, scrutinized in isolation, meets that standard. Securities Exchange Act of 1934, § 10(b), <u>15 U.S.C.A. § 78j(b)</u>; <u>Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.</u>

**[4] Securities Regulation 349B ⟨⟩60.51**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
                349Bk60.51 k. In General. <u>Most Cited Cases</u>
In determining whether securities fraud complaint gives rise to "strong inference" of scienter, within meaning of Private Securities Litigation Reform Act (PSLRA), court must consider competing inferences; to determine whether plaintiff has alleged facts that give rise to requisite "strong inference" of scienter, court must consider plausible nonculpable explanations for defendant's conduct, as well as inferences favoring plaintiff. Private Securities Litigation Reform Act of 1995, § 101(b), <u>15 U.S.C.A. § 78u-4(b)(2)</u>.

**[5] Securities Regulation 349B ⟨⟩60.51**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
                349Bk60.51 k. In General. <u>Most Cited Cases</u>
Inference of scienter in securities fraud complaint must be more than merely "reasonable" or "permissible" to satisfy Private Securities Litigation Reform Act (PSLRA); it must be cogent and compelling, thus strong in light of other explanations, and complaint will survive only if reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. Private Securities Litigation Reform Act of 1995, § 101(b), <u>15 U.S.C.A. § 78u-4(b)(2)</u>.

**[6] Securities Regulation 349B ⟨⟩60.51**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading

                349Bk60.51 k. In General. <u>Most Cited Cases</u>
While motive can be relevant consideration, and personal financial gain may weigh heavily in favor of finding that securities fraud complaint gives rise to "strong inference" of scienter, within meaning of Private Securities Litigation Reform Act (PSLRA), absence of motive allegation is not fatal. Private Securities Litigation Reform Act of 1995, § 101(b), <u>15 U.S.C.A. § 78u-4(b)(2)</u>.

**[7] Jury 230 ⟨⟩34(1)**

230 Jury
    230II Right to Trial by Jury
        230k30 Denial or Infringement of Right
            230k34 Restriction or Invasion of Functions of Jury
            230k34(1) k. In General. <u>Most Cited Cases</u>
In determining whether securities fraud complaint gives rise to "strong inference" of scienter, within meaning of Private Securities Litigation Reform Act (PSLRA), court's comparative assessment of plausible inferences, while constantly assuming plaintiff's allegations to be true, does not impinge upon Seventh Amendment right to jury trial. <u>U.S.C.A. Const.Amend. 7</u>; Private Securities Litigation Reform Act of 1995, § 101(b), <u>15 U.S.C.A. § 78u-4(b)(2)</u>.
*Syllabus* <u>FN*</u>

> <u>FN*</u> The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See <u>United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499</u>.

**\*1** As a check against abusive litigation in private securities fraud actions, the Private Securities Litigation Reform Act of 1995 (PSLRA) includes exacting pleading requirements. The Act requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.,* the defendant's intention "to deceive, manipulate, or defraud." <u>Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, and n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668</u>. As set out in § 21D(b)(2), plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." <u>15 U.S.C. § 78u-4(b)(2)</u>. Congress left the key term "strong inference" undefined.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----                                                    Page 3
--- S.Ct. ----, 2007 WL 1773208 (U.S.)
**(Cite as: --- S.Ct. ----)**

Petitioner Tellabs, Inc., manufactures specialized equipment for fiber optic networks. Respondents (Shareholders) purchased Tellabs stock between December 11, 2000, and June 19, 2001. They filed a class action, alleging that Tellabs and petitioner Notebaert, then Tellabs' chief executive officer and president, had engaged in securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5, and that Notebaert was a "controlling person" under the 1934 Act, and therefore derivatively liable for the company's fraudulent acts. Tellabs moved to dismiss the complaint on the ground that the Shareholders had failed to plead their case with the particularity the PSLRA requires. The District Court agreed, dismissing the complaint without prejudice. The Shareholders then amended their complaint, adding references to 27 confidential sources and making further, more specific, allegations concerning Notebaert's mental state. The District Court again dismissed, this time with prejudice. The Shareholders had sufficiently pleaded that Notebaert's statements were misleading, the court determined, but they had insufficiently alleged that he acted with scienter. The Seventh Circuit reversed in relevant part. Like the District Court, it found that the Shareholders had pleaded the misleading character of Notebaert's statements with sufficient particularity. Unlike the District Court, however, it concluded that the Shareholders had sufficiently alleged that Notebaert acted with the requisite state of mind. In evaluating whether the PSLRA's pleading standard is met, the Circuit said, courts should examine all of the complaint's allegations to decide whether collectively they establish an inference of scienter; the complaint would survive, the court stated, if a reasonable person could infer from the complaint's allegations that the defendant acted with the requisite state of mind.

*Held:* To qualify as "strong" within the intendment of § 21D(b)(2), an inference of scienter must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. Pp. ---- - ----6-18.

(a) Setting a uniform pleading standard for § 10(b) actions was among Congress' objectives in enacting the PSLRA. Designed to curb perceived abuses of the § 10(b) private action, the PSLRA installed both substantive and procedural controls. As relevant here, § 21D(b) of the PSLRA "impose[d] heightened pleading requirements in [§ 10(b) and Rule 10b-5] actions." *Dabit,* 547 U.S., at 81, 126 S.Ct. 1503. In the instant case, the District Court and the Seventh Circuit agreed that the complaint sufficiently

specified Notebaert's alleged misleading statements and the reasons why the statements were misleading. But those courts disagreed on whether the Shareholders, as required by § 21D(b)(2), "state[d] with particularity facts giving rise to a strong inference that [Notebaert] acted with [scienter]," § 78u-4(b)(2). Congress did not shed much light on what facts would create a strong inference or how courts could determine the existence of the requisite inference. With no clear guide from Congress other than its "inten[tion] to strengthen existing pleading requirements," H.R. Conf. Rep., at 41, Courts of Appeals have diverged in construing the term "strong inference." Among the uncertainties, should courts consider competing inferences in determining whether an inference of scienter is "strong"? This Court's task is to prescribe a workable construction of the "strong inference" standard, a reading geared to the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims. Pp. ---- - ----6-10.

*2 (b) The Court establishes the following prescriptions: *First,* faced with a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. See *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517. *Second,* courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions. The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. *Third,* in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. The Seventh Circuit expressly declined to engage in such a comparative inquiry. But in § 21D(b)(2), Congress did not merely require plaintiffs to allege facts from which an inference of scienter rationally *could* be drawn. Instead, Congress required plaintiffs to plead with particularity facts that give rise to a "strong"- *i.e.,* a powerful or cogent-inference. To determine whether the plaintiff has alleged facts giving rise to the requisite "strong inference," a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, but it must be more than merely "reasonable" or "permissible"-it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----                                                                                    Page 4
--- S.Ct. ----, 2007 WL 1773208 (U.S.)
**(Cite as: --- S.Ct. ----)**

must be cogent and compelling, thus strong in light of other explanations. A complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged. Pp. ---- - ----11-13.

