## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— )
**REPUBLIC PROPERTY TRUST**, *et al.*,  )
                                       )
    **Plaintiffs,**                 )
                                       )
    **v.**                          )    **Civil Action No. 07-595 (RCL)**
                                       )
**REPUBLIC PROPERTIES**                 )
**CORPORATION**, *et al.*,              )
                                       )
    **Defendants.**                 )
———————————————————— )

## MEMORANDUM OPINION

Defendants Richard L. Kramer ("Kramer") and Republic Properties Corporation ("RPC") and separately, defendant Stephen A. Grigg ("Grigg"), have moved to dismiss plaintiffs' amended complaint for failure to state a claim. The Court has considered plaintiffs' amended complaint [10]; Kramer and RPC's motion [14], plaintiffs' opposition thereto [23], and Kramer and RPC's reply [25]; Grigg's motion [15], plaintiffs' opposition thereto [22], and Grigg's reply [26]; and the applicable law. For the reasons set forth below, both motions are hereby GRANTED.

## BACKGROUND

Defendants Grigg and Kramer are entrepreneurs who have established and controlled various business entities to develop and manage commercial properties. On July 19, 2005, along with non-party Mark Keller, they organized plaintiff Republic Property Trust ("the REIT") to acquire, develop, and ultimately operate office properties in the Washington, D.C. metropolitan

1

area.  (Am. Compl. ¶ 11.)  Both Grigg and Kramer served on the REIT's Board of Trustees –

Grigg as Vice-Chairman, and Kramer as Chairman.[1]  (*Id.* ¶¶ 4, 5, 11.)  The REIT also employed

Grigg as President and Chief Development Officer.  (*Id.* ¶ 4.)

Prior to its initial public offering on December 20, 2005, the REIT established several

subsidiary entities, among them plaintiff Republic Property Limited Partnership ("RPLP").  (*Id.* ¶

13.)  Through these subsidiaries, the REIT then acquired real property and contracts in exchange

for its own shares and/or RPLP limited partnership units.  (*Id.*)

On the other side of many such transactions were entities owned and/or controlled by

Kramer and Grigg, including defendant RPC.  (*Id.* ¶ 14.)  At that time, Kramer owned 85% of

RPC and served as Chairman of RPC's Board of Directors.  (*Id.* ¶ 5.)  Grigg owned the

remaining 15% and also served on RPC's Board and as its President and Chief Executive

Officer.  (*Id.* ¶ 4.)  In or around October 2004, RPC entered into a contract ("the Services

Agreement") with an arm of the West Palm Beach, Florida city government, the Community

Redevelopment Agency ("the Agency").  (*Id.* ¶ 15.)  Under the Services Agreement, RPC would

design, develop, and construct a $100 million urban mixed-use property development in West

Palm Beach.  (*Id.*)  In doing so, RPC pledged it would conduct business reputably, that it would

notify the Agency of any potential conflicts of interest, and that it had not paid anyone contingent

on forming the contract.  (*Id.* ¶ 90.)

On September 23, 2005, RPC assigned the Services Agreement to RPLP in exchange for

limited partnership units that would be worth $1,202,808.00 when the initial public offering

---

[1] At the time plaintiffs filed their complaint, Kramer remained Chairman, and Grigg also
remained a trustee.  (Compl. ¶¶ 4, 5.)

occurred in December.[2]  (*Id.* ¶ 18.)  The present litigation concerns this transaction.

      To formalize the exchange, the parties formed a second contract ("the Contribution Agreement").  (*Id.*)  Grigg, with Kramer's knowledge and approval, signed on RPC's behalf, and the REIT's CEO signed for RPLP.  (*Id.* ¶ 19.)  In the Contribution Agreement, RPC warranted that "no [] litigation or proceeding, either judicial or administrative, [was] pending or, to RPC's knowledge, threatened, affecting all or any portion of" the Services Agreement.  (Am. Compl. Ex. A § 2.4.)  It further promised that the Services Agreement was "in full force and effect" and that to its knowledge, neither it nor the Agency was in default.  (*Id.* § 2.10.)

      On acquiring the Services Agreement, RPLP promptly assigned it to an indirectly wholly owned subsidiary ("the Subsidiary").  (Am. Compl. ¶ 20.)  The Agency approved both assignments on December 19, 2005.  (*Id.* ¶ 53.)  For the next few months, the Subsidiary provided development services to the Agency in accordance with the Services Agreement.  (*Id.* ¶ 22.)  It and the Agency amended the agreement twice:  in March 2006, they added a provision authorizing the Subsidiary to demolish and properly prepare the site for a $36,366.96 fee, and in April 2006, they agreed the Subsidiary would complete the project for an aggregate fee in excess of $4 million.  (*Id.* ¶¶ 60, 63.)  Although this latter amendment was never executed, the Subsidiary performed services pursuant to it until May 5, 2006.  (*Id.* ¶ 64.)

      That day, plaintiffs received an unwelcome surprise.  The United States Attorney for the Southern District of Florida charged Raymond Liberti ("Liberti"), a West Palm Beach city commissioner and voting member of the Agency, with accepting bribes and otherwise abusing

---

      [2] At some point, its two owners, Kramer and Grigg, also became limited partners in their individual capacities.  (*Id.* ¶¶ 4, 5.)

his elected position.  (*Id.* ¶ 71.)  No party to this lawsuit was directly implicated.  (*Id.* ¶ 72.)

Since approximately October 2004, however, RPC had been making payments to Liberti under a series of "Consulting Agreements."  (*Id.* ¶¶ 29, 30.)  Liberti engaged in various business development activities on RPC's behalf, including government relations and lobbying, but he avowedly abstained from involvement in any matter touching West Palm Beach.  (*Id.* ¶ 57; Am. Compl. Exs. B, D, E.)  Plaintiffs describe this arrangement as

> a scheme whereby Grigg authorized payments from RPC to Liberti while Liberti cast favorable votes and engaged in other related activities as a member of the City Commission and the Community Redevelopment Association [sic] on matters benefitting RPC, [the REIT], and other businesses in which Grigg, Kramer, and others held an interest.

