## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REPUBLIC PROPERTY TRUST, *et al.*,

      Plaintiffs,

      v.

REPUBLIC PROPERTIES CORPORATION, *et al.*,

      Defendants.

Civil Action No. 1:07-cv-00595-RCL
Judge Lamberth

## PLAINTIFFS' MOTION FOR RECONSIDERATION

Pursuant to Federal Rule of Civil Procedure 59(e), Plaintiffs Republic Property Trust ("RPT") and Republic Property Limited Partnership ("RPLP") (collectively "Plaintiffs")[1] file this Motion for Reconsideration. Plaintiffs respectfully move the Court to reconsider and amend its March 31, 2008 Memorandum Opinion [Doc. No. 29] and accompanying Order [Doc. No. 30]. In support of this Motion, Plaintiffs file contemporaneously herewith their Memorandum in Support of Motion for Reconsideration.

Respectfully submitted this 14th day of April, 2008.

/s/ Mark E. Nagle_____
Mark E. Nagle, Bar No. 416364
Tameka M. Collier, DC Bar No. 488979
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 274-2972
mark.nagle@troutmansanders.com

*Counsel for Republic Property Trust and*
*Republic Property Limited*

---

[1] Contemporaneous with this Motion, Plaintiffs filed a motion substituting Liberty Property Trust and Liberty Property Limited Partnership as the successor in interest to RPT and RPLP respectively pursuant to Fed. R. Civ. P. 25.

**CERTIFICATE OF SERVICE**

  I hereby certify that a true copy of the foregoing was served electronically via the ECF System of this Court this 14th day of April, 2008 to:

     William T. Burke
     WILLIAMS & CONNOLLY LLP
     725 12th Street, N.W.
     Washington, D.C. 20005

     *Counsel for Republic Properties Corporation*
     *and Richard L. Kramer*

     Seymour Glanzer
     Richard J. Conway
     DICKSTEIN SHAPIRO LLP
     1825 Eye Street, N.W.
     Washington, D.C. 20006

     *Counsel for Steven A. Grigg*

     /s/ Tameka Collier

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REPUBLIC PROPERTY TRUST, *et al*.,

     Plaintiffs,

     v.

REPUBLIC PROPERTIES CORPORATION, *et al*.,

     Defendants.

Civil Action No. 1:07-cv-00595-RCL
Judge Lamberth

**PLAINTIFFS' MEMORANDUM IN SUPPORT
OF MOTION FOR RECONSIDERATION**

Plaintiffs Republic Property Trust ("RPT") and Republic Property Limited Partnership

("RPLP") (collectively "Plaintiffs") [1], by counsel, file this Memorandum in Support of their

Motion for Reconsideration. Plaintiffs respectfully request that the Court reconsider and amend

its March 31, 2008 Memorandum Opinion [Doc. No. 29] and accompanying Order [Doc. No. 30]

to hold that:

     (1) The RPLP limited partnership units issued to Republic Properties Corporation

("RPC") were securities under the Securities and Exchange Act of 1934; and

     (2) Both RPLP and RPT have standing to pursue securities fraud claims under Section

10(b) of the Securities and Exchange Act and Rule 10b-5.

     The Court's Opinion on these two issues overlooks the totality of the circumstances and

economic realities surrounding the formation of the Republic Property Trust Real Estate

---

[1] Contemporaneous with this Motion, Plaintiffs filed a motion substituting Liberty Property Trust and Liberty Property Limited Partnership as the successor in interest to RPT and RPLP pursuant to Fed. R. Civ. P. 25.

Investment Trust ("REIT"), and instead focuses on limited aspects of the REIT formation.  The

Court's decision contradicts the accepted treatment of Umbrella Partnership REIT ("UPREIT")

operating partnership units as securities.

RPT and RPLP were, for all intents and purposes, one functioning REIT, engaged in one

business, with two economically equivalent types of securities: (1) publicly traded shares of

RPT, provided to cash investors in the REIT; and, (2) privately held limited partnership interests

in RPLP (the "Units"), which were, effectively, convertible to RPT shares on a Unit for share

basis, provided to investors who invested by contributing real property and other assets to the

REIT.  Moreover, RPT, as general partner of RPLP, was responsible for all RPLP (and REIT)

activities, including the issuance of RPLP partnership units.

## ARGUMENT

RPT was formed and operated as an UPREIT.[2]  In an UPREIT structure, real estate and

other assets are contributed to a limited partnership, which operates as an "umbrella partnership."

In exchange for these assets, the umbrella partnership (here, RPLP) issues limited partnership

units in the umbrella or operating partnership to the people and entities contributing assets (here,

RPC).  Contemporaneously, a REIT (RPT) is formed and sells shares to the public.  The REIT

contributes the proceeds from the public offering to the umbrella partnership in exchange for a

general partnership interest.  This multi-tiered structure was developed to allow individuals and

entities to transfer property to the REIT on a tax-deferred basis – *i.e.,* by transferring assets in

exchange for operating partnership units, investors in the REIT are able to defer tax recognition

---

[2] The details of RPT's formation and operation, and UPREIT structures in general, are discussed more fully in the Amended Complaint [Doc. No. 10] and Plaintiffs' Responses to the Motions to Dismiss filed by Steven Grigg, Richard Kramer and RPC [Doc. Nos. 22-23].  The Argument contained herein focuses on the aspects of REIT transaction that are most relevant to the RPT Motion for Reconsideration.

that would be required if the same appreciated property were transferred directly to the publicly traded REIT in exchange for shares. *See, e.g.,* Russell J. Singer, *Note: Understanding REITS, UPREITS, and Down-REITS, and the Tax and Business Decisions Surrounding Them*, 16 Va. Tax Rev. 329, 334 (1996).

Though issued by different entities in order to achieve tax deferral for asset contributing investors, the units in the umbrella partnership and the REIT's public common shares are economic equivalents. *See* Peter M. Fass, *et al.*, *Real Estate Investment Trusts Handbook, 2008 Ed.* 1070 (2007) ("a unit in the operating partnership is economically equivalent to a REIT share"); Jack H. McCall, Jr., *A Primer on Real Estate Trusts: The Legal Basics of REITS*, 2 Transactions 1, 12 (2001) ("Because of their ability to be generally redeemed on a one-for-one basis for shares of REIT stock, Units in UPREITs [] are structured to be the economic and functional equivalent of REIT shares of capital stock.") (emphasis added);[3] Singer, at 334-35 ("Because the UPREIT owns substantially all of its property through its general partnership interest in the umbrella partnership, the limited partnership interests held by the original contributors are the economic equivalent of an interest in the UPREIT itself.") (emphasis added). For example, the total number of outstanding common shares of the REIT equals the total number of partnership units owned by the REIT. In addition, the cash distributions made on each partnership unit mirror the cash distributions made on each publicly held common share of the REIT. *See, e.g.,* Fass, *et al.* at 1070. Finally, the limited partners of the umbrella partnership generally have a right, after one year, to have their partnership units redeemed by the umbrella partnership. *See, e.g., id.* Significantly, this redemption right, essentially, amounts to a one-for-

---

[3] A copy of this article, which describes various securities issues related to the issuance of operating partnership units, is attached hereto as Exhibit A.

one conversion right for partnership unit holders because the REIT has the option to issue one publicly traded share, instead of cash, for each redeemed unit. *See, e.g., id.* at 52, 1070.

In sum, in an UPREIT, the publicly traded REIT and the umbrella partnership are both pieces of a single operating business, with the publicly traded REIT conducting the business, and holding most of its assets, indirectly through its general partnership interest in the umbrella partnership. Accordingly, from an economic perspective, an investment in the limited partnership via asset contribution is substantially the same as a cash investment in shares of the publicly traded REIT.[4]

## I.    THE RPLP UNITS ISSUED TO RPC WERE SECURITIES

Due to the close relationship between the public REIT shares and limited partnership units, limited partnership units generally are considered securities. *See, e.g,* McCall, at 10-12 ("[S]ince Units are securities (much like shares of common stock), they are subject to applicable federal and state securities laws . . . [and] [b]ecause UPREIT Units are generally sold without registration under the 1933 Act and state "Blue Sky" laws, they are considered to be 'restricted' securities."); *c.f., e.g.*, Fass, at 503-20 (discussing various securities law issues associated with issuance of operating partnership units, with a focus on avoiding the private placement of operating partnership units losing its exemption by being integrated with the REIT's initial public offering); Judith F. Fryer, *REITS: 1999 Strategies for Financing & Growth in a Challenging Market*, 1137 PLI/Corp 439, 439-453 (1999) (analyzing securities issues affecting

---

[4] As set forth more fully in Plaintiffs' Memorandum in Opposition to Grigg's Motion to Dismiss, limited partners, in their capacity as such, also are similar to shareholders in that they generally have no control over the day to day operations of the REIT, which is run by the publicly traded general partner – here, RPT. Significantly, however, limited partners of the operating partnership have less of a voice in the control of the REIT than shareholders of the publicly traded entity. For example, holders of limited partnership interests do not normally benefit from the same voting rights enjoyed by shareholders. *See, e.g.,* Fass, at 503, 1070.

REITs, and noting, "thought should be given when structuring acquisitions using such securities [operating partnership units] in order to avoid having 'private placements' of these securities integrated with each other or with follow on offerings of REIT securities;" and noting that, "[b]oth the issuance of OP Units which are exchangeable for REIT shares and the actual exchange of REIT shares for OP Units create opportunities for inadvertently violating the securities laws due to gun-jumping and integrations issues").

Consistent with this general consensus, the SEC also has treated operating partnership units as securities. *See* Limited Partnership Rollup Trans. Order, Exchange Act Release No. 34-34533, 59 Fed. Reg. 43147, 43153-54 (Aug. 22, 1994) (noting that there are at least three mechanisms by which OP units are offered: (1) issuance of OP units and REIT shares pursuant to "*bona fide* private placement exemptions under the Section 4(2) of the Securities Act;" (2) issuance of the OP units via "a registered transaction, with a simultaneous public offering of REIT units;" and (3) similar to the structure here, issuance of OP units "pursuant to a *bona fide* private placement exemption, along with a public offering of REIT units by the general partner"); Summit Properties Partnership, L.P., SEC No-Action Letter, 2005 SEC No-Act. LEXIS 338 (March 7, 2005) (stating no action would be taken with respect to merger involving UPREIT OP); Fass, at 582 (noting that the SEC has, in some instances, required similar accounting treatment for redeemable operation partnership units as for redeemable preferred stock). The SEC's treatment of an instrument as a security is significant because, "the task has fallen to the Securities and Exchange Commission (SEC), the body charged with administering the Securities Acts, and ultimately to the federal courts, to decide which of the myriad financial transactions in our society come within the coverage of these statutes." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990).

Here, RPC received RPLP Units as part of the REIT's formation transactions. Indeed, the REIT formation here – *i.e.,* the issuance of RPLP Units in exchange for property and assets, and RPT's IPO, issuance of shares, and purchase of a general partnership interest in RPLP – mirrored a typical UPREIT formation in every possible way.[5] Although RPT and RPLP were distinct legal entities, they were, for all practical purposes, one operating business. As such, the publicly traded RPT shares and the RPLP units (which were redeemable, after one year, on a one-for-one basis for RPT shares) were economic equivalents. Therefore, and because limited partnership units issued in connection with the formation of an UPREIT consistently are considered securities – by practitioners, investors and by the SEC – due to the economic realities of the transaction, Plaintiff respectfully requests that the Court reconsider its Opinion and hold that the RPLP Units issued to RPC were securities.

The authorities upon which the Court relied do not dictate a different result. First, limited partnership units typically are considered securities for purposes of federal securities laws. *E.g., Rodeo v. Gillman,* 787 F.2d 1175, 1177 (7th Cir. 1986). Though determining whether specific limited partnership interests are securities can be a complex task, the analysis begins with an inquiry regarding the "legal rights and powers enjoyed by the investor." *Steinhardt Group, Inc. v. Citicorp,* 126 F.3d 144, 153 (2d Cir. 1997);[6] *cf, e.g., Hirsch v. DuPont,* 396 F. Supp. 1214, 1227

---

[5] That Grigg and Kramer stood on both sides of the transaction does not change the analysis, as standard practice is for UPREITS to be "controlled by 'insiders' – limited partners in the [umbrella partnership] who contributed their property to the partnership." Chadwick M. Cornell, *Comment: REITS and UPREITS: Pushing the Corporate Law Envelope,* 145 U. Pa. L. Rev. 1565, 1602 (1997); *see* Fass, at 53 (noting that "the limited partners of the UPREIT generally have an interest in the management and policies in the company which acts as the general partner of the UPREIT").

