UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LIBERTY PROPERTY TRUST, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 07-595 (RCL) |
| REPUBLIC PROPERTIES CORPORATION, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION & ORDER**

On March 31, 2008, this Court granted defendants' motions to dismiss plaintiffs' amended complaint. *See Republic Prop. Trust v. Republic Props. Corp.*, 540 F. Supp. 2d 144 (D.D.C. 2008) (Lamberth, J.).[1] Plaintiffs now ask the Court to reconsider two aspects of that decision. Accordingly, the Court has considered plaintiffs' motion [31], defendants' joint opposition [34], plaintiffs' reply [35], and the applicable law. For the reasons expressed herein, plaintiffs' motion shall be DENIED.

This Court's previous opinion set out the facts of this case at some length. *See* 540 F. Supp. 2d at 149-52. For present purposes, it suffices to recount a few, salient details. On July 19, 2005, defendants Richard L. Kramer ("Kramer") and Stephen A. Grigg ("Grigg"), along with non-party Mark Keller, organized Republic Property Trust ("the REIT") to acquire, develop, and ultimately operate office properties in the Washington, D.C. metropolitan area. (Am. Compl. ¶

---

[1] On April 16, 2008, this Court granted plaintiffs' consent motion to substitute Liberty Property Trust and Liberty Property Limited Partnership for Republic Property Trust and Republic Property Limited Partnership, respectively, as plaintiffs. (Order of Apr. 16, 2008 [33].)

11.) Both Grigg and Kramer served on the REIT's Board of Trustees – Grigg as Vice-Chairman, and Kramer as Chairman. (*Id.* ¶¶ 4, 5.) The REIT also employed Grigg as President and Chief Development Officer. (*Id.* ¶ 4.)

Prior to its initial public offering ("IPO") on December 20, 2005, the REIT established several subsidiary entities, among them Republic Property Limited Partnership ("RPLP"). (*Id.* ¶ 13.) Through these subsidiaries, the REIT then acquired real property and contracts in exchange for its own shares and/or RPLP limited partnership units. (*Id.*)

One such transaction forms the subject of this lawsuit. Defendant Republic Properties Corporation ("RPC") – an entity wholly owned and controlled by Kramer and Grigg[2] – contributed a property development contract it had previously signed with the city of West Palm Beach, Florida, in exchange for limited partnership units that would be worth $1,202,808.00 when the IPO occurred. (*Id.* ¶¶ 14, 15, 18.) To formalize the exchange, the parties executed a second contract. (*Id.*) Grigg, with Kramer's knowledge and approval, signed on RPC's behalf, and the REIT's CEO signed for RPLP. (*Id.* ¶ 19.) RPC made various representations in this latter contract, some of which plaintiffs now allege were materially false or misleading, and based on which they sued RPC, Kramer, and Grigg for federal securities fraud. (*Id.* ¶¶ 102-10.)

This Court dismissed plaintiffs' complaint once it determined that the facts pleaded therein did not establish that the limited partnership units at issue were "investment contracts" under the seminal test of *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and that plaintiffs had

---

[2] At that time, Kramer owned 85% of RPC and served as Chairman of RPC's Board of Directors. (Am. Compl. ¶ 5.) Grigg owned the remaining 15% and also served on RPC's Board and as its President and Chief Executive Officer. (*Id.* ¶ 4.)

consequently failed to state a claim under the federal securities statutes.[3]  *See* 540 F. Supp. 2d at 160-62.  It also resolved a threshold issue, standing, against the REIT, concluding that RPLP, the entity that had actually issued the limited partnership units in exchange for the property development contract, was the only proper plaintiff.  *See id.* at 154-56; *see also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) (private plaintiff must be an actual purchaser or seller of securities to have standing to sue under federal securities laws).  Plaintiffs have asked the Court to reconsider both conclusions, and it will begin with the latter.