(c) Tellabs contends that when competing inferences are considered, Notebaert's evident lack of pecuniary motive will be dispositive. The Court agrees that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference. The absence of a motive allegation, however, is not fatal for allegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the complaint's entirety. Tellabs also maintains that several of the Shareholders' allegations are too vague or ambiguous to contribute to a strong inference of scienter. While omissions and ambiguities count against inferring scienter, the court's job is not to scrutinize each allegation in isolation but to access all the allegations holistically. Pp. ---- - ----13-15.

*3 (d) The Seventh Circuit was unduly concerned that a court's comparative assessment of plausible inferences would impinge upon the Seventh Amendment right to jury trial. Congress, as creator of federal statutory claims, has power to prescribe what must be pleaded to state the claim, just as it has power to determine what must be proved to prevail on the merits. It is the federal lawmaker's prerogative, therefore, to allow, disallow, or shape the contours of-including the pleading and proof requirements for- § 10(b) private actions. This Court has never questioned that authority in general, or suggested, in particular, that the Seventh Amendment inhibits Congress from establishing whatever pleading requirements it finds appropriate for federal statutory claims. Provided that the Shareholders have satisfied the congressionally "prescribe[d] ... means of making an issue," _Fidelity & Deposit Co. of Md. v. United States,_ 187 U.S. 315, 320, 23 S.Ct. 120, 47 L.Ed. 194, the case will fall within the jury's authority to assess the credibility of witnesses, resolve genuine issues of fact, and make the ultimate determination whether Notebaert and, by imputation, Tellabs acted with scienter. Under this Court's construction of the "strong inference" standard, a plaintiff is not forced to plead more than she would be required to prove at trial. A plaintiff alleging fraud under § 10(b) must plead facts rendering an inference of scienter _at least as likely as_ any plausible opposing inference. At trial, she must then prove her case by a "preponderance of the evidence." Pp. ---- - ----15-17.

(e) Neither the District Court nor the Court of Appeals had the opportunity to consider whether the Shareholders' allegations warrant "a strong inference that [Notebaert and Tellabs] acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2), in light of the prescriptions announced today. Thus, the case is remanded for a determination under this Court's construction of § 21D(b)(2). P. ----18.

437 F.3d 588, vacated and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C.J., and KENNEDY, SOUTER, THOMAS, and BREYER, JJ., joined. SCALIA, J., and ALITO, J., filed opinions concurring in the judgment. STEVENS, J., filed a dissenting opinion.

Carter G. Phillips, Washington, DC, for petitioners.
Kannon K. Shanmugam, Washington, DC, for the United States as amicus curiae, by special leave of the Court, supporting petitioners.
Arthur R. Miller, New York, NY, for respondents.
David F. Graham, Hille R. Sheppard, Robert N. Hochman, Melanie E. Walker, Sidley Austin LLP, Chicago, Illinois, Carter G. Phillips, Counsel of Record, Richard D. Bernstein, Eamon P. Joyce, Sidley Austin LLP, Washington, D.C., for Petitioners.
Arthur R. Miller, Cambridge, MA, Melvyn I. Weiss, Jerome M. Congress, Richard H. Weiss, Counsel of Record, Clifford S. Goodstein, Milberg Weiss & Bershad LLP, New York, NY, for Respondents.For U.S. Supreme Court Briefs, see:2007 WL 432763 (Pet.Brief)2007 WL 760412 (Resp.Brief)2007 WL 835317 (Reply.Brief)
Justice GINSBURG delivered the opinion of the Court.

*4 This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC). See, _e.g., Dura Pharmaceuticals, Inc. v. Broudo,_ 544 U.S. 336, 345, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); _J.I. Case Co. v. Borak,_ 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Private securities fraud actions, however, if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law. See _Merrill Lynch, Pierce, Fenner &_

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1773208 (U.S.)
**(Cite as: --- S.Ct. ----)**

Page 5

*Smith Inc. v. Dabit,* 547 U.S. 71, 81, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006). As a check against abusive litigation by private parties, Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA), 109 Stat. 737.

Exacting pleading requirements are among the control measures Congress included in the PSLRA. The Act requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.,* the defendant's intention "to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194, and n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); see 15 U.S.C. § 78u-4(b)(1),(2). This case concerns the latter requirement. As set out in § 21D(b)(2) of the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Congress left the key term "strong inference" undefined, and Courts of Appeals have divided on its meaning. In the case before us, the Court of Appeals for the Seventh Circuit held that the "strong inference" standard would be met if the complaint "allege[d] facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." 437 F.3d 588, 602 (2006). That formulation, we conclude, does not capture the stricter demand Congress sought to convey in § 21D(b)(2). It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind. Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by § 21D(b)(2) must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, as the Seventh Circuit did, but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as "strong" within the intendment of § 21D(b)(2), we hold, an inference of scienter must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

I

**\*5** Petitioner Tellabs, Inc., manufactures specialized equipment used in fiber optic networks. During the

time period relevant to this case, petitioner Richard Notebaert was Tellabs' chief executive officer and president. Respondents (Shareholders) are persons who purchased Tellabs stock between December 11, 2000, and June 19, 2001. They accuse Tellabs and Notebaert (as well as several other Tellabs executives) of engaging in a scheme to deceive the investing public about the true value of Tellabs' stock. See 437 F.3d, at 591; App. 94-98.[FN1]

> FN1. The Shareholders brought suit against Tellabs executives other than Notebaert, including Richard Birck, Tellabs' chairman and former chief executive officer. Because the claims against the other executives, many of which have been dismissed, are not before us, we focus on the allegations as they relate to Notebaert. We refer to the defendant-petitioners collectively as "Tellabs."