(Am. Compl. ¶ 30.)  RPC paid Liberti $5,000 per month from November 2004 through April 2005, during which time Liberti voted to approve an amendment to the Services Agreement that secured more city funds for RPC.  (*Id.* ¶¶ 37, 40, 41, 42, 44, 45.)  Two days after this vote, Kramer emailed Grigg to praise Liberti and proposed hiring him as an exclusive RPC employee. (*Id.* ¶ 47.)  In April 2005, Liberti's monthly fee rose to $8000, at which rate RPC paid him for the next year. (*Id.* ¶¶ 49, 52, 56, 59.)  During this period, Liberti participated in several Agency votes on the Services Agreement and on other Grigg/Kramer ventures, always voting in a manner favorable to Grigg, Kramer, and/or RPC.  (*Id.* ¶¶ 53, 60, 63, 67.)

Though Grigg apparently served as Liberti's primary point of contact, Kramer was aware of, authorized, and/or ratified Grigg's conduct in hiring and paying Liberti.  (*Id.* ¶¶ 31, 70.) Grigg regularly reported to Kramer, RPC's other owner, on the corporation's business activities in and around West Palm Beach and on its arrangement with Liberti.  (*Id.* ¶ 69.)  Prior to Liberti's exposure, neither Grigg nor Kramer disclosed this arrangement's existence to the REIT

4

(on whose Board of Trustees they both served), RPLP, or the Subsidiary.  (*Id.* ¶ 4, 5, 81.)

On May 5, 2006, Grigg informed the REIT's officers in an email that RPC had "retained Liberti under an agreement dated November 2004 on retainer, that was extended by [RPC] in January 2006," and had paid him by check.  (*Id.* ¶ 73.)  Over the next few days, both the REIT and West Palm Beach city officials learned more about the Liberti-RPC relationship, and the local press speculated that additional criminal charges might soon follow.  (*Id.* ¶ 72, 76.)  Within the month, the Agency notified the Subsidiary that it intended to terminate the Services Agreement.  (*Id.* ¶ 77.)

On June 20, the REIT's Audit Committee voted to hire independent counsel to investigate the entire affair and to supplement an earlier internal investigation.  (*Id.* ¶¶ 82, 83.)  Only at this inquiry's conclusion did the REIT discover the depth, duration, and details of the Liberti-RPC relationship, elucidated above.  (*Id.* ¶ 87.)  Meanwhile, the Subsidiary and the Agency signed mutual releases terminating the Services Agreement.  (*Id.* ¶¶ 79, 80.)  Neither the Subsidiary nor its parents were fully paid for the work they had performed under that contract.  (*Id.* ¶¶ 22, 64.)

Several months later, in March 2007, Kramer filed suit against the REIT in a Maryland federal court.  (*Id.* ¶ 97.)  He sought a declaration that he was entitled to indemnification for legal fees he incurred in responding to the REIT's independent investigation, and he later requested advancement of legal fees to defend the present lawsuit.  (*Id.* ¶¶ 97, 99.)  Kramer voluntarily dismissed this complaint on May 3, 2007 and re-filed in state court.  (Kramer and RPC Mem. Supp. Mot. to Dismiss 19 n.14.)

Plaintiffs filed their original complaint in this Court on March 28, 2007, amending it on

April 27.  In their amended complaint, they plead nine causes of action.

Plaintiffs seek recovery from RPC, Kramer, and Grigg for securities fraud, under both 15 U.S.C. section 78j(b) ("Section 10(b)") and D.C. Code section 31-5606.05(a)(3)(b)(ii), and for common law fraud, and they also seek punitive damages.  (Am. Compl. ¶¶ 102-110, 117-126, 139-147, 157-158.)

Against Kramer and Grigg, individually, they assert claims for control person liability, under 15 U.S.C. section 78t(a) ("Section 20(a)") and D.C. Code section 31-5606.05(c), and for unjust enrichment, and they further seek a declaratory judgment absolving the REIT of any duty to reimburse or advance legal fees to Kramer.  (*Id.* ¶¶ 111-116, 127-131, 148-156.)

Finally, plaintiffs claim RPC breached the Contribution Agreement and demand damages and indemnification.  (*Id.* ¶¶ 132-138.)

## DISCUSSION

### I.    Applicable Pleading Standards

Plaintiffs' various claims implicate three different pleading standards.  Federal Rule of Civil Procedure 8(a) supplies the default standard, while Rule 9(b) applies to certain "special matters," including fraud.  Fed. R. Civ. Pro. 8(a), 9(b).  The Private Securities Litigation Reform Act of 1995 ("PSLRA") prescribes additional, strict pleading requirements for private federal securities fraud claims.  15 U.S.C. § 78u-4 *et seq.* (2008).

#### A.    The Default Standard: Rule 8(a)

In resolving a Rule 12(b)(6) motion to dismiss, the Court must ascertain whether the challenged complaint adequately states a claim on which relief may be granted.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Harlow v. Fitzgerald*, 457

U.S. 800 (1982).  Generally, the Federal Rules require only "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. Pro. 8(a)(2)).  In measuring a complaint against this standard, the court must construe all allegations therein and draw all reasonable inferences in the plaintiff's favor.  *Scheuer*, 416 U.S. at 236; *United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 5 (D.D.C. 2003).  Indeed, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007). While a complaint need not plead "detailed factual allegations," the factual allegations it does include "must be enough to raise a right to relief above the speculative level" and to "nudge[] [] claims across the line from conceivable to plausible."  *Id.* at 1964-65, 1974.  As the Court observed, Rule 8(a)(2) requires a "showing" that the pleader is entitled to relief.  *Id.* at 1965 n.3. Though conclusory assertions may afford a defendant "fair notice" of the nature of a plaintiff's claim, only factual allegations can clarify the "grounds" on which that claim rests.  *Id.*

Thus, in evaluating a motion to dismiss, the court need not accept plaintiffs' unsupported inferences, nor "legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  The court may consider "documents attached as exhibits or incorporated by reference in the complaint" in addition to the complaint, itself.  *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (Walton, J.).

### B.     Pleading Special Matters: Rule 9(b)

Under Federal Rule of Civil Procedure 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. Pro.

9(b).  Various rationales support this heightened pleading requirement, *see* 5A Charles Alan

Wright & Arthur R. Miller, Federal Practice & Procedure § 1296 (2004), among them, that

"[b]ecause 'fraud' encompasses a wide variety of activities, the requirements of Rule 9(b)

guarantee all defendants sufficient information to allow for preparation of a response," *United*

*States ex rel Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981).