[6] In *Steinhardt,* the court held that that the ***limited partnership interests*** at issue were not securities because:

(S.D.N.Y. 1975), *aff'd* 553 F.2d 750 (2d Cir. 1977) ("Because limited partners must, by statute, rely solely on the efforts of others for their profit, limited partnership interests have been held to be securities in this district."). Here, RPC – the recipient of the Units at issue – had no legal right or power, *in any capacity,* to assert influence or control over RPLP, and neither Kramer nor Grigg had any such ability, either as *limited partners of RPLP or owners of RPC.*

Second, in appropriate circumstances, "a limited partnership interest has been found to constitute a security even where there was an accompanying general partnership interest." *Rodeo,* 787 F.2d at 1178 (citing *Hirsch* 396 F. Supp. at 1227-28). Here, RPC had no legal right or authority to control the affairs of RPLP, and any management authority exercised by Grigg and Kramer derived solely from their role as members of RPT's management, not from RPC's or their status as limited partners. *See Hirsch*, 396 F. Supp. at 1228.[7] Moreover, treatment of the

---

The [Limited Partnership Agreement] gives [the Limited Partner, who owned a 98.7% interest in the partnership] pervasive control over the management of the Partnership. Indeed, these quite significant powers are far afield of the typical limited partnership agreement whereby a limited partner leaves the control of the business to the general partners.

126 F.3d at 154.

[7] Although the court in *Hirsch* based its analysis, in part on the timing of the transaction, it further held, "[m]oreover, for purposes of the Howey test, all rights and powers to participate in the management of the firm derive from the general partnership, not the limited partnership, interests." *Hirsch,* 396 F. Supp. at 1228 (emphasis added). To the extent the Court deems the timing of the various transactions as material to the analysis, Plaintiff submits that the timing here is more closely aligned with *Hirsch*, than with *Frazier v. Manson*, 651 F.2d 1078 (5th Cir. 1981). RPT completed its initial public offering on December 20, 2005. (Am. Comp. at ¶ 5.) As is customary in the formation of an UPREIT, RPT then purchased its general partnership interest in RPLP from the proceeds of the IPO. Also on December 20, 2005, RPT caused RPLP to issue 100,234 Units in connection with the Development Contribution Agreement. (Am. Comp. at Ex. A, December 20, 2005 Limited Partner Acceptance, appended to Development Contribution Agreement). Accordingly, RPT's acquisition of its general partnership interest did not precede RPC's acquisition of its limited partnership interest.

Units is particularly appropriate where, as here, the Units were convertible to publicly traded shares and, in many ways, were the equivalent of RPT's publicly traded common shares.

Finally, even if the Court does not determine that, as a matter of law, the Units were securities, there remain complex issues of fact that require resolution prior to a decision that the Units were not securities. *See, e.g., SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001) (reversing trial court's dismissal of claims on 12(b)(6) motion, and holding that determining whether a particular investment was a security required fact intensive analysis and was not appropriately decided on a motion to dismiss). As both Cornell and Fass have observed, *see* discussion at 6 and n. 5 *supra,* insider control is a common characteristic of UPREITs. This is to be expected, since REITs are formed not just by purchase of stock for money, as occurs with any other publicly traded entity, but also by the contribution of real estate assets by those who are the primary actors in the REIT's formation. This sort of in-kind contribution naturally correlates with a more active role on the part of the contributor in the affairs of the new entity than might be associated with a traditional stock purchase for cash.

Notwithstanding this frequently observed characteristic of REITs, limited partnership units can be, and as noted above have been by the SEC, treated as securities. Should the Court have any question regarding the status of the RPLP Units here at issue, further development of the factual record is in order, and RPC's Units should not, *ipso facto,* be deemed not to be securities.

## II.    RPT AND RPLP BOTH HAD STANDING TO PURSUE FEDERAL SECURITIES FRAUD CLAIMS AGAINST DEFENDANTS

RPT owned approximately 88% of RPLP, was RPLP's sole general partner, and generally had the exclusive right and full authority and responsibility to manage and operate RPLP's business. RPT and RPLP were two necessary parts of the one functioning UPREIT, and

8

RPT caused RPLP to enter into the Development Contribution Agreement at issue and to issue Units to RPC. Looking at the REIT as a whole, and taking into consideration the relationship between RPT and RPLP, and between RPT shares and RPLP Units, both RPT and RPLP should be considered sellers of the Units. *Cf. Allard v. Arthur Andersen & Co.*, 924 F. Supp. 488, 496 (S.D.N.Y. 1996) (noting that general partners have been deemed "sellers" for purposes of Section 12(a)(2) claims under the Securities Act of 1933, 15 U.S.C. § 771(2), and that there was no reason to apply a different definition to claims under the Securities Exchange Act of 1934);[8] *Lawrence v. Cohn*, 932 F. Supp. 564, 573 (S.D.N.Y. 1996) (holding that, in addition to having derivative standing to bring claims, standing "comports with the underlying purpose of section 10(b) and rule 10b-5. . . . Although plaintiffs were not technically buyers or sellers, they were the ones who essentially negotiated the [transaction] . . .").

The Court's holding that only RPLP was the seller overlooks the operation and function of the REIT as an integrated business, and the relatedness of RPT shares and RPLP Units. The REIT's business, which was controlled by RPT, required the formation of RPLP to offer a tax preferred investment to individuals and entities that contributed properties to the REIT. Therefore, both RPT and RPLP engaged in the sale of securities and both had standing to pursue the securities fraud claims against Grigg, Kramer and RPC. At a minimum, RPT and RPLP pled facts sufficient to establish, for purposes of a motion to dismiss, that RPT can be considered the seller of the RPLP Units.

---

[8] In its Opinion, the Court drew a distinction between a general partner being liable as sellers under Section 12 of the Securities Act, on the one hand, and maintaining a cause of action as sellers under Section 10(b) of the Exchange Act, on the other. Plaintiffs submit that there is no basis here to draw such a distinction with respect to RPT. Both it and RPLP were the sellers of the Units.

## CONCLUSION

For the above reasons, and for the reasons set forth in Plaintiffs' Memoranda in Opposition to the Motions to Dismiss filed by Grigg, Kramer and RPC, Liberty Property Trust requests that the Court reconsider its Memorandum Opinion and Order entered on March 31, 2008, and that the Court allow Republic Property Trust to proceed with its claims.


Dated:   April 14, 2008

Respectfully submitted,


/s/ Mark E. Nagle_____
Mark E. Nagle, Bar No. 416364
Tameka M. Collier, DC Bar No. 488979
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 274-2972
mark.nagle@troutmansanders.com

*Counsel for Republic Property Trust*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was served electronically via the ECF System of this Court this 14th day of April, 2008 to:

William T. Burke
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005

*Counsel for Republic Properties Corporation
and Richard L. Kramer*

Seymour Glanzer
Richard J. Conway
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C. 20006

*Counsel for Steven A. Grigg*

/s/ Tameka Collier___

# EXHIBIT A

LEXSEE 2 TRANSACTIONS 1

Copyright (c) 2001 The Clayton Center for Entrepreneurial Law, University of Tennessee
College of Law
Transactions: The Tennessee Journal of Business Law

Spring, 2001

*2 Transactions 1*

**LENGTH:** 17372 words

ARTICLE: A Primer on Real Estate Trusts: The Legal Basics of Reits

**NAME:** By Jack H. McCall *

**BIO:**

* B.A., Vanderbilt University, 1983; J.D., The University of Tennessee, 1991; Associate, Hunton & Williams, Knoxville, Tennessee. The author gratefully wishes to thank the following for their advice, assistance, comments, edits and suggestions made in the development and preparation of this primer: his colleagues David C. Wright, Randall S. Parks, Gerald R. Best, Cameron N. Cosby, Catherine L. Colocotronis, and Caroline G. Root of Hunton & Williams; Mark A. Murphy of Innkeepers USA Trust; Jeffrey Horowitz and Daniel Guglielmone of Salomon Smith Barney; Carr L. Kinder, III and James Taylor of Wheat First Butcher Singer, Inc.; E. Marlee Mitchell of Waller Lansden Dortch & Davis, PLLC; Professor Carl Pierce of the University of Tennessee College of Law; and, for their invaluable research assistance, UT law students Kyle Eiselstein and Kevin Perkey.

Portions of this primer have previously appeared and are reprinted with permission from Probate & Property [March/April/1999] (American Bar Association. Copyright (c) 1999 American Bar Association).

**TEXT:**

    [*2]  Since the early 1990s, real estate investment trusts, or "REITs," have become the focus of a growing portion of both the U.S. capital markets and the real estate section of the national economy. Yet, despite REITs' relatively rapid growth, heightened popularity and publicity, some business and legal commentators occasionally seem to view REITs with a mix of skepticism and uncertainty. This may stem partly from misunderstandings, combined with the relative complexity of REITs and the equally relative scarcity of easily accessible and understandable information about what these unique business entities really are, how they are formed, and how they operate.

    This primer is intended to help redress that situation. It is intended to provide a "plain English" introduction to REITs; to the tax aspects that make them such an attractive vehicle for real estate operators, property sellers, and stock investors; to the various forms of REITs and how they differ; to the key formation and securities law issues affecting all REITs; and to some selected operational and accounting issues that play their respective parts in the "care and feeding" of REITs on an ongoing basis.

## I. REITs: An Overview

### A. What, Exactly, Is a REIT?

    Real estate investment trusts ("REITs") are, in essence, financial vehicles that allow investors to pool their capital for participation in real estate ownership or mortgage financing, while providing those investors with the benefits of many of the tax advantages available to larger and more sophisticated investors and businesses who can afford to invest directly in real estate and the benefits stemming from professional management of a highly diversified portfolio of real estate assets. Hence, REITs can generally be thought of as being a kind of business enterprise that is analogous to a mu-

tual fund for real estate investments. More than 300 REITs existed with total estimated assets in excess of $ 310.7 billion at December 31, 1998, of which date 210 were publicly traded.

## B. A Brief History of REITs

The first REITs were created in response to federal REIT legislation enacted in 1960. This legislation's goal was to enable small investors to pool their wealth in a single business enterprise, thereby collectively improving their access to investments in larger income-producing commercial real estate programs--an opportunity hitherto largely unavailable to the average small investor. (In fact, the 1960 Internal Revenue Code (the "Code") additions creating favorable tax treatment for REITs were largely patterned after the Investment Company Act of 1940.) The passage of this first REIT legislation led to an early proliferation of REITs through the 1960s and into the early 1970s. Nevertheless, the overall growth of the REIT industry at this early stage was somewhat slow, for several reasons.

First, the early REIT laws prohibited REITs from operating or managing property that required the engagement of third-party managers, and the early REITs' efforts to capitalize on third-party managers to run their properties were not very satisfactory. Also, other aspects of the Code then in effect, which permitted investment vehicles like limited partnerships to take significant interest and accelerated depreciation deductions, and "paper" losses and tax credits encouraging highly leveraged tax shelters, provided much more favorable tax benefits to many potential investors than what REITs could provide at that time. These were factors which also discouraged more active investments in REITs.

Furthermore, very early on in the development of the REIT industry--due to REITs' needs for ongoing access both to equity capital and debt to maintain the financings necessary for a steady stream of property acquisitions--it was realized that REITs would be particularly affected both by interest rate increases and by the "risk-rewards" analysis by which investors tend to seek safer investments when they can receive comparable returns on more "secure" fixed income investments. The recessionary cycle of the 1970s, characterized by the period's "stagflation" and spiraling interest rates, crippled the existing REITs' ability to maintain steady growth through affordable acquisitions of properties. These economic conditions placed a damper on the REIT industry at large: first, by crippling mortgage REITs--which tend to be particularly vulnerable to such conditions-and then, by attribution, equity REITs. As a result, REITs became a less attractive investment vehicle for many years to come. Additionally, many of the original REITs had excessively leveraged themselves into indebtedness, at rates approaching 70% or more of their equity, and these could not weather the decade's economic storms. Few of the original REITs formed after the passage of the 1960 REIT laws remained in the wake of this period, which marked what has been to date the nadir of the REIT industry's fortunes.

The Tax Reform Act of 1986 (the "1986 Act") provided the first impetus for a revival of the REIT industry at large. Although certain Congressional amendments enacted in 1975 and 1976 had already eased the harshness of some of the original REIT law's provisions, the popularity of REITs as an investment vehicle increased after the passage of the 1986 Act for three crucial reasons. First, the 1986 Act placed severe limitations on the ability of partnerships to generate tax losses for their investors. Second, the 1986 Act's repeal of the accelerated depreciation methods that were previously applicable to real estate caused many real estate-oriented investors to focus on income-oriented investments. Together, these changes stripped away both the ability to claim paper losses and the advantages offered by tax shelters predicated on such losses. Finally, the 1986 Act relaxed some of the earlier, even more rigorous tax qualification tests applicable to REITs under the original 1960 REIT tax legislation. REITs were now able not only to own, but also to manage and operate, most (but, as will be seen, not all) kinds of income-producing properties.

Since the early 1990s, there has been a veritable boom in REITs, including what will be explored in Part III, "A Surfeit of Choices: The Specialized REITs" below as UPREITs, DOWNREITs, paired-share, paperclipped and [*3] stapled REITs. As will be discussed, the unique advantages offered by the UPREIT model, and the significant differentiation provided by REITs from real estate limited partnerships (see Appendix F) in the wake of several notorious real estate syndication failures of the late 1980s, helped precipitate a renaissance of the REIT industry in the 1990s.