First, however, the Court must identify the legal standard it will apply to plaintiffs' motion.  Our Court of Appeals has characterized motions for reconsideration under Federal Rule of Civil Procedure 59(e) as "discretionary."  *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam).  Thus, a court need only grant such a motion if it finds that there has been an intervening change of controlling law, that new evidence is available, or that granting the motion is necessary to correct a clear error or to prevent manifest injustice.  *Id.*  Indeed, Rule 59(e) motions are "disfavored" and should be granted only in "extraordinary circumstances."  *Niedermeier v. Office of Baucus*, 153 F. Supp. 2d 23, 28 (D.D.C. 2001) (Hogan, C.J.).

Plaintiffs' argument in favor of the REIT's standing falls far short of this threshold.  In essence, plaintiffs urge the Court to look to function rather than form: although the REIT and Liberty Property Limited Partnership ("LPLP") are distinct legal entities, they operate as "an integrated business," and LPLP's limited partnership units' value bears a direct relationship to

---

[3] The Court declined to exercise subject matter jurisdiction over plaintiffs' remaining, state law claims.  540 F. Supp. 2d at 163-64.

the REIT's publicly traded shares' value.[4]  (*See* Mot. for Reconsideration at 9.)

  This Court would ordinarily find such an appeal to pragmatism more persuasive.  Yet here, plaintiffs have unwittingly offered additional support for the Court's original assessment.  They explain that the purpose of creating and operating their business through distinct legal entities – a REIT whose shares are publicly traded and a private, limited partnership – is to

---

[4] Renewing a related argument rejected in this Court's earlier opinion, plaintiffs point to cases in which general partners were deemed "sellers" of limited partnership units under the securities laws. (*See* Mot. for Reconsideration at 9 (citing *Allard v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 488, 496 (S.D.N.Y. 1996), and *Lawrence v. Cohn*, 932 F. Supp. 564, 573 (S.D.N.Y. 1996)).)  Neither decision, however, supports the result plaintiffs desire.

*Lawrence* stands for the proposition that beneficial owners of securities, such as trust beneficiaries, must have derivative standing to sue the legal titleholder or fiduciary for fraudulent sales because "the individual responsible for pressing the claim . . . is [the] alleged fraudsman." 932 F. Supp. at 572-73.  As this Court observed in its original opinion,

> [t]hat is not the case here. RPLP, which issued limited partnership units to RPC and thus made the "sale" on which plaintiffs rest their federal securities fraud claims, is a plaintiff in this action.  The logic of . . . *Lawrence* might permit a limited partner to sue a general partner for securities fraud based on an issuance of limited partnership units because the general partner could not be expected "to sue himself for the benefit of the [partnership]." *Lawrence*, 932 F. Supp. at 573.  But it does not support a distinct right of action for the general partner when the limited partnership has been the victim of fraud and ably asserts its rights.

540 F. Supp. 2d at 155-56.  In *Allard*, Judge Mukasey did not resolve whether the plaintiff general partner was a "seller" of limited partnership units but merely cited *Capri v. Murphy*, 856 F.2d 473 (2d Cir. 1988).  924 F. Supp. at 496.  This Court analyzed and dismissed *Capri* in its original opinion: *Capri* "held that under certain circumstances, general partners of a limited partnership could be *liable* as sellers of limited partnership units under [the federal securities laws].  It did not address whether they could *maintain an independent cause of action as plaintiffs* under [those laws], alongside the limited partnership." 540 F. Supp. 2d at 155 (citations omitted).  Plaintiffs see "no basis" for such a distinction. (Mot. for Reconsideration at 9 n.8.)  The Court emphatically disagrees: if "causing" limited partnership units to be issued suffices to confer standing on the general partner as a "seller" alongside the limited partnership, then – for example – corporate directors might sue as co-plaintiffs with the corporation because they "caused" it to issue stock.  The distinction drawn in this Court's previous opinion avoids such absurd results.