Beginning on December 11, 2000, the Shareholders allege, Notebaert (and by imputation Tellabs) "falsely reassured public investors, in a series of statements ... that Tellabs was continuing to enjoy strong demand for its products and earning record revenues," when, in fact, Notebaert knew the opposite was true. *Id.,* at 94-95, 98. From December 2000 until the spring of 2001, the Shareholders claim, Notebaert knowingly misled the public in four ways. 437 F.3d, at 596. First, he made statements indicating that demand for Tellabs' flagship networking device, the TITAN 5500, was continuing to grow, when in fact demand for that product was waning. *Id.,* at 596, 597. Second, Notebaert made statements indicating that the TITAN 6500, Tellabs' next-generation networking device, was available for delivery, and that demand for that product was strong and growing, when in truth the product was not ready for delivery and demand was weak. *Id.,* at 596, 597-598. Third, he falsely represented Tellabs' financial results for the fourth quarter of 2000 (and, in connection with those results, condoned the practice of "channel stuffing," under which Tellabs flooded its customers with unwanted products). *Id.,* at 596, 598. Fourth, Notebaert made a series of overstated revenue projections, when demand for the TITAN 5500 was drying up and production of the TITAN 6500 was behind schedule. *Id.,* at 596, 598-599. Based on Notebaert's sunny assessments, the Shareholders contend, market analysts recommended that investors buy Tellabs' stock. See *id.,* at 592.

The first public glimmer that business was not so

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----                                                                                                  Page 6
--- S.Ct. ----, 2007 WL 1773208 (U.S.)
(Cite as: --- S.Ct. ----)

healthy came in March 2001 when Tellabs modestly reduced its first quarter sales projections. *Ibid.* In the next months, Tellabs made progressively more cautious statements about its projected sales. On June 19, 2001, the last day of the class period, Tellabs disclosed that demand for the TITAN 5500 had significantly dropped. *Id.,* at 593. Simultaneously, the company substantially lowered its revenue projections for the second quarter of 2001. The next day, the price of Tellabs stock, which had reached a high of $67 during the period, plunged to a low of $15.87. *Ibid.*

On December 3, 2002, the Shareholders filed a class action in the District Court for the Northern District of Illinois. *Ibid.* Their complaint stated, *inter alia,* that Tellabs and Notebaert had engaged in securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 CFR § 240.10b-5 (2006), also that Notebaert was a "controlling person" under § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), and therefore derivatively liable for the company's fraudulent acts. See App. 98-101, 167-171. Tellabs moved to dismiss the complaint on the ground that the Shareholders had failed to plead their case with the particularity the PSLRA requires. The District Court agreed, and therefore dismissed the complaint without prejudice. App. to Pet. for Cert. 80a-117a; see *Johnson v. Tellabs, Inc.,* 303 F.Supp.2d 941, 945 (N.D.Ill.2004).

*6 The Shareholders then amended their complaint, adding references to 27 confidential sources and making further, more specific, allegations concerning Notebaert's mental state. See 437 F.3d, at 594; App. 91-93, 152-160. The District Court again dismissed, this time with prejudice. 303 F.Supp.2d, at 971. The Shareholders had sufficiently pleaded that Notebaert's statements were misleading, the court determined, *id.,* at 955-961, but they had insufficiently alleged that he acted with scienter, *id.,* at 954-955, 961-969.

The Court of Appeals for the Seventh Circuit reversed in relevant part. 437 F.3d, at 591. Like the District Court, the Court of Appeals found that the Shareholders had pleaded the misleading character of Notebaert's statements with sufficient particularity. *Id.,* at 595-600. Unlike the District Court, however, the Seventh Circuit concluded that the Shareholders had sufficiently alleged that Notebaert acted with the requisite state of mind. *Id.,* at 603-605.

The Court of Appeals recognized that the PSLRA "unequivocally raise[d] the bar for pleading scienter"

by requiring plaintiffs to "plea[d] sufficient facts to create a strong inference of scienter." *Id.,* at 601 (internal quotation marks omitted). In evaluating whether that pleading standard is met, the Seventh Circuit said, "courts [should] examine all of the allegations in the complaint and then ... decide whether collectively they establish such an inference." *Ibid.* "[W]e will allow the complaint to survive," the court next and critically stated, "if it alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent .... If a reasonable person could not draw such an inference from the alleged facts, the defendants are entitled to dismissal." *Id.,* at 602.

In adopting its standard for the survival of a complaint, the Seventh Circuit explicitly rejected a stiffer standard adopted by the Sixth Circuit, *i.e.,* that "plaintiffs are entitled only to the most plausible of competing inferences." *Id.,* at 601, 602 (quoting *Fidel v. Farley,* 392 F.3d 220, 227 (C.A.6 2004)). The Sixth Circuit's standard, the court observed, because it involved an assessment of competing inferences, "could potentially infringe upon plaintiffs' Seventh Amendment rights." 437 F.3d, at 602. We granted certiorari to resolve the disagreement among the Circuits on whether, and to what extent, a court must consider competing inferences in determining whether a securities fraud complaint gives rise to a "strong inference" of scienter. [FN2] 549 U.S. ----, 127 S.Ct. 853, 166 L.Ed.2d 681 (2007).

> FN2. See, *e.g.,* 437 F.3d 588, 602 (C.A.7 2006) (decision below); *Brown v. Credit Suisse First Boston Corp.,* 431 F.3d 36, 49, 51 (C.A.1 2005); *Ottmann v. Hanger Orthopedic Group, Inc.,* 353 F.3d 338, 347-349 (C.A.4 2003); *Pirraglia v. Novell, Inc.,* 339 F.3d 1182, 1187-1188 (C.A.10 2003); *Gompper v. VISX, Inc.,* 298 F.3d 893, 896-897 (C.A.9 2002); *Helwig v. Vencor, Inc.,* 251 F.3d 540, 553 (C.A.6 2001) (en banc).

II

*7 [1] Section 10(b) of the Securities Exchange Act of 1934 forbids the "use or employ, in connection with the purchase or sale of any security ..., [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements § 10(b) by declaring it unlawful:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 CFR § 240.10b-5.

Section 10(b), this Court has implied from the statute's text and purpose, affords a right of action to purchasers or sellers of securities injured by its violation. See, e.g., Dura Pharmaceuticals, 544 U.S., at 341, 125 S.Ct. 1627. See also id., at 345, 125 S.Ct. 1627 ("The securities statutes seek to maintain public confidence in the marketplace .... by deterring fraud, in part, through the availability of private securities fraud actions."); Borak, 377 U.S., at 432, 84 S.Ct. 1555 (private securities fraud actions provide "a most effective weapon in the enforcement" of securities laws and are "a necessary supplement to Commission action"). To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst, 425 U.S., at 193-194, and n. 12, 96 S.Ct. 1375. [FN3]

> FN3. We have previously reserved the question whether reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b-5. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Every Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required. See Ottmann, 353 F.3d, at 343 (collecting cases). The question whether and when recklessness satisfies the scienter requirement is not presented in this case.