Thus, "[c]onclusory allegations that a defendant's actions were fraudulent or deceptive

are not sufficient to satisfy Rule 9(b)."  *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 73

(D.D.C. 2002) (Walton, J.).  A plaintiff must specifically allege the time, place, and contents of

any affirmative misrepresentation.  *See United States ex rel. Totten v. Bombardier Corp.*, 286

F.3d 542, 552 (D.C. Cir. 2002).  By extension, a plaintiff claiming fraud through omission must

identify with particularity the facts not disclosed and the source of the duty to speak.  "In other

words, Rule 9(b) requires that the pleader provide the 'who, what, when, where, and how' with

respect to the circumstances of the fraud."  *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253

(D.D.C. 2004) (Urbina, J.).

### C.    Securities Fraud: the PSLRA

Congress enacted the PSLRA in 1995 to curb abusive securities fraud litigation by private

parties.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504 (2007).  In pursuit of

this objective, the PSLRA prescribes two heightened pleading requirements for securities fraud

complaints filed by private litigants.  *Id.*  First, when a plaintiff alleges the defendant made a

material false statement or "omitted to state a material fact necessary in order to make the

statements made, in light of the circumstances in which they were made, not misleading," his

complaint must specifically identify "each statement alleged to have been misleading[] [and] the

8

reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1) (2008).

Second, the complaint must "state with particularity facts giving rise to a strong inference the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2). An inference of *scienter* qualifies as "strong" if it is "cogent and at least as compelling as any inference of nonfraudulent intent." *Tellabs*, 127 S. Ct. at 2505. On a motion to dismiss for failure to state a claim, a court must, as is customary, accept a complaint's factual allegations as true and should further consider the complaint in its entirety, along with any incorporated documents. *Id.* at 2509. "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* Allegations of motive and personal financial gain favor such an inference, while "omissions and ambiguities" cut against a finding of *scienter*. *Id.* at 2511. Restated negatively, the critical question is whether a reasonable person would deem some "plausible nonculpable explanation[] for the defendant's conduct" more convincing than the plaintiff's proffered inference of *scienter*. *Id.* at 2510.

## II.    Sufficiency of Plaintiffs' Complaint

### A.    Federal Securities Fraud - 15 U.S.C. § 78j(b)

Securities and Exchange Commission ("SEC") Rule 10b-5, promulgated pursuant to Section 10(b) of the Securities and Exchange Act, makes it unlawful to "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5 (2008). Though the Act does not expressly confer a private right of action for violations of this proscription, the U.S. Supreme Court has identified an

implied right in the language of Section 10(b) and Rule 10b-5. *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13 n.9 (1971). To recover, a private plaintiff must have standing: he must be an actual purchaser or seller of securities. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731 (1975). He must further prove: (1) a material misrepresentation or omission by the defendant; (2) *scienter*; (3) a connection with the purchase or sale of securities; (4) reliance on the omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 768 (2008). Where the plaintiff alleges the defendant withheld material information despite a duty to speak, reliance – causation in fact – may be presumed. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972).

### 1.    Standing

Kramer and RPC contend that either the REIT or RPLP lacks standing because plaintiffs' complaint alleges only one "arguable purchase or sale of securities" – "the issuance of limited-partnership units to RPC by RPLP." (Kramer and RPC Mem. Supp. Mot. to Dismiss 12.) A Delaware limited partnership such as RPLP is a legal entity distinct from its individual partners. (Kramer and RPC Reply 8 (citing Del. Code Ann., tit. 6, § 15-201(a) (2008)).) Thus, either RPLP, the issuer, or the REIT, which allegedly "caused" RPLP to issue the units and which executed the associated Limited Partner Acceptance, can be a seller – but not both. (Kramer and RPC Mem. Supp. Mot. to Dismiss 12.)

In response, plaintiffs cite a precedent suggesting that federal securities law may sometimes recognize the general partner of a limited partnership as a "seller" of limited partnership units. (Mem. Opp. Kramer and RPC Mot. to Dismiss 25-26.) There, the Second Circuit Court of Appeals, interpreting section 12(2) of the Securities and Exchange Act, held that

10

two general partners were "sellers" within the meaning of that provision. *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988). It relied on the U.S. Supreme Court's holding in *Pinter v. Dahl*, 486 U.S. 622 (1988), that "the term 'seller' must include the person 'who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.'" *Capri*, 856 F.2d at 478 (quoting *Pinter*, 486 U.S. at 647). In *Capri*, the general partners had so controlled an agent's solicitation and promotional efforts that the court "ha[d] no difficulty in concluding" they were sellers. *Id.*

But *Capri* provides little guidance in the present case. It held that under certain circumstances, general partners of a limited partnership could be *liable* as sellers of limited partnership units under section 12(2). *Id.* It did not address whether they could *maintain an independent cause of action as plaintiffs* under section 10(b), alongside the limited partnership.

In other cases, courts have permitted parties other than literal sellers to maintain private actions for securities fraud. *E.g.*, *Kirschner v. United States*, 603 F.2d 234 (2d Cir. 1978), *cert. denied*, 442 U.S. 909 (1978) and 444 U.S. 995 (1979); *Lawrence v. Cohn*, 932 F. Supp. 564 (S.D.N.Y. 1996). In *Kirschner*, for example, a pension trust beneficiary sued based on purchases and sales by the fund trustee. 603 F.2d at 236-38. Analogizing his position to that of a shareholder in a derivative action, the Second Circuit Court of Appeals held he had standing to pursue Rule 10b-5 claims against the trustee. *Id.* at 240-42. Similarly, in *Lawrence*, the district court held that will beneficiaries could sue the will's executor for fraud in connection with his sales of securities from the estate because the beneficiaries' legacies comprised the corpus of a testamentary trust of which the executor was also the trustee. 932 F. Supp. at 571-72.

In these cases, however, as in a shareholder derivative suit, the plaintiffs had standing

11

because the parties entrusted with protecting their interests – corporate directors and officers, or

trustees – had abdicated that duty.  As the *Lawrence* court observed,

> [i]t is the shareholders and [trust beneficiaries] who are, at bottom, hurt by a fiduciary's violation of 10(b).  Yet, without standing, they cannot obtain the relief they deserve, since the individual responsible for pressing the claim on the corporation's or trust's behalf is an alleged fraudsman.

> Will beneficiaries are faced with the same potential predicament.  If the estate has a viable 10(b) claim, and the executor was a party to the fraud underlying the claim, the will beneficiaries must have standing to sue on the estate's behalf.  Otherwise, the estate's 10(b) claim will never be brought.  The executor, quite plainly, cannot be expected to sue himself for the benefit of the Estate.