## C. What Makes the REIT Such an Attractive Investment Vehicle?

REITs--particularly the publicly-traded REITs--generally provide investors with liquidity, diversification, security, and performance in at least five ways.

First, REIT investors can freely trade shares of the over 200 publicly-traded REIT stocks daily on the New York and American Stock Exchanges, the Nasdaq Stock Market, and in over-the-counter trading. Second, REIT investors are able to maintain highly diverse real estate investment portfolios by investing in any or all of the categories of REITs discussed below and by selecting from REITs that specialize in a variety of property types, including retail shopping

centers and malls, apartments, warehouses, office buildings, industrial parks, health care facilities and hotels. (Even real estate assets as highly specialized as self-storage units, golf courses, movie theaters, auto dealership lots and prisons have now been added to the host of investment options available to REIT investors.)

Next, publicly-traded REITs offer investors the protection of investing (1) in a public company that owns long-life, income-producing physical assets or, in the case of mortgage REITs, the "bundle" of rights adhering to real estate mortgages and secured financings underlying those physical assets, and (2) in the securities of a company subject to SEC and stock exchange regulation. REITs are professionally managed by officers generally skilled in real estate acquisition, management, financing, development and operations, and the performance of public REITs is overseen by independent directors, independent public auditors and financial analysts, whose collective scrutiny helps provide investors with an added degree of protection and accountability. Fourth, the low levels of debt currently maintained by most REITs-- frequently coupled with board-mandated policies and governing documents' requirements (*i.e.*, charter, articles of incorporation or declaration of trust, and related organizational documents like bylaws) that are intended to maintain conservative debt levels and modest fiscal practices--provide a degree of greater security for the financial system at large. Finally, total returns on REITs have routinely matched the performance levels attained by several leading market indices and have regularly exceeded returns on fixed debt instruments and direct investments in real estate. Because REITs must pay out a large amount of their taxable income on an annual basis--see Part II, "An Overview of REIT Federal Income Tax Considerations-The 95% Distribution Requirement" below--a large component of REITs' total return tends to be generated from dividends and other distributions to their shareholders.

## D. The Primary Types of REITs

There are two main, overarching types of REITs: *equity REITs* and *mortgage REITs*. An equity REIT specializes in *property ownership*. By directly owning, investing in or acquiring, managing, or developing real property, an equity REIT derives its revenue primarily from income generated by rental and lease payments. An equity REIT can benefit from appreciation in its underlying real properties; its income can grow through increases in rents from such properties; and cash in excess of taxable income can be produced through property depreciation, which the equity REIT can use to reinvest in its own operations.

On the other hand, a mortgage REIT concentrates on *financing activities*. A mortgage REIT invests in the mortgages, mortgage-backed securitizations and whole or subprime loans, or portions thereof, on real property assets. In essence, mortgage REITs loan money to real estate owners, and such REITs generate their revenue from the interest earned on such loans. Unlike equity REITs, however, "pure" mortgage REITs do not own real property. Rapid, successive increases in interest rates can raise borrowing costs without corresponding increases in income. While all REITs depend on the maintenance of favorable interest rates, mortgage REITs are particularly susceptible to the adverse effects of interest rate and credit fluctuations and loan defaults.

A survey of the basic tax rules applicable to all REITs follows.

## II. An Overview of REIT Federal Income Tax Considerations

The significant advantages available under the Code to entities qualifying for REIT tax treatment are the keys to their success and growth during the 1990s. A REIT generally is not subject to corporate income tax to the extent that it distributes the lion's share of its earnings to its shareholders on a current basis. Pass-through tax treatment for REITs is achieved by allowing them a dividends-paid deduction. To meet and maintain the Code's stringent tax requirements for REIT qualification, all REITs, both public and private, are required to meet certain tax tests. These are: (i) *income and asset* tests, designed to ensure that REITs invest primarily in real estate assets; (ii) *distribution* tests, intended to ensure that they distribute substantially all of their taxable income to their shareholders; and (iii) *ownership* tests, designed to ensure that their shares of capital stock are widely held--the latter being a factor that tends to make REITs ideal candidates for public company status.

Where the equity REIT itself cannot operate or manage properties (*e.g.*, hotels), to avoid violating tax tests--see "The Two Income Tests" below--it may enter into a type of lease arrangement with an affiliated entity or a third-party operating company, known synonymously as a *participating lease* or *percentage lease*, to derive its income as lease revenues from such operating company's management [*4] of the property. This income may be derived from a fixed base rent and, once certain revenue thresholds are met or exceeded at the property, from a percentage of such revenues exceeding those thresholds.

## A. REIT Organizational and Ownership Tests

A REIT must be organized as a business trust, a corporation, or an unincorporated association (including, under the laws of several states--notably, Maryland and Texas--as a form of business entity specifically denominated as a "real estate investment trust"), that, but for the REIT provisions of the Code, would be otherwise treated as a domestic corporation for federal income tax purposes. Additionally, a REIT may not be a financial institution or an insurance company.

The beneficial ownership of the REIT must be evidenced by fully transferable shares of capital stock (if a corporation) or certificates of beneficial interest (if a business trust or state-authorized real estate investment trust), with such voting, distribution and other rights as may be set forth in the REIT's charter, articles of incorporation or declaration of trust and bylaws, as applicable, or as may otherwise be required by the jurisdiction where the REIT is incorporated or organized. Ownership of the REIT must be widely held, *i.e.*, (a) the REIT's shares must be beneficially owned by at least 100 persons for at least 335 days in each taxable year or during a proportionate part of a shorter taxable year, and (b) no more than 50% of the value of a REIT's shares may be owned, directly or indirectly (as tested by application of certain constructive ownership rules), by five or fewer individuals at any time during the second half of the REIT's taxable year. Each REIT's organizational documents normally contain share transfer restrictions designed to ensure that the REIT's beneficial ownership does not become overly concentrated in contravention of the "five or fewer" rule. See Part V, "Selected REIT Operational Issues and Topics - REIT Share Transfer Restrictions" below.

REITs must be managed by one or more trustees or directors elected by and responsible to the REIT's shareholders. The trustees or directors, who are usually well-known and respected members of the real estate, business, financial and professional communities, appoint and oversee the REIT's management team based on the officers' extensive real estate business and financial background and prior experience.

In order for REIT status to apply, an appropriate election must be made on the tax return for the first taxable year for which the election is made. If a REIT fails to meet *any* of the foregoing requirements, the REIT will (1) risk loss of its REIT status; (2) be required to pay full corporate income tax on the taxable income of the trust or corporation; and (3) be prohibited from electing REIT status again for a five-year period.

## B. The Two Asset Tests

Because Congress intended REITs to invest primarily in real estate, the composition of a REIT's assets must satisfy the following two asset tests. First, at the end of each quarter of the REIT's taxable year, at least 75% of the value of the REIT's assets must consist of the following assets: (a) cash and cash items; (b) government securities; (c) real estate assets, which include equity interests in real estate, mortgage loans, and shares of other REITs; and (d) temporary investments (for up to one year) of new capital in stocks and bonds. Second, the balance of the REIT's assets may be invested without restriction, except that holdings of securities of any one issuer (other than securities that count towards satisfying the 75% asset test) cannot exceed 5% of the value of the REIT's assets or 10% of the total outstanding voting securities of such issuer.

If a REIT fails one or both of the asset tests solely as a result of changes in the market values of its assets, it will not lose REIT status. If, however, one of the asset tests is not satisfied as a result of a voluntary act, such as the acquisition of a nonqualifying asset during the relevant calendar quarter, and if the discrepancy is not corrected within 30 days after the end of the quarter, the REIT's special tax status will be lost.

## C. The Two Income Tests

In order to qualify as a REIT for any given tax year, an entity must also satisfy two annual income tests. These tests are designed under the Code to ensure that the entity invests primarily in real estate and that it does not function as an active trading vehicle.

First, at least 75% of a REIT's gross income must consist of income from the following sources: (a) rents from real property; (b) interest from mortgage loans; (c) gain from the disposition of real property or mortgage loans (other than inventory); (d) dividends from or gains from disposition of shares in other REITs; (e) abatements and refunds of real property taxes; (f) income from foreclosure property; (g) commitment fees received as consideration for entering into agreements to make mortgage loans or to purchase or lease real property; and (h) income from qualifying temporary investments of new capital. Second, at least 95% of the REIT's gross income must consist of the following: (1) income that satisfies the 75% income test; (2) dividends; (3) interest; and (4) gains from the disposition of stock or securities.

For purposes of the two income tests, "rents from real property" generally include (a) rents from interests in real property, (b) charges for services customarily furnished in connection with the rental of real property, and (c) rents attributable to personal property that is leased in connection with a lease of real property (provided that such rent does not exceed 15% of the total for both the real and personal property). "Customary" services are those provided in other buildings of the same class (*e.g.*, a class A office building; a limited service hotel property; or a multi-family  [*5]  apartment complex) within the same geographic market in which the building in question is located.

The Code restricts what can be included as rents from real property. First, rents that are dependent on the income or profits (other than gross receipts or sales) derived by the occupant of the property are not included as rents from real property. A similar restriction applies to interest received by a REIT. This limitation is designed to prevent REITs from effectively becoming partners in operating businesses. Second, rents from a tenant in which the REIT owns, directly or indirectly, 10% or more of the ownership interests are not included as rents from real property. Third, rents derived from properties where the REIT furnishes services or manages the property other than through an independent contractor from whom the REIT does not receive any income are not included as rents from real property. An independent contractor is any person owning, directly or indirectly, no more than 35% of the REIT's shares. The REIT can manage a property and provide services to tenants directly, rather than through an independent, if the services at issue are limited to those customarily rendered in connection with the rental of space for occupancy only and are not rendered for the convenience of the occupant. In other words, providing water, heat, light, air conditioning, trash collection, or common-area maintenance, for example, is a permissible activity under the "rents from real property" analysis, but furnishing hotel-type services is not acceptable.

If a REIT fails either the 75% or the 95% income test for a given tax year, but the failure is due to a reasonable cause, the REIT is permitted to pay a penalty tax equal to 100% of the amount by which the REIT failed the relevant test, instead of losing REIT status. If the REIT cannot show reasonable cause, however, it will lose its REIT status. Reasonable cause is shown by the use of ordinary business care and prudence in attempting to satisfy the Code's REIT provisions.

## D. The 95% Distribution Requirement

A REIT generally is required to distribute to its shareholders at least 95% of its taxable income (excluding capital gains) yearly. This requirement is intended to prevent a REIT from becoming a vehicle for income accumulation. In order for a distribution to count for a given year, it ordinarily must be either (a) made during the tax year or (b) declared by March 15 of the following year and paid on the next regular dividend date following the declaration.

As can be seen, this 95% distribution requirement provides another attractive incentive for many investors to consider making investments in REITS, combining as they do long-term growth with a reasonable assurance of periodic dividends on their stock. (The fact that a REIT is exempt from corporate taxation so long as it meets the 95% distribution test and the various other tax tests also helps to make the REIT an attractive tool for any private real estate developer or financier seeking access to the public capital markets.) There is, however, a downside: this particular requirement is also perhaps the principal net cost of organizing as a REIT, since it means that little or no retained earnings can be generated to grow the REIT's business internally. Accordingly, because of this lack of retained earnings and because of REITs' ongoing needs to continue to acquire, develop and expand, REITs tend to be more highly dependent than many--if not most--"C" corporations upon frequent infusions of equity capital (whether through public or private stock offerings) and access to debt at attractive interest rates in order to fuel their ongoing growth.

## E. The Taxes That May Be Imposed on a REIT.

Although a REIT generally receives pass-through tax treatment, it is potentially subject to five different federal taxes:

a. A REIT is subject to normal corporate income tax on any undistributed taxable income (including capital gains).

b. A REIT is subject to a 4% excise tax to the extent that it does not distribute substantially all of its taxable income (including capital gains) by the end of the taxable year. That tax is designed to eliminate the benefit from the one-year deferral of income that arises when a REIT pays a dividend at the beginning of a year and elects to have the dividend relate back to the previous year. Certain dividends that are paid in January are treated as having been paid at the end of the preceding year for purposes of both applying the excise tax and determining the income of the REIT's shareholders.

c. A 100% penalty tax is imposed on the amount by which the REIT fails to pass either the 75% or the 95% income test.

d. Regular corporate income tax is imposed on income from foreclosure property that is considered inventory.

e. A 100% penalty tax is imposed on gains from prohibited transactions, which are defined as dispositions of inventory (other than foreclosure property). This tax is intended to prevent a REIT from acting as a dealer with respect to real property, mortgage loans, or any other assets.

All of the above taxes may, however, generally be avoided by appropriate action on the part of the REIT.