4

permit investors who acquire limited partnership units by contributing real property to defer the tax consequences that would follow from their direct acquisition of shares in the REIT. (*See id.* at 2-3.) That is, plaintiffs created two, distinct legal entities precisely because these entities receive differential treatment under the tax laws. Hence, when it serves their interests, plaintiffs wish the law to look on the REIT and LPLP as distinct entities. Here, where differential treatment harms their interests, they urge the opposite.

Plaintiffs are separate and distinct legal entities. They must abide by the consequences of their chosen legal forms equally when it is to their detriment as when it benefits them. Hence, plaintiffs' "integrated business" does not persuade the Court that its previous decision as to standing was infected by "clear error" or precipitated "manifest injustice." *See Firestone*, 76 F.3d at 1208. Consequently, it reaffirms its ruling that "[LPLP] – and only [LPLP] – is the proper plaintiff." *See* 540 F. Supp. 2d at 156.

In challenging the Court's ruling that the limited partnership units at issue here were not "investment contracts" under *Howey*, plaintiffs offer four, interrelated lines of argument. First, they recast the "function over form" reasoning described above. (*See* Mot. for Reconsideration at 4-6.) Second, they suggest the authorities on which this Court relied do not support the result it reached. (*Id.* at 6-8.) Third, they allege that some authors and the Securities and Exchange Commission ("SEC") treat limited partnership units issued by REIT operating partnerships such as RPLP as securities. (*Id.* at 4-5.) Finally, they contend that determining whether particular limited partnership units are investment contracts requires "fact-intensive analysis" not feasible at the pre-answer motion stage of litigation. (*Id.* at 8.) The Court will briefly address each of these arguments.

Plaintiffs summarize their "core" argument as follows:

> Though issued by different entities in order to achieve tax deferral for asset contributing investors, the units in [LPLP] and the REIT's public common shares are economic equivalents. For example, the total number of outstanding common shares of the REIT equals the total number of partnership units owned by the REIT. In addition, the cash distributions made on each partnership unit mirror the cash distributions made on each publicly held common share of the REIT. Finally, the limited partners of the umbrella partnership generally have a right, after one year, to have their partnership units redeemed by the umbrella partnership. Significantly, this redemption right, essentially, amounts to a one-for-one conversion right for partnership unit holders because the REIT has the option to issue one publicly traded share, instead of cash, for each redeemed unit. . . . Accordingly, from an economic perspective, an investment in the limited partnership via asset contribution is substantially the same as a cash investment in shares of the publicly traded REIT.

(*See* Reply [35] at 2 (quoting Mot. for Reconsideration [33] at 3-4).) In short, plaintiffs argue that because LPLP's limited partnership units and the REIT's common shares are functional equivalents, the Court should simply treat the limited partnership units at issue here *as if they were* publicly-traded common shares – stock, which 15 U.S.C. section 77b(1) explicitly includes in its definition of "security."

But the statutory definition this Court must follow refers only to "stock" and "investment contracts" – not to "investment contracts functionally equivalent to stock." *See* 15 U.S.C. § 77b(1) (2008).[5] Congress did not explain what it meant by the term "investment contract," leaving the Supreme Court to craft a test that would conform to the Securities Acts' broad, prophylactic purpose. *See Howey*, 328 U.S. at 298-99. Its resulting, tripartite definition – (1) "a contract, transaction, or scheme whereby a person invests his money"; (2) "in a common

---

[5] Plaintiffs offer no authority for treating limited partnership units as anything other than investment contracts, and this Court's survey of the case law indicates courts have consistently classified limited partnership units as such. *See, e.g., Rodeo v. Gillman*, 787 F.2d 1175, 1177 (7th Cir. 1986); *SEC v. Murphy*, 626 F.2d 633, 640-41 (9th Cir. 1980).

enterprise"; (3) "with profits to come solely from the efforts of others" – "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299.