In an ordinary civil action, the Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2). Although the rule encourages brevity, the complaint must say enough to give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it

rests." Dura Pharmaceuticals, 544 U.S., at 346, 125 S.Ct. 1627 (internal quotation marks omitted). Prior to the enactment of the PSLRA, the sufficiency of a complaint for securities fraud was governed not by Rule 8, but by the heightened pleading standard set forth in Rule 9(b). See Greenstone v. Cambex Corp., 975 F.2d 22, 25 (C.A.1 1992) (Breyer, J.) (collecting cases). Rule 9(b) applies to "all averments of fraud or mistake"; it requires that "the circumstances constituting fraud ... be stated with particularity" but provides that "[m]alice, intent, knowledge, and other condition of mind of a person, may be averred generally."

Courts of Appeals diverged on the character of the Rule 9(b) inquiry in § 10(b) cases: Could securities fraud plaintiffs allege the requisite mental state "simply by stating that scienter existed," In re GlenFed, Inc. Securities Litigation, 42 F.3d 1541, 1546-1547 (C.A.9 1994) (en banc), or were they required to allege with particularity facts giving rise to an inference of scienter? Compare id., at 1546 ("We are not permitted to add new requirements to Rule 9(b) simply because we like the effects of doing so."), with, e.g., Greenstone, 975 F.2d, at 25 (were the law to permit a securities fraud complaint simply to allege scienter without supporting facts, "a complaint could evade too easily the 'particularity' requirement in Rule 9(b)'s first sentence"). Circuits requiring plaintiffs to allege specific facts indicating scienter expressed that requirement variously. See 5A C. Wright & A. Miller, Federal Practice and Procedure § 1301.1, pp. 300-302 (3d ed.2004) (hereinafter Wright & Miller). The Second Circuit's formulation was the most stringent. Securities fraud plaintiffs in that Circuit were required to "specifically plead those [facts] which they assert give rise to a strong inference that the defendants had" the requisite state of mind. Ross v. A.H. Robins Co., 607 F.2d 545, 558 (1979) (emphasis added). The "strong inference" formulation was appropriate, the Second Circuit said, to ward off allegations of "fraud by hindsight." See, e.g., Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (1994) (quoting Denny v. Barber, 576 F.2d 465, 470 (C.A.2 1978) (Friendly, J.)).

*8 Setting a uniform pleading standard for § 10(b) actions was among Congress' objectives when it enacted the PSLRA. Designed to curb perceived abuses of the § 10(b) private action-"nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers," Dabit, 547 U.S., at 81, 126 S.Ct. 1503 (quoting H.R. Conf. Rep. No. 104-369, p.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1773208 (U.S.)
**(Cite as: --- S.Ct. ----)**

31 (1995), U.S.Code Cong. & Admin.News 1995, p. 730 (hereinafter H.R. Conf. Rep.))-the PSLRA installed both substantive and procedural controls.[FN4] Notably, Congress prescribed new procedures for the appointment of lead plaintiffs and lead counsel. This innovation aimed to increase the likelihood that institutional investors-parties more likely to balance the interests of the class with the long-term interests of the company-would serve as lead plaintiffs. See *id.,* at 33-34; S.Rep. No. 104-98, p. 11 (1995), U.S.Code Cong. & Admin.News 1995, pp. 679, 690. Congress also "limit[ed] recoverable damages and attorney's fees, provide[d] a 'safe harbor' for forward-looking statements, ... mandate[d] imposition of sanctions for frivolous litigation, and authorize[d] a stay of discovery pending resolution of any motion to dismiss." *Dabit,* 547 U.S., at 81, 126 S.Ct. 1503. And in § 21D(b) of the PSLRA, Congress "impose[d] heightened pleading requirements in actions brought pursuant to § 10(b) and Rule 10b-5." *Ibid.*

> FN4. Nothing in the Act, we have previously noted, casts doubt on the conclusion "that private securities litigation [i]s an indispensable tool with which defrauded investors can recover their losses"-a matter crucial to the integrity of domestic capital markets. See *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 81, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006) (internal quotation marks omitted).

Under the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1); and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," § 78u-4(b)(2). In the instant case, as earlier stated, see *supra,* at ----5, the District Court and the Seventh Circuit agreed that the Shareholders met the first of the two requirements: The complaint sufficiently specified Notebaert's alleged misleading statements and the reasons why the statements were misleading. 303 F.Supp.2d, at 955-961, 437 F.3d, at 596-600. But those courts disagreed on whether the Shareholders, as required by § 21D(b)(2), "state[d] with particularity facts giving rise to a strong inference that [Notebaert] acted with [scienter]," § 78u-4(b)(2). See *supra,* at --

--5.

*9 The "strong inference" standard "unequivocally raise[d] the bar for pleading scienter," 437 F.3d, at 601, and signaled Congress' purpose to promote greater uniformity among the Circuits, see H.R. Conf. Rep., p. 41. But "Congress did not ... throw much light on what facts ... suffice to create [a strong] inference," or on what "degree of imagination courts can use in divining whether" the requisite inference exists. 437 F.3d, at 601. While adopting the Second Circuit's "strong inference" standard, Congress did not codify that Circuit's case law interpreting the standard. See § 78u-4(b)(2). See also Brief for United States as *Amicus Curiae* 18. With no clear guide from Congress other than its "inten[tion] to strengthen existing pleading requirements," H.R. Conf. Rep., p. 41, Courts of Appeals have diverged again, this time in construing the term "strong inference." Among the uncertainties, should courts consider competing inferences in determining whether an inference of scienter is "strong"? See 437 F.3d, at 601-602 (collecting cases). Our task is to prescribe a workable construction of the "strong inference" standard, a reading geared to the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims.

### III

### A

[2] We establish the following prescriptions: *First,* faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. See *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). On this point, the parties agree. See Reply Brief 8; Brief for Respondents 26; Brief for United States as *Amicus Curiae* 8, 20, 21.

[3] *Second,* courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. See 5B Wright & Miller § 1357 (3d ed.2004 and Supp.2007). The inquiry, as several Courts of Appeals have

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----                                                    Page 9
--- S.Ct. ----, 2007 WL 1773208 (U.S.)
**(Cite as: --- S.Ct. ----)**

recognized, is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. See, *e.g.,* <u>Abrams v. Baker Hughes Inc.,</u> 292 F.3d 424, 431 <u>(C.A.5 2002)</u>; <u>Gompper v. VISX, Inc.,</u> 298 F.3d 893, 897 (C.A.9 2002). See also Brief for United States as *Amicus Curiae* 25.