*Id.* 572-73.  Thus, recognizing standing in plaintiffs who had not *directly* sold securities was

necessary, as a practical matter, because the *actual* sellers and proper plaintiffs were also

potential defendants.  *Id.* at 572.

More to the point, shareholders and trust beneficiaries have *derivative* standing.  Such

plaintiffs assert the rights of another, defrauded purchaser or seller to whom they bear a particular

relationship when a section 10(b) violation would otherwise remain unremedied.  *See*, *e.g.*,

*Schoenbaum v. Firstbrook*, 405 F.2d 215, 219 (2d Cir. 1968) (stockholders "state[d] a triable

claim" for securities fraud against the corporation), *approved by Blue Chip Stamps*, 421 U.S. at

738.

That is not the case here.  RPLP, which issued limited partnership units to RPC and thus

made the "sale" on which plaintiffs rest their federal securities fraud claims, is a plaintiff in this

action.  The logic of *Kirshner* and *Lawrence* might permit a limited partner to sue a general

partner for securities fraud based on an issuance of limited partnership units because the general

partner could not be expected "to sue himself for the benefit of the [partnership]."  *Lawrence*,

932 F. Supp. at 573.  But it does not support a distinct right of action for the general partner

when the limited partnership has been the victim of fraud and ably asserts its rights.  The Court

concludes the REIT cannot be considered a "seller" and thus lacks standing to pursue this federal

securities fraud claim.  RPLP – and only RPLP – is the proper plaintiff.

### 2.    Fraudulent Conduct

#### a.    Material Omission

 As an initial matter, Grigg contends plaintiffs' fraud allegations lack the specificity

required by Rule 9(b) and the PSLRA.  (Grigg Mem. Supp. Mot. to Dismiss 7-8.)  Contrary to

Grigg's assertions, however, the Court concludes plaintiffs have adequately pleaded a material

omission under both the PSLRA and Rule 9(b).

Plaintiffs have specifically identified "each statement alleged to have been misleading[]

[and] the reason or reasons why the statement is misleading" as the PSLRA requires.  *See* 15

U.S.C. § 78u-4(b)(1) (2008).  Moreover, they have provided the "'who, what, when, where, and

how' with respect to the circumstances of the fraud." *Anderson*, 221 F.R.D. at 253.  As set forth

above, their complaint recounts the facts not disclosed in minute detail.  In short, Liberti, a voting

member of the Agency, was on RPC's payroll at the time RPC assigned the Services Agreement

to RPLP, and he voted on that agreement while receiving regular payments from RPC.  (Am.

Compl. ¶¶ 34-63, 67, 73.)  Plaintiffs insist this information would have affected their decision to

accept the Services Agreement in consideration for RPLP limited partnership units.  (*Id.* ¶ 105.)

They contend its omission rendered misleading RPC's promises in the Contribution Agreement

that the Services Agreement was "in full force and effect," and that to its knowledge, neither it

nor the Agency was in default.  (*Id.* ¶¶ 89-90; Am. Compl. Ex. A § 2.10.)

13

Defendants make much of plaintiffs' unwillingness to explicitly allege a "quid pro quo" or "bribe." (*E.g.*, Kramer and RPC Reply 2.) But one can interpret plaintiffs' thesis to be that whether or not the Liberti-RPC relationship *actually* involved the exchange of cash for votes, the *appearance* of impropriety it created called the Services Agreement's validity into question. An omitted fact is material if "there is a substantial likelihood that a reasonable [person] would [have] consider[ed] it important in deciding how to [act]." *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976). In the Services Agreement, RPC had promised to notify the Agency of any potential conflicts of interest but was – without the Agency's knowledge – making payments to one of its voting members. The agreement does not clearly define what would constitute default, but it would not be unreasonable under these circumstances to infer that RPC *might* be "in default." In any event, the situation was not free from doubt. Thus, there is a substantial likelihood a reasonable buyer in RPLP's position would have viewed disclosure of the Liberti-RPC relationship as a significant addition to "the 'total mix' of information" then available concerning the Services Agreement. *See TSC Indus.*, 426 U.S. at 449. Hence, the Court concludes plaintiffs have adequately pleaded a material omission of fact.

### b.     Defendants' Duty to Speak

Nevertheless, defendants deny they had any duty to disclose these facts. Grigg and Kramer each contend they had no duty, as individuals, to speak because they were not parties to the Services Agreement. (*Id.* at 8; Kramer and RPC Mem. Supp. Mot. to Dismiss 8.) All defendants also insist they had no duty to "accuse themselves of misconduct," (Kramer and RPC Mem. Supp. Mot. to Dismiss 6-7; Grigg Mem. Supp. Mot. to Dismiss 9), nor to speculate concerning the potential "effect" of Liberti's consulting arrangement. (Kramer and RPC Mem.

14

Supp. Mot. to Dismiss 7-8; Grigg Mem. Supp. Mot. to Dismiss 12-13.)

As to Grigg and Kramer, these arguments can be simply and succinctly answered.  On a motion to dismiss, the Court need only determine whether the plaintiffs have pleaded some facts which, if true, would give rise to a duty to speak.  They have done so.  When RPC and RPLP entered into the Contribution Agreement, both Grigg and Kramer were trustees of the REIT, RPLP's general partner.  (Am. Compl. ¶¶ 4, 5.)  As trustees, they owed a "duty of utmost good faith and loyalty and the obligation . . . to make full disclosure of all known information that is significant, and material . . . ."  *Lampton v. LaHood*, 617 A.2d 1142, 1151 (Md. Ct. Spec. App. 1993) (citations omitted).  According to plaintiffs' complaint, both Grigg and Kramer knew of the Liberti-RPC relationship.  (Am. Compl. ¶¶ 30, 31.)  As explained above, this information was material.  Grigg and Kramer thus owed a fiduciary duty to disclose it.

As to RPC, Rule 10b-5 imposes an affirmative duty on buyers and sellers of securities to disclose any additional facts "necessary in order to make [other] statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5 (2008).  As defendants accurately observe, the federal securities laws generally, including Rule 10b-5, "do not require a company to accuse itself of wrongdoing."  *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004).  But Rule 10b-5's requirement that parties disclose material, factual information does not provide an exception for facts that might give rise to civil or criminal liability.  *See* 17 C.F.R. § 240.10b-5 (2008).  "The fact that a defendant's act may be a crime does not justify its concealment.  As the First Circuit has expressed it, 'The securities laws do not operate under the assumption that material information need not be disclosed if management has reason to suppress it.'"  *Ballan v. Wilfred Am. Educ. Corp.*, 720 F. Supp. 241,

249 (E.D.N.Y. 1989) (quoting *Roeder v. Alpha Indus.*, 814 F.2d 22, 25 (1st Cir. 1987)).