## F. Taxation of REIT Shareholders.

Distributions made to a REIT's shareholders out of its earnings and profits are generally treated as ordinary dividends. REIT distributions, however, are not eligible for the dividends-received deduction that is normally available to corporate shareholders.

REIT distributions generally are taxed to shareholders in the taxable year in which they are paid. The one exception is that any dividends declared in the last quarter of the taxable year and paid in January of the following year are taxed to shareholders in the year of declaration. For instance, if a REIT declares a quarterly distribution in November [*6] 1997, which will be payable to its shareholders in January 1998, this distribution will remain taxable to the REIT's shareholders for the tax year ending December 31, 1997.

A REIT may designate a portion of its distributions for any year as capital gain distributions, provided that the amount so designated does not exceed the REIT's net capital gain for the year. Amounts designated as capital gain distributions are taxed as long-term capital gains to the shareholders.

A REIT also may elect to retain and pay income tax on any net long-term capital gain that it receives. In that case, the REIT's shareholders would include in their income as long-term capital gain their proportionate share of the REIT's undistributed long-term capital gains. In addition, the shareholders would be deemed to have paid their proportionate share of the tax paid by the REIT, which would be credited or refunded to the shareholders.

Distributions in excess of a REIT's earnings and profits are treated as a non-taxable return of capital to the extent that they do not exceed a shareholder's adjusted basis in his stock. Any distributions in excess of basis are treated as gain from the sale of the shareholder's stock. Losses of the REIT (whether attributable to operations or to depreciation) are not passed through to shareholders.

REIT distributions are treated as portfolio income for purposes of the passive activity loss rules. Thus, REIT distributions received by a shareholder who is an individual cannot be offset by losses from an investment in a real estate limited partnership until the shareholder has disposed of his entire interest in that partnership.

REIT distributions generally are not considered to be unrelated business taxable income ("UBTI")--and, therefore, taxable income--for pension plans and other tax-exempt investors, unless such an investor borrows to acquire the REIT shares or the REIT is closely held by pension plans.

## G. The "REIT Modernization Act:" The Taxpayer Refund and Relief Act of 1999.

On August 5, 1999, Congress passed the Taxpayer Refund and Relief Act of 1999 (the "TRRA"). This legislation contains several provisions that would affect REITs, notably the overhaul of tax rules applicable to REIT taxable subsidiaries. Despite the Clinton administration's threatened veto of the TRRA at the time of writing, it appears likely that most of the provisions summarized below will be included in any tax bill to be ultimately enacted.

## (i) Taxable REIT Subsidiaries

**Current Law:** Currently, REITs use taxable subsidiaries to conduct businesses or provide services related to their real estate activities to third parties. REITs cannot conduct those activities directly because the income from these activities would not be qualifying REIT income ("bad income"). (For example, some hotel REITs have taxable subsidiaries that conduct third-party property management businesses, and some mortgage REITs have taxable subsidiaries that originate, service, and sell mortgages.) REITs also use taxable subsidiaries to own property that they cannot own directly, such as property that generates bad income or that is considered inventory. Under current law, a taxable subsidi-

ary generally cannot perform "non-customary" services to the REIT's tenants without generating bad income for the REIT.

At present, these REIT subsidiaries generally are fully taxable corporations in which a REIT owns, directly or indirectly, up to 99% of the value, but not more than 10% of the voting stock. All or substantially all of the taxable subsidiary's voting stock generally is owned by a party that is "friendly" to the REIT (*i.e.*, a founder, director, senior officer or other affiliate of the REIT). Presently, a REIT may not own more than 10% of the voting stock of a taxable subsidiary. In addition, the value of the stock of each taxable subsidiary owned by a REIT cannot exceed 5% of the value of the REIT's assets. Although a taxable subsidiary is fully subject to corporate income tax on its taxable income, the related REIT and its shareholders benefit from their participation in the after-tax income it derives from a related or synergistic business.

**The TRRA:** The TRRA would allow a REIT to own up to 100% of the stock of a "taxable REIT subsidiary" ("TRS"). Under the TRRA, a TRS could provide both "customary" services and "non-customary" services to the tenants of its affiliated REIT and others without causing the REIT to receive bad income. A TRS also could conduct other activities but could not operate, manage, or provide franchise services as to hotels or health care facilities. A TRS' ability to provide services to a REIT's tenants would enable the REIT to provide competitive services to its tenants, thus generating tenant loyalty, to operate more efficiently, and to have more control over the services provided to its tenants. REITs and their shareholders also would receive the benefit of the after-tax income derived from providing those services.

Under the TRRA, a REIT can lease property to a TRS, so long as at least 90% of the leased space in the property is leased to persons other than TRSs and other persons in whom the REIT has a 10% or greater ownership interest. This would enable a TRS to lease space in the REIT's property, through which the TRS could then provide services to the REIT's tenants or conduct a related business. In addition, the TRRA allows a hotel REIT to lease any non-casino hotels to a TRS as long as the TRS does not operate or manage the hotels. Instead, the hotels must be operated by a third-party hotel manager who also operates hotels for persons that are unaffiliated with the REIT and the TRS. (Under current law, a hotel REIT cannot lease hotels to any lessee in which it owns a 10% or greater interest.) That provision would allow hotel REITs and their shareholders to share a greater portion of the revenues from those REITs' hotels.

[*7]  The TRRA generally (1) limits the tax deductibility of interest paid or accrued by a TRS to its affiliated REIT to assure that the TRS is subject to an appropriate level of corporate taxation, and (2) imposes a 100% excise tax on any transactions not conducted on an arm's-length basis between a TRS and its affiliated REIT or the REIT's tenants. That excise tax generally would apply to any rent, interest, or other deductible amount paid by a TRS to a REIT in an amount determined to be more than what one expects in a negotiated transaction between third parties. Otherwise, a TRS could significantly reduce its taxable income by paying above-market rent or interest to the REIT.

**Rules for Non-TRS Taxable Subsidiaries:** Under the TRRA, a taxable subsidiary and the related REIT will be required to make an election in order for the subsidiary to be treated as a TRS. If no election is made, the taxable subsidiary will be subject to two ownership rules. First, the TRRA retains the current rule that the value of the stock of each taxable subsidiary owned by a REIT cannot exceed 5% of the value of the REIT's assets. Second, the TRRA modifies the current 10% asset test to prevent a REIT from owning more than 10% of the voting power *or* value of the stock of a non-TRS taxable subsidiary. Current law only prevents a REIT from owning more than 10% of the voting stock of a taxable subsidiary. That provision generally requires REITs with existing taxable subsidiaries to convert them into TRSs because most REITs own more than 10% of the value of existing taxable subsidiaries. Overall, no more than 25% of a REIT's assets may consist of securities of TRSs and other taxable subsidiaries under the TRRA.

**Effective Date:** The TRS provisions of the TRRA would apply for taxable years beginning after December 31, 2000; however, a taxable subsidiary in existence on July 12, 1999 would be "grandfathered in," with certain exceptions. Existing taxable subsidiaries could be converted into TRSs on a tax-free basis before January 1, 2004. The effective date generally would prevent existing taxable subsidiaries from expanding, with REITs generally needing to convert existing taxable subsidiaries into TRSs, instead.

In summary, the TRS provisions of the TRRA have the following benefits for REITs:

. A REIT could own all of the stock, including all of the voting stock, of a TRS and thereby avoid all of the headaches involved in finding a "friendly" holder for the voting stock of a taxable subsidiary as is required under current law.

. A TRS could provide "non-customary" services to a REIT's tenants without generating bad income for the REIT. Hence, REITs could provide competitive services to their tenants, operate more efficiently, and have more control over the services their tenants received. REITs and their shareholders also would reap the financial benefits of providing those services. Under current law, a taxable subsidiary generally cannot provide non-customary services to the REIT's tenants without causing the REIT to receive bad income.

. A hotel REIT could lease hotels to a TRS as long as the hotel is operated by a third-party hotel manager. Under current law, a hotel REIT cannot lease a hotel to a taxable subsidiary in which it owns 10% or more of the stock without generating bad income.

On the other hand, the TRRA also imposes certain "toll" charges or tax costs on REITs:

. The tax deductibility of interest paid by a TRS to the REIT or an affiliate of the REIT will be limited.

. Severe penalties may be imposed on payments of excessive amounts from a TRS to the REIT or excessive deductions by a TRS for services provided to the REIT's tenants.

. TRSs cannot manage, operate, or franchise hotels or health care properties.

. Existing taxable subsidiaries would continue to be governed by current law, but they could not expand their business activities or assets after July 12, 1999 without becoming subject to the modified 10% asset test described above. Most existing taxable subsidiaries are not structured to satisfy the modified 10% asset test.

### (ii) Other Provisions

Other TRRA provisions prevent the formation of "closely-held" or "captive" REITs, change the REIT distribution requirement from 95% to the 90% level currently applicable to mutual funds, modify the rules for determining whether a corporation is an "independent contractor" with respect to a REIT, and permit a REIT to own and operate a health care facility for at least two years after acquiring the facility through foreclosure.

### III. A Surfeit of Choices: The Specialized REITs

### A. The Basic REIT Types

Several REIT subtypes have developed from the two main types of REITs discussed in Part I.D (*i.e.*, equity and mortgage REITs), and these have established niches in the REIT market at large. These species of REITs include the following:

. A **hybrid REIT**, as the name suggests, owns a combination of equity and mortgage interests in properties.

. A **finite life REIT, or "FREIT"**, sets forth in the offering documents for its securities a termination date (usually, seven to fifteen years from the REIT's date of inception) and an investment strategy.

. A **special purpose or dedicated REIT** invests in a single type of property and may be tied to a particular developer or user of real estate. Certain REITs invest in a variety of property types (*e.g.*, apartments, hotels, self-storage facilities, restaurants, golf courses, office buildings, [*8] shopping centers, etc.), while many more tend to specialize in one exclusive property type or in certain segments within a particular real estate property market (*e.g.*, not merely hotels, but in full-service, limited service or extended stay hotels). Additionally, some REITs focus their investments in specific geographical regions (e.g., ownership of properties located only in the southeastern United States).

. A **single property REIT** invests in one, usually very large, property (*e.g.*, Rockefeller Center is currently owned by a single property REIT).

. An **umbrella partnership REIT ("UPREIT")** is a REIT in which the REIT itself does not own a direct interest in properties. Rather, the REIT owns a direct interest, as the general partner (either itself or through a wholly-owned subsidiary), in an "umbrella" limited partnership. The UPREIT umbrella partnership (also frequently called the REIT's operating partnership) owns a direct interest in properties. (See Appendix A.)

. An IPO surge in 1992-93 because of the cheaper costs of capital then available in the public markets meant better returns on investment and led to the rejuvenation of REITs. In this period, the UPREIT concept was first adopted by tax and securities lawyers. At roughly the same time, the UPREIT model was discovered by investment bankers to be an

ideal vehicle by which a newly formed REIT could reach an appropriate size to readily access the public capital markets. This major structural innovation helped foster the move from private to public ownership, led to the creation of the "baby" REITs, *i.e.*, those formed from 1992 today, and revitalized the REIT industry at large. When adapted by older REITs to become the basis for the DOWNREIT structure (see below), additionally, the UPREIT model helped provide a new lease on life for several older REITs whose opportunities for growth had hitherto been thwarted.

. **"DOWNREITs:"** By comparison to UPREITs, "DOWNREITs" (also called "Down-REITs") are now encountered more frequently with many REITs formed before 1992. In such older REITs, properties may have been initially held at the REIT level, but, in order to obtain many of the benefits of the UPREIT model--particularly the ability to defer taxable gains through issuance of limited partnership interests to sellers of real property; see Part IV, "'Doing the Deal': REIT Formation and Securities/Financing Issues - The Fundamental Securities Law Aspects of REITs" below--one or more new subsidiary partnerships may be formed, and many or all newly acquired properties will be held and owned at the level of these subsidiary partnerships. (See Appendix B.)

Another prime example of the trend towards specialization in the REIT industry is the healthcare REIT, which is treated by some industry experts as a different category from equity, mortgage and hybrid REITs and which operates either through purchase/sale lease-backs of healthcare facilities or through mortgages that are secured by healthcare facilities.

## B. "Paired-Share" and "Stapled" Structures: The "Grandfathered" REITs.

The primary advantage of the *paired-share REIT* and *stapled REIT* models is the ability of these two types of REITs both to own *and* operate virtually any real estate asset class in a more tax-efficient structure than can either conventional REITs or "C" corporations. While most REITs cannot directly operate properties in which their earnings are not derived from rents or leases but result from other types of sales (*e.g.*, gaming casinos, hotel operations and stores), paired-share and stapled REITs can effectively both own *and* manage such properties, deriving their revenues not only from rental income but from property operations as well. Hence, paired-share and stapled REITs have at least three advantages: (1) they receive the tax benefits offered by the REIT provisions of the Code; (2) unlike conventional equity REITs, they can invest in operationally intensive businesses, yet maintaining operational control over their real estate assets; and (3) also unlike conventional equity REITs, their investors derive the full economic benefits of both ownership *and* management of those real estate assets.