The Supreme Court later clarified that the third requirement – that profits must derive "solely" from the efforts of others – should be liberally construed. *See Landreth Timber Co. v. Landreth*, 471 U.S. 681, 692 (1985). Yet as this Court previously concluded, when an investor contributes his money to a common enterprise over which he already exercises management authority, his investment falls outside *Howey*'s broad definition. *See* 540 F. Supp. 2d at 161-62. The Court synthesized the relevant case law and extracted a "general principle": "when the same parties stand on both sides of the transaction – no matter how many nominally distinct legal entities lie in between, and no matter how convoluted their interrelationships – the transaction is not an investment contract." *Id.* at 162.

Plaintiffs point to no new case law, merely citing decisions and renewing arguments this Court has already weighed.[6] They submit that these cases turned on "'the legal rights and powers enjoyed by the investor,'" and that RPC, itself, "had no legal right or power, *in any capacity*, to assert influence or control over RPLP." (Mot. for Reconsideration [33] at 6-7 (quoting *Steinhardt Group, Inc. v. Citicorp*, 126 F.3d 144, 154 (3d Cir. 1997)).) Yet as this Court

---

[6] Their reply brief does cite *Ballard & Cordell Corporation v. Zoller & Danneberg Exploration, Limited*, 544 F.2d 1059 (10th Cir. 1976), for *Howey*'s characterization of its test as a "flexible rather than a static principle." (Reply [35] at 3.) In that case, however, the Court of Appeals *affirmed* the district court's ruling that the interest in question was *not* an investment contract because the purchaser exercised significant control over the investment's outcome. *See* 544 F.2d at 1065.

7

previously recognized, RPC was wholly owned and controlled by trustees of RPLP's general partner.[7]  Indeed, in opposing Kramer and RPC's motion to dismiss, plaintiffs themselves argued that "Kramer is RPC."  (Mem. Opp'n Kramer and RPC's Mot. to Dismiss at 22.)  They now protest that Kramer and Grigg had no ability as "owners of RPC" to control RPLP and that "any management authority exercised by Grigg and Kramer derived solely from their role as members of [the REIT's] management."[8]  (Mot. for Reconsideration at 7.)  That they possessed such authority is dispositive, regardless of its source:  RPC's investment in RPLP would succeed or fail based, in part, on its owners' efforts.  This salient fact places the investment beyond the scope of *Howey*.

Perhaps because precedent appears to compel this outcome, plaintiffs rely on various other authorities for the proposition that "[d]ue to the close relationship between the public REIT shares and limited partnership units, [the] limited partnership units generally are considered securities."  (Mot. for Reconsideration at 4.)  Somewhat persuasively, they contend the Securities

---

[7] Other courts have likewise declined to ignore investors' control simply because it is channeled through other, nominally distinct business entities.  *See*, *e.g.*, *Piaubert v. Sefrioui*, No. 97-56131, 2000 U.S. App. LEXIS 2462, at *12-13 (9th Cir. Feb. 17, 2000) (no investment contract where limited partnership purchaser holds majority stake in company of which general partner is a wholly-owned subsidiary); *Frazier v. Manson*, 651 F.2d 1078 (5th Cir. 1981) (no investment contract where general partner of general partner purchased limited partnership interest); *Kravco, Inc. v. Rodamco North America, N.V.*, No. Civ. A. 00-0272, 2000 WL 1839735, at *5-6 (E.D. Pa. Dec. 13, 2000) (no investment contract where parties control partnership which purchases limited partnership units and also control one general partner of seller's general partner).