*10 [4] *Third,* in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. The Seventh Circuit expressly declined to engage in such a comparative inquiry. A complaint could survive, that court said, as long as it "alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent"; in other words, only "[i]f a reasonable person could not draw such an inference from the alleged facts" would the defendant prevail on a motion to dismiss. <u>437 F.3d, at 602.</u> But in § 21D(b)(2), Congress did not merely require plaintiffs to "provide a factual basis for [their] scienter allegations," *ibid.* (quoting <u>In re Cerner Corp. Securities Litigation,</u> 425 <u>F.3d 1079, 1084, 1085 (C.A.8 2005)</u>), *i.e.,* to allege facts from which an inference of scienter rationally *could* be drawn. Instead, Congress required plaintiffs to plead with particularity facts that give rise to a "strong"-*i.e.,* a powerful or cogent-inference. See American Heritage Dictionary 1717 (4th ed.2000) (defining "strong" as "[p]ersuasive, effective, and cogent"); 16 Oxford English Dictionary 949 (2d ed.1989) (defining "strong" as "[p]owerful to demonstrate or convince" (definition 16b)); cf. 7 *id.,* at 924 (defining "inference" as "a conclusion [drawn] from known or assumed facts or statements"; "reasoning from something known or assumed to something else which follows from it").

[5] The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the "smoking-gun" genre, or even the "most plausible of competing inferences," <u>Fidel,</u> 392 F.3d, at 227 (quoting <u>Helwig v. Vencor, Inc.,</u> 251 <u>F.3d 540, 553 (C.A.6 2001)</u> (en banc)). Recall in this regard that § 21D(b)'s pleading requirements are but one constraint among many the PSLRA installed to

screen out frivolous suits, while allowing meritorious actions to move forward. See *supra,* at ----9, and n. 4. Yet the inference of scienter must be more than merely "reasonable" or "permissible"-it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.[FN5]

> FN5. Justice SCALIA objects to this standard on the ground that "[i]f a jade falcon were stolen from a room to which only A and B had access," it could not "*possibly* be said there was a 'strong inference' that B was the thief." *Post,* at ---- 1 (opinion concurring in judgment) (emphasis in original). I suspect, however, that law enforcement officials as well as the owner of the precious falcon would find the inference of guilt as to B quite strong-certainly strong enough to warrant further investigation. Indeed, an inference at least as likely as competing inferences can, in some cases, warrant recovery. See <u>Summers v. Tice,</u> 33 Cal.2d 80, 84-87, 199 P.2d 1, 3-5 (1948) (in bank) (plaintiff wounded by gunshot could recover from two defendants, even though the most he could prove was that each defendant was at least as likely to have injured him as the other); <u>Restatement (Third) of Torts § 28(b),</u> Comment *e,* p. 504 (Proposed Final Draft No. 1, Apr. 6, 2005) ("Since the publication of the Second Restatement in 1965, courts have generally accepted the alternative-liability principle of [<u>Summers v. Tice,</u> adopted in] § 433B(3), while fleshing out its limits."). In any event, we disagree with Justice SCALIA that the hardly stock term "strong inference" has only one invariably right ("natural" or "normal") reading-his. See *post,* at ----3.
> Justice ALITO agrees with Justice SCALIA, and would transpose to the pleading stage "the test that is used at the summary-judgment and judgment-as-a-matter-of-law stages." *Post,* at ----3 (opinion concurring in judgment). But the test at each stage is measured against a different backdrop. It is improbable that Congress, without so stating, intended courts to test pleadings, unaided by discovery, to determine whether there is "no genuine issue as to any material

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fact." See Fed. Rule Civ. Proc. 56(c). And judgment as a matter of law is a post-trial device, turning on the question whether a party has produced evidence "legally sufficient" to warrant a jury determination in that party's favor. See Rule 50(a)(1).

B

**\*11** [6] Tellabs contends that when competing inferences are considered, Notebaert's evident lack of pecuniary motive will be dispositive. The Shareholders, Tellabs stresses, did not allege that Notebaert sold any shares during the class period. See Brief for Petitioners 50 ("The absence of any allegations of motive color all the other allegations putatively giving rise to an inference of scienter."). While it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference, we agree with the Seventh Circuit that the absence of a motive allegation is not fatal. See 437 F.3d, at 601. As earlier stated, *supra,* at ----11, allegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint.

Tellabs also maintains that several of the Shareholders' allegations are too vague or ambiguous to contribute to a strong inference of scienter. For example, the Shareholders alleged that Tellabs flooded its customers with unwanted products, a practice known as "channel stuffing." See *supra,* at ----3. But they failed, Tellabs argues, to specify whether the channel stuffing allegedly known to Notebaert was the illegitimate kind (*e.g.,* writing orders for products customers had not requested) or the legitimate kind (*e.g.,* offering customers discounts as an incentive to buy). Brief for Petitioners 44-46; Reply Brief 8. See also *id.,* at 8-9 (complaint lacks precise dates of reports critical to distinguish legitimate conduct from culpable conduct). But see 437 F.3d, at 598, 603-604 (pointing to multiple particulars alleged by the Shareholders, including specifications as to timing). We agree that omissions and ambiguities count against inferring scienter, for plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u-4(b)(2). We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. See *supra,* at ----11; 437 F.3d, at 601. In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the

inference of scienter at least as strong as any opposing inference? [FN6]

> FN6. The Seventh Circuit held that allegations of scienter made against one defendant cannot be imputed to all other individual defendants. 437 F.3d, at 602-603. See also *id.,* at 603 (to proceed beyond the pleading stage, the plaintiff must allege as to each defendant facts sufficient to demonstrate a culpable state of mind regarding his or her violations) (citing *Phillips v. Scientific-Atlanta, Inc.,* 374 F.3d 1015, 1018 (C.A.11 2004)). Though there is disagreement among the Circuits as to whether the group pleading doctrine survived the PSLRA, see, *e.g., Southland Securities Corp. v. INSpire Ins. Solutions Inc.,* 365 F.3d 353, 364 (C.A.5 2004), the Shareholders do not contest the Seventh Circuit's determination, and we do not disturb it.

IV

[7] Accounting for its construction of § 21D(b)(2), the Seventh Circuit explained that the court "th[ought] it wis[e] to adopt an approach that [could not] be misunderstood as a usurpation of the jury's role." 437 F.3d, at 602. In our view, the Seventh Circuit's concern was undue.[FN7] A court's comparative assessment of plausible inferences, while constantly assuming the plaintiff's allegations to be true, we think it plain, does not impinge upon the Seventh Amendment right to jury trial.[FN8]

> FN7. The Seventh Circuit raised the possibility of a Seventh Amendment problem on its own initiative. The Shareholders did not contend below that dismissal of their complaint under § 21D(b)(2) would violate their right to trial by jury. Cf. *Monroe Employees Retirement System v. Bridgestone Corp.,* 399 F.3d 651, 683, n. 25 (C.A.6 2005) (noting possible Seventh Amendment argument but declining to address it when not raised by plaintiffs).