Furthermore, while RPC's duty to speak admittedly did not require that it speculate as to possible future outcomes and warn plaintiffs of any conceivable adverse consequence, RPC *was* obliged to disclose presently available material facts.  *See In re. Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 760 (S.D.N.Y. 2001).  *Cf. Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) (no duty to predict and disclose possible adverse consequences should facility fail inevitable future FDA inspection); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d at 377 ("'fraud by hindsight' [is not] a viable basis upon which to challenge management practices that ultimately result in losses").

Kramer and RPC assert that "[t]o have perceived any need to disclose the consulting arrangement, [they] would have had to foresee Liberti's unrelated criminal conduct and the reaction of the political establishment of the City of West Palm Beach."  (Kramer and RPC Reply 3.)  This statement misconstrues RPC's duty to speak.  The then-existing apparent conflict of interest – making confidential payments to a voting Agency member, even if for only tangentially related services – gave rise to the duty to disclose.  This information, though also material when viewed from hindsight, was material at the time RPLP and RPC executed the Contribution Agreement.  Had Liberti never been criminally charged, his pecuniary relationship with RPC would still have cast doubt on whether the Services Agreement and its subsequent amendments had been validly adopted by the Agency.

### c.     Reliance

Finally, defendants suggest plaintiffs cannot demonstrate reliance, which ordinarily would be presumed.  *See Affiliated Ute Citizens*, 406 U.S. at 153-54.  First, Kramer and RPC point to

the Contribution Agreement's integration clause as precluding reasonable reliance on any

"alleged omissions or representations not contained in" that agreement.  (Kramer and RPC Mem.

Supp. Mot. to Dismiss 5.)  In this Circuit, an integration clause will bar fraud claims premised on

"alleged oral promises as to future behavior, not included in the final written contract," or on

non-disclosure of conduct contrary to those promises.  *Whelan v. Abell*, 48 F.3d 1247, 1258

(D.C. Cir. 1995) (clarifying holding in *One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283 (D.C.

Cir. 1988)).  Indeed, if plaintiffs were permitted to use "defendants' prior representations . . . to

defeat the clear words and purpose of the Final Agreement's integration clause, 'contracts would

not be worth the paper on which they are written.'"  *One-O-One Enters., Inc.*, 848 F.3d at 1287

(citations omitted).  But conversely, reading an integration clause to bar "fraud-in-the-

inducement claims generally or [to] confine[] them to claims of fraud in execution . . . would

leave swindlers free to extinguish their victims' remedies simply by sticking in a bit of

boilerplate."  *Whelan*, 48 F.3d at 1258.  If defendants' theory were correct, "sticking in a bit of

boilerplate" would essentially obviate Rule 10b-5's affirmative duty of disclosure.  Federal

securities laws cannot be so easily circumvented.

Second, Grigg insists plaintiffs could have discovered the Consulting Agreement's

existence through the exercise of due diligence, and their failure to exert such efforts renders any

claimed reliance unjustified.  (Grigg Mem. Supp. Mot. to Dismiss 8-9.)  But the cases he cites for

this proposition establish only that when facts within a plaintiff's knowledge should reasonably

prompt further inquiry, the plaintiff must exercise due diligence.  *See Royal Am. Managers, Inc.

v. IRC Holding Corp.*, 885 F.2d 1011, 1015-16 (2d Cir. 1989) (experienced businessman

represented by counsel could not complain that defendants who brought statute to his attention

17

failed to disclose their interpretation of it when he had every opportunity to consult it and draw his own conclusion); *Hirsch v. DuPont*, 553 F.2d 750, 762-63 (2d Cir. 1977) (businessmen who conducted "exhaustive and unrestricted investigation" of company could not complain of non-disclosure when "given the information they possessed . . . any reasonable investor of the appellants' level of sophistication would have made a further inquiry").

One court in this district has characterized due diligence as an element that the plaintiff must affirmatively plead. *Hammerman v. Peacock*, 607 F. Supp. 911, 916 (D.D.C. 1985) (Johnson, J.). But the weight of authority suggests the defendant bears the burden of establishing "the plaintiff should have discovered the true facts." *E.g., Royal Am. Managers, Inc.*, 885 F.2d at 1015 (citing 5A A. Jacobs, Litigation & Practice Under Rule 10b-5 § 64.01(b)(ii), at 3-353 to 3-359 (2d ed. 1988 rev.)); *Media Gen., Inc. v. Tomlin*, 505 F. Supp. 2d 51, 62-63 (D.D.C. 2007) (Roberts, J.). Accordingly, plaintiffs may properly state a 10b-5 claim without pleading the exercise of due diligence. At this stage, Grigg's objection is premature.

In sum, plaintiffs' complaint establishes that defendants failed to disclose material facts despite a duty to do so, and plaintiffs' reliance thereon may be presumed. Thus, plaintiffs have adequately pleaded fraudulent conduct as required for their Section 10(b) claim.

### 3. Scienter

Despite defendants' arguments to the contrary, plaintiffs have also pleaded "with particularity facts giving rise to a strong inference the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (2008).

Accepting plaintiffs' factual allegations as true and weighing the entire complaint, the Court finds plaintiffs have raised a cogent inference of fraudulent intent. *See Tellabs*, 127 S. Ct.

at 2509.  When the transaction at issue here occurred in September 2005, RPC had been paying

Liberti as a "consultant" for nearly a year.  (Am. Compl. ¶¶ 29, 30.)  Both Grigg – Liberti's

primary point of contact – and Kramer – with whom Grigg regularly consulted on his dealings

with Liberti – were well aware that a city commissioner and voting Agency member was on

RPC's payroll.  (*Id.* ¶¶ 31, 69, 70.)  Indeed, at the time Liberti voted to approve an amendment to

the Services Agreement that benefitted RPC, he was receiving $5,000 per month from the

corporation.  (*Id.* ¶¶ 37, 40, 41, 42, 44, 45.)  Only two days after this vote, Kramer emailed Grigg

to praise Liberti and proposed hiring him as an exclusive RPC employee.  (*Id.* ¶ 47.)  Before the

parties executed the Contribution Agreement, neither Grigg nor Kramer, either personally or on

RPC's behalf, disclosed to plaintiffs the apparent conflict of interest created by RPC's payments

to Liberti.  (*Id.* ¶ 81.)  In fact, disclosure occurred only in May 2006, after Liberti was criminally

charged with unrelated corruption.  (*Id.* ¶ 71.)