Paired-share and stapled REITs are considered (and are often called) "grandfathered" REITs, inasmuch as these REITs were formed in the 1970s and 1980s before the implementation of 1984 federal legislation that eliminated the ability to create new paired-share or stapled REITs but that granted the few then-existing REITs of that type the right to continue to operate in such form. These included Hotel Investors Trust (later acquired by Starwood Capital, which then formed Starwood Lodging); Santa Anita Realty (later acquired by Meditrust); California Jockey Club (later acquired by Patriot American Hospitality); First Union Real Estate; Hollywood Park; and Corporate Property Investors (a private REIT).

The primary difference between paired-share and stapled REITs is structural. (See Appendices C and D). In essence, however, both paired-share and stapled REITs contain two companies whose stock is "paired" or "stapled," so that their shares trade as a single unit. As a result, the two companies--the REIT and the operating company--are owned by the same stockholders.

The leading competitive advantages--or, rather, the perceived advantages--of the "grandfathered" REITs include the following: (a) the elimination of conflicts of interest that arise from leasing properties to a management-owned lessee and operational conflicts created by the potentially divergent interests between an asset's owner and manager; (b) the elimination of *leakage (i.e.*, the excess profits created at a lessee level after payment of all operating expenses and lease payments back to the REIT under a percentage lease operating structure) because any economic advantage lost to the REIT under the participating lease structure and retention of leakage by the lessee is still ultimately retained by the REIT's shareholders, who also own shares in the "C" corporation operating company/lessee; (c) the benefit to shareholders of management teams' operational expertise in driving property-level performance; [*9] (d) the benefit of the operating company's unrestricted ability to operate businesses otherwise precluded to a REIT, so that it can operate certain real estate-related businesses (*e.g.*, casinos, hotels or golf courses) that typically demand high levels of customer service; and (e) the ability to pay marginally higher prices for assets and charge marginally lower rents for the same assets than their similarly valued but fully taxed counterparts structured as "C" corporations or as non-paired REITs with some leakage.

Recent criticisms (some of which are erroneous, including the charge that they are totally exempt from federal taxation) may potentially threaten many of the tax advantages offered by the paired-share and stapled REITs. The Clinton administration's budget proposals for the 1999 federal fiscal year recommended tax legislation with significant potential effects on various REITs. Among other things, the practical effect of these proposals would, if enacted, "freeze" the ability of the "grandfathered" REITs to acquire substantially new assets or to engage in a new line of business after the date of first committee action by the Ways and Means Committee of the House of Representatives. These concerns have partially helped encourage the development of yet another type of REIT structure--the "paperclip" REIT.

## C. "Paperclip" REITs

The *paperclip REIT*, another relatively recent innovation intended to capture all of the competitive advantages of the "grandfathered REITs'" model for the newer REITs but without subjecting them to the risks presented by the Clinton administration's tax proposals, provides similar economics to the paired-share or stapled REIT structure but with less of a direct structural linkage between the related entities.

In this case, the REIT forms an operating company (usually, a "C" corporation) that will (1) lease properties from the REIT; (2) pursue certain opportunities that cannot be undertaken by the REIT; and (3) acquire certain assets that cannot be held by the REIT due to the tax concerns arising from the two asset tests' requirements. Moreover, the same leading advantage offered by the "grandfathered" REIT structure--the elimination of leakage and the operation of the REIT's assets within a relatively self-contained, autarchic universe, while avoiding the obvious conflicts of interest inherent in a system in which the lessee/operating company is largely owned by the REIT's own management--are offered to the REIT's shareholders by the paperclip REIT structure. Unlike the paired-share REIT, though, where both companies' stocks trade as a single linked unit, the REIT and the "C" corporation are separate public companies, whose stocks trade separately. The two organizations are "paperclipped" together through an inter-company agreement. This agreement (a) gives the operating company a right of first refusal to lease and manage all future properties acquired by the REIT, and (b) provides the REIT with a similar right of first refusal to acquire properties presented to it by the operating company. In addition, the two companies share certain senior members of management and board members, which arrangements are intended to fully align the two companies' interests for the benefit of both companies' shareholders. (See Appendix E.)

Once formed, the newly formed operating company is "spun off" to create a new publicly traded corporation, complete with its own majority of independent directors on its board who are, moreover, largely separate from the REIT's board, so as to reduce (if not eliminate outright) the potential conflicts of interest within the system. Each shareholder of the REIT receives one or more shares of the operating company's separately traded common stock, thus giving the REIT's shareholders the benefits of (a) the REIT's ownership of real estate and (b) the "paperclipped" operator's management and operational capabilities. In theory, if the REIT's and operating company's separate teams of independent board members do their jobs correctly, the potential and actual conflicts of interest facing the paperclip REIT system would be minimized.

As compared to a conventional REIT, the paperclip REIT structure provides investors with greater flexibility. They may invest separately (a) at the REIT level for steady real estate growth and income, (b) at the operating company level for growth through operating leverage, or (c) in both entities jointly. Compared to a paired-share REIT, a paperclip REIT also costs much less to structure and implement; offers significantly easier tax-free acquisitions of corporate targets; and enables investors to invest independently in two different entities, depending on their investment objectives. Like the UPREIT and DOWNREIT, moreover, a paperclip REIT may also use units of limited partnership interest (as will be explored in the next part) as an alternative "acquisition currency" for tax-sensitive real property sellers.

## IV. "Doing the Deal": REIT Formation and Securities/Financing Issues

### A. Tax Issues Involved in Forming and Financing REITs.

If an owner of appreciated real estate transfers the real estate to a REIT in exchange for REIT shares, such a transfer is taxable if it results in any material diversification of the owner's investment. In addition, even if there is no diversification of investment, taxable gain is recognized to the extent that the REIT assumes any liabilities encumbering the transferred property in excess of the owner's basis in that property. Accordingly, it is generally unusual for appreciated real estate to be transferred directly to a REIT in situations where the existing owner wants to receive tax-deferred treatment. The existing owners' desire for continued tax deferral normally is satisfied through the use of the umbrella

limited partnership--"UPREIT"--structure (or the DOWNREIT structure if an existing REIT did not begin life as an UPREIT).

In the case of an UPREIT, existing owners transfer their properties to a newly-formed umbrella limited partnership under the aegis of the REIT, rather than directly to the REIT itself, in exchange for units of limited partnership interests [*10] (commonly referred to as "Units") in the umbrella partnership. The REIT acquires a controlling general partnership interest in the umbrella partnership (also frequently called the "operating partnership"), in exchange for contributing most or all of the net proceeds from the REIT's initial public offering and any subsequent offerings of the REIT's capital stock. Because transfers to a partnership are subject to more lenient tax rules than transfers to a REIT (*i.e.*, the rules regarding diversification of investment and liabilities in excess of basis do not apply), the existing owners typically are able to defer part or all of the taxable gain embedded in the transferred properties. In order to provide liquidity to the existing owners, the Units of limited partnership interests in the UPREIT umbrella partnership that they receive generally are redeemable for cash or, generally at the sole election of the REIT, for shares of the REIT's capital stock on a one-for-one basis at any time more than one year after the completion of the REIT's initial public offering ("IPO"). (See Part IV.B, "The Fundamental Securities Law Aspects of REITs - A Cautionary Word on Roll-Ups" below, for more on this one-year holding period.) Furthermore, potential sellers of properties to the UPREIT after completion of the REIT's IPO can negotiate and receive Units in the UPREIT in exchange for the interests in their properties, with precisely the same benefits of tax deferral and liquidity to such later sellers as if they had been original property contributors to the UPREIT at the time of the IPO.

A number of special tax issues arise in implementing the UPREIT structure. These include the following:

a. A disguised sale may result if the existing owners (1) are relieved of liabilities that were incurred within the two years prior to the transfer (other than to acquire or improve the encumbered property or to refinance existing debt) in connection with the formation transaction or (2) receive cash or property (other than normal operating distributions) from the UPREIT umbrella partnership within two years after the formation transaction. A disguisedsale presumption also will arise if a redemption of UPREIT Units for shares of REIT stock occurs within two years of the formation transaction. That presumption can be avoided by having the REIT, instead of the umbrella partnership, satisfy the existing owners' redemption option. In addition, that presumption could be rebutted by demonstrating that the redemption was motivated by post-transfer events.

b. Gain from relief of liabilities may result if the liabilities of an existing owner that are assumed by the UPREIT umbrella partnership exceed the sum of (1) the share of the umbrella partnership's liabilities that are allocated to the existing owner and (2) the existing owner's basis in the properties being contributed.

c. Gain from relief of liabilities may result from the pay-off by the UPREIT umbrella partnership of liabilities that are assumed from an existing owner. The umbrella partnership generally can refinance nonrecourse liabilities of the existing owners that it assumes without triggering recognition of gain from relief of liabilities, as long as the partnership maintains a nonrecourse debt balance with respect to the transferred property equal to the principal balance of the nonrecourse liabilities assumed with respect to that property.

d. An UPREIT umbrella partnership could be classified as a publicly-traded partnership ("PTP") if it fails to meet one of the safe harbors from PTP status set out in recently issued IRS regulations. The private placement safe harbor is the one most commonly relied upon by REITs' umbrella partnerships. In order to qualify for that safe harbor, all interests in the umbrella partnership must be offered in private placements, and the umbrella partnership must have no more than 100 partners. If PTP status applies, it would result in (1) corporate taxation of the REIT umbrella partnership, (2) recognition of deferred gain by the existing owners, and (3) disqualification of the REIT unless at least 90% of the umbrella partnership's income consisted of passive-type income (e.g., rents from real property and gains from the disposition of real property). Most UPREIT umbrella partnerships would meet the 90% passive-type income exception because their income consists primarily of rents from real property. However, even assuming that an umbrella partnership qualifies for the 90% exception, PTP status would cause the existing owners not to be able to use passive activity losses from other sources to offset taxable income from the umbrella partnership.

## B. The Fundamental Securities Law Aspects of REITs

### (i) Introduction

As with any other business entity offering or selling securities, a REIT is subject to the federal Securities Act of 1933, as amended (the "1933 Act") and the various state securities (*i.e.*, "Blue Sky") laws. The implications of securities

2 Transactions 1, *

laws on REIT securities transactions involving potential issuances of limited partnership interests in UPREITs and DOWNREITs are particularly noteworthy and somewhat complex.

Many REITs with UPREIT or DOWNREIT partnership structures offer potential sellers of properties Units in the operating limited partnerships in exchange for their properties. Because of their ability to be generally redeemed on a one-for-one basis for shares of REIT stock, Units in UPREITs (and DOWNREITs) are structured to be the economic and functional equivalent of REIT shares of capital stock. Further, as previously noted, Units are a particularly valuable alternative form of "acquisition currency" when compared with cash, since a seller taking Units can readily defer his or her capital gain on the portion of the consideration represented by the Units. Most importantly, since Units are securities (much like shares of common stock), they are subject to the applicable federal and state securities laws governing registration of securities and exemptions from registration.

Compliance with these laws, however, often forces REITs to make a number of demands that are often somewhat time-consuming, costly and difficult for existing owners and potential sellers of properties to UPREITs to understand or readily accept. A brief overview of the applicable  [*11]  securities laws and other securities law issues pertinent to REITs follows.

### (ii) An Overview of the Securities Laws and the Applicable Exemptions from Registration

As a fundamental matter of securities regulation, all securities--including shares of REIT capital stock and UPREIT Units--must either be (a) registered under the 1933 Act and state Blue Sky laws or (b) exempt from registration by virtue of a valid statutory or rule-based exemption. Any violation of the 1933 Act and its accompanying rules and regulations or of state Blue Sky laws in connection with an UPREIT property acquisition involving the issuance of Units creates a right to rescind the Unit issuance component of the transaction, thereby "unwinding" the issuance of Units and triggering a host of related difficulties and expenses. Obviously, in order to avoid such an outcome, REITs must strictly comply with the 1933 Act and its related regulations in connection with an acquisition of real property combined with an issuance of Units in the transaction, while also ensuring compliance with the relevant state Blue Sky laws, to avoid creating rescissionary rights.

Registration under the 1933 Act can easily be a highly time-consuming and costly undertaking. It can take anywhere from 45 days, at a bare minimum, up to eight months for a registration statement to undergo the drafting, review and clearance process with federal and state securities examiners. An "all-in" minimum expense of at least $ 150,000 is fairly typical for such registrations at the IPO stage, although the total costs and expenses incurred are frequently much greater. Registration via the 1933 Act is, of course, the procedure by which REITs and other companies that are originally privately held typically become public companies through the IPO process.

In most cases, IPO registrations of REIT securities are made by the use of a registration statement on Form S-11. The Form S-11 is explicitly applicable to REITs and other types of real estate issuers of securities and differs from the registration statement on Form S-1 used by most companies for their IPOs in terms of the amount and type of detail required in its disclosures. These include, for instance, specific disclosures relating to the REIT's investment policies; real estate assets owned or identified for purchase by the REIT; financial and operating data for significant property acquisitions; and tax considerations applicable to REITs and their prospective investors.