[8] Plaintiffs intimate that this argument carried the day in *Hirsch v. DuPont*, 396 F. Supp. 1214 (S.D.N.Y. 1975), which this Court distinguished in its previous opinion.  (Mot. for Reconsideration at 7 n.7.)  In essence, they contend that if an investor "wears a different hat" when he exercises control over his investment's outcome, then that investment meets the *Howey* test.  To the extent the district court in *Hirsch* adopted this proposition, this Court declines to follow it.

and Exchange Commission ("SEC") has followed the "general consensus" in treating such units as securities.[9] (*Id.* at 5.) Yet at most, the documents they cite suggest that the SEC may consider units in a REIT operating partnership to be securities in circumstances very different from those present here.[10] It is not clear from these documents that this Court's previous ruling conflicts with the SEC's approach. More to the point, they do not reveal any "clear error" in the Court's determination that *these* limited partnership units do not meet the *Howey* test. *See Firestone*, 76 F.3d at 1208.

---

[9] By contrast, commentaries and treatises that simply *assume* REIT limited partnership units to be securities without addressing the governing statutory and case law are entirely unhelpful.

[10] Plaintiffs rely on two sources. First, in approving a proposed rule change concerning limited partnership "rollup" transactions, the SEC discussed whether and to what extent the rule would apply to certain transactions involving UPREITs, real estate investment trusts structured like the one in this case. *See* Order Approving NASD Proposed Rule Change Relating to Limited Partnership Rollup Transactions, Release No. 34-34533, 59 Fed. Reg. 43147 (Aug. 15, 1994). In particular, the SEC analyzed whether the rule would apply to UPREIT *consolidation* transactions – those in which limited partners are offered publicly-traded REIT shares in exchange for their limited partnership units. *Id.* at 42-47. In such cases, a REIT offers *stock* to the limited partners, which would clearly fall within the SEC's regulatory purview. This document, then, does not aid plaintiffs' position.

Plaintiffs' second source, a no-action letter, also pertains to a very different sort of transaction from that here. *See* Summit Props. P'ship, L.P. & Camden Prop. Trust, SEC No-Action Letter, 2005 SEC No-Act. LEXIS 338 (Mar. 7, 2005). Camden, a Texas real-estate trust, planned to merge with Summit, an UPREIT comprised of a Maryland corporation and Delaware limited partnership. *Id.* at *6. For various reasons, executing the planned merger necessitated amending the limited partnership's partnership agreement, and Summit and Camden feared that their soliciting the other limited partners' approval of this amendment "could be viewed as an arrangement to purchase [these other partners' units] outside of [Camden's offer to buy those units at the same cash price it was offering the corporation's shareholders for their stock]" in violation of Rule 14e-5. *Id.* at *9-14. The SEC accepted Summit and Camden's representation that this solicitation was necessary to the merger and issued the requested no-action letter. *See id* at *1-4. The Court does not see, and plaintiffs do not explain, how the SEC's finding as to Summit and Camden indicates it would consider RPLP's issuance of *these* limited partnership units to be a sale of securities.

Finally, plaintiffs urge that "there remain complex issues of fact that require resolution prior to a decision that the Units were not securities." (Mot. for Reconsideration at 8.) They cite a First Circuit decision for the proposition that "determining whether a particular investment [is] a security require[s] fact intensive analysis and [is] not appropriately decided on a motion to dismiss." (*Id.*) But there, the Court of Appeals simply held that the trial court had gotten it wrong, and that the scheme described in the SEC's complaint *did* meet the *Howey* definition. *See SEC v. SG Ltd.*, 265 F.3d 42, 55 (1st Cir. 2001). Moreover, plaintiffs do not identify which material factual issues they consider unresolved. This omission is necessarily fatal to their contention that additional fact-finding is needed here.

Having weighed and rejected each of plaintiffs' arguments, the Court concludes their motion does not satisfy Rule 59(e)'s strict standard. *See Firestone*, 76 F.3d at 1208. Thus, for the reasons articulated above, it is hereby

ORDERED that plaintiffs' motion for reconsideration [31] of this Court's Order of March 31, 2008 [30] dismissing their amended complaint shall be DENIED.

SO ORDERED.

Signed by Royce C. Lamberth, Chief Judge, August 13, 2008.