> FN8. In numerous contexts, gatekeeping judicial determinations prevent submission of claims to a jury's judgment without violating the Seventh Amendment. See, *e.g., Daubert v. Merrell Dow Pharmaceuticals,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (expert testimony can be excluded based on judicial determination of reliability); *Neely v. Martin K. Eby Constr. Co.,* 386 U.S. 317, 321, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967) (judgment as a matter of law); *Pease v. Rathbun-Jones Engineering Co.,* 243 U.S. 273, 278, 37 S.Ct. 283, 61 L.Ed. 715 (1917) (summary judgment).

Congress, as creator of federal statutory claims, has power to prescribe what must be pleaded to state the claim, just as it has power to determine what must be proved to prevail on the merits. It is the federal lawmaker's prerogative, therefore, to allow, disallow, or shape the contours of-including the pleading and proof requirements for- § 10(b) private actions. No decision of this Court questions that authority in general, or suggests, in particular, that the Seventh Amendment inhibits Congress from establishing whatever pleading requirements it finds appropriate for federal statutory claims. Cf. *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 512-513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Leatherman,* 507 U.S., at 168, 113 S.Ct. 1160 (both recognizing that heightened pleading requirements can be established by Federal Rule, citing Fed. Rule Civ. Proc. 9(b), which requires that fraud or mistake be pleaded with particularity).[FN9]

FN9. Any heightened pleading rule, including Fed. Rule Civ. Proc. 9(b), could have the effect of preventing a plaintiff from getting discovery on a claim that might have gone to a jury, had discovery occurred and yielded substantial evidence. In recognizing Congress' or the Federal Rule makers' authority to adopt special pleading rules, we have detected no Seventh Amendment impediment.

*12 Our decision in *Fidelity & Deposit Co. of Md. v. United States,* 187 U.S. 315, 23 S.Ct. 120, 47 L.Ed. 194 (1902), is instructive. That case concerned a rule adopted by the Supreme Court of the District of Columbia in 1879 pursuant to rulemaking power delegated by Congress. The rule required defendants, in certain contract actions, to file an affidavit "specifically stating ..., in precise and distinct terms, the grounds of his defen[s]e." *Id.,* at 318, 23 S.Ct. 120 (internal quotation marks omitted). The defendant's affidavit was found insufficient, and judgment was entered for the plaintiff, whose declaration and supporting affidavit had been found

satisfactory. *Ibid.* This Court upheld the District's rule against the contention that it violated the Seventh Amendment. *Id.,* at 320, 23 S.Ct. 120. Just as the purpose of § 21D(b) is to screen out frivolous complaints, the purpose of the prescription at issue in *Fidelity & Deposit Co.* was to "preserve the courts from frivolous defen[s]es," *ibid.* Explaining why the Seventh Amendment was not implicated, this Court said that the heightened pleading rule simply "prescribes the means of making an issue," and that, when "[t]he issue [was] made as prescribed, the right of trial by jury accrues." *Ibid.;* accord *Ex parte Peterson,* 253 U.S. 300, 310, 40 S.Ct. 543, 64 L.Ed. 919 (1920) (Brandeis, J.) (citing *Fidelity & Deposit Co.,* and reiterating: "It does not infringe the constitutional right to a trial by jury [in a civil case], to require, with a view to formulating the issues, an oath by each party to the facts relied upon."). See also *Walker v. New Mexico & Southern Pacific R. Co.,* 165 U.S. 593, 596, 17 S.Ct. 421, 41 L.Ed. 837 (1897) (Seventh Amendment "does not attempt to regulate matters of pleading").

In the instant case, provided that the Shareholders have satisfied the congressionally "prescribe[d] ... means of making an issue," *Fidelity & Deposit Co.,* 187 U.S., at 320, 23 S.Ct. 120, the case will fall within the jury's authority to assess the credibility of witnesses, resolve any genuine issues of fact, and make the ultimate determination whether Notebaert and, by imputation, Tellabs acted with scienter. We emphasize, as well, that under our construction of the "strong inference" standard, a plaintiff is not forced to plead more than she would be required to prove at trial. A plaintiff alleging fraud in a § 10(b) action, we hold today, must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference. At trial, she must then prove her case by a "preponderance of the evidence." Stated otherwise, she must demonstrate that it is *more likely* than not that the defendant acted with scienter. See *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

* * *

*13 While we reject the Seventh Circuit's approach to § 21D(b)(2), we do not decide whether, under the standard we have described, see *supra,* at --- - ----11-14, the Shareholders' allegations warrant "a strong inference that [Notebaert and Tellabs] acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2). Neither the District Court nor the Court of Appeals had the opportunity to consider the matter in light of

--- S.Ct. ----
--- S.Ct. ----, 2007 WL 1773208 (U.S.)
(Cite as: --- S.Ct. ----)

the prescriptions we announce today. We therefore vacate the Seventh Circuit's judgment so that the case may be reexamined in accord with our construction of § 21D(b)(2).

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice SCALIA, concurring in the judgment.

I fail to see how an inference that is merely "at least as compelling as any opposing inference," *ante,* at ----2, can conceivably be called what the statute here at issue requires: a "strong inference," 15 U.S.C. § 78u-4(b)(2). If a jade falcon were stolen from a room to which only A and B had access, could it *possibly* be said there was a "strong inference" that B was the thief? I think not, and I therefore think that the Court's test must fail. In my view, the test should be whether the inference of scienter (if any) is *more plausible* than the inference of innocence.[FN*]

> [FN*] The Court suggests that "the owner of the precious falcon would find the inference of guilt as to B quite strong." *Ante,* at ----13, n. 5. If he should draw such an inference, it would only prove the wisdom of the ancient maxim "*aliquis non debet esse Judex in propria causa*"-no man ought to be a judge of his own cause. *Dr. Bonham's Case,* 8 Co. 107a, 114a, 118a, 77 Eng. Rep. 638, 646, 652 (C.P. 1610). For it is quite clear (from the dispassionate perspective of one who does not own a jade falcon) that a *possibility,* even a strong possibility, that B is responsible is not a strong *inference* that B is responsible. "Inference" connotes "belief" in what is inferred, and it would be impossible to form a strong belief that it was B and not A, or A and not B.