       Taken together, these allegations give rise to a credible inference of fraudulent intent as to

Grigg and Kramer.  As discussed above, information concerning RPC's pecuniary relationship

with Liberti was decidedly material to RPLP's decision to accept the Services Agreement as

consideration for limited partnership units.  Grigg and Kramer, both experienced entrepreneurs,

were keenly aware of this information and should reasonably have recognized its materiality.  On

these facts, it seems extremely unlikely their failure to disclose was attributable to mere

negligence.  Instead, plaintiffs' allegations suggest defendants intentionally concealed RPC's

payments to Liberti because they feared RPLP would otherwise perceive the offered

consideration as the product of bribery and decline to issue limited partnership units for it.

       This inference will only qualify as "strong," however, if it is "at least as compelling as

any inference of nonfraudulent intent." *Tellabs*, 127 S. Ct. at 2505. Grigg, echoed by Kramer and RPC, proposes one such alternative inference: he "entered into a consulting agreement on behalf of RPC that he believed honestly, sincerely, and in 'good faith' was in the best interests of advancing RPC's real estate development business in Florida;" he did not disclose this agreement to plaintiffs because it "did not raise any red flags" and because he "did not foresee any problem with the consulting agreement and/or the [] Services Agreement." (Grigg Reply 8. *See also* Kramer and RPC Reply 4-5.) He further insists that "the matter was being treated as a normal, run-of-the-mill contract and not an unusual or clandestine matter." (Grigg Reply 9.) Finally, Grigg argues one cannot reasonably infer he concealed the Liberti-RPC relationship from plaintiffs with fraudulent intent because defrauding RPLP and the REIT, entities he helped to found and in which he remained invested, was against his economic interest. (*Id.* at 13. *See also* Kramer and RPC Reply 4 ("Plaintiffs ignore that Defendants . . . had a significant ownership interest in the very entity (RPLP) they allegedly cheated").)

This generous characterization of events is less than compelling. Grigg and Kramer may well have orchestrated the consulting agreement with Liberti in good faith, and all transactions may, in fact, have been above-board. They may have genuinely believed RPLP and the REIT stood to profit from the Services Agreement's assignment. But to claim RPC's payments to Liberti "did not raise any red flags" defies common sense. Whether or not it was indeed improper, RPC's pecuniary relationship with a voting Agency member created an *obvious* appearance of impropriety. That RPC paid Liberti by check rather than by a briefcase stuffed with non-sequential bills perhaps lessens but does not eliminate the taint of corruption that necessarily attaches to such an interested transaction. The Court does not find persuasive the

20

inference that Grigg and Kramer, sophisticated businessmen, naively believed RPC's arrangement with Liberti would be of no interest to a potential assignee for consideration of the Services Agreement.

Accordingly, the Court concludes plaintiffs have raised a strong inference of *scienter* as to Grigg and Kramer.  Because "the doctrines of respondeat superior and apparent authority remain applicable to suits for securities fraud," this fraudulent intent may be imputed to RPC. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, No. 04-1687, 2008 U.S. App. LEXIS 975, at *15-16 (7th Cir. Jan. 17, 2008) (citing *AT&T v. Winback & Conserve Program, Inc.*, 32 F.3d 1421, 1429-33 (3d Cir. 1994)).

### 4.      In Connection with the Purchase or Sale of Securities

Nonetheless, plaintiffs' complaint does not demonstrate the pleaded fraud occurred in connection with the sale of securities.  Typically, federal securities laws apply to purchases and sales of limited partnership units because such interests qualify as investment contracts, which fall within the Securities and Exchange Act's definition of securities.  *E.g.*, *Rodeo v. Gillman*, 787 F.2d 1175, 1177 (7th Cir. 1986); *SEC v. Murphy*, 626 F.2d 633, 640-41 (9th Cir. 1980).  The Supreme Court has defined an investment contract as "a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party."  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). Courts have interpreted the requirement that profits should derive "solely" from the efforts of others quite broadly.  *See Landreth Timber Co. v. Landreth*, 471 U.S. 681, 692 (1985) ("we cannot agree . . . that the Acts were intended to cover only 'passive investors' and not privately negotiated transactions involving the transfer of control to 'entrepreneurs.'").

21

But "[w]hile the transfer of some control has not prevented courts from finding a security, courts have also held that if a transaction is designed primarily to transfer control to the purchaser, the deal is commercial and outside the ambit of the securities laws." *Rodeo*, 787 F.2d at 1177. Managerial authority and control are the touchstones of this inquiry. "Where the investing limited partners exercise[] no managerial role in the partnership's affairs, courts have held that limited partnership interests are securities, at least when . . . there [are] a considerable number of limited partners." *Mayer v. Oil Field Sys. Corp.*, 721 F.2d 59, 65 (2d Cir. 1983).

Here, Grigg argues the RPLP limited partnership units were not securities under the Securities and Exchange Act because he and Kramer, "through RPC and their positions in [the REIT], exercised significant control and influence over the business affairs of RPLP." (Grigg Mem. Supp. Mot. to Dismiss 17.) For essentially the same reason – "the same individuals were on both sides of the transaction" – he contends the sale of limited partnership units was not an arms-length transaction." (*Id.* at 19-20.) In response, plaintiffs assert that the REIT, as sole general partner of RPLP, "has exclusive control over RPLP's business dealings." (Mem. Opp. Grigg Mot. to Dismiss 19.) They insist all parties have to this point treated the limited partnership units as securities and suggest this issue is "not ripe on Grigg's motion to dismiss." (*Id.* at 19, 21.)

But plaintiffs overlook Grigg's core argument: as trustees of the REIT, he and Kramer held management authority within RPLP's general partner. (Grigg Reply 21; Am. Compl. ¶¶ 4, 5 (identifying Grigg and Kramer as trustees of the REIT).) When RPC "purchased" the limited partnership units from RPLP, it could expect profits from this investment to derive from the efforts of the REIT and by extension, those of its trustees – including RPC's two co-owners.