Any registration of Units with the federal Securities and Exchange Commission (the "SEC"), however, would similarly require the UPREIT umbrella partnership also to become subject to the registration and filing requirements of both the 1933 Act and the federal Securities Exchange Act of 1934, as amended (the "1934 Act"). Therefore, the additional time and expense (and potential liabilities) incurred with 1934 Act registration generally militate against UPREIT partnerships willingly becoming 1934 Act registrants. As a direct consequence of these concerns, virtually all UPREITs structure their Unit issuances in such a way as to attempt to take advantage of the so-called "private placement" exemption from federal and state securities registration requirements.

The touchstone of private placement analysis begins with Section 4(2) of the 1933 Act. This statutory provision exempts from federal securities registration any offers and sales of securities "not involving any public offering." The statutory language of Section 4(2) is brief and fairly perfunctory, and courts have generally interpreted it to mean that the securities ostensibly exempt offered under the transaction (a) cannot be offered through any sort of "general solicitation" (*i.e.*, by means of television, radio, print advertisements, direct mail, and similar forms of mass communications) and (b) the potential buyers of the securities must be so "sophisticated" as to be able to "fend for themselves."

As a general rule for securities issuers, this statutory-based exemption is highly useful, since its requirements are simple and relatively non-technical. It is frequently relied on when "unaccredited" investors are involved in a potential securities transaction. For the UPREIT, however, Section 4(2) has two substantial disadvantages. First, its application is heavily dependent on case law and judicial interpretation and is, thus, uncertain and risky to a large degree. Its very brevity and simplicity are therefore both a boon and a drawback to issuers such as UPREITs. Second, despite this statute's primacy at the *federal* level for potential SEC filings, each UPREIT must still ensure that it complies with the applicable *state* laws and Blue Sky regulations in each jurisdiction where prospective Unit holders may reside. Hence, given the potential risks associated with any failure of an issuer to meet Section 4(2)'s statutory exemption (most obviously, the potential application of rights of rescission) and the costs of Blue Sky compliance on a state-by-state basis, many UPREITs have instead opted to rely exclusively on the "safe-harbor" exemption from registration provided by SEC Rule 506 promulgated under the 1933 Act.

One of the several federal rules promulgated under Regulation D of the 1933 Act--"Reg D"--Rule 506 provides a safe-harbor exemption for private placements conducted under Section 4(2). A private offering will fall within Rule 506's safe harbor if *each* of the following essential conditions are met: (i) there are no more than 35 "unaccredited investors;" (ii) all unaccredited investors, either alone or with a representative, possess adequate sophistication to evaluate the risks and merits of the potential investment; (iii) the offering of the securities in question is not made through any general solicitation; (iv) the issuer uses reasonable care to ensure that the securities are not purchased "with a view to distribution;" and (v) a Form D (a short-form notice of sale of securities) is filed with the SEC within 15 days after the first sale of the securities in reliance on the exemption.

If unaccredited investors participate in a Rule 506 private placement, under Reg D's Rule 502, the UPREIT must provide them with more extensive disclosures about the UPREIT. These disclosures are much like that provided in a registration statement for an IPO of stock and are made [*12] in the form of a *private placement memorandum*. To avoid this requirement, many UPREITs will require all unaccredited investors to take cash instead of Units for their respective portions of the purchase price for a property.

Private placements made in accordance with Rule 506 have another additional advantage in that they are exempt from most state securities laws. Since Reg D's promulgation at the federal level, the majority of states have adopted a uniform limited offering exemption--"ULOE"--that is largely based on Regulation D's requirements. Therefore, for many states, compliance with Rule 506's requisites at the federal level will generally satisfy their Blue Sky requirements as well. Further, for securities listed on national stock exchanges, the federal National Securities Markets Improvements Act of 1996 (the "NSMIA") preempts such securities from all state securities laws as to registration, while allowing for certain fraud and notice filings at the state level. UPREITs are well advised, however, to examine closely the laws of each jurisdiction in which a potential recipient of Units may reside, in order to confirm any notice filing requirements that states may still require in the wake of the NSMIA, or, for non-publicly traded securities, to ensure compliance with any otherwise applicable Blue Sky and ULOE requirements.

### (iii) A Trap for the Unwary: The Doctrine of Integration

In applying the various statutory (*i.e.*, Section 4(2)) and Reg D private placement exemptions, courts and the SEC will "integrate" offerings that are considered to be part of the same plan of financing and include the same, or substantially similar, securities that are offered at the same time, for the same purpose and for the same consideration. Under the integration doctrine, the two separate offerings are deemed to be part of a unified, single financing "package," against which all of the exemptive tests are then applied.

The SEC's staff has, with some consistency, taken the position that shares of REIT common stock and UPREIT Units are effectively one and the same security. Consequently, REITs must take great care to avoid integrating their public offerings of shares of REIT common stock with private placements of Units offered by their UPREIT subsidiaries. If the two offerings were to be integrated, the private offering exemption would be unavailable because the general solicitation of the public offering would be deemed to have applied to the private placement of Units as well. (Recall that, to be a valid private placement, no "general solicitation" can occur.) Consequently, the UPREIT would have sold the privately-placed Units in violation of the 1933 Act, with the resulting application of rights of recession for the Unit holders as the likely remedy for the violation. Helpfully, however, SEC Rule 152 and its Black Box, Inc. no-action letter provide some useful guidelines to direct REITs in how to conduct their private offerings of UPREIT Units that occur in close proximity to public offerings of REIT shares.

2 Transactions 1, *

First, all investment decisions in the UPREIT's private placement of Units must be made *before* the filing of the registration statement in connection with the public stock offering of REIT shares. If the private offering of Units cannot be completed before the filing of the registration statement, then the completion of the investment decision made by potential recipients of Units (*e.g.*, the individual members of a selling partnership) must be documented by executed purchase and sale agreements. The terms of such agreements must include no contingencies within the control of the seller (*i.e.*, the potential recipient of the Units) so that the seller's investment decisions would not be regarded as being complete and irrevocable. Furthermore, no amendments are permissible to the UPREIT's purchase and sale agreements following the filing of the REIT's registration statement for its shares of stock.

Second, no offers of Units can be made for thirty days after the closing of the public offering of the shares of the REIT's stock. This "cooling-off" period is longstanding and commonly accepted "lore" in the REIT industry. There is, however, presently no official regulatory (i.e., SEC) or judicial pronouncement on the question, and there are many REITs that choose not to adhere to this view.

#### (iv) UPREIT Units Are "Restricted" Securities

Because UPREIT Units are generally sold without registration under the 1933 Act and state "Blue Sky" laws, they are considered to be "restricted" securities. This means that--just as they were originally issued subject to an exemption from registration--they cannot be freely transferred by the holder without federal or state registration or without the availability of an applicable exemption from such registration. Most UPREITs' agreements of limited partnership impose additional restrictions on transfers, assignments, hypothecations or pledges of Units. In most cases, these agreements of limited partnership also make all such transfers, assignments, etc. subject to the general partner's sole veto power.

As a result, finding alternative sources of liquidity for the Unit holders assumes greater importance, particularly for the holders of Units. See Part IV.C, "Getting Liquidity for UPREIT Units: Redemption Rights and Redemption/Resale Registrations" below.

#### (v) A Cautionary Word on Roll-Ups

*Roll-ups* are transactions in which one or more finite-life limited partnerships (or similar finite-life entities) are combined or reorganized, with some or all of the investors in those finite-life limited partnerships receiving in exchange new securities or securities in another entity which involve a "significant adverse change" regarding voting rights, management compensation, term of existence of the entity and investment objectives. A roll-up may be structured as an acquisition, a merger, a tender or exchange offer or in some other fashion. In other words, any successor or acquiring entity that offers its securities to the investors of any limited partnership or entity with a fixed life span, in any transaction(s) involving a merger, share [*13] exchange, tender offer or similar acquisition, will be generally subject to the roll-up rules.

The SEC, the National Association of Securities Dealers, Inc. (the "NASD"), the North American Securities Administrators Association ("NASAA") and several states (notably, California) have each adopted detailed rules requiring the preparation and delivery to such partnerships' partners of extensive disclosures regarding the potential roll-up transaction and the participants in that transaction. *See, e.g.*, SEC Rule 901 *et seq.* These include, among others, certain disclosures as to all compensation paid to outside parties in the potential roll-up and whether or not a fairness opinion was obtained and provided for the members of each affected partnership.

The roll-up requirements are generally considered to be so burdensome, difficult both to implement and interpret, and expensive to meet that virtually all UPREIT transactions are structured with great efforts to avoid the potential application of these rules. Most transactions do so by relying on an exemption for transactions involving securities to be either issued or exchanged that are not required to be and are not registered under the 1933 Act. To preserve this exemption in light of the SEC's position on the integration of offerings of Units and REIT shares (see Part IV.B(iii), "A Trap for the Unwary: The Doctrine of Integration" above), most UPREITs do not allow redemptions of Units for registered REIT shares to be made until the Units have been outstanding for at least one year. Under unwritten SEC staff interpretations, the filing of a registration statement to cover any redemption of Units for REIT shares that is made either two weeks *before* or two weeks *after* the one-year anniversary of the initial receipt of such Units will be regarded as being in compliance with this exemption.

Roll-up implications may also arise in the organization of a REIT when properties held by limited partnerships are acquired in connection with the REIT's formation transactions in exchange for REIT stock or Units in the UPREIT part-

nership. When limited partnership interests are acquired in a registered offering of REIT shares that do not meet the "seasoned issuer" exclusion (*i.e.*, any transaction generally involving an entity with securities which have been reported and traded no less than twelve months before the date the roll-up solicitation is mailed to investors and where the securities to be issued in the roll-up do not exceed 20% of the issuer's total outstanding securities), the roll-up rules may apply.

When Units are acquired in a private placement, on the other hand, the private placement exclusion may apply. Close attention must be paid to the offer of both REIT stock and Units to verify whether such issuances are a valid public offering or private placement, respectively, and to ensure that integration concerns are met. Rule 152's "safe harbor" from integration and the related five-factor test set out in the Black Box, Inc. no-action letter and Reg D's Rule 502 should be scrutinized closely to determine whether integration has occurred.

## C. Getting Liquidity for UPREIT Units: Redemption Rights and Redemption/Resale Registrations.

As noted above, to preserve certain SEC exemptions, most UPREIT agreements of limited partnership provide that holders of Units may require the UPREIT to redeem their Units (whether originally acquired in the REIT's IPO or in connection with a later transaction) for cash after the expiration of a one-year holding period, running from the date of issuance of the Units in the particular transaction. To preserve the UPREIT's liquidity, the partnership agreement generally will further provide that the REIT itself can opt, in its discretion, to satisfy the redemption obligation, either by delivering cash or shares of REIT stock for the Units on a one-for-one basis. This procedure is generally known within the REIT industry as the *redemption right*. Unit holders generally negotiate for the right to require the REIT to register the redemption shares following the expiration of the one-year holding period, after which point in time they may tender their UPREIT Units for redemption and conversion into shares of REIT common stock and, in general, receive freely marketable securities once the shares of REIT common stock issuable upon the redemption have been successfully registered with the SEC.

REITs generally employ two principal methods of registering redemption shares. First, they may register the original *issuance* of the redemption shares to the Unit holders. Alternatively, they may register the *resale* of the redemption shares to the public. Both methods of registration permit the holder of Units to sell redemption shares without restriction, although with nuanced differences to the REIT itself.

The first method is, for the REIT's purposes, generally much cleaner and easier to utilize in its application than the second. Although the SEC staff requires that the registration statement covering the redemption shares be filed *not earlier than* two weeks before the first anniversary of the issuance of the Units and *not later than* two weeks after that first anniversary, it does result in the REIT's ability to deliver fully registered and readily marketable shares to Unit holders immediately upon redemption. The timing restrictions on the filing are derived from the SEC staff's positions, under the integration doctrine, that UPREIT Units and REIT shares are deemed to be essentially one and the same security and that a private offering (*i.e.*, of the Units) cannot be converted into a public offering (of the REIT shares) via the registration statement. As noted above, in accord with SEC lore and interpretations, the one-year holding period is therefore considered necessary to avoid integration of the initial private placement of the Units and the public offering of the redemption shares of REIT stock covered by the registration statement. The timing concerns generally do not inconvenience Unit holders, who, in most cases--whether for tax reasons (as the conversion of Units to shares of REIT stock triggers a taxable event and, thus, potentially a major capital gain) or otherwise - usually do not plan to convert and sell their Units quickly.

[*14] The second method requires that the redemption shares be issued in a complying private placement transaction and then be resold under a resale registration statement. Since the timing of redemption of Units is generally left up to the option of the holder of the Units and, accordingly, may not occur for many years, the resale registration statement method involves some difficulties for the REIT faced with this alternative.