The Court's explicit rejection of this reading, *ante,* at ----12, rests on two assertions. The first (doubtless true) is that the statute does not require that "[t]he inference that the defendant acted with scienter ... be irrefutable, *i.e.,* of the 'smoking-gun' genre," *ibid.* It is up to Congress, however, and not to us, to determine what pleading standard would avoid those extremities while yet effectively deterring baseless actions. Congress has expressed its determination in the phrase "strong inference"; it is our job to give that phrase its normal meaning. And if we are to abandon text in favor of unexpressed purpose, as the Court

does, it is inconceivable that Congress's enactment of stringent pleading requirements in the Private Securities Litigation Reform Act of 1995 somehow manifests the purpose of giving plaintiffs the edge in close cases.

The Court's second assertion (also true) is that "an inference at least as likely as competing inferences can, in some cases, warrant recovery." *Ante,* at ----13, n. 5 (citing *Summers v. Tice,* 33 Cal.2d 80, 84-87, 199 P.2d 1, 3-5 (1948) (in bank)). *Summers* is a famous case, however, because it sticks out of the ordinary body of tort law like a sore thumb. It represented "a relaxation" of "such proof as is ordinarily required" to succeed in a negligence action. *Id.,* at 86, 199 P.2d, at 4 (internal quotation marks omitted). There is no indication that the statute at issue here was meant to relax the ordinary rule under which a tie goes to the defendant. To the contrary, it explicitly strengthens that rule by extending it to the pleading stage of a case.

*14 One of petitioners' *amici* suggests that my reading of the statute would transform the text from requiring a "strong" inference to requiring the "strongest" inference. See Brief for American Association for Justice as *Amicus Curiae* 27. The point might have some force if Congress could have more clearly adopted my standard by using the word "strongest" instead of the word "strong." But the use of the superlative would not have made any sense given the provision's structure: What does it mean to require a plaintiff to plead "facts giving rise to *the strongest* inference that the defendant acted with the required state of mind"? It is certainly true that, if Congress had wanted to adopt my standard with even greater clarity, it could have restructured the entire provision-to require, for example, that the plaintiff plead "facts giving rise to *an inference of scienter that is more compelling than the inference that the defendant acted with a nonculpable state of mind.*" But if one is to consider the possibility of total restructuring, it is equally true that, to express the Court's standard, Congress could have demanded "*an inference of scienter that is at least as compelling as the inference that the defendant acted with a nonculpable state of mind.*" Argument from the possibility of saying it differently is clearly a draw. We must be content to give "strong inference" its normal meaning. I hasten to add that, while precision of interpretation should always be pursued for its own sake, I doubt that in this instance what I deem to be the correct test will produce results much different from the Court's. How often is it that inferences are precisely in equipoise? All the more reason, I think,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----                                                                Page 13
--- S.Ct. ----, 2007 WL 1773208 (U.S.)
**(Cite as: --- S.Ct. ----)**

to read the language for what it says.

The Court and the dissent criticize me for suggesting that there is only one reading of the text. *Ante,* at ---- 13, n. 5; *post,* at ----2, n. 1 (STEVENS, J., dissenting). They are both mistaken. I assert only that mine is the natural reading of the statute (*i.e.,* the normal reading), not that it is the only conceivable one. The Court has no standing to object to this approach, since it concludes that, in another respect, the statute admits of only one natural reading, namely, that competing inferences must be weighed because the strong-inference requirement "is inherently comparative" *ante,* at ----12. As for the dissent, it asserts that the statute cannot possibly have a natural and discernible meaning, since "courts of appeals" and "Members of this Court" "have divided" over the question. It was just weeks ago, however, that the author of the dissent, joined by the author of today's opinion for the Court, concluded that a statute's meaning was "plain," *Rockwell Int'l Corp. v. United States,* 549 U.S. ----, ----, 127 S.Ct. 1397, 1412, 167 L.Ed.2d 190 (2007) (STEVENS, J., dissenting), even though the Courts of Appeals and Members of this Court divided over the question, *id., at ----, n. 5 (127 S.Ct., at 1407, n. 5).* Was plain meaning then, as the dissent claims it is today, *post,* at ----2, n. 1, "in the eye of the beholder"?

It is unremarkable that various Justices in this case reach different conclusions about the correct interpretation of the statutory text. It is remarkable, however, that the dissent believes that Congress "implicitly delegated significant lawmaking authority to the Judiciary in determining how th[e] [strong-inference] standard should operate in practice." *Post,* at ----1. This is language usually employed to describe the discretion conferred upon administrative agencies, which need not adopt what courts would consider the interpretation most faithful to the text of the statute, but may choose some other interpretation, so long as it is within the bounds of the reasonable, and may later change to some *other* interpretation that is within the bounds of the reasonable. See *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Courts, by contrast, *must* give the statute its single, most plausible, reading. To describe this as an exercise of "delegated lawmaking authority" seems to me peculiar-unless one believes in lawmakers who have no discretion. Courts must apply judgment, to be sure. But judgment is not discretion.

**\*15** Even if I agreed with the Court's interpretation of

"strong inference," I would not join the Court's opinion because of its frequent indulgence in the last remaining legal fiction of the West: that the report of a single committee of a single House expresses the will of Congress. The Court says, for example, that "Congress'[s] purpose" was "to promote greater uniformity among the Circuits," *ante,* at ----10, relying for that certitude upon the statement of managers accompanying a House Conference Committee Report whose text was never adopted by the House, much less by the Senate, and as far as we know was read by almost no one. The Court is sure that Congress " 'inten[ded] to strengthen existing pleading requirements,' " *ibid.,* because-again-the statement of managers said so. I come to the same conclusion for the much safer reason that the law which Congress adopted (and which the Members of both Houses actually *voted* on) so indicates. And had the legislation not done so, the statement of managers assuredly could not have remedied the deficiency.

With the above exceptions, I am generally in agreement with the Court's analysis, and so concur in its judgment.

Justice ALITO, concurring in the judgment.

I agree with the Court that the Seventh Circuit used an erroneously low standard for determining whether the plaintiffs in this case satisfied their burden of pleading "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). I further agree that the case should be remanded to allow the lower courts to decide in the first instance whether the allegations survive under the correct standard. In two respects, however, I disagree with the opinion of the Court. First, the best interpretation of the statute is that only those facts that are alleged "with particularity" may properly be considered in determining whether the allegations of scienter are sufficient. Second, I agree with Justice SCALIA that a "strong inference" of scienter, in the present context, means an inference that is more likely than not correct.

I

**\*16** On the first point, the statutory language is quite clear. Section 78u-4(b)(2) states that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Thus, "a strong inference" of scienter must arise from those facts that are stated "with particularity." It follows

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.Ct. ----                                                    Page 14
--- S.Ct. ----, 2007 WL 1773208 (U.S.)
**(Cite as: --- S.Ct. ----)**

that facts not stated with the requisite particularity cannot be considered in determining whether the strong-inference test is met.