This circular relationship suggests that under the *Howey* test, the RPLP limited partnership units are not securities under the Securities and Exchange Act.[3]

A survey of analogous cases supports this conclusion.  In *Rodeo v. Gillman*, the court considered whether a sale of limited partnership interests along with an option to purchase the general partnership interests was a sale of securities.  787 F.2d at 1176, 1178.  In deciding this question affirmatively, the court noted, *inter alia*, that in order to exercise their option and assume managerial control, the limited partners would first have "had to pay $20,000 and repay any loans made by the general partners to the limited partnership," which "might have been substantial."  *Id.* at 1178.  Given these obstacles, "[p]otential managerial control . . . [was] not enough to take a limited partnership out of the reach of the securities laws."  *Id.*[4]

Here, by contrast, Grigg and Kramer had authority to exercise *actual* managerial control over the REIT, RPLP's general partner, when RPLP issued the limited partnership units to their company.[5]  Where such a chain of control exists, courts have declined to treat limited partnership

---

[3]  Plaintiffs argue that "[u]nder Grigg's analysis the shares owned by the CEO of a company would not be securities because the CEO exercises control of the company's business." (Mem. Opp. Grigg Mot. to Dismiss 19.)  But such shares qualify as securities not because they meet the *Howey* test but because the Securities Acts explicitly recognize stock as a separate category of security alongside investment contracts.  *Landreth Timber Co.*, 471 U.S. at 692-93.

[4]  *Cf. Steinhardt Group Inc. v. Citicorp*, 126 F.3d 144, 154 (3d Cir. 1997) (where limited partnership agreement conferred "pervasive control over the management of the Partnership," limited partnership units were not securities); *Hirsch v. DuPont*, 396 F. Supp. 1214, 1227-28 (S.D.N.Y. 1975), *aff'd* 553 F.2d 750 (2d Cir. 1977) (where plaintiffs purchased limited and general partnership interests *simultaneously*, transaction involved a sale of securities because plaintiffs had no management authority *when it occurred*).

[5]  Whether they, in fact, exerted such control is irrelevant: "the issue does not turn on whether the investor actually exercised its rights, but rather, on what 'legal rights and powers [were] enjoyed by the investor.'" *Steinhardt*, 126 F.3d at 155 (quoting *Goodwin v. Elkins & Co.*, 730 F.2d 99, 107 (3d Cir. 1984), *cert. denied*, 469 U.S. 831 (1984)).

units as securities. For example, where the limited partnership purchaser holds a majority stake

in a company of which the general partner is a wholly-owned subsidiary, the transaction is not a

sale of securities under the federal securities laws because the purchaser does not expect profits

"solely from the efforts of others." *Piaubert v. Sefrioui*, No. 97-56131, 2000 U.S. App. LEXIS

2462, at *12-13 (9th Cir. Feb. 17, 2000). Similarly, where parties control a partnership which

purchases limited partnership units and also control one of the general partners of the seller's

general partner, the transaction is not a sale of securities because the parties had an "active role in

the direction and management" of the limited partnership. *Kravco, Inc. v. Rodamco North

America, N.V.*, No. Civ. A. 00-0272, 2000 WL 1839735, at *5-6 (E.D. Pa. Dec. 13, 2000). *See

also Frazier v. Manson*, 651 F.2d 1078 (5th Cir. 1981) (holding general partner of general

partner's purchase of a limited partnership interest was not a sale of securities).

       One can extract a general principal from these various results: when the same parties

stand on both sides of the transaction – no matter how many nominally distinct legal entities lie

in between, and no matter how convoluted their interrelationships – the transaction is not an

investment contract under *Howey* because the buyers necessarily have power to control their

investment's outcome.

       According to plaintiffs' complaint, Grigg and Kramer, together, wholly owned and thus

controlled RPC, the buyer. (Am. Compl. ¶¶ 4, 5.) Grigg and Kramer were also trustees of the

REIT. (*Id.*) As trustees, they presumptively had authority to manage the REIT. *See* Md. Code

Ann., Est. & Trusts §§ 8-202, 8-301 (LexisNexis 2008) (describing creation and powers of real

estate investment trusts); *id.* § 15-102 (enumerating trustee's powers under Maryland law). As

general partner, the REIT had authority to manage RPLP, the seller. *See* Md. Code Ann., Corps.

24

& Ass'ns, §§ 9A-301, 10-403 (LexisNexis 2008) (general partner has authority to act as limited

partnership's agent).   Hence, RPC's investment in RPLP would succeed or fail based not just on

"the entrepreneurial or managerial efforts of others," but also on those of its owners.   *United*

*Housing Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975).   Accordingly, accepting the

allegations in plaintiffs' complaint as true, RPLP's sale of limited partnership units to RPC was

not a sale of securities under the federal securities laws.

As such, plaintiffs' allegations cannot support a cause of action under Section 10(b) and

Rule 10b-5,[6] and these claims must be dismissed.

---

[6] Plaintiffs' pleading of economic loss and loss causation is likewise problematic.  In any private cause of action under the federal securities laws, the plaintiff must plead and prove that the defendant's allegedly wrongful act or omission "caused the loss for which the plaintiff seeks to recover [pecuniary] damages."  15 U.S.C. § 78u-4(b)(4) (2008).  This requirement is comparable to the tort-law element of proximate cause.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  "[B]ut the tort analogy is imperfect. . . . Put another way, a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed by* the misrepresentations and omissions alleged by a disappointed investor."  *Id.* at 173.  The plaintiff's injury must have been foreseeable, and it must have been "caused by the materialization of the concealed risk."  *Id.*

Here, RPLP exchanged limited partnership units allegedly worth over $1 million for the Services Agreement, which was ultimately cancelled.  (Am. Compl. ¶¶ 21, 80.)  Plaintiffs' complaint demands "damages . . . in an amount to be established and proven at trial" but does not identify those damages with any particularity.  (*Id.* ¶ 110.)  Rather, it merely references RPLP's issuance of valuable consideration to RPC, "[i]n reliance upon the misrepresentations and omissions by Defendants."  (*Id.* ¶¶ 110.)  Based on plaintiffs' pleading, defendants should reasonably have foreseen that their concealment of material, potentially adverse information concerning the Services Agreement would induce plaintiffs to give value in consideration for it.  But Section 10(b) plaintiffs typically must show *investment* losses – injuries due not to the act of concealment, itself, but to the materialization of the risk concealed.  *Lentell*, 396 F.3d at 173.