First, it is virtually impossible to guarantee that the issuance of redemption shares can be made in a complying private placement. For example, since receiving his or her Units in the original private placement, a Unit holder may have experienced insolvency or similar financial woes and, therefore, may no longer qualify as an accredited investor. A REIT may accordingly feel compelled to reverify the "accreditation" and "sophistication" information it originally received at the time the Units were issued in order for its counsel to be able to issue a "clean" legal opinion as to the resale. If not, the REIT or the UPREIT could then be forced to redeem the Units for cash, or the Unit holder could be unable to exercise the redemption right until his or her financial situation changes for the better. Although some REITs will offer this sort of registration right, many are unwilling to assume the risk that they might be unable to satisfy a re-

demption request by delivering shares instead of cash. Ultimately, however, Unit holders ought to be indifferent as to which method the REIT uses to register their redemption shares of REIT stock, since either method will provide them with the liquidity they seek.

A list of frequently asked questions regarding Units and their securities and liquidity implications is attached as Appendix G hereto.

## V. Selected REIT Operational Issues and Topics

### A. "Funds From Operations"

One issue that is often germane to REITs' accounting treatment is that of historical cost accounting for real estate assets.

The basic long-standing presumption behind historical cost accounting is that, in general terms, the value of any business's assets diminishes or depreciates over time in a relatively predictable manner. For many businesses, this assumption may be generally valid, but such is hardly the case with real property, the values of which have risen or fallen (at times, precipitously) with market conditions. As a result, many investment bankers and real estate industry leaders have criticized the application of the standard historical cost/depreciation accounting methodology to REITs as being either misleading at worst or, at best, wholly irrelevant and meaningless.

In order to rectify this issue, the REIT industry's trade association, the National Association of Real Estate Investment Trusts ("NAREIT"), has advocated a supplemental accounting measure for REITs' operating performance, called *Funds From Operations*. In theory, Funds From Operations (also called "FFO") provides a fuller and more accurate accounting of the REIT's actual earnings from operations and its cash flows devoted to repayment of indebtedness.

Funds From Operations, under the NAREIT definition, means net income, excluding gains (or losses) from debt restructuring, sales of property and items classified by generally accepted accounting principles ("GAAP") as extraordinary or unusual, along with significant non-recurring events that materially distort the comparative measurement of the REIT's performance over time, plus depreciation and amortization, exclusive of amortization of deferred financing costs, depreciation of computer software, office improvements, other items commonly found in other industries and required to be recognized as expenses in the calculation of net income, and after adjustments for unconsolidated partnerships and joint ventures. Adjustments for unconsolidated partnerships and joint ventures will be calculated to reflect Funds From Operations on the same basis.

The underlying concept behind Funds From Operations as a performance indicator for REITs' operations was that, because historically real estate assets do not diminish predictably over time, depreciation is not an appropriate charge against a REIT's operations. Likewise, sales of a REIT's assets or financial restructurings are not components of operating real estate, and therefore, should not be considered in evaluating a REIT's operations. Moreover, Funds From Operations is not intended to be a substitute for net income or cash flows from operations, which are computed in accordance with GAAP. Additionally, Funds From Operations is not a measure of a REIT's distribution-paying capacity. Funds From Operations is not reported within audited financial statements, but it is typically disclosed in the "Summary and Selected Financial Data" and the "Management's Discussion and Analysis of Operations and Financial Condition" sections of a REIT's annual and quarterly reports to the SEC and offering prospectuses.

### B. REIT Share Transfer Restrictions

In order to comply with the Code's organizational and ownership tests, shares of a REIT's capital stock must be held by a minimum of 100 persons for at least 335 days in each taxable year, and additionally, during the second half of each taxable year, no more than 50% in value of the REIT's shares may be directly or indirectly held by five or fewer individuals. See Part II, "An Overview of REIT Federal Income Tax Considerations - REIT Organizational and Ownership Tests" above. To ensure their qualification under these tests, many REITs include ownership and share transfer restrictions in their charters, articles of incorporation and declarations of trust. While variations exist, these restrictions generally assume two forms.

One frequently used format for such restrictions provides that, subject to certain limited exceptions (including underwriters in public offerings and "look-through" exemptions for institutional investors), no REIT shareholder may own or be deemed to own more than a fixed percentage [*15] (frequently, between 8.0% and 9.9%) of the REIT's outstanding shares of stock. The REIT's board may, it its discretion, waive this ownership limitation if satisfactory evi-

dence is presented to it that a particular person's ownership in excess of such percentage will not jeopardize the company's REIT status. If shares (a) in excess of the limitation or (b) that would cause the Company to be beneficially owned by fewer than 100 persons are issued or transferred to any person, the issuance or transfer will be null and void, *ab initio - i.e.*, from the outset of ownership - and the intended transferee will acquire no rights to the shares. Additional requirements are usually provided that require any direct or indirect owner of 5% or more of the REIT's outstanding stock to provide such information as may be necessary to ensure that the REIT continues to abide by the Code's REIT tests. Certain provisions allowing the REIT's board to redeem any stock held in excess of the ownership limitation are also frequently included.

A recent variation on these share transfer restrictions may also be encountered in newer REIT charters and comparable documents or amendment to those documents. In addition to the percentage-of-ownership limits noted above, this mechanism specifies that, in the event of a violation of the ownership percentage "ceiling," any REIT shares owned in excess of the prescribed limits will be designated as "shares-in-trust." These will be transferred automatically to a share trust, ostensibly effective on the day *before* the purported transfer of such shares occurred. The owner will be required to submit such number of shares to the REIT for registration in the name of the share trust, and the shares-in-trust will remain issued and outstanding shares, entitled to the same rights and privileges as all other shares of the same class or series. The share trust receives all distributions paid on the shares-in-trust and holds such distributions in trust for the benefit of a charitable beneficiary, to be selected by the REIT. In exchange for this transfer, the owner of the excess shares transferred to the share trustee will generally be repaid the market value of the shares.

## C. REIT Antitakeover Mechanisms

Possibly to a greater degree than is found in the average "C" corporation, certain standard clauses in REIT charters, articles of incorporation or declarations of trust and related organizational documents tend to limit or restrict the ability of persons to undertake a hostile corporate takeover. The share transfer restrictions discussed above in Part V. B, "REIT Share Transfer Restrictions"--which also contain general prohibitions on share transfers exceeding 10% of a REIT's stock (and which, concomitantly, effectively prohibit any one person from buying a large enough bloc of REIT stock to exercise effective control over the REIT)--provide one clear example of a REIT charter provision that can have the practical effect of precluding an acquisition of control of a REIT by third parties without board approval.

Many REITs have also adopted classified boards with staggered terms, with the directors or trustees for each class being elected for a two or three-year term upon the expiration of that class's term. Besides affecting the shareholders' ability to change control of a REIT all at one instance, staggered boards can also discourage offers or other bids for the REIT's stock at a premium over the then-current market price. Most, if not all, public REITs have also provided in their charters and comparable documents for the issuance of shares of preferred stock. The power to issue shares of preferred stock is, in general, a matter left to the sole discretion of the REIT's board (so-called "blank check" preferred stock). The issuance of preferred stock may likewise have the effect of delaying or preventing an outright change in control of a REIT.

Further, since the 1980s, most states have enacted business combination, "greenmail" and investor protection statutes, which impose certain restrictions and mandate specific procedures regarding various kinds of takeover or tender offers and business combinations. These may include restrictions on combinations with interested shareholders and share repurchases from major corporate shareholders. While many of these statutes require corporations to take conscious actions--*i.e.*, either to "opt in" or "opt out"--of the statute's protections, many REITs have chosen to take advantage of these statutes' protections if available in their jurisdictions of organization or incorporation.

Finally, the frenetic merger-and-acquisition activities of the 1980s fostered the development of shareholder rights plans--*i.e.*, "poison pills"--of various types as another substantial deterrent to hostile takeover bids. Because of the various existing antitakeover mechanisms noted above, all of which are readily available to most REITs at little or no cost, and the dictates of the marketplace (and underwriting investment bankers) when many REITs first "went public," many REITs originally decided not to implement shareholder rights plans. Since the global financial crises of August 1998, however, triggering fears of increased hostile-takeover activity, and in the wake of several REIT hostile takeover bids, a growing number of REITs--37 alone from the beginning of 1998 up to March 1999--have adopted such plans as a further measure of added protection against unsolicited and unwelcome takeovers.

## D. Conflicts of Interest and REIT Governance

2 Transactions 1, *

In addition to SEC-required disclosures in various 1933 Act and 1934 Act filings regarding related transactions and conflicts of interest, publicly owned REITs have additional cause to scrutinize any potential conflict-of-interest scenarios. Among other examples, such conflicts frequently arise with regards to (a) management and leasing of the REIT's properties by entities owned by or otherwise affiliated with members of the REIT's management; (b) provision of services or office space to the REIT by affiliates or to the affiliates by the REIT; (c) initial and ongoing acquisitions by the REIT of properties owned by members of the REIT's management or their affiliates; and (d) once an affiliated property is acquired by the REIT, any subsequent decision as to whether or not to sell the property [*16] (because the REIT's decision as general partner of the UPREIT or down-REIT partnership to sell a particular property will likely have serious tax implications to those limited partners who originally sold the property to the REIT in the first instance).

One key mechanism to help avoid or mitigate such conflicts is through the selection of a board of directors or trustees, a majority of whom are deemed to be independent--*i.e.*, to have a majority of the board's members be composed of persons who are not affiliated with or employed by the REIT, the UPREIT partnership, the REIT's predecessor or sponsor, or any subsidiaries of the REIT. The presence of an independent board theoretically helps to align more closely the interests of the REIT's management with its shareholders. Many underwriters (and many institutional investors, too, whose active investments in REIT stocks, and sometimes vocal criticisms of a given REIT's performance, have played leading roles in the post-1992 growth of the REIT market and in the fortunes of many individual REITs) will insist on the establishment of an independent board as a prerequisite to "take the REIT public" in an IPO. NAREIT's code of ethics similarly requires that a majority of independent directors or trustees be used by its member REITs.

In addition, many REITs provide in their organizational documents--particularly, their bylaws--that decisions regarding the sale of a property owned by a REIT, director or trustee, officer or affiliate will be made solely by the independent directors. Further, besides the applicable state business code provisions and SEC rules regarding director and trustee conflicts and matters requiring independent board approval or shareholder approval, REIT boards and officers must also ensure their companies comply with stock exchange (notably, AMEX and NYSE) rules regarding shareholder approval of certain matters. Non-exchange listed REITs that are not traded on the Nasdaq Stock Market must also pay attention to NASAA policies regarding the administration and oversight of investment and borrowing practices. The presence and effective functioning of independent audit committees, as a subset of each REIT's board to ensure independent and thorough review of the REIT's accounting policies and practices, is also a prerequisite for sound REIT governance and accounting practices, much as it is for any other corporation.

## VI. Conclusion

Obviously, not all business persons and attorneys will find themselves engaged in the forming, financing and maintenance of a REIT. Although they have been authorized since 1960, the 316 public and private REITs in existence at the end of 1998 represent a relatively small portion--approximately 11% to 12%--of all commercially-owned U.S. real property as of mid-1999.

Still, it seems clear that REITs are here to stay, regardless of economic downturns or real estate business cycles. An ever-expanding portion of the domestic real estate market is being captured by REITs each year, and that percentage is likely to continue to grow. Whether as a securities practitioner with a large law firm, a lawyer advising small real estate owners and potential sellers of property as to their options in selling or financing real property transactions, or an investment banker, financial planner, or in-house tax/transactional law practitioner, the growth and development of REITs affect corporate/securities and real property law practices at all levels.

Hopefully, this primer will help provide the average practitioner and business person with a basic understanding of REITs and their ins-and-outs and will demystify what has been viewed by some as an arcane area and baffling of transactional practice.

[*17] **Appendix A: The Basic UPREIT Structure**

[SEE ILLUSTRATION IN ORIGINAL]

[*18] **Appendix B: The DOWNREIT Structure**

[SEE ILLUSTRATION IN ORIGINAL]

[*19] **Appendix C: The Stapled REIT Structure**

[SEE ILLUSTRATION IN ORIGINAL]

[*20]  **Appendix D: The Paired-Share REIT Structure**

[SEE ILLUSTRATION IN ORIGINAL]

[*21]  **Appendix E: The Paperclip REIT Structure**

[SEE ILLUSTRATION IN ORIGINAL]

[*22]  **Appendix F**

**A Brief Comparison of REITs and Real Estate Partnerships**

A REIT is not simply a type of real estate partnership (although UPREITs and down-REITs may utilize limited partnerships in their structures). In fact, very significant differences exist between the formation and operations of these two types of business entity.

The *formation* of the two entities differs in that a real estate partnership ordinarily is relatively easier to organize than a REIT. This is because a REIT is required to have at least 100 shareholders for at least 335 days of each taxable year other than the year in which it first elects REIT status under the Code. No similar requirement exists for a partnership. Further, contributions of property to a REIT are much more likely to be taxable than similar contributions to a partnership (*e.g.*, diversification of investment; liabilities in excess of basis).