In dicta, however, the Court states that "omissions and ambiguities" merely "count against" inferring scienter, and that a court should consider all allegations of scienter, even nonparticularized ones, when considering whether a complaint meets the "strong inference" requirement. *Ante,* at ----14. Not only does this interpretation contradict the clear statutory language on this point, but it undermines the particularity requirement's purpose of preventing a plaintiff from using vague or general allegations in order to get by a motion to dismiss for failure to state a claim. Allowing a plaintiff to derive benefit from such allegations would permit him to circumvent this important provision.

Furthermore, the Court's interpretation of the particularity requirement in no way distinguishes it from normal pleading review, under which a court naturally gives less weight to allegations containing "omissions and ambiguities" and more weight to allegations stating particularized facts. The particularity requirement is thus stripped of all meaning.

Questions certainly may arise as to whether certain allegations meet the statutory particularity requirement, but where that requirement is violated, the offending allegations cannot be taken into account.

II

I would also hold that a "strong inference that the defendant acted with the required state of mind" is an inference that is stronger than the inference that the defendant lacked the required state of mind. Congress has provided very little guidance regarding the meaning of "strong inference," and the difference between the Court's interpretation (the inference of scienter must be at least as strong as the inference of no scienter) and Justice SCALIA's (the inference of scienter must be at least marginally stronger than the inference of no scienter) is unlikely to make any practical difference. The two approaches are similar in that they both regard the critical question as posing a binary choice (either the facts give rise to a "strong inference" of scienter or they do not). But Justice SCALIA's interpretation would align the pleading test under *§ 78u-4(b)(2)* with the test that is used at the summary-judgment and judgment-as-a-matter-of-

law stages, whereas the Court's test would introduce a test previously unknown in civil litigation. It seems more likely that Congress meant to adopt a known quantity and thus to adopt Justice SCALIA's approach.

Justice STEVENS, dissenting.
***17** As the Court explains, when Congress enacted a heightened pleading requirement for private actions to enforce the federal securities laws, it "left the key term 'strong inference' undefined." *Ante,* at ----2. It thus implicitly delegated significant lawmaking authority to the Judiciary in determining how that standard should operate in practice. Today the majority crafts a perfectly workable definition of the term, but I am persuaded that a different interpretation would be both easier to apply and more consistent with the statute.

The basic purpose of the heightened pleading requirement in the context of securities fraud litigation is to protect defendants from the costs of discovery and trial in unmeritorious cases. Because of its intrusive nature, discovery may also invade the privacy interests of the defendants and their executives. Like citizens suspected of having engaged in criminal activity, those defendants should not be required to produce their private effects unless there is probable cause to believe them guilty of misconduct. Admittedly, the probable-cause standard is not capable of precise measurement, but it is a concept that is familiar to judges. As a matter of normal English usage, its meaning is roughly the same as "strong inference." Moreover, it is most unlikely that Congress intended us to adopt a standard that makes it more difficult to commence a civil case than a criminal case.[FN1]

> FN1. The meaning of a statute can only be determined on a case by case basis and will, in each case, turn differently on the clarity of the statutory language, its context, and the intent of its drafters. Here, in my judgment, a probable-cause standard is more faithful to the intent of Congress, as expressed in both the specific pleading requirement and the statute as a whole, than the more defendant-friendly interpretation that Justice SCALIA prefers. He is clearly wrong in concluding that in divining the meaning of this term, we can merely "read the language for what it says," and that it is susceptible to only one reading. *Ante,* at ----3 (opinion concurring in judgment). He argues that we "must be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

content to give 'strong inference' its normal meaning," *ibid.,* and yet the "normal meaning" of a term such as "strong inference" is surely in the eye of the beholder. As the Court's opinion points out, Courts of Appeals have divided on the meaning of the standard, see *ante,* at ----2, ----10, and today, the Members of this Court have done the same. Although Justice SCALIA may disagree with the Court's reading of the term, he should at least acknowledge that, in this case, the term itself is open to interpretation.

In addition to the benefit of its grounding in an already familiar legal concept, using a probable-cause standard would avoid the unnecessary conclusion that "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court *must* take into account plausible opposing inferences." *Ante,* at ----11 (emphasis added). There are times when an inference can easily be deemed strong without any need to weigh competing inferences. For example, if a known drug dealer exits a building immediately after a confirmed drug transaction, carrying a suspicious looking package, a judge could draw a strong inference that the individual was involved in the aforementioned drug transaction without debating whether the suspect might have been leaving the building at that exact time for another unrelated reason.

If, using that same methodology, we assume (as we must, see *ante,* at ----11, ----14) the truth of the detailed factual allegations attributed to 27 different confidential informants described in the complaint, App. 91-93, and view those allegations collectively, I think it clear that they establish probable cause to believe that Tellabs' chief executive officer "acted with the required intent," as the Seventh Circuit held.[FN2] 437 F.3d 588, 602 (2006).

FN2. The "channel stuffing" allegations in ¶¶ 62-72 of the amended complaint, App. 110-113, are particularly persuasive. Contrary to petitioners' arguments that respondents' allegations of channel stuffing "are too vague or ambiguous to contribute to a strong inference of scienter," *ante,* at ----13, this portion of the complaint clearly alleges that Notebaert himself had specific knowledge of illegitimate channel stuffing during the relevant time period. See, *e.g.,* App. 111, ¶ 67 ("Defendant Notebaert

worked directly with Tellabs' sales personnel to channel stuff SBC"); *id.,* at 110-112 (alleging, in describing such channel stuffing, that Tellabs took "extraordinary" steps that amounted to "an abnormal practice in the industry"; that "distributors were upset and later returned the inventory" (and, in the case of Verizon's Chairman, called Tellabs to complain); that customers "did not want" products that Tellabs sent and that Tellabs employees wrote purchase orders for; that "returns were so heavy during January and February 2001 that Tellabs had to lease extra storage space to accommodate all the returns"; and that Tellabs "backdat[ed] sales" that actually took place in 2001 to appear as having occurred in 2000). If these allegations are actually taken as true and viewed in the collective, it is hard to imagine what competing inference could effectively counteract the inference that Notebaert and Tellabs " 'acted with the required state of mind.' " *Ante,* at ----18 (opinion of the Court) (quoting 15 U.S.C. § 78u-4(b)(2)).

Accordingly, I would affirm the judgment of the Court of Appeals.

U.S.,2007.
Tellabs, Inc. v. Makor Issues & Rights, Ltd.
--- S.Ct. ----, 2007 WL 1773208 (U.S.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.