Plaintiffs thus pursue a different tack in their opposition to Grigg's motion, citing the Services Agreement's termination and the loss of future profits thereunder as their principal loss.  (Mem. Opp. Grigg Mot. to Dismiss 17.)  Grigg points to one potential problem with this theory: RPLP had assigned the Services Agreement to the Subsidiary, so any loss caused by that agreement's termination would have befallen the Subsidiary, a distinct legal entity, not RPLP.  (Grigg Reply 19 & n.13.)  Ordinarily, "[i]njury that arises solely out of harm done to a subsidiary corporation . . . is insufficient to confer standing to sue on a parent corporation."  *Classic*

**B.     Control Person Liability – 15 U.S.C. § 78t(a)**

Plaintiffs have also asserted claims against Grigg and Kramer as "control persons" under

the federal securities laws.  *See* 15 U.S.C. § 78t(a) (2008).  A split of authority exists among the

Courts of Appeals concerning the precise elements of this cause of action, and the question

remains an open one in this Circuit.[7]  *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1170, 1171 n.49

(D.C. Cir. 1978) (describing split of authority without choosing sides); *compare Evergreen*

*Equity Trust v. Fannie Mae*, 503 F. Supp. 2d 25, 44 (D.D.C. 2007) (Leon, J.) (requiring proof of

culpable conduct "as consistent with the Supreme Court's analysis in" *Ernst & Ernst v.*

*Hochfelder*, 425 U.S. 185 (1976)), *with In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 23 (D.D.C.

2000) (Green J.) (adopting view that plaintiff need not prove culpable conduct, but good faith is

an affirmative defense).

It is undisputed, however, that there can be no control person liability without a primary

violation by the person allegedly controlled.  *See* 15 U.S.C. § 78t(a) (2008).  Because the Court

---

*Commc'ns v. Rural Tel. Serv. Co.*, 956 F. Supp. 896, 902 (D. Kansas 1996).  Here, plaintiffs'
complaint describes the Subsidiary as "indirectly wholly owned" by RPLP.  (Am. Compl. ¶ 20.)
It is questionable whether this ambiguous relationship would permit RPLP to claim the
Subsidiary's injury as its own, contrary to the general rule.  Because the Court has concluded no
purchase or sale of securities occurred, however, it need not resolve this issue at present.

[7] Some Courts of Appeals have required the plaintiff to plead and prove that the allegedly
controlling person meaningfully participated in the fraud or otherwise engaged in culpable
conduct.  *Rochez Bros. v. Rhoades*, 527 F.2d 880, 884-85 (3d Cir. 1975); *Lanza v. Drexel & Co.*,
479 F.2d 1277, 1299 (2d Cir. 1973) (en banc).  Others, however, treat the cause of action as one
for vicarious liability but permit the defendant an affirmative defense of good faith.  *Howard v.*
*Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396
(11th Cir. 1996); *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880-81 (7th Cir. 1992);
*First Interstate Bank v. Pring*, 969 F.2d 891, 896 (10th Cir. 1992), *rev'd on other grounds by*
*Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994); *Metge v. Baehler*, 762 F.2d
621, 631 (8th Cir. 1985); *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 & n.23 (5th Cir.
1981).

has determined the transaction at issue here did not comprise a purchase or sale of securities under federal securities laws, plaintiffs' complaint does not establish a primary violation, and their control person claims consequently fail.

## C.     Plaintiffs' State Law Claims

Before testing the sufficiency of plaintiffs' pleading of their remaining claims, the Court must assure itself of jurisdiction. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). Plaintiffs' remaining claims all arise under District of Columbia or Maryland common or statutory law.[8] Moreover, as plaintiffs appear to concede, (Am. Compl. ¶ 2-5, 7, 98), the parties in this case are not completely diverse, *see Carden v. Arkoma Assocs.*, 494 U.S. 185, 189-90 (1990) (limited partnership shares citizenship of each limited partner). Thus, this Court could hear these claims only if they qualify for supplemental jurisdiction – that is, if "they form part of the same case or controversy" as plaintiffs' federal securities law claims. *See* 28 U.S.C. § 1367(a) (2008).

Under the supplemental jurisdiction statute, however, when a district court has dismissed

_____

[8] Additionally, plaintiffs seek recovery from RPC, Kramer, and Grigg for securities fraud under D.C. Code section 31-5606.05(a)(3)(b)(ii) and for common law fraud, and they also seek punitive damages. (Am. Compl. ¶¶ 117-126, 139-147, 157-158.) Against Kramer and Grigg, individually, they assert claims for control person liability, under D.C. Code section 31-5606.05(c), and for unjust enrichment, and they further seek a declaratory judgment absolving the REIT of any duty to reimburse or advance legal fees to Kramer for this or related litigation. (*Id.* ¶¶ 127-131, 148-156.) Finally, plaintiffs claim RPC breached the Contribution Agreement and demand damages and indemnification. (*Id.* ¶¶ 132-138.)

On its face, their request for declaratory relief pursuant to 28 U.S.C. section 2201 also invokes federal law. (Am. Compl. ¶¶ 153-156.) But "in declaratory judgment actions, 'federal question jurisdiction exists [only] if such jurisdiction would have existed in a coercive action by the defendant.'" *Commercial Union Ins. Co. v. United States*, 999 F.2d 581, 585 (D.C. Cir. 1993) (quoting *Bell & Beckwith v. United States*, 766 F.2d 910, 914 (6th Cir. 1985)). Here, as plaintiffs, themselves, admit, a coercive action by Kramer would rely on state law. (Am. Compl. ¶¶ 93-96, 98.)

all claims over which it has original jurisdiction, it may decline to exercise jurisdiction over any remaining state law claims. *Id.* § 1367(c)(3). "[C]onsiderations of judicial economy, convenience, and fairness to litigants" guide this discretionary decision. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). Yet "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise [such] jurisdiction." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Here, the defendants have not yet filed an answer, and no discovery has occurred. Hence, considerations of judicial economy do not weigh against dismissal. The primary plaintiff, RPLP, shares District of Columbia citizenship with defendants Grigg and RPC, and in this suit, at least, defendant Kramer chose not to contest personal jurisdiction. Moreover, many of plaintiffs' claims rest on District of Columbia law. Hence, it appears a convenient and appropriate alternative forum is available to hear plaintiffs' suit. Accordingly, the Court declines to exercise supplemental jurisdiction over plaintiffs' remaining claims, and they must also be dismissed.

## CONCLUSION

For the forgoing reasons, the Court concludes plaintiffs have failed to state a claim under the federal securities laws on which relief may be granted, and the Court must grant defendant's motion to dismiss Counts I and II pursuant to Federal Rule of Procedure 12(b)(6). The Court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims, Counts III - X, and these must likewise be dismissed.

A separate order shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, March 31, 2008.