Moreover, the *operations* of a REIT differ widely from those of a partnership in a variety of ways, including income restrictions, pass-through expenses, unrelated business income taxes, and pro rata allocation requirements. Additionally, a REIT differs from a partnership in its tax computation and reporting, including a lower level of complexity for tax accounting and reporting and the lack of an option to make a section 754 election under the Code. A brief explanation of these differences is appropriate.

First, REITs and real estate partnerships face considerably different income restrictions. The types of income that a REIT may earn are substantially restricted by the 75% and the 95% income tests (as explained in detail in Part III, "An Overview of REIT Federal Income Tax Considerations"). For example, qualifying rents and interest cannot be based upon the net income of the tenant or borrower. In addition, there are significant restrictions on the types of services that a REIT can provide to tenants (other than through an independent contractor) without disqualifying the rents received from the tenants. However, nonpublicly-traded partnerships are not subject to any income restrictions. In order for a publicly-traded partnership to avoid being taxed as a corporation, at least 90% of that partnership's income must consist of passive-type income.

A second difference between REITs and partnerships occurs in passing through expenses. A partnership has the disadvantage of passing section 212 expenses (*e.g.*, advisory and administrative expenses) through to its partners who are individuals, which pass-through procedure typically results in the realization of "phantom" income for those partners. No such pass-through disadvantage, though, occurs in the case of a REIT.

Third, REIT dividends, known as *distributions*, generally do not give rise to unrelated business taxable income ("UBTI") for tax-exempt investors, even where the REIT must borrow to acquire its properties. The only exceptions to this rule occur when a tax-exempt investor borrows to acquire REIT shares or when a REIT is closely held by pension plans. On the other hand, when a partnership borrows to acquire its properties, a frequent consequence is that a portion of the income derived from the partnership is considered to be UBTI.

Fourth, the pro rata allocation requirements are significantly different between REITs and partnerships. In the case of partnerships, income and expense items are not required to be allocated pro rata to each partner. The partnership instead can make special allocations of particular items or classes of items to specified partners as long as there is compliance with the substantial economic effect rules of the Code. A REIT can accomplish non-pro rata allocations of income or expense on a more limited basis, but it can only do so by creating special classes of stock.

Two crucial operating differences regarding taxes are also worth noting. First, investor tax accounting and reporting is much simpler in the case of a REIT than in the case of a partnership. A REIT shareholder generally accounts for his or her investment in the same way that he or she would for any other holding of stock. At the end of each year, the REIT shareholder receives an IRS Form 1099 from the REIT that shows the amount of ordinary and capital gain dividends paid to him during the past year. An investor in a partnership, however, receives a much more complicated Schedule K-1, which requires the partner to report her share of the partnership's income and expenses on her own tax return.

2 Transactions 1, *

As noted previously in connection with taxes, a partnership has the ability to make a section 754 election, which permits the partnership to adjust the basis of its assets to match the corresponding changes in the partners' basis in their partnership interests resulting from sales of such interests. No such election, however, is available to REITs. (It should be noted as a practical matter, though, that, in the case of large partnerships, such elections are difficult and expensive to implement.)

[*23] **Appendix G**

**Some Frequently Asked Questions About Holding Partnership Units in UPREITs ***

> \* With appreciation to Randall S. Parks, who prepared and shared with the author an earlier version of this appendix.

1. *Q:* Why are my Units generally not transferable?

*A:* Your Units are being issued to you in a private placement that is exempt from registration under the 1933 Act. This exemption requires that the REIT restrict the transferability of the Units. The REIT will also want to ensure that it retains adequate control over the identity and number of its UPREIT's limited partners for tax and general business reasons.

2. *Q:* When will my Units be redeemable?

*A:* Generally, on the first anniversary of issuance.

3. *Q:* Can that holding period be shortened?

*A:* No. The holding period is required to avoid the application of the SEC's roll-up rules. Shortening the holding period (a) could result in the transaction becoming a roll-up and (b) will prevent the REIT from filing a redemption shelf registration statement to register any shares issued upon redemption (although a resale shelf registration statement would still be available as an alternative).

4. *Q:* Can I borrow against my Units, using them as collateral?

*A:* Maybe. After the Units become redeemable, many banks will be willing to lend against the Units as collateral. Some banks will lend against Units before they become redeemable. Most UPREIT umbrella partnerships' agreements of limited partnership, however, have restrictions requiring the sole advance approval of the general partner before such a pledge of Units as collateral can be validly made.

5. *Q:* Why do I need to be an "accredited investor" to participate in a Unit transaction?

*A:* Most REITs determine to rely upon an exemption from registration of the Units under federal and state securities laws. This exemption operates most efficiently when only accredited investors participate.

6. *Q:* My family partnership includes a number of unaccredited partners. Can we still take Units?

*A:* Yes. If your family partnership itself is accredited (*i.e.*, if it has assets exceeding $ 5 million and was not formed for the purpose of acquiring the Units), your partnership may still take Units as consideration for the sale of its property to the UPREIT.

7. *Q:* Can our family partnership distribute the Units it receives in the UPREIT private placement to its partners (including unaccredited investors)?

*A:* Generally, yes, but only after the Units have been held for one year. The REIT may require an opinion of counsel confirming that the private placement exemption relied upon in the original transfer will not be jeopardized by the distribution.

8. *Q:* If our selling partnership is not accredited, can the deal be structured so that only the accredited investors take Units, with the unaccredited investors taking cash?

*A:* Yes. This is a situation frequently encountered by many UPREITs, and while cash will be the only acceptable consideration to be paid to such unaccredited investors, each of the accredited investors can be issued Units in lieu of cash. Another acceptable alternative combination may involve the payment of both cash and Units as consideration to accredited investors.

9. *Q:* Why can't the REIT just file a shelf registration statement covering any redemption shares it might issue immediately after the closing of the acquisition?

*A:* The REIT has chosen to register the issuance of the redemption shares to you, rather than your resale of the redemption shares to the public. In that case, the SEC will not permit the redemption shelf registration statement to be filed more than two weeks before the first anniversary of the issuance of the Units.

10. *Q:* Couldn't the REIT file the shelf registration statement sooner if it registered the resale of REIT shares issuable upon the redemption of the Units?

*A:* Possibly. The SEC appears to be permitting this, but the REIT may have problems with the transaction being treated as a roll-up, or it may face problems in issuing the shares to you later in a private placement. Unless you plan to redeem your Units on the first day possible, you should prefer the method the REIT has chosen.

11. *Q:* When I'm ready to sell my redemption shares, do I need to deliver a prospectus to the seller or the applicable stock exchange or notify the REIT?

*A:* No. Unless you are an "affiliate" of the REIT, once you have received the redemption shares, you may treat them just like any shares of any other public company that you might own.

[*24] **SELECTED SOURCES**

**Books and Treatises:**

Peter M. Fass, Michael E. Shaff & Donald B. Zief, REAL ESTATE INVESTMENT TRUSTS HANDBOOK (1999 ed., Clark Boardman Callaghan, 1999).

Judith D. Fryer (Chairperson), REITs: WHAT YOU NEED TO KNOW NOW (Practising Law Institute, Corporate Law & Practice Handbook No. B-859, 1994).

Charles J. Johnson, Jr. & Joseph McLaughlin, CORPORATE FINANCE AND THE SECURITIES LAWS (2d ed., Aspen Law & Business, 1997).

Louis Loss & Joel Seligman, FUNDAMENTALS OF SECURITIES REGULATION (3d ed., Little Brown and Company, 1995 & Supp. 1998).

Various authors, THE PUBLIC REIT LEGAL SOURCEBOOK (National Association of Real Estate Investment Trusts, 1995).

THE 1998 REIT HANDBOOK: THE COMPLETE GUIDE TO THE REAL ESTATE INVESTMENT TRUST INDUSTRY (National Association of Real Estate Investment Trusts, 1998).

THE 1999 STATISTICAL DIGEST (National Association of Real Estate Investment Trusts, 1999).

**Law Review, Periodical and Newspaper Articles:**

Christopher B. Crowder, Note, *Rolled-Up and Rolled Over: An Analysis of the Limited Partnership Roll-Up Reform Act of 1991,* ST. LOUIS UNIV. LAW JOURNAL 405 (1993).

Peter M. Fass, *NASD Rollup Rules Finalized,* INVESTMENT LIMITED PARTNERSHIPS LAW REPORT, Jan. 1995, at 129.

2 Transactions 1, *

David W. Marcus, *Corporate Scorecard: Real Estate Investment Trusts,* AMERICAN LAWYER, Apr. 1998, at 53.

Brad S. Markoff & Jeffrey D. Miller, *Hostile Takeovers in the REIT Industry*, REVIEW OF SECURITIES & COM-MODITIES REGULATION, Feb. 10, 1999, at 25.

Neal Templin, *Building Tension: REIT Revolution Hits An Unexpected Bump: Opposition by Clinton*, WALL STREET JOURNAL, Jan. 30, 1998, at A-1.

Maria Wood, *Bear Market Stalks Lodging Trusts*, REAL ESTATE FORUM, Aug. 1998, at 123.

*Commercial Mortgage REITs: The Leading Edge of Debt Securitization,* THE REIT REPORT, Winter 1998, at 43.

*The New World of Real Estate*, BUSINESS WEEK, Sept. 22, 1997, at 78.

Press Release, *Why A Paper Clip REIT?* CapStar Hotel Company and American General Hospitality Corporation (Mar. 16, 1998).

SNL Securities, *SNL REIT Weekly* (various issues, 1997-1999).

**Investment Banking Research Reports and Analyses:**

Arthur K. Bender, *Mortgage REIT Industry Overview* (Tucker Anthony Equity Research, Sept. 16, 1997).

*The ABCs of REITs* (Smith Barney Inc., Nov. 21, 1996).

*Federal Income Tax Effects of the Paired-Share REIT Structure of Starwood Lodging* (Price Waterhouse LLP, Nov. 7, 1997).

*Paired and Stapled REITs: Some Answers to Recent Investor Questions* (BT Alex. Brown Research, Nov. 24, 1997).

*REIT Monthly Update* (Smith Barney Inc., Nov. 28, 1997).

*A Real Estate Based Approach to Office REIT Valuation Market Capitalization Per Square Foot* (Smith Barney Inc., May 7, 1997).

**Industry Trade Groups:**

The National Association of Real Estate Investment Trusts, Inc. ("NAREIT").

**Miscellaneous:**

John J. Huber & R. Ronald Hopkinson, *Current Developments in Integration of Offerings and General Solicitations* (CLE presentation, 15th Annual Ray Garrett Jr. Corporate & Securities Law Institute, Northwestern Univ. School of Law, Apr. 27-28, 1995).

*SEC Adopts Rules Governing Limited Partnership Roll-Up Transactions,* SEC TODAY (Wash. Service Bureau, Dec. 5, 1994), at 1.

*Limited Partnership Roll-Up Transactions,* SEC Rel. No. 33-7113, 34-35036 (Dec. 1, 1994), *available in 1994 SEC LEXIS 3741.*

Real Estate Investment Trusts, MD. CODE ANN., CORPORATIONS AND ASSOCIATIONS §§ 8-101 TO 8-701 (1998).

Regulation D, Securities and Exchange Commission.

2 Transactions 1, *

Regulation S-K, Securities and Exchange Commission.

Regulation S-X, Securities and Exchange Commission.

Texas Real Estate Investment Trust Act, *TEX. REV. CIV. STAT. art. 6138A* (West 1997).

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Real Property LawLandlord & TenantLease AgreementsResidential LeasesReal Property LawTrustsReal Estate Investment Trusts (REITs)Real Property LawTrustsHolding Trusts

100195

********** Print Completed **********

Time of Request: Monday, April 14, 2008  09:44:00 EST

Print Number:    1822:86996534
Number of Lines: 967
Number of Pages:

Send To:  SACHA, NATALIE
          TROUTMAN SANDERS LLP
          600 PEACHTREE ST NE
          ATLANTA, GA 30308-2265

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

REPUBLIC PROPERTY TRUST, *et al.*,

      Plaintiffs,

      v.

REPUBLIC PROPERTIES CORPORATION, *et al.*,

      Defendants.

Civil Action No. 1:07-cv-00595-RCL
 Judge Lamberth

---

## ORDER

      This matter comes before the Court on Plaintiffs' Motion for Reconsideration.  The Court

having considered the Motion, all opposition thereto and all matters of record, and for good

cause shown, it is this _____ day of _____, 2008

      **ORDERED** that Plaintiffs' Motion is **GRANTED**.  Plaintiffs' claims as set forth in their

Amended Complaint are hereby reinstated.


_____
ROYCE C. LAMBERTH
United States District Judge

Copies to:

Mark E. Nagle
Tameka M. Collier
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004

Seymour Glanzer
Richard J. Conway
DICKSTEIN SHAPIRO LLP
1825 Eye Street, N.W.
Washington, D.C. 20006

William T. Burke